# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| STICHTING DEPOSITARY APG DEVELOPED MARKETS EQUITY POOL and STICHTING DEPOSITARY APG FIXED INCOME CREDITS POOL, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>SYNCHRONY FINANCIAL, MARGARET M. KEANE, BRIAN D. DOUBLES, THOMAS M. QUINDLEN, DAVID MELITO, PAGET ALVES, ARTHUR COVIELLO, JR., WILLIAM GRAYLIN, ROY GUTHRIE, RICHARD HARTNACK, JEFFREY NAYLOR, LAUREL RICHIE, OLYMPIA SNOWE, BARCLAYS CAPITAL INC., MIZUHO SECURITIES USA LLC, MORGAN STANLEY & CO. LLC, TD SECURITIES (USA) LLC, BLAYLOCK VAN, LLC, CASTLEOAK SECURITIES, L.P., MISCHLER FINANCIAL GROUP, INC., R. SEELAUS & CO., INC., and THE WILLIAMS CAPITAL GROUP, L.P.<br><br>    Defendants. | Case No. 3:18-cv-01818-VAB<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL<br><br>**ECF CASE** |

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................. 1

II.  JURISDICTION AND VENUE ..................................................................... 13

III.  PARTIES ......................................................................................................... 14

    A.  Plaintiffs ................................................................................................. 14

    B.  The Exchange Act Defendants ............................................................... 14

IV.  EXCHANGE ACT ALLEGATIONS .............................................................. 16

    A.  Synchrony's Business Depended on Its Retail Partnerships ................... 16

    B.  Walmart's Subprime-Heavy Account Was Synchrony's Most
        Valuable Partnership ............................................................................... 18

    C.  Synchrony's Lax Underwriting Caused Defaults and Losses ................. 21

    D.  Synchrony Drastically Tightened Its Lax Underwriting ........................ 23

    E.  Synchrony Misrepresented that Its Underwriting Remained
        "Disciplined" and Was "Consistent" ...................................................... 28

    F.  The Truth Began to Partially Emerge as Synchrony Disclosed
        Disappointing First Quarter 2017 Results and that the Company
        Had "Tightened" Its Underwriting .......................................................... 32

    G.  Synchrony's Underwriting Changes Caused Serious, Undisclosed
        Retail Partner Backlash ........................................................................... 34

    H.  Synchrony Misrepresented the State of the Walmart Negotiations
        and a Purported Lack of Retail Partner "Pushback" ............................. 46

    I.  The Truth Fully Emerged as Walmart Canceled Its Synchrony
        Contract, Moved Its Business to Capital One, and Sued Synchrony,
        and Synchrony Admitted It Had Tightened Underwriting "Across
        Pretty Much [the] Entire Business" ........................................................ 51

V.  THE SYNCHRONY DEFENDANTS' FALSE AND MISLEADING
    STATEMENTS .............................................................................................. 53

    A.  Synchrony's Purported Asset Quality and "Consistent" and
        "Disciplined" Underwriting .................................................................... 54

    B.  The Purported Lack of Partner "Pushback" on Synchrony's
        "Refinements" to Its Underwriting Standards ....................................... 62

VI.  LOSS CAUSATION ....................................................................................... 68

|  |  | A. | Synchrony's Disclosure of Poor Loan Performance and Deficient Underwriting | 69 |

|  |  | B. | The True Scope of the Underwriting Changes and Their Negative Impact on Synchrony's Walmart Partnership | 72 |

| VII. |  |  | PRESUMPTION OF RELIANCE | 79 |

| VIII. |  |  | INAPPLICABILITY OF THE STATUTORY SAFE HARBOR | 80 |

| IX. |  |  | SUMMARY OF SCIENTER ALLEGATIONS | 81 |

|  | A. |  | Underwriting Credit Card Loans Was Synchrony's Core Operation | 81 |

|  | B. |  | The Walmart Partnership Was Critically Important to Synchrony's Business | 84 |

|  | C. |  | Defendants Were Aware that Walmart Was Unsatisfied with Synchrony's Tightened Underwriting Standards and Was Considering Replacing Synchrony | 85 |

|  |  | 1. | Walmart Issued a Request for Proposals to Synchrony and Other Banks | 85 |

|  |  | 2. | Walmart Began Partnering with Other Financial Institutions for Its Consumer Finance Business | 85 |

|  |  | 3. | Negotiations Between Walmart And Synchrony to Renew the Partnership Faltered | 86 |

|  |  | 4. | The Exchange Act Individual Defendants Were Intimately Involved in Attempts to Salvage the Walmart Relationship | 86 |

|  | D. |  | Defendants Keane, Doubles, and Quindlen Engaged in Suspiciously Timed Insider Stock Sales | 88 |

|  |  | 1. | Defendant Keane's Insider Sales | 90 |

|  |  | 2. | Defendant Doubles' Insider Sales | 91 |

|  |  | 3. | Defendant Quindlen's Insider Sales | 92 |

| X. |  |  | CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT | 93 |

| XI. |  |  | SECURITIES ACT ALLEGATIONS | 100 |

|  | A. |  | Securities Act Parties | 102 |

|  |  | 1. | Securities Act Plaintiff | 102 |

|  |  | 2. | Securities Act Individual Defendants | 102 |

|  |  | 3. | The Underwriter Defendants | 105 |

B.      The Offering Materials Contained Material Misstatements and Omissions.............................................................................. 107

C.      The Securities Act Defendants Failed to Exercise Reasonable Care or Conduct a Reasonable Investigation in Connection with the Offering.......................................................................................... 111

XII.    CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT ............................. 113

XIII.   CLASS ACTION ALLEGATIONS .............................................................. 116

XIV.    PRAYER FOR RELIEF ........................................................................... 117

XV.     JURY DEMAND .................................................................................... 118

Lead Plaintiff Stichting Depositary APG Developed Markets Equity Pool ("APG" or "Lead Plaintiff") and Plaintiff Stichting Depositary APG Fixed Income Credits Pool (collectively, "Plaintiffs"), by and through their counsel, bring this action individually and on behalf of all persons and entities who: (i) purchased or otherwise acquired the publicly traded common stock of Synchrony Financial ("Synchrony" or the "Company") between October 21, 2016 and November 1, 2018, inclusive (the "Class Period"); and/or (ii) purchased or otherwise acquired Synchrony 3.95% bonds due 2027 (CUSIP No. 87165BAM5) (the "Synchrony Notes") either in or traceable to Synchrony's December 1, 2017 note offering (the "Offering") during the Class Period.

Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which Plaintiffs allege upon personal knowledge. Plaintiffs' information and belief is based upon Lead Counsel's investigation, which included review and analysis of: (i) Synchrony's regulatory filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) Synchrony's press releases and public statements; (iii) analyst reports concerning Synchrony; (iv) interviews with former Synchrony employees; and (v) additional public information regarding the Company. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    INTRODUCTION

1.    This case is about a company that loosened its underwriting standards to boost growth, handing out credit cards to consumers who never should have had them. When it saw that this scheme generated a pool of bad loans, the company pulled back on underwriting so hard that

it stalled its own growth and killed its most lucrative retail partnership with Walmart. Each step of the way, rather than disclose to investors that its lax underwriting standards had generated significant loan losses and historic charge-offs, and how its pull-back on underwriting was causing pushback from retail partners and jeopardizing the Walmart contract, Synchrony hid the truth and issued a series of materially false and misleading statements to investors that artificially inflated Synchrony's securities prices. When the truth was revealed, Synchrony's securities prices fell sharply in response, causing significant harm to the class of Synchrony investors that Lead Plaintiff APG represents in this action.

2.     Synchrony is the largest provider of private-label credit cards in the United States, and it provides a broad range of credit products to consumers by partnering with retailers. During the Class Period, Synchrony issued store-branded credit cards for Walmart, Sam's Club, Lowe's, Amazon, The Gap and others, and those retailers co-promoted Synchrony's credit products to customers on the expectation of increased sales and strengthened customer loyalty.

3.     As a credit card provider with long-standing retail partnerships, Synchrony's adherence to prudent, disciplined and consistent underwriting standards was critical to its long-term success. As Synchrony well knows, a loosening of underwriting can generate a short-term boost in credit card approvals, loan balances and revenues, but loosening also generates a pool of lower-quality loans that will generate greater loan losses and charge-offs that will drag down the lender's profitability. Retailers also expect that the banks that issue their store-brand credit cards will approve qualified customers and apply their underwriting standards in a diligent, consistent and reliable way, such that consumers are predictably approved for the level of credit appropriate to them. Synchrony also enters into Retailer Share Arrangements ("RSAs") with retailers that provide for Synchrony and the retail partner to share in the gains from their partnership that flow

from customers' fees, interest payments and other charges on their credit accounts above a certain threshold.  If Synchrony approves customers who are unable to repay their debts, the amount of gain share available to Synchrony and its partners decreases.

4.      Before the Class Period, Synchrony operated with loosened underwriting standards and increasingly marketed, offered, and extended its credit cards to riskier borrowers in order to boost and sustain growth.  When Synchrony internally came to grips with the fact that its overly lax underwriting had created a low-quality pool of credit card loans, and that it needed to significantly tighten its underwriting, it hid from investors that need to tighten underwriting.  Instead, Defendants engaged in a cover up that consisted of overstating the value of its deteriorating loan portfolio and setting inadequate reserves for probable loan losses and charge-offs, while concealing its lax underwriting as the underlying cause.

5.      Synchrony's need to pull back from its lax underwriting and tighten its credit approvals were not facts that Defendants wanted to share with the market.  A loosening of underwriting standards, and a decline in the credit quality of Synchrony's loan portfolio, necessarily has a significant negative impact on the Company's balance sheet and securities prices.  Under Generally Accepted Accounting Principles ("GAAP") and reporting standards required by the Financial Accounting Standards Board, the Company must set aside assets or reserve for probable loan losses.  Moreover, as a regulated bank, Synchrony is subject to stringent capital, liquidity and leverage ratio requirements.  If the credit quality of its portfolio deteriorates, Synchrony must increase provisions for loan losses, which offsets the Company's net income.

6.      In addition, broad-based tightening of Synchrony's underwriting would signal that Synchrony had previously operated with overly lax underwriting.  Also, tightened underwriting itself:  (i) sharply cuts into Synchrony's growth, as it decreases credit card approvals, customers'

purchase volumes, and loan receivables; and (ii) aggravates Synchrony's partners, who lose out on sales they would otherwise make and need to respond to complaining customers who are denied credit. As a result, Defendants lied to investors about the existence and scope of the changes to its underwriting that it was undertaking, claiming instead that its underwriting had remained "consistent" and "disciplined."

7.     After Synchrony tightened its underwriting and this led it to approve significantly fewer credit cards, Synchrony failed to disclose that this drove a wedge between Synchrony and its largest retail partner, Walmart. Indeed, undisclosed to investors, Walmart complained to Synchrony about the reduction in its credit card approvals, which caused Walmart to publicly terminate its multibillion-dollar partnership with Synchrony. Walmart also subsequently sued Synchrony for how Synchrony had exposed it to excess credit risk through its poor underwriting. Synchrony's partnership with Walmart, which dated back nearly 20 years, had been the Company's highest revenue-producing account, generating more than $10 billion in annual loan receivables and 19% of Synchrony's overall retail card balances.

8.     Defendants made materially false and misleading statements during the Class Period to conceal Synchrony's poor underwriting and its need to drastically tighten its underwriting, as well as the pushback Synchrony received from Walmart. These false statements and omissions artificially inflated the prices of Synchrony's securities. Defendants Keane, Doubles and Quindlen were highly motivated to inflate, and maintain the inflation of, Synchrony's securities prices, as they had significant personal holdings in Synchrony stock and options. Those millions of dollars of personally-held Synchrony securities provided a strong financial motive for them to hide from investors Synchrony's poor underwriting, its tightening of its underwriting, and the actual pushback it received from its retail partners. Defendants thus had the motive and

4

opportunity to make the false statements at issue herein, drive up Synchrony's stock price, and cash in millions of dollars of Synchrony shares before the truth was disclosed to the market.

9.     As discussed above, unbeknownst to investors, Synchrony had, for years, loosened its underwriting to boost its credit card approvals and revenues.  Synchrony's lax underwriting included converting customers with private label credit cards ("PLCCs") to so-called "Dual Cards."  Consumers can only use PLCCs to make purchases at the name brand retailer on the card, and consumers can use Dual Cards anywhere that credit cards are accepted.  PLCCs have looser underwriting standards than Dual Cards, PLCCs are generally easier to obtain than conventional bank-issued credit cards, and they often attract a larger segment of higher-risk borrowers.

10.     Synchrony used these back-door approvals via Dual Card conversions, and its otherwise lax underwriting, to drive up its approvals and increase credit card holders' purchase volume and boost Synchrony's retail card loan receivables and revenue.  However, the outcome was that loan losses increased because risky borrowers had more freedom to use their cards and retail partners like Walmart saw less revenue than they had expected under their partnerships with Synchrony as losses mounted.

11.     In June 2016, before the start of the Class Period, Synchrony understood that the rate at which it would need to charge off its credit card loans would increase over the next 12 months.  At the time, the Company told investors that it expected only a 20-30 basis point increase in its net charge-off rates, which it described as "relatively modest."  When disclosing this guidance on June 14, 2016, Synchrony blamed it on "a general kind of softening in the consumers' ability to pay" – *not* on Synchrony's bad underwriting.  On the investor call discussing the guidance, one analyst asked Defendants point-blank what precipitated it, pressing Defendants Keane and Doubles:  "***Is it because of how you've been underwriting?***"  Doubles responded, "***[I]t doesn't***

5

*appear to be anything that pertains to how we're underwriting*," and that what they saw was not "indicative that we need to tighten up on credit."

12.     In reality, Synchrony's increased loan loss reserves and charge-offs resulted not from "a general kind of softening in the consumers' ability to pay" but from Synchrony's poor underwriting.  As Synchrony has admitted, by July or August of 2016, Synchrony recognized internally that its underwriting was the root cause of its need to increase loan loss reserves and charge-offs and Synchrony internally tightened its underwriting in the second half of 2016. However, Synchrony's broad-based tightening was a ticking time bomb that had long-lasting, negative impacts on Synchrony's business and retail partnerships.

13.     Indeed, Synchrony's tightened underwriting shrank its purchase volume from near-prime and subprime customers by 13%, and then 15%, and Synchrony's reduced credit card approvals drew serious complaints from Synchrony's partners.  Walmart – who depends to a large extent on revenues from near-prime and subprime customers – pushed back on Synchrony's credit decisions and subsequently cancelled its multibillion-dollar contract with Synchrony, sending shockwaves through the market.

14.     But for much of the Class Period, Synchrony hid from investors the fact that, as Synchrony only disclosed on July 27, 2018, Synchrony had tightened underwriting "across pretty much [the] entire business."  First, Defendants misled investors that Synchrony saw no need to tighten underwriting, at a time when Synchrony had already tightened it.  For example, on October 21, 2016, Defendant Doubles emphasized to investors the Company's "strong growth" in loan receivables and the "favorable" "credit environment" and on October 27, 2016, Synchrony again reported the purported "stable asset quality" of its loan portfolio.  Similarly, on November 3, 2016 Synchrony told investors that, since from the third quarter of 2010 through the third quarter of

2016, the Company had "Focus[ed] on a ***Higher Quality Asset Base***" and maintained "***Disciplined*** Underwriting" that "led to a ***higher quality portfolio***."

15.     Defendants' misrepresentations artificially inflated Synchrony's stock price, as it rose from a closing price of $27.13 on October 20, 2016, to $30.22 per share on November 9, 2016 – an increase of ***more than 11%***.

16.     Defendants Doubles and Keane personally benefited from this increase as, on November 9, 2016, shortly after making these false claims to investors, they collectively sold 4,000 shares of their personally-held Synchrony stock at a price of $30.00/share.  Then, on November 22, 2016, while they knew that Synchrony's loan portfolio had deteriorated, and that Synchrony had significantly tightened underwriting, Doubles and Keane entered into Rule 10b5-1 trading plans to make more personal sales of Synchrony stock in February 2017.

17.     Defendants continued their stream of public misrepresentations to artificially increase Synchrony's stock price in advance of their scheduled February 28, 2017 stock sales.  On December 7, 2016, Doubles specifically claimed to investors that "***we're not seeing anything right now that tells us to change our underwriting.***"  The same day, Doubles also focused on subprime credit scores and claimed that, "We're still profitable on that segment of the population, which allows us to be ***consistent***, which is important for us and frankly, very important for our retailers to ***maintain that consistency in our underwriting***."

18.     Synchrony's stock price continued to rise in response.  On January 3, 2017, the Company's common stock closed at $37.13, which was ***an additional almost 23% increase*** since November 9, 2016.

19.     On February 27, 2017, Defendants discussed again with investors how Synchrony's retail partners valued consistency in underwriting, but falsely claimed that Synchrony satisfied

those partners by maintaining "disciplined" and "consistent" underwriting.  In Doubles' words, "one of the things that's really important in our business is ***consistency for the retailer***."  He then falsely claimed that "when times are really good, we don't go a lot deeper [by underwriting to lower FICO scores].  And when times start to soften or normalize [as they had since at least mid-2016], whatever you want to call it, ***we don't pull back dramatically either***."  Doubles added that "what's really important is rather than taking your underwriting guidelines up and down quarter to quarter or year to year, is to be ***very consistent so that your retailers know what to expect from you***.  And that just creates a better partnership."  He further claimed that "***[w]e haven't really changed our underwriting significantly over the past 9 to 12 months,***" and ***"I think that consistency point is really important to us***."  These claims were all false.

20.     The next day, Keane and Doubles collectively sold 19,609 of their personally-held Synchrony shares at an artificially inflated price of $36.13 for total proceeds of more than $700,000.

21.     In reality, as the Company partially revealed on April 28, 2017, after Keane and Doubles sold thousands of their Synchrony shares, the quality of the Company's loan portfolio was far worse than previously disclosed, and Synchrony had already tightened its underwriting in response (while downplaying the scale of the changes).  On April 28, 2017, the Company announced disappointing first quarter 2017 earnings driven by poor loan performance, that it was setting aside over $1.3 billion in reserves to cover probable loan losses (a 21% increase over the prior quarter), and that its charge-off rate climbed to 5.33% (the highest rate since 2012).  Synchrony also disclosed that it expected the write-off rate for the full year to be 5% or slightly higher, as compared to its earlier forecast of 4.75%.  When asked on that day's investor call whether Synchrony was doing anything to "tighten from a credit perspective" to "mitigate some

8

of these results," Doubles finally admitted, directly contrary to his own false statements just months before, "[Y]es, we tightened a bit in the second half [of 2016]," and "Yes, *we're making some modifications [to underwriting]*."  As Doubles only later elaborated, starting in *July and August of 2016*, Synchrony had already "*tightened up criteria around credit line increases [and] tightened up . . . criteria around dual card upgrades*."

22.     Investors were shocked by these disclosures of higher than expected loan losses and charge-offs, and the need to tighten underwriting, and these revelations caused Synchrony's shares to fall by $5.25 per share, or nearly 16%.  This was the Company's worst day of trading since its shares began trading in 2014, with the price closing at $27.80 on April 28, 2017.

23.     Defendants, however, still had the value of significant personal Synchrony stock holdings to protect.  Thus, they understated the scope of the necessary underwriting changes, and withheld from investors the threat that those changes posed to Synchrony's retail partnerships.

24.     Indeed, Synchrony claimed to investors that its changes to underwriting were merely "surgical" and not broad-based, which further hid from investors the scope of the shortcomings in Synchrony's historically poor underwriting and the changes that it had already made.  On the April 28, 2017 investors' call, as Synchrony admitted to the existence of some underwriting changes, Doubles claimed that "*we haven't made what I would call significant changes to our underwriting model to tighten up*" and that the changes Synchrony had been making were "*pretty surgical* in nature."  But, in reality, as Synchrony only admitted on July 27, 2018, the underwriting changes in fact "applied across pretty much [the] entire business."

25.     Doubles also claimed on April 27, 2018 that "I wouldn't say [the underwriting change is] anything dramatic that's going to slow the growth rate of the business."  Yet, as of April

2018, Synchrony knew, or recklessly disregarded, that the underwriting changes were so severe that they would drastically slow its credit card approvals and loan volumes, which they did.

26.     As Synchrony was downplaying the scope of the underwriting changes as merely "surgical," Defendants hid from investors that Synchrony's reduced credit card approvals were causing important retail partners like Walmart to push back on the tightened underwriting.  In fact, the Company's shift to more conservative underwriting practices—*i.e.*, the "disciplined" approach that it told investors it had "consistently" followed all along—was damaging its relationships with its retail partners.  Instead, the Company repeatedly, falsely claimed that Synchrony's interests and its partners' interests were "aligned."

27.     Indeed, Synchrony's undisclosed, broad-based tightening of underwriting presented a serious conflict between Synchrony and its retail partners, who depended on approvals of large numbers of near-prime and subprime customers to drive sales.  Such retailers push Synchrony to maintain or increase their credit card approvals under their partnerships with the Company, because more approvals mean more retail purchases, higher customer credit card balances, and increased interest and fees paid on the cards.

28.     The result of Synchrony tightening its underwriting standards was that it approved far fewer near-prime and subprime credit card applications – the bread and butter customer of Synchrony's largest retail partner, Walmart.  This caused material, undisclosed pushback from Walmart and jeopardized Walmart's renewal of its contract with Synchrony, as Walmart saw Synchrony's credit approvals shrink throughout 2017.

29.     In 2017, as the *Wall Street Journal* later reported, Walmart executives "want[ed] Synchrony to approve a higher percentage of applicants" and believed that Synchrony was "keeping too much of the cards' revenue."  As the *Wall Street Jounral* reported, Walmart "aired

*those concerns* in a meeting with Synchrony's board" in 2017.  And, during a meeting with Synchrony in the fall of 2017, Walmart "balked' at renewing its extremely valuable contract with the Company.

30.    Understanding the seriousness of these undisclosed risks to the long-standing multibillion-dollar Walmart contract, and to Synchrony's overall business and its stock price, in the fall of 2017, Defendants Keane, Doubles and Quindlen entered into Rule 10b5-1 plans on November 17 and 20, 2017, to collectively sell more than *111,000* shares of their personally-held Synchrony stock in February and May of 2018, a sharp increase in the number of shares to be sold compared to their prior Class Period purchases.  This was also the first time ever that Defendant Quindlen had entered into a Rule 10b5-1 trading plan.  Defendants improperly entered into these plans while they were in possession of the material adverse, undisclosed information about Synchrony's business and the pushback from its largest retail partner, Walmart.

31.    Despite the clear pushback from Walmart, including as it was communicated to Synchrony's Board in 2017, on January 19, 2018, when asked about how Synchrony's partners were responding to the underwriting changes that Synchrony had described as "surgical," Defendant Keane misleadingly claimed to investors that "*we are not getting any pushback on credit*."  As a Board member who personally saw Walmart push back on Synchrony's handling of the Walmart account, Keane knew that this statement was false when made.

32.    Defendants' false statements and material omissions artificially inflated and maintained Synchrony's stock price, and Defendants Keane, Doubles and Quindlen personally benefited from the artificial inflation when they collectively sold *more than 111,000* shares of their personally-held Synchrony stock in February and May 2018 at prices ranging from $32.87 to $36.70, for total proceeds of *more than $3.9 million*.

33.     The Defendants continued to misstate the contract renewal negotiations with Synchrony's partners and failed to disclose that Walmart had balked at the contract's renewal.  For example, on June 13, 2018, in response to an analyst's question about Synchrony's partnerships, Defendant Keane stated:  "We have a good partnership . . . I think we have good – ***Walmart is a good partner*** . . . I'm not afraid by our competition.  I think we feel pretty positive about how we built out what we built out . . .  ***With the renewals that we're working on, we have great partnerships, great dialogue going on***."

34.     When the truth emerged about Synchrony's sharply tightened underwriting standards, and Walmart's pushback against the tightened underwriting – which culminated in Walmart not only bidding out its long-standing Synchrony contract to other credit card companies but Walmart terminating its Synchrony contract and moving its credit card portfolio to Synchrony's rival Capital One – the price of Synchrony stock fell drastically, resulting in significant harm to Synchrony investors.

35.     The truth about the impact that Synchrony's tightening of its underwriting was having on its retail partnerships began to emerge on July 12, 2018.  That day, news outlets first reported that Walmart was considering ending its relationship with Synchrony.  As mentioned above, the *Wall Street Journal* added that Walmart executives "want[ed] Synchrony to approve a higher percentage of applicants" and believed that Synchrony "is keeping too much of the cards' revenue"—and, in fact, had "aired ***those concerns*** in a meeting with Synchrony's board last year." In response to this news, the price of Synchrony's shares fell by over 5%.

36.     Two weeks later, on July 26, 2018, multiple news outlets confirmed that Walmart had chosen Synchrony's competitor, Capital One, to replace Synchrony.  In response to this disclosure, the price of Synchrony's shares fell by more than 10%.  The next day, the stock price

continued to decline as Defendant Doubles admitted that Synchrony's changes to its underwriting had been "applied across pretty much [the] entire business."

37.     Subsequently, on November 1, 2018, Walmart sued Synchrony, alleging that the Company had deliberately underwritten the Walmart/Synchrony credit card program in a way that exposed the program to significant credit risk, including by converting Walmart PLCCs to Dual Cards.  Walmart sought damages "in an amount . . . estimated to be no less than $800 million."  As a result of this disclosure, Synchrony shares fell by over 10%.

38.     By this Complaint, Plaintiffs bring two different sets of claims on behalf of purchasers of Stericycle's securities during the Class Period.  Counts I, II and III assert securities fraud, insider trading, and control person claims under Sections 10(b), 20A and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 thereunder, against Synchrony and the Exchange Act Individual Defendants (defined below).  Counts IV and V assert strict-liability, negligence and control person causes of action under the Securities Act of 1933 (the "Securities Act") against those Defendants who are statutorily responsible under Sections 11 and 15 of the Securities Act for materially untrue statements and misleading omissions made in connection with Synchrony's December 1, 2017 note offering (the "Offering").

## II.     JURISDICTION AND VENUE

39.     The claims asserted herein arise under and pursuant to:  (i) Sections 10(b), 20A and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (ii) Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77(o).

40.     This Court has jurisdiction over the claims asserted in this Complaint pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. §§ 1331 and 1337.

41.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1391(b). Synchrony maintains its corporate headquarters in Stamford, Connecticut, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

42.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Plaintiffs

43.     Lead Plaintiff APG is an institutional investment fund whose authorized representative, APG Asset Management N.V., has over $500 billion under management and is one of the largest institutional investors in the world.  APG purchased shares of Synchrony stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

44.     Plaintiff Stichting Depositary APG Fixed Income Credits Pool is an investment pool also managed by APG Asset Management N.V. that purchased Synchrony bonds during the Class Period, including Synchrony 3.95% bonds due 2027 (CUSIP No. 87165BAM5), and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.     The Exchange Act Defendants

45.     Defendant Synchrony is a consumer financial services company.  Incorporated in Delaware, the Company maintains its corporate headquarters at 777 Long Ridge Road, Stamford,

Connecticut.  Synchrony stock trades on the NYSE, which is an efficient market, under ticker symbol "SYF."  As of October 26, 2017 (the midpoint of the Class Period), Synchrony had over 780 million shares of stock outstanding, owned by at least thousands of investors.

46.     Defendant Margaret M. Keane ("Keane") is, and was at all relevant times, CEO and President of Synchrony, as well as a member of the Company's Board of Directors (the "Board").

47.     Defendant Brian D. Doubles ("Doubles") is, and was at all relevant times, Synchrony's CFO and Executive Vice President.

48.     Defendant Thomas M. Quindlen ("Quindlen") is, and was at all relevant times, Synchrony's Executive Vice President and CEO of Retail Card.

49.     Defendants Synchrony, Keane, Doubles and Quindlen are referred to within the Exchange Act section of this Complaint as "Defendants."  Defendants Keane, Doubles and Quindlen are referred to herein as the "Exchange Act Individual Defendants."

50.     During the Class Period, Defendants Keane and Doubles, because of their positions with Synchrony, regularly spoke in public, at investor conferences and on earnings calls about the Company's underwriting standards and practices, the quality of its loan portfolio, its relationships with its retail partners, the Offering, and/or other relevant subjects as discussed herein, possessed the power and authority to control the contents of Synchrony's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and investors.  Defendants Keane and Doubles were each provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, Defendants Keane and Doubles each knew that the adverse facts specified herein had not been disclosed to, and were being concealed

from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.   EXCHANGE ACT ALLEGATIONS

### A.   Synchrony's Business Depended on Its Retail Partnerships

51.     Synchrony is the nation's largest provider of PLCCs.  A private-label credit card is a credit card branded by one of Synchrony's retail or consumer brand partners, such as Walmart or Lowe's, or branded by an industry-wide program.  A consumer may use these cards to purchase goods or services only from the branded partner or within the relevant industry.

52.     In addition to PLCCs, Synchrony offers Dual Cards (otherwise known as a general purpose co-brand credit card).  Also branded by one of Synchrony's retail partners, a Dual Card functions like a PLCC when the consumer uses it to purchase goods or services from that retail partner, but it functions like an ordinary credit card when the consumer uses it elsewhere. Synchrony issues Dual Cards for use on the Visa, MasterCard, American Express, and Discover networks.  Synchrony has stated publicly that Dual Card customers "tend to be [a] higher FICO customer"—and thus less risky—than PLCC customers.

53.     Synchrony also has a practice of converting PLCC customers into Dual Card customers using a purported "low and grow" strategy.  On a January 2015 earnings call, Defendant Doubles claimed, "[W]e start out consumers with a smaller line PLCC card.  And then over time we watch them and then we upgrade them to a larger PLCC line and then ultimately we upgrade them into a Dual Card."

54.     In an earnings call in April 2015, Defendant Doubles further claimed that "low and grow" is a "strategy that we've had in place for four years where we start consumers up with a lower line on PLCC and we upgrade them over time, and that strategy has been pretty consistent.

. . . If we were going to change that in the future and do something big we would obviously come and we would describe it at that point."

55.     Synchrony also offers its credit card products through three sales platforms:  Retail Card, Payment Solutions, and CareCredit.  Through the Retail Card platform, Synchrony provides PLCCs, Dual Cards and small- and medium-sized business credit products.  Payment Solutions provides promotional financing in the form of PLCCs and installment loans for major consumer purchases (such as luxury products).  CareCredit provides promotional financing specifically for health and personal care procedures, products, and services (including dental, veterinary, cosmetic, vision, and audiology).  Synchrony's Retail Card segment, the business unit responsible for store-branded cards, traditionally accounts for nearly *75%* of Synchrony's total annual revenue.

56.     Within each of its sales platforms, Synchrony has partner relationships with retailers and consumer brands.  These partner relationships, with retail giants like Walmart, Sam's Club, Amazon, BP, Lowe's, The Gap, BP, J.C. Penney, and Ashley Furniture HomeStore, are the cornerstone of Synchrony's business.

57.     Retailers enter into Retail Card arrangements with Synchrony to increase sales and marketing, and to encourage customer loyalty.  Customers take advantage of branded credit cards because they provide instant access to credit, discounts, attractive loyalty programs, and promotional offers.  In one of Synchrony's typical Retail Card partnerships, the retailer agrees to support the program and promote it to its customers, while Synchrony controls credit criteria and issues the credit cards.  Synchrony also owns the underlying accounts and all loan receivables generated under the program.

58.     Synchrony's Retail Card partnership agreements typically contain Retailer Share Arrangements ("RSAs") that provide for payments to the retail partners if the economic

performance of the program exceeds a contractually-defined threshold.  As a result, Synchrony and the retail partner share in the gains from their partnership that flow from customers' fees, interest payments and other charges on their credit accounts.  The RSAs typically measure the economic performance of a program as the agreed-upon revenue of the credit card program, less the agreed-upon expenses of the program.  Synchrony claims that its RSAs align its interests with its partners' and provide incentive to its partners to promote Synchrony's credit card products.

**B.    Walmart's Subprime-Heavy Account Was Synchrony's Most Valuable Partnership**

59.    Walmart, the nation's largest retailer, was Synchrony's most important retail partner.  Synchrony and Walmart began their partnership in 1999, and until 2018, Walmart was among Synchrony's longest-standing retail partners.

60.    The Walmart relationship was so significant to Synchrony that Synchrony maintained an office in Bentonville, Arkansas—the city where Walmart has its headquarters.  As the *Wall Street Journal* reported in October 2018, Synchrony "stationed dozens of employees in Walmart's headquarters city of Bentonville, Ark., some of its executives lived in the same gated community as their Walmart counterparts, and employees would hit the same golf course and hunt quail together."

61.    Underscoring the importance of the Walmart relationship, Synchrony also maintains a separate, extremely valuable strategic partnership with Walmart subsidiary and retail wholesale club, Sam's Club.  Synchrony's partnership with Sam's Club also ranks among Synchrony's five largest retail credit programs, bringing in over $8 billion in annual loan receivables.

18

62.     On October 16, 2015, Defendant Keane described the close relationship between Walmart and Synchrony in the following terms:  "We have 80 people sitting out in Bentonville, who all they think about every single day is Walmart and Sam's Club and that is their job."

63.     As of the end of 2017, the Walmart partnership accounted for more than 10% of the total interest and fees on Synchrony loans and as of early 2019, Synchrony estimated the size of its Walmart portfolio to be approximately $9 billion.

64.     Sound credit and risk management practices are critical components of Synchrony's management and growth strategy and are of upmost importance to its investors. Given the Company's roster of discount retailer partners, Synchrony's customer base includes many lower-income, higher risk borrowers whose credit scores rank as "below-prime" or "subprime."

65.     Credit scores "rank order" consumers by their predicted credit risk, and a credit score indicates how likely a consumer is to repay a debt relative to other consumers.  Below-prime borrowers are typically defined as individuals with a FICO score below 660.[1]  In 2016, 2017, and

---

[1] A FICO score is the brand of credit score, developed by the Fair Issac Corporation, that most lenders use to decide whether to offer a consumer a credit card or a loan, and in setting the card or loan's rate and terms.  Ranging from 300 to 850, a FICO score predicts how likely a consumer is to pay back a loan on time.  While the three major credit reporting agencies – Experian, TransUnion, and Equifax – consider different criteria and utilize different scoring models to calculate credit scores, some common factors comprise a typical credit score, including: the consumer's bill-paying history; the consumer's current unpaid debt; the number, type, and age of loan accounts the consumer has open; how much credit the consumer is using; whether the consumer has recently applied for credit; and whether the consumer has ever had a debt sent to collection, a foreclosure, or a bankruptcy.  The Consumer Financial Protection Bureau (the "CFPB") considers a FICO score below 580 to be "deep subprime," between 580 and 619 to be "subprime," between 620 and 659 to be "near-prime," between 660 and 719 to be "prime," and above 720 to be "super-prime."    https://www.consumerfinance.gov/data-research/consumer-credit-trends/credit-cards/borrower-risk-profiles/.

2018, over 25% of Synchrony's credit card loans were issued to borrowers with FICO scores of 660 or less.[2]

66.     Subprime and near-prime borrowers typically have lower incomes, worse credit histories, and represent a higher risk of loss than prime borrowers.  This risk is compounded by the fact that consumer credit loans rarely require any collateral to protect the company from losses.  Synchrony also leverages its balance sheets, and therefore a modest increase in losses can have a meaningful impact on the Company's capital position and its securities prices.

67.     Synchrony's single-largest retail partner during the Class Period, Walmart, has historically drawn a significant amount of its business from low-income consumers with subprime credit.  In 2014, the consulting firm Kantar Retail polled more than 4,000 consumers on their shopping habits and showed that more than 50% of Walmart's customers have an annual household income of less than $50,000, and more than 25% have an annual household income of less than $25,000.

68.     In 2017, Walmart generated approximately $13 billion in sales from shoppers whose income qualified them for the Supplemental Nutrition Assistance Program ("SNAP"), formerly known as Food Stamps.  While SNAP eligibility varies by state, in Connecticut for example, a SNAP-eligible, one-person household makes less than $22,464 per year.  In 2017, SNAP purchases at Walmart accounted for approximately 18% of all money spent through SNAP nationwide.

69.     A significant portion of Walmart's store credit card business is thus focused on subprime borrowers.  As a result, Walmart was incentivized to encourage Synchrony to grant

---

[2] *See* Synchrony's Form 10-Ks dated February 22, 2018 and February 15, 2019.

subprime customers access to credit, to increase Walmart's sales as well as Walmart's fees on the credit card financing under its RSA with Synchrony.

70.     However, as Defendant Doubles has stated, retailers' principal concern pursuant to the partnership agreements is driving retail sales at their own stores.  In Doubles' words:  "A lot of retailers look at whatever they're earning on a RSA as secondary, to [whether they're] driving sales, right?  ***They want the sales, they want the margin on the sales***."

71.     Synchrony Former Employee ("FE") 1 ("FE1")[3] recounted that Walmart's credit portfolio comprised very risky credit, and he explained that Synchrony generated a lot of revenue from these types of customers through interest payments and late fees.  FE1 further stated that it was widely known throughout Synchrony that Synchrony would approve a Walmart customer with a FICO score below 660 for $300 of credit, and that Walmart customers with FICO scores below 660 could access between $1,000 and $1,500 of credit.  But Synchrony even occasionally approved riskier Walmart customers for $100 or $150 in credit.  Indeed, as FE2[4] put it, Walmart wanted approval for almost everyone.

### C.     Synchrony's Lax Underwriting Caused Defaults and Losses

72.     It is now undisputed that, in mid-2016, Synchrony recognized a marked deterioration in the credit quality of its 2015 and 2016 vintage loans and anticipated charge-offs across the whole portfolio.

73.     As CFO Doubles publicly admitted much later (on a June 2, 2017 earnings call), Synchrony saw mid-2016 "as the inflection point," as Synchrony anticipated that 2015 and 2016

---

[3] A former Synchrony Underwriter and Customer Service Manager who worked at Synchrony from before the Class Period through November 2018 at Synchrony's Alpharetta, Georgia and Kettering, Ohio locations.

[4] Former Credit Sales Manager for Synchrony's Walmart account between 2017 and 2018.

vintages were going to drive "a[n] uptick in charge-offs for the whole portfolio" and internally "started making changes *almost immediately*" to underwriting.

74.      As the *Wall Street Journal* also reported, Synchrony's loan losses, particularly on Walmart-branded cards, increased after Synchrony had converted a number of Walmart PLCCs (which can only be used at Walmart) to general purpose co-branded cards (which can be used anywhere) and "much of that activity occurred roughly between 2011 and 2016."

75.      People familiar with the matter also told the *Wall Street Journal* that, while Synchrony converted the cards to boost usage and revenue, the outcome was that losses increased—because riskier borrowers had more freedom to use their cards—and Walmart saw less revenue than it expected to receive under its partnership with Synchrony.

76.      Indeed, according to FE3,[5] in 2016, Synchrony undertook a widespread analysis of its loan losses, studying its major portfolios' losses to assess whether each was correctly reserved. FE3, who worked on Synchrony's Gap portfolio, became involved with this analysis in October and November 2016 when the Company began its budget planning for 2017.  However, FE3 understood from speaking to his counterpart on the Walmart portfolio that, at the end of 2016, Walmart's loan losses were dramatically higher than Synchrony had originally anticipated.  FE3 also explained that while his portfolio, Gap, was around this time experiencing loan losses that were lower than expected, the entire Company's loan loss metric was pulled down by losses in the Walmart portfolio.

77.      As Walmart later alleged in its suit against Synchrony, filed in November 2018, Synchrony has not suggested that the deteriorating credit quality of its 2015 and 2016 loans was

---

[5] Former Vice President for Financial Planning & Analysis at Synchrony from before the Class Period through June 2017.

the result of widespread economic turmoil in the United States consumer market. Quite the opposite. Synchrony has stressed repeatedly that the economy has not entered a recession—and in fact has remained healthy. For instance, in an earnings call on July 22, 2016, Defendant Doubles stated, "[T]he consumer is still generally healthy," and "The overall macro environment is pretty strong." Two years later, in an appearance at the Sanford C. Bernstein Strategic Decisions Conference on May 31, 2018, Defendant Keane reiterated, "[W]e entered 2018 with an economy that I think is in good shape. We feel the consumer is in good shape." On this same call, Doubles stated, "I think we still feel pretty good about the U.S. consumer. I think the consumer is strong. They're spending. Unemployment levels are at historic lows right now. So we feel pretty good about the environment."

78.    As a result of Synchrony's own risky and deteriorating portfolio, and unbeknownst to investors, beginning in the second half of 2016 and through early 2017, Synchrony drastically tightened its underwriting standards. At the same time, Synchrony misrepresented to investors that its underwriting remained "consistent" and "disciplined," and that any underwriting changes were "surgical" in nature.

79.    Indeed, CFO Doubles only admitted later on the June 2, 2017 earnings call, that Synchrony saw mid-2016 "as the inflection point" at which Synchrony started "making changes almost immediately" to its underwriting practices.

80.    Doubles also reiterated this point on a January 2018 earnings call, admitting that Synchrony "started making refinements to our underwriting in the second half of 2016."

**D.    Synchrony Drastically Tightened Its Lax Underwriting**

81.    Beginning in mid-2016, in response to the dramatic increase in the number of defaults Synchrony was experiencing, Synchrony significantly tightened its underwriting

standards.  According to FE4[6], Synchrony began "tightening the belt" on credit in the summer of 2016.

82.     On November 14, 2017, Doubles publicly elaborated on the changes to underwriting that Synchrony made "right away" after mid-2016, which were necessary to tighten credit approvals.  Specifically, Doubles elaborated that:

> *[B]ack in mid-2016*, that's where we saw the inflection point on credit for us.  And we said, okay, *we went in right away as early as July, August [2016] after we saw then we started making changes*. . . .   They were -- we went after and kind of *tightened up criteria around credit line increases, tightened up some criteria around dual card upgrades*.  So we've talked about in the past, we have a low-and-grow strategy so we start somewhere with the private label card, upgrade to Dual Card over time.  We kind of *tightened up around some of the approval criteria in some programs*, not across-the-board but in certain target areas. And *those have had an impact*.

83.     Former employee accounts corroborate that these changes began occurring in 2016, while Synchrony falsely claimed to investors that it had not made changes to its underwriting. FE5[7], whose work included Synchrony's commercial business (*i.e.*, credit cards for commercial businesses that have a Synchrony retail partner credit card), stated that Synchrony received a lot of pressure from commercial customers who felt that they did not receive the amount of credit they deserved, and that complaints from commercial customers became worse in 2016 through 2018.

84.     Specifically, FE5 dealt with the Lowe's account.  He stated that many Synchrony associates related that they were hearing more and more complaints from Lowe's customers who, for example, had requested a $20,000 credit line but only received $7,000.  FE5 also stated that he also heard complaints from Lowe's itself that its customers could not receive the credit they

---

[6] Former Consumer Bank Credit Leader at Synchrony from before the Class Period through February 2017, based at corporate headquarters in Stamford, Connecticut.

[7] Former Vice President of Operations at Synchrony from before the Class Period through early 2018, based at Synchrony's Merriam, Kansas call center.

needed.  He specified that "noise" of this nature – an increase in customers complaining about not obtaining as much credit as they hoped for – stemmed from concerns at Synchrony that collectible losses were higher than what the Company expected.  FE5 explained that he learned about the Company's concerns on this issue through quarterly updates from the CEO, Defendant Keane.

85.     FE6[8] explained that, because Synchrony tied employees' bonuses to account originations and sales (*i.e.*, customers using a store credit card within the store to make purchases), he realized that Synchrony's underwriting change "***definitely wasn't modest*** because our bonuses definitely changed immodestly."  In other words, employees' bonuses decreased in parallel to the decrease in the number of consumers that Synchrony approved because Synchrony based a portion of sales employees' bonuses on the number of applications submitted and a portion on the number of applications actually approved.  FE6 stated that some credit sales managers did not receive a bonus for a full year, from the end of 2016 through 2017.

86.     FE3 likewise stated that Synchrony's changes to its underwriting standards impacted all of Synchrony's portfolios, and the Walmart portfolio – because it was so large – was the driver of those changes.

87.     According to FE7[9], Synchrony really tightened up its underwriting process in 2016. FE7 added that after Synchrony tightened lending, the underwriting department could no longer manually override the decision – which, by that point, was entirely automated – either to approve or not to approve a customer's application.

---

[8] Former Regional Credit Sales Manager at Synchrony from before the Class Period through February 2018, whose territory covered portions of four states.

[9] Former Senior Underwriter at Synchrony from before the Class Period through May 2017, based at Synchrony's Alpharetta, Georgia office where Synchrony's Underwriting Department was located.

88.     FE8[10] similarly described witnessing an increase in customers with better credit scores obtaining Synchrony cards in early 2017.  According to FE8, employees noticed that the new customers had FICO scores in the 700s, whereas customers previously tended to have scores in the 500s or low 600s.

89.     FE6 knew that Synchrony had made changes to underwriting because he witnessed a "significant drop" in approvals going into the spring of 2017, with approvals down tremendously in late March and early April 2017, with a year-over-year decline of approximately 15-20%.

90.     In 2017, as Synchrony was internally tightening its underwriting standards through broad-based changes, Defendants repeatedly told investors that it was only making minor, targeted or surgical changes.  For example, on April 28, 2017, after Synchrony employees already internally noticed significant changes in the pool of customers Synchrony was approving, Defendant Doubles told investors that, with respect to underwriting, "***The changes that we've been making, we'll continue to make, are pretty surgical in nature***."

91.     Additional former Synchrony employees explain that, contrary to Defendants' public claims to investors, Synchrony's approach to changing its underwriting was not "surgical." FE9[11] dealt with all of Synchrony's commercial portfolios, which included Walmart, Sam's Club, and Lowe's.  He stated that, on the commercial end, "***There was nothing surgical about it.***  They broad-based . . . redesigned every single strategy."

---

[10] Former Credit Collections Specialist at Synchrony from before the Class Period through September 2017, based at Synchrony's Kettering, Ohio office – where, along with the Canton, Ohio site, Synchrony's collections department was based.

[11] Former Acquisitions Strategy Manager at Synchrony Financial from December 2016 until June 2018, based at Synchrony's Alpharetta, Georgia office.

92.     When FE9 started at Synchrony in 2016, Synchrony extended credit to commercial borrowers based on the business's commercial credit score, but some businesses (such as Lowe's) required the owner of the company applying for commercial credit also to sign as a personal guarantor.  At that time, there was no floor cutoff for commercial credit based on the guarantor's personal FICO score, and the FICO cutoff for consumer lending was 591 across the board for all consumer accounts.  But in the fall of 2017, Synchrony implemented a new floor of 620 for the FICO scores of personal guarantors for commercial cards.

93.     FE9 also stated that, to lower Synchrony's loss rates, the Company asked him to change over Synchrony's internal score system, called Compass, which was old and not particularly predictive, to a more predictive scoring system (such as Experian's commercial scoring system SBCS).  As FE9 stated, "That was not surgical"; instead, it was across all commercial portfolios.  Synchrony gave FE9 nine months to design, build and roll out every single commercial strategy, and Synchrony's data analytics estimated that the strategies he developed and executed would save Synchrony $3.5 million a year in commercial losses.  FE9 stated that the new SBCS system was rolled out gradually – the Lowe's portfolio was operational by October 2017 and all other portfolios were in place by January 2018.

94.     Similarly, FE9 stated that Synchrony's consumer business also changed its credit rating system from a system called Radar 3, to a new score, called Radar 4.  FE9 was part of the group and on the calls discussing the transition to Radar 4.  He stated that Synchrony rolled out Radar 4 to every single portfolio and tightened up credit across every single portfolio.  FE9 similarly stated that Synchrony rolled out Radar 4 across the consumer portfolios on a rolling basis across August, September, and October 2017.

95.     Synchrony's tightening of its underwriting was so significant that it caused Synchrony to approve significantly fewer near-prime and subprime credit card customers.  As Doubles later elaborated in January 2018, "purchase volume for the below 660 FICO range [had] actually **_declined 13%_**, reflecting the actions we have been taking" to tighten Synchrony's underwriting.

96.     Also, on April 20, 2018, Doubles reported that, during the first quarter of 2018, consumer lending underwritten for customers with FICO scores lower than 600 **_declined 15%_**, also "reflecting the actions we have been taking."

97.     These disclosures of underwriting changes and their impact on Synchrony's near-prime and subprime customer base did not disclose the broad-based nature of Synchrony's underwriting changes and in fact increased market analyst focus on the issue of whether the supposedly "surgical" underwriting changes were having negative effects on Synchrony's retail partnerships, and whether Synchrony's partners were pushing back on the tightened underwriting.

98.     As discussed below (*see infra* §§ IV.G and IV.H), Defendants publicly misstated (and failed to disclose) that the modifications to Synchrony's underwriting, and the resulting decrease in near-prime and subprime customers, frustrated retail partners' (including Walmart's) ongoing demand for more approvals from Synchrony for near-prime and subprime customers, and caused Synchrony's retail partners to push back on these credit decisions by Synchrony.

**E.     Synchrony Misrepresented that Its Underwriting Remained "Disciplined" and Was "Consistent"**

99.     It is now undisputed that Synchrony tightened its underwriting standards in mid-2016, including to such a degree that it materially reduced Synchrony's approvals of near-prime and subprime customers.  But, during the first third of the Class Period, Synchrony hid from investors its need to tighten underwriting – and the fact that it had already tightened underwriting

– because it would have sent a negative message to the market that Synchrony's underwriting was previously too lax.

100.    As discussed in brief above, from the start of the Class Period on October 21, 2016 through the first partial corrective disclosure on April 28, 2017, Defendants repeatedly falsely claimed that Synchrony had a high-quality credit portfolio, and that its underwriting standards were "disciplined" and had remained "consistent."  For example:

- On October 21, 2016, Defendant Doubles emphasized to investors the Company's "strong growth" in loan receivables and the "favorable" "credit environment";

- On October 27, 2016, Synchrony filed a Form 10-Q in which it again reported the purported "stable asset quality" of its loan portfolio; and

- On November 3, 2016, Synchrony's presentation to investors emphasized that since at least the third quarter of 2010 through the third quarter of 2016, the Company "Focus[ed] on [a] Higher Quality Asset Base" and maintained "Disciplined Underwriting" which "led to [a] higher quality portfolio."  Defendant Doubles also claimed that, "we're very disciplined in our approach to underwriting."

101.    The foregoing claims were materially false and misleading because, as Synchrony admitted on April 28, 2017 for the first time, Synchrony had tightened underwriting since mid-2016 in recognition of the poor asset quality of its portfolio and the need for tightened underwriting.  Indeed, its overly lax underwriting standards were not "disciplined" or "consistent" and they resulted in the need for increased charge-offs and loan losses, and its portfolio was not comparatively "stronger" or of "higher quality."

102.    Defendants' misrepresentations artificially inflated the price of Synchrony common stock, as the stock price rose from a closing price of $27.13 on October 20, 2016, to $30.22 per share on November 9, 2016 – an increase of *more than 11%*.

103.    Defendants Doubles and Keane personally benefited from this price increase.  On November 9, 2016, shortly after making these false claims to investors, Defendant Doubles sold

2,000 shares of Synchrony stock at a price of $30.00/share, and Defendant Keane sold 2,000 shares of Synchrony stock at a price of $30.00/share.

104.    On November 22, 2016, at a time when they knew that Synchrony's loan portfolio had deteriorated, and that Synchrony had tightened its underwriting standards in a manner contrary to its public statements, Defendants Doubles and Keane entered into Rule 10b5-1 plans for stock sales to occur in February 2017.  The same day (November 22, 2016), Doubles also sold 6,000 shares of Synchrony stock at an artificially-inflated price of $34.00 per share, and Keane sold 6,000 shares of Synchrony stock at an artificially-inflated price of $34.00 per share.

105.    Defendants continued their efforts to artificially inflate Synchrony's stock price through materially false and misleading statements to investors.  For example:

- On December 7, 2016, Synchrony appeared at the Goldman Sachs U.S. Financial Services Conference, and Defendant Doubles claimed that "importantly, *we're not seeing anything right now that tells us to change our underwriting."*  And, when discussing accounts with FICO scores between 600 and 625, Doubles claimed that "We're still profitable on that segment of the population, which allows us to be consistent, which is important for us and frankly, very important for our retailers to maintain that consistency in our underwriting";

- On January 20, 2017, Synchrony reported its financial results and held its earnings call for the fourth quarter of 2016.  On the call, Defendant Doubles stated, "You can *maintain very consistent credit guidelines, which we have*";

- On January 30, 2017, Synchrony's 2016 Fourth Quarter Investor Presentation emphasized that since at least the third quarter of 2010 through the third quarter of 2016, the Company "Focus[ed] on [a] Higher Quality Asset Base" and maintained "Disciplined Underwriting" which "led to [a] higher quality portfolio";

- On February 23, 2017, Synchrony emphasized its "stable asset quality" and that the "credit environment remained favorable during 2016."  It added that, "*Our actual net charge-off rates have remained relatively stable*" and "In the near term . . . *we do not anticipate making significant changes to our underwriting standards*";

- On February 27, 2017, Synchrony executives attended the KBW Cards, Payments & Financial Technology Symposium.  At this conference, Doubles claimed that Synchrony's underwriting practices and FICO stratifications have "actually been very consistent" and have been "very consistent over the past few years"; and

- On February 27, 2017, Doubles elaborated that "one of the things that's really important in our business is consistency for the retailer.  So when times are really good, we don't go a lot deeper.  And when times start to soften or normalize [as they had over the past six months or so], whatever you want to call it, *we don't pull back dramatically either*."  He added that "what's really important is rather than taking your underwriting guidelines up and down quarter to quarter or year to year, is to be very consistent so that your retailers know what to expect from you.  And that just creates a better partnership."  He further claimed that "*[w]e haven't really changed our underwriting significantly over the past 9 to 12 months*," and "I think that consistency point is really important for us."  When asked if Synchrony had seen higher engagement at lower credit scores (or "lower down the credit spectrum"), Doubles responded, "We see a little bit of that," but "*we keep our underwriting guidelines pretty tight, pretty consistent.*"

106.    The foregoing statements were materially false and misleading when made because Synchrony's underwriting standards were not "consistent" and Synchrony had not "maintain[ed]" "very consistent credit guidelines."   Synchrony had already recognized that its underwriting standards were too lax and would necessarily result in increased charge-offs and loan losses and had already significantly tightened them.

107.    The foregoing statements artificially inflated Synchrony's stock price and maintained it at its inflated level.  From November 22, 2016 through February 27, 2017, Synchrony's stock price increased from $33.97 on November 22, 2016 to close at $36.94 on February 27, 2017, an increase of *more than 8%*.

108.    Analysts also accepted Defendants' representations.  On May 27, 2016, June 15, 2016, and February 14, 2017, Jefferies praised Synchrony's "higher quality portfolio" compared to its competitors.   Similarly, on April 8, 2016, Deutsche Bank published an analyst report remarking on Synchrony's "higher quality card portfolio" compared to banks "within [its] subsector" and praising its "higher quality credit strategies."

109.    On February 28, 2017, Defendants Keane and Doubles personally benefited from artificially increasing Synchrony's stock price through their sales of personally-held Synchrony

stock.  That day, Doubles sold 8,109 shares of Synchrony stock at an artificially-inflated price of $36.13 per share and Defendant Keane sold 11,500 shares of Synchrony stock at the same price.

110.    On April 4, 2017, Synchrony filed its 2017 Proxy Statement on Form DEF 14A. As part of the Company's 2016 "Performance Highlights," Synchrony continued to misrepresent that it "maintained stable credit metrics and ***remained disciplined*** on underwriting."  This was materially false and misleading because Synchrony's underwriting had not "remained" at a "disciplined" state, and Synchrony had in fact tightened its otherwise lax underwriting.

**F.      The Truth Began to Partially Emerge as Synchrony Disclosed Disappointing First Quarter 2017 Results and that the Company Had "Tightened" Its Underwriting**

111.    On April 28, 2017, after the Exchange Act Individual Defendants had sold hundreds of thousands of dollars' worth of Synchrony stock, and just 24 days after Synchrony falsely told investors that it had been "maintaining stable credit metrics," on the Company's first quarter 2017 earnings call, Synchrony announced sharply disappointing results for the first quarter of fiscal year 2017, including a 14% decline in annual net income, and attributed its poor performance to its souring loan portfolio.

112.    The Company's net charge-offs spiked to $974 million, leading to a charge off rate of 5.33% – far above the prior 4.75%-5% guidance and the highest Synchrony had reported since at least 2012 – with the Company warning that additional charge-offs were coming.  The Company also increased its loan loss reserves by $423 million to $1.3 billion.

113.    As Keane stated on the earnings call that day:  "Our results were impacted by the 45% increase in the provision for loan losses we experienced this quarter" and "net charge-offs came in at 5.33% compared to 4.74% in the first quarter of last year."  The Company also stated that it expected the write-off rate to remain at 5% or higher for the remainder of 2017, as compared to the Company's earlier forecast of 4.75%.  Doubles added that "The provision for loan losses

increased 45% over last year" and "[t]he increase was driven by **higher reserve build** and receivables growth."

114.    Doubles also stated that loans from "'15 and '16 have higher loss content" and "I would say, back half of '16 is a little better than first half of '16 for us. . . . The underwriting box for us has been largely consistent."

115.    On the call, an analyst at Credit Suisse specifically asked Doubles:  "[C]ould you just talk about what things you're doing differently, if anything, in response to this?  Like, are you doing things either to **tighten from a credit perspective** or from a profitability perspective, to kind of mitigate some of these results?"  Doubles responded:

> [W]hile I'll say that, **overall, our underwriting standards and cutoffs have been largely consistent**, you see that, if you look at the FICO stress strats on the portfolio, which have been pretty consistent for a number of years now.  But given we're still seeing attractive risk-adjusted returns, **we haven't made what I would call significant changes to our underwriting model to tighten up.  The changes that we've been making, we'll continue to make, are pretty surgical in nature**.  They're specific to certain portfolios or certain credit strategies.  We're always adjusting things like line assignments, refining upgrade strategies and things like that.  So yes, **we tightened a bit in the second half**.  We'll continue to refine our strategies here as we move throughout 2017.  We saw that actually improve some of the performance in the more recent vintages.  So we're obviously adapting to what we're seeing as these high-growth vintages mature, but **I wouldn't say it's anything dramatic that's going to slow the growth rate of the business**.

116.    Later, Doubles repeated, "Yes, we're making some modifications [to underwriting], but as I mentioned, they're pretty surgical."

117.    These statements partially revealed that Synchrony's prior underwriting was lax because it required "tighten[ing]," the negative financial impact that Synchrony's prior lax underwriting had had on Synchrony – in the form of loan losses, increased loan loss reserves and charge-offs, and that Synchrony had made some purportedly "surgical" changes to its underwriting.

118.    On this news, Synchrony's stock dropped nearly 16%.

119.    However, Defendants' April 28, 2017 statements continued to downplay the widespread nature of Synchrony's tightening of its underwriting and that the underwriting changes were so significant that they would materially reduce approvals and threatened Synchrony's long-standing relationships with its retail partners, including Walmart.

120.    Defendants' statements still downplayed any changes to Synchrony's underwriting by calling them "surgical" and not "anything dramatic that's going to slow the growth rate of the business."  Synchrony had in fact recognized that its underwriting standards had been too lax and made significant changes to tighten them, which in fact led to the approval of fewer loans, slowed growth, and retail partner backlash.

### G.    Synchrony's Underwriting Changes Caused Serious, Undisclosed Retail Partner Backlash

121.    Undisclosed to investors, Synchrony's tightened underwriting standards, which caused the Company to approve fewer subprime customers, upset Synchrony's retail partners, including Walmart.  Synchrony's approval rates, among the most important metrics that its retail partners focused on, were a particularly significant concern for Walmart because Walmart's below-prime portfolio meant that achieving sufficient approval rates was especially challenging.

122.    FE2 recounted that, by 2017, he became aware that Walmart had complaints about its relationship with Synchrony, particularly that Synchrony was not approving enough of Walmart's customers for credit cards.  By 2018, FE2 stated, the relationship between Walmart and Synchrony became contentious.

123.    Similarly, according to FE1, Synchrony could have set more realistic expectations for its retail partners.  Because Synchrony did not, the Company was often "under the gun" and felt the need to increase approvals to meet its obligations under its retail partnership agreements.

Since Synchrony was typically concerned about meeting those approval numbers, it had constantly lowered its credit standards for Walmart in the past. As FE1 stated, the retail partners' requirements drive the approval ratings and credit, and Walmart historically had one of the lowest requirements for credit approvals across all of Synchrony's portfolios. As FE1 put it, the bar was "lowered dramatically for Walmart customers."

124. FE10[12] stated that, prior to his leaving the Company in September 2017, the increase in delinquencies and defaults that Synchrony was facing particularly imperiled the Walmart relationship because the losses exceeded the expectations as outlined by the Allowance for Loan and Lease Losses ("ALLL") Guidelines.[13]  Consequently, Synchrony had to re-reserve for losses twice, if not three times, heavily for Walmart. These reserves affected the economics of Synchrony's RSA with Walmart—and the parties' relationship—and resulted in a lower bottom line on the deal and less money for Walmart. As a result, Synchrony representatives, including the general manager overseeing the Walmart relationship, were required to deliver this bad news to Walmart, who responded negatively. FE10 was aware of Walmart's negative reaction to this news because he participated in meetings of Synchrony's Enterprise Risk Management Committee ("ERMC") at which the re-reserve issue was discussed, and he had discussions on the topic with his track leader at the time, who was the Chief Credit Officer for Synchrony's Retail Card segment.

---

[12] Former Analyst in Synchrony's Credit & Risk function from before the Class Period through September 2017 who worked in various offices including Synchrony's Stamford, Connecticut headquarters.

[13]  In banking, the ALLL, formerly known as the reserve for bad debts, is a calculated reserve that financial institutions establish in relation to the estimated credit risk within the institution's assets. This credit risk represents the charge-offs that will most likely be realized against an institution's operating income as of the financial statement end date. This reserve reduces the book value of the institution's loans and leases to the amount that the institution reasonably expects to collect. The higher the estimated risk of uncollectable assets in the portfolio, the larger the ALLL reserve should be.

125. FE10 explained that there were drawbacks to Synchrony's re-reserving upwards, and because the renewal date of the Walmart partnership was approaching, the issue caused turbulence between Synchrony and Walmart. FE10 recalled discussion about the tensions in Synchrony's relationship with Walmart occurring at the regular ERMC meetings, which Defendants Keane and Doubles consistently attended.

126. The *Wall Street Journal*'s October 2018 reporting corroborates these former employees' accounts. According to the *Wall Street Journal*, Walmart had expected to receive "more revenue from the [Synchrony] deal in previous years, but loan losses cut into the amount the retailer was receiving," with losses standing at "roughly 9% of outstanding balances on Walmart cards this spring."

127. As Synchrony tightened its underwriting standards, Walmart wanted Synchrony to continue to extend credit to subprime customers, including for smaller, one-time purchases. The tension between Walmart's desire to increase its credit card approvals and Synchrony's tightening of its underwriting became a sticking point in the companies' relationship.

128. For example, in attempts to encourage Synchrony to increase its approvals of near-prime and subprime customers, Walmart and Synchrony explored agreements with two firms whose technology could expand Walmart's and Synchrony's approvals beyond their current approval rate.

129. As the *Wall Street Journal* reported in August of 2017, Synchrony was looking at ways to make adjustments to its underwriting approaches with new technology and models. It reported that Synchrony was testing technology from the financial technology firm ZestFinance, "which has software that helps lenders determine the riskiness of consumers, including those with little to no credit history." ZestFinance utilizes automated machine learning to "transform . . .

36

underwrit[ing]" and claims that its software allows retailers to "identify millions of new creditworthy borrowers," causing an "increase in approval rates with no increase in defaults."

130.    The August 2017 *Wall Street Journal* article also reported that Walmart and Affirm, Inc., a startup financing firm, were "in talks to offer installment loans" to Walmart customers. Affirm specializes in offering small installment loans to less creditworthy individuals.  As the article reported, "Installment loans, which are designed to be paid off by a certain date, generally appeal to shoppers who want to spread out their payments over time."  Affirm describes its business as providing "an alternative to traditional credit cards . . . giving [consumers] the flexibility to buy now and make simple monthly payments," with no compounding interest or "unexpected costs."

131.    The August 2017 *Wall Street Journal* article reported that the talks between Walmart and Affirm, including for Affirm to offer installment loans to Walmart customers, were "the latest sign of retailers' ***desire to reach new customers with limited credit histories***."  The article added that "Affirm's loans are often geared to people who don't have enough of a borrowing history to get a credit card," that "Affirm's loans will be largely geared to costlier Walmart items like tires and other purchases over $200" and that "many retailers, under pressure from online competition, are seeking to expand their customers' access to financing as a way to boost sales."[14] But, as of August 2017, the *Wall Street Journal* reported that Synchrony "has been the exclusive Wal-Mart credit card issuer for the past 17 years" and "[i]t will keep that post."

---

[14] In February 2019, Walmart and Affirm announced that they had reached a deal, under which Walmart would offer its customers point-of-sale installment loans, in-store and online, through Affirm.

132.    However, the *Wall Street Journal* later reported on October 24, 2018, that, unbeknownst to investors, "last year [2017]," Walmart actually "began offering loans from financial technology firm Affirm Inc. to some shoppers as an alternative to Synchrony cards" and that this took place "***after Walmart told Synchrony it should approve more applicants***."

133.    A former employee, FE2 also recounted that, as Walmart was transitioning to app-based payment systems like Walmart Pay, which allowed customers to pay for purchases using their credit cards saved to their phones, Synchrony's employees at FE2's level became increasingly concerned about Synchrony's failure to pivot to these changes.  FE2 stated that he was particularly concerned that Synchrony had not yet designed a process through which customers could apply for credit cards at its retailer partners' self-checkout lines.

134.    Other former Synchrony employees have confirmed that the Company's retail partners disapproved of Synchrony's tightening its underwriting standards, and that these changes had the biggest impact on Synchrony's relationship with Walmart, its largest retail portfolio. According to FE9, Synchrony's underwriting changes would have begun to affect Walmart's business in 2017.  He added that, "Walmart was squawking pretty big time," beginning in the fall of 2017, when it saw approval rates beginning to drop.

135.    FE9 pinpointed these complaints by Walmart as a red flag that Synchrony could lose Walmart as a partner.  In his role, FE9 had visibility into why Synchrony was making underwriting changes and what their impact would be before the changes went into effect.  As such, he participated in phone calls with Synchrony's risk manager for the Walmart portfolio – the voice of Synchrony in communications with the client – who explained to Walmart the changes to Synchrony's underwriting procedures.  FE9 stated that Synchrony knew, by the fall of 2017, that approval rates were going to be much lower than the Company communicated to Walmart.

136.    According to FE9, since the Walmart approval rate came in much lower than Synchrony previously told Walmart, Walmart felt that Synchrony did not know what it was doing, and that this was part of the reason why Synchrony lost the Walmart contract.

137.    FE9 also described participating in the fall of 2017 in two phone calls among the relationship managers for Synchrony and Walmart and other representatives of both companies to discuss Walmart's commercial and consumer portfolios with Synchrony.   On these calls, Synchrony conveyed to Walmart the actual approval rates and the anticipated loss numbers—both of which decreased.  FE9 stated that Synchrony's approval rate was wrong by a fair amount on the consumer side, which clearly displeased Walmart.  On these calls, Walmart asked Synchrony why approval rates were falling, despite Synchrony's assurance that Walmart would see a lift in approvals and a decline in losses.

138.    Former employees of Synchrony also described that, in addition to Walmart's unhappiness that Synchrony was approving fewer applicants, Walmart was displeased that its portion of the "gain share"—*i.e.*, Walmart's share of the gain on the Synchrony-Walmart RSA— decreased from 2016 to 2017.  FE2 stated that, due to losses, Walmart did not receive what it expected to receive under the gain share provision—an amount that Walmart believed it should receive no matter what.  FE2 stated that he heard Walmart's feedback to Synchrony through his supervisors.

139.    The former Senior Director of Finance & Strategy for Walmart's Financial Services Division, who was based at Walmart's Bentonville, Arkansas headquarters, also explained that under the Synchrony-Walmart RSA and the companies' "gain share," Walmart is not responsible for the downside of any losses.  The agreement was structured so that when Synchrony has more than a certain return on the Walmart portfolio, Walmart received a portion of that upside.  If

Synchrony had large reserves or loan losses, that would reduce Walmart's potential return.  He added that if Synchrony were hit with loan losses, Synchrony would want to adjust its approval metrics.  Then Walmart would lose some sales if customers were being turned down for credit, but Walmart would want to approve as many customers as possible for as high a credit limit as possible.  On the issue of approvals, if Synchrony and Walmart could not reach an agreement on the approval metrics, the final decision was made by Synchrony because Walmart only had profit share and no downside risk, and Synchrony had the downside risk.

140.    Former employees have described that not only was Synchrony's relationship with Walmart faltering, but its relationship with Sam's Club, a subsidiary of Walmart and one of Synchrony's top five largest retail partners, was struggling as well.  FE6 explained that in 2017, Sam's Club was also displeased with the amount of money it was due to receive that year – less than what Synchrony had projected – in gain share under its RSA.  Under Sam's Club's RSA with Synchrony, Synchrony received 30% of the profits from Sam's Club credit card accounts, and Sam's Club received the remaining 70%.  In late February and early March 2017, around the same time that the Sam's Club's CEO departed Sam's Club, Synchrony employees understood that the relationship between Sam's Club and Synchrony had become fragile because Sam's Club's new CEO learned that Sam's Club would not receive the gain share that it had targeted for 2017.

141.    Specifically, FE6 explained that Synchrony had projected that Sam's Club would receive approximately $200 million to $300 million in gain share per year from its relationship with Synchrony, and Synchrony typically beat that number with a gain share of between $350 million and $520 million.  In 2017, however, Synchrony projected that it would not even meet its projections, let alone exceed them, because the levels of defaults were increasing.  FE6 explained that he learned this information from the president of the Sam's Club portfolio (who held overall

responsibility for Sam's Club's gain share projections) during a divisional portfolio meeting at a fishing retreat, which all credit sales managers for the Sam's Club portfolio and their assistant vice presidents attended.

142.    Former Synchrony employees have also stated that, in the middle of 2017, Defendant Keane's contacts with Walmart increased significantly, evidence that the relationship between Synchrony and Walmart was suffering.   FE6 stated that Defendant Keane and Synchrony's CEO of Retail Cards, Defendant Quindlen, were flying from Synchrony headquarters in Connecticut to Walmart's headquarters in Arkansas frequently between April and June 2017. Because Arkansas was in FE6's territory, he was aware of these meetings and knew something was going on.

143.    FE9 also stated that he had heard that Defendant Keane visited Bentonville, Arkansas multiple times to speak with Walmart's leadership.   FE9 knew that Keane had always been involved with managing the Walmart relationship, but he felt that her calls and trips to Walmart increased in the middle of 2017 through the first half of 2018.   FE9 estimated that during this period, Keane visited Arkansas approximately once every month, whereas before mid-2017, she visited once or twice a year.   FE9 suspects that Keane increased her contact with Walmart after receiving alarming feedback from the Walmart client relationship manager that the relationship was doomed.   FE3 similarly stated that Doubles was spending a significant amount of time in Arkansas.   He was aware of this because several meetings that he was supposed to attend with Doubles and other executives were cancelled due to Doubles' travel to Bentonville.

144.    The *Wall Street Journal* later reported on July 13, 2018, and October 24, 2018, that Walmart and Synchrony had at least two high-level meetings in 2017 that made clear to Synchrony that the Walmart contract was in jeopardy.   Unbeknownst to investors, in the fall of 2017, Walmart

"balked" when Synchrony approached Walmart about renewing the companies' agreement. In addition, also unbeknownst to investors, in 2017, Walmart expressed its problems with Synchrony's business directly to the Synchrony Board, including Walmart's concerns that Synchrony was not approving enough cards and was keeping too much of the cards' revenue.

145.    Former employees also recounted that concerns were widespread throughout the Company about the likely end of Synchrony's relationship with Walmart.

146.    FE9 described that he knew—in the fall of 2017 and into January 2018—based on his experience and the tone of Synchrony's calls with Walmart, on which FE9 participated, that Synchrony was going to lose Walmart as a partner. He explained that, in his experience, one can tell if a client is not happy, and that a client might want very specific answers, but Walmart was not receiving them from Synchrony.

147.    According to FE9, the writing was on the wall, and several people on the calls felt that the Walmart-Synchrony relationship was doomed. He felt that Synchrony knew well before publicly announcing the end of the Walmart relationship that the Company was going to lose Walmart's commercial and consumer portfolios, and he believes it was misleading for Defendants to advertise publicly that the contract would survive. FE9 stated, "They knew they were going to lose Walmart . . . so that was certainly misleading." FE9 estimates that Synchrony knew no later than January 2018—but most likely even earlier—that Walmart would not renew its contract with Synchrony.

148.    As the *Wall Street Journal* later reported on July 12, 2018, a further red flag of Walmart's fraying relationship with Synchrony was the fact that, unbeknownst to investors, in late 2017, Walmart launched, for the "first time," a formal request for bids from other credit card

issuers.   Those discussions included meetings between Walmart and Synchrony competitors Capital One and Goldman Sachs Group in early 2018.

149.    FE2 stated that he began hearing in 2017 that Walmart had complaints about Synchrony's business—particularly that Synchrony was not approving enough of Walmart's applicants—and that Walmart intended to issue a request for proposals to move its business elsewhere.

150.    Former Synchrony employees stated that Synchrony was aware – before the *Wall Street Journal* published the news – that Walmart issued a request for proposals from competitor banks.  FE9 stated that it was well known within the Company that Walmart issued a request for proposals to Synchrony and at least one other competitor.   FE3 explained that, based on his discussions with a Finance VP at Synchrony responsible for the Walmart account, Synchrony knew well before the summer of 2018 that Walmart was planning to issue a request for proposals to other banks, including Capital One, for its retail credit card business.

151.    FE2 explained that, in January 2018, Synchrony employees at his level became concerned about whether Synchrony would renew the Walmart contract.  FE2 described that the request for proposal process typically lasts for a full year, that Synchrony employees knew before July 2017 that Walmart's request for proposals was coming up, and that Synchrony employees knew in 2017 that Walmart was soliciting bids from other credit card companies.  FE11[15], who dealt with the Walmart account during her tenure at Synchrony, stated that she would have learned by April or May 2018 that other banks were competing for Walmart's business.  FE11 explained that employees heard on team conference calls that Walmart was negotiating with Synchrony and

---

[15] Former Market Credit Manager at Synchrony from before the Class Period until June 2018, overseeing numerous Walmart stores.

several other banks, but then they heard that Walmart had narrowed down its potential choice to Synchrony or one other bank. These weekly conference calls consisted of the entire Walmart field sales team – about 40-45 employees and six regional managers.

152. FE8, who left Synchrony in September 2017—several months before Walmart announced that it was taking its business from Synchrony to Capital One—also described employees' concerns about the Walmart relationship during her tenure at Synchrony. FE8's group had been exclusively handling Synchrony's Care Cards, but the group was informed that it would begin handling Walmart's and Sam's Club accounts as well, because the Company was receiving many more complaints from Walmart and Sam's Club customers. FE8 also noted that, in addition to noticing an increase in Walmart customers complaining to Synchrony's customer service representatives about unwanted charges on their credit cards or billing delays, Synchrony employees learned that Walmart itself had complaints. FE8 heard her supervisors worrying, "We are going to lose Walmart. We are going to lose Walmart."

153. Approximately two months before Walmart announced that it was not renewing its contract with Synchrony, FE11 left the Company because she felt that Synchrony's relationship with Walmart was insecure, which gave her an "uneasy" feeling. FE11 knew that Synchrony valued the Walmart contract highly, and that Synchrony was eager to maintain the relationship, but she generally felt that Synchrony's relationship with Walmart was a "big, big grey area."

154. According to FE11 and FE2, Synchrony underwent a leadership reshuffle about nine months prior to the expiration of the Walmart contract. FE2 described that, at the end of the first quarter of 2018, Jeff Trowbridge left his position as Synchrony's Vice President of the Walmart portfolio. Trowbridge entered a new role at Synchrony in which he was receiving compensation, but FE2 described this arrangement as akin to severance. As the *Wall Street Journal*

44

reported in October 2018, "Jeff Trowbridge, who was recently in charge of the Walmart account, has left Synchrony, people familiar with the matter said."

155.    Former employees have explained that the pushback that Synchrony received from its retail partners about its new underwriting standards and decreased approvals was not limited to Walmart.  For example, FE6 stated that employees talked amongst themselves about the possibility of losing both Walmart's and Sam's Club's business.  In particular, FE6 explained that Sam's Club was concerned about the rising level of defaults stemming from Synchrony's underwriting practices.

156.    FE5 stated that Lowe's—Synchrony's oldest, and one of its top five largest, retail partners—voiced strongly its concern that its commercial customers were not receiving the credit they required.  FE5 knew this because he participated in monthly phone calls about the Lowe's portfolio with Lowe's representatives, including its head of Credit Risk, Synchrony's client operations manager for the Lowe's portfolio, and Synchrony's Risk and Fraud Operations units, during which the group discussed this issue.  FE5 described that in the previous few years, Synchrony was under significant pressure from its partners because customers did not receive the credit that they requested.  FE5 stated that, overall, Synchrony's relationship with Lowe's was solid, but that there was *a lot of negativity and finger-pointing* about customers who did not receive credit.  Specifically, FE5 sensed that Synchrony was under the spotlight from Lowe's about failing to meet goals, and because Defendant Keane personally managed the Lowe's portfolio, FE5 knew that Synchrony was committed to maintaining a strong relationship with Lowe's.  As a result, Synchrony was under pressure from Lowe's to collect more dollars, including by attempting to mandate that employees ask customers on every call whether they would like to increase their credit lines.  FE9 also stated that, on the consumer side, Lowe's pushed back against Synchrony's

45

FICO score cutoffs and requested that Synchrony lower the score cuts and approve more borrowers.

### H.     Synchrony Misrepresented the State of the Walmart Negotiations and a Purported Lack of Retail Partner "Pushback"

157.    As set forth above, Synchrony was receiving significant pushback from its retail partners – including Walmart – on its tightened underwriting and decreased credit card approvals. However, during the Class Period, Defendants repeatedly overstated the health of its partnerships and affirmatively, falsely represented that Synchrony was receiving no "pushback" from its partners on its credit decisions.  For example:

- On June 2, 2017, in response to a question about "2 big partnerships up in 2019" Keane claimed that she was "confident" the Company would keep those partners: "My mantra right now inside the company is . . . our partners need us now more than ever, and we have to be hitting the ball out of the park for them.  So *I feel confident* we'll continue those relationships," and she stated later on same call:  "*I feel pretty confident* we'll be able to keep these relationships in our portfolio";

- On July 21, 2017, Synchrony held its earnings call for the second quarter of 2017, on which Doubles similarly claimed, "*[W]e feel pretty positive* about the relationships that are coming up, the relationships we've had for a very, very long time," and reiterated that he was "*confident* that we'll be able to renew those relationships";

- On October 20, 2017, Synchrony held its earnings call for the third quarter of 2017.  On the call, in response to an analyst's question about "large renewals out in 2019," Defendant Keane claimed that the Company was "*very confident* that we'll be able to renew those relationships . . . I feel like we have very good relationships right now.  Our partners need us probably more now than ever, given the transformation that's occurring in retail";

- On November 14, 2017, Defendant Doubles dismissed analyst concerns about how Synchrony was managing the "natural tension" between "retailers that want to drive sales" and Synchrony's goals from "the standpoint of both credit extension and growth."  Mischaracterizing this as an issue of the past, Doubles claimed:  "You saw that tension more pre-crisis than we do today.  I think we're pretty far removed from 2008, 2009 but not that far removed that both retailers and issuers don't remember what happened, right?  And so *I think that desire to stretch on credit and underwrite deeper is not there today to the same extent as it was pre-crisis*"; and

- On November 14, 2017, Doubles claimed to investors that Synchrony's RSAs, which provide for profit sharing depending on the economic performance of the program, "***completely aligned [the Company's] interest with [its] retail partners***, so [the retailers] have a real incentive not to underwrite deeper as well."

158.    These statements were materially false and misleading, including because Defendants lacked a reasonable basis to be "confident" or "very confident" in Walmart's renewal of its relationship with Synchrony.  In addition, Doubles' claims that the "desire to stretch on credit and underwrite deeper is not there today to the same extent as it was pre-crisis" and that Synchrony's RSAs "completely aligned [the Company's] interest with [its] retail partners, so [the retailers] have a real incentive not to underwrite deeper as well," were misleading and directly contrary to the pressure and pushback that Synchrony had been receiving from, at least, Walmart and Lowe's to "stretch" more on credit, increase approvals and "underwrite deeper."

159.    The foregoing misstatements and omissions artificially inflated Synchrony's stock price and maintained inflation in the stock.  From June 2, 2017 to November 14, 2017, the price of Synchrony stock increased from $27.40 to $32.56, an increase of ***almost 19%***.

160.    On November 17, 2017, Defendants Doubles and Keane entered into Rule 10b5-1 plans for stock sales in early 2018, while they knew that Walmart was pushing back against Synchrony's tightened underwriting standards and Synchrony's approval of significantly fewer subprime credit card applications, and they knew that Walmart had balked at renewing its partnership with Synchrony.  All of these undisclosed material facts were directly contrary to Defendants' materially false and misleading reassurances to investors set forth above.

161.    On January 19, 2018, Synchrony held its earnings call for the fourth quarter of 2017.  On this call, Defendant Keane rejected analyst concerns that the Company's "underwriting refinements and tightening" had led to a decline in consumer purchase volume and "pushback" from retail partners.  Keane misleadingly stressed that "our partners are very cognizant of the fact

47

that they don't want to put credit in the hands of people that can't handle it…[T]heir names are on

the cards… and ***we are not getting any pushback on credit***. . . . [T]hese are ***modest refinements***.

These aren't wholesale changes to our underwriting strategy."

162.    On the January 19, 2018 call, Defendant Doubles also described that the

Company's purported underwriting "refinements" had had a "positive impact," stating that:  "First,

the most recent vintages continued to trend in line with our expectations.  As you remember, we

started making refinements to our underwriting in the second half of 2016, and ***we continue to see***

***the positive impact of those changes***."

163.    The foregoing statements were materially false and misleading because Synchrony

had in fact received "pushback on credit" from its partners, including Walmart and Lowe's, who

wanted Synchrony to extend credit to more borrowers, including near-prime and subprime

borrowers with FICO scores of less than 660.  Synchrony was also not seeing only a "positive

impact" of its underwriting changes.

164.    Former employees stated explicitly that Defendant Keane's statement that

Synchrony was receiving "no pushback on credit" from its retail partners was false:

- FE9 described Keane's claim as "baloney," and stated, "That's a bunch of hooey because they were certainly getting pushback";

- FE10 similarly stated that the claim of "no pushback" seemed incorrect to him, given Synchrony's underwriting strategy and FICO cutoffs, and Walmart's subprime-focused business model; and

- FE2 stated that Synchrony was facing pushback from Walmart before January 2018 on reduced credit approvals for borrowers with low FICO scores because Walmart wanted approval for almost everyone.

165.    The above-quoted false and misleading statements artificially inflated and

maintained the price of Synchrony's stock and Defendants Doubles and Keane personally

benefited from that inflation by selling personally-held Synchrony shares.  Specifically, on

February 15, 2018, Defendant Doubles sold 12,374 shares of Synchrony stock at an artificially-inflated price of $36.70 per share, and Defendant Keane sold 24,748 shares of Synchrony stock at the same artificially-inflated price, for combined total proceeds of ***$1.362 million***.  Five and six days later, Defendant Quindlen sold a total of 27,932 shares of his personally-held Synchrony stock at prices ranging from $36.72 to $37.00, for total proceeds of ***$1.027 million***.  Based on publicly-available information, this was the first time that Quindlen had ever sold any personally-held shares of Synchrony stock.

166.    On March 1, 2018, Synchrony executives attended the KBW Cards, Payments & Financial Technology Symposium.  In response to an analyst's question, "When you guys do some large renewals with partners, will it not be that big of an impact on the income statement in the earnings part?"  Doubles responded, "***[W]e haven't seen anything*** in the last 12 to 18 months that says, okay, we would materially change our RSA guidance or that historical level that we've been operating at."  This absolute statement – that Synchrony had not "seen anything" that would materially change its RSA guidance was materially misleading because Walmart's balking at the Synchrony contract renewal in the fall of 2017 jeopardized Synchrony's RSA guidance.

167.    On April 20, 2018, Synchrony held its earnings call for the first quarter of 2018.  Discussing changes to the Company's underwriting practices, Defendant Doubles claimed, "[W]e started to make refinements to our underwriting in the second half of 2016, and ***we continue to see the positive impact of those changes***."  And in response to an analyst's question about "big renewals" up in 2019, Defendant Keane stated that the Company was "well entrenched" with its partners.  Those statements were materially false and misleading for their failure to disclose the retailer partner pushback that Defendants' significant changes to its underwriting had caused, and that this jeopardized the Walmart partnership.

49

168.    The price of Synchrony stock remained artificially inflated by the Defendants' misstatements and omissions discussed above and Defendants Keane, Doubles and Quindlen continued to benefit from that artificial inflation when they sold personally-held shares of Synchrony stock in May of 2018.  On May 1, 2018, Defendant Doubles sold 4,994 shares of Synchrony stock at an artificially-inflated price of $32.87 per share, Defendant Keane sold 20,496 shares of Synchrony stock at the same artificially-inflated price, and Defendant Quindlen sold 17,772 shares of Synchrony stock at an artificially-inflated price of $32.89.  In addition, Defendant Quindlen sold 3,082 shares of Synchrony stock on May 22, 2018 at the artificially inflated price of $36.00 per share.  Defendants' total proceeds from these May 2018 sales were ***$1.533 million***.

169.    On May 31, 2018, Synchrony executives attended the Sanford C. Bernstein Strategic Decisions Conference.  At this conference, an analyst asked what gave Synchrony the confidence that it would achieve the upcoming renewals (including Walmart's), and Defendant Keane responded, "So I think, one of the things that gives us confidence is the fact that we have very long-term relationships. . . . We work very closely with our partners as renewals are coming up. . . . ***we feel good about where we're positioned competitively right now***."  At this same appearance, Defendant Keane stated that "a lot of what we're trying to do right now, and this is in both the big retailers down to the smaller retailers, is helping them accelerate their mobile capabilities."

170.    On June 13, 2018, Synchrony executives attended the Morgan Stanley Financials Conference.  At this appearance, in response to an analyst's question regarding Synchrony's partner relationships, Defendant Keane stated:  "We have a good partnership . . . I think we have good – ***Walmart is a good partner*** . . . I'm not afraid by our competition.  I think we feel pretty

positive about how we built out what we built out . . . ***With the renewals that we're working on, we have great partnerships, great dialogue going on***."

171.    These statements were materially false and misleading because Keane lacked a reasonable basis to feel "very good" about where Synchrony was positioned with Walmart, including in light of Synchrony's failure to adopt adequate capability to support the Walmart Pay technology, Walmart's "balking" at its contract renewal, Walmart's issuing an RFP to competing banks, the negative tone of the communications between Walmart and Synchrony, and the concerns Walmart expressed to the Synchrony Board.

**I.    The Truth Fully Emerged as Walmart Canceled Its Synchrony Contract, Moved Its Business to Capital One, and Sued Synchrony, and Synchrony Admitted It Had Tightened Underwriting "Across Pretty Much [the] Entire Business"**

172.    On July 12, 2018, multiple media sources reported that Walmart was considering moving its branded credit card business from Synchrony to Capital One and had, in fact, pushed back on Synchrony's reduction in credit approvals after it tightened its underwriting.  Citing "people familiar with the matter," the *Wall Street Journal* reported that "this is the first time Walmart launched a formal request for bids from other card issuers."

173.    The *Wall Street Journal* also reported that Walmart executives "want[ed] Synchrony to approve a higher percentage of applicants" and believed that Synchrony "is keeping too much of the cards' revenue"—and, in fact, had "aired ***those concerns*** in a meeting with Synchrony's board last year."  The *Wall Street Journal* added, "Walmart has been investing in self-checkout and mobile payments, pushing customers toward its own digital wallet, Walmart Pay," and Walmart "sees Capital One as a more tech-forward partner whose broader banking capabilities could aid Walmart's digital ambitions."  On this news, Synchrony's stock fell over 5%.

174.    On July 26, 2018, media sources reported that Walmart selected Capital One for its store-brand cards, ending its 20-year relationship with Synchrony, and Synchrony confirmed that news the same afternoon.  This development also cast doubt on whether Synchrony would renew its RSA with Sam's Club—an $8 billion portfolio accounting for more than 10% of Synchrony's annual income from interest and fees.  In response to this news, Synchrony shares fell another 10%.

175.    On July 26, 2018, *MarketWatch* reported that "losing Walmart is a major blow to Synchrony."  On July 27, 2018, *American Banker* wrote that, "After losing out on the opportunity to issue new credit cards to Walmart customers, Synchrony Financial is at a crossroads," but "the problem is" that Synchrony "does not get to decide its path forward."  The same day, *Bloomberg* reported that Capital One was also "interested in examining the Sam's Club portfolio currently held by Synchrony" which "has about $8 billion in receivables, or about 80 percent the size of Walmart's."  Sam's Club said in a statement, "Our contract with Synchrony continues for a few more years. . . . At that time, we will evaluate our options to make the best decision on behalf of our members."

176.    On July 27, 2018, Synchrony held its earnings call for the second quarter of 2018.  On this call, in response to an analyst's question about the state of the partnership between Synchrony and Walmart, Defendant Doubles explained that the terms of the Walmart partnership were going to change if the two companies renewed their contract.  Doubles stated that the "old agreement"—the Walmart deal in place at the time of this earnings call:

> [W]as somewhat unique in terms of the profile.  That became a challenge for us from an economic standpoint.  And in this case, we just weren't able to earn a return that was in line with the credit risk of the portfolio.  Under the old agreement, we were earning an acceptable return for that risk.  In the renewal discussions, it became clear that we weren't . . . going to be able to maintain that acceptable level of return for the risk that we are taking.

177.   On November 1, 2018, the last day of the Class Period, Walmart filed a lawsuit against Synchrony in Arkansas, alleging that Synchrony's conduct breached the parties' contract and breached the implied covenant of good faith and fair dealing.  Seeking no less than $800 million in damages, Walmart claimed that Synchrony intentionally underwrote the Walmart/Synchrony credit card program in a way that exposed the program to significant credit risk and harmed Walmart.

178.   Specifically, Walmart alleged, "Synchrony said it took on a 'unique' level of 'credit risk' with the Walmart/Synchrony credit card program (that is, Synchrony extended credit to riskier customers in the Walmart/Synchrony credit card program as compared to other programs) because the contract between Synchrony and Walmart gave Synchrony what it viewed as an 'acceptable return' for that risk."[16]  This included Synchrony's practice of converting Walmart PLCCs to Dual Cards.

179.   In response to this news, Synchrony's shares declined by $3.01 per share, or 10%, from a closing price of $29.44 on November 1, 2018, to a closing price of $26.43 on November 2, 2018.

180.   Following this news, an analyst with Stephens stated that Walmart's lawsuit may spur other retailers to reevaluate their relationships with Synchrony, and that the "Amazon account is also in jeopardy."

## V.   THE SYNCHRONY DEFENDANTS' FALSE AND MISLEADING STATEMENTS

181.   As summarized in detail below, throughout the Class Period, Defendants Synchrony, Keane and Doubles each made materially false and misleading statements and omissions concerning, among other things: (i) the quality of Synchrony's credit portfolio; (ii)

---

[16] *Walmart v. Synchrony*, Complaint, No. 5:18-cv-05216-TLP (W.D. Ark. Nov. 1, 2018)

Synchrony's purported "consistent" and "disciplined" approach to underwriting; and (iii) the strength of Synchrony's relationships with its key retail partners and purported lack of any pushback from them on Synchrony's changes to its credit approvals.

**A.    Synchrony's Purported Asset Quality and "Consistent" and "Disciplined" Underwriting**

182.    On October 21, 2016, the first day of the Class Period, Synchrony held its earnings call for the third quarter of 2016.  On this call, Defendant Doubles emphasized the Company's "strong growth" in loan receivables, and the overall "favorable" "credit environment" in which it was operating and reported that "the net charge-off rate was 4.38%."

183.    The same day, Synchrony filed with the SEC a Form 8-K and earnings release, in which the Company touted "strong loan receivables growth" and "broad-based" receivables growth "across partner programs" and a net charge-off rate of 4.38%.

184.    The same day, Synchrony issued a press release in which it reported, *inter alia*, net earnings of $604 million and a $986 million provision for loan losses.

185.    In response to Defendants' October 21, 2016 statements, Synchrony's stock price increased by $1.10 or 4.05% from the previous day's close, to close at $28.23.

186.    On October 27, 2016, Synchrony filed a Form 10-Q, signed by Defendant Doubles, in which Synchrony reported again on the "stable asset quality" of its loan portfolio.

187.    In response to Defendants' October 27, 2016 statement, Synchrony's stock price increased by $0.24 or 0.84% from the previous day's close, to close at $28.94.

188.    On November 3, 2016, Synchrony executives appeared at the BancAnalysts Association of Boston Conference and gave a presentation emphasizing that since at least the third quarter of 2010 through the third quarter of 2016, the Company had a "Focus on Higher Quality Asset Base" and maintained "Disciplined Underwriting" which "has led to a higher quality

portfolio."[17]   At this appearance, Defendant Doubles stated, "I'll cover risk management and our approach to underwriting.   So first, we have a very experienced risk team and ***we're very disciplined in our approach to underwriting***."

189.    On December 7, 2016, Synchrony appeared at the Goldman Sachs U.S. Financial Services Conference, at which Defendant Doubles claimed that:

> I think importantly, ***we're not seeing anything right now that tells us to change our underwriting***.   We're always making tweaks and refinements and modifying the model a little bit, but ***we still really like how we're underwriting today***, we like the risk-adjusted yields.   When we look at those and I think that's an important part of how we underwrite, ***it's easy to underwrite to a positive return today in this kind of environment***.   What we do is, we look at that risk-adjusted yield on that marginal account.   So for us, say between 600 and 625 FICO, that's as low as we go when we look at the returns today and ***we really like the returns***.   Most importantly, when we stress the losses, the loss profile on those accounts, ***we still really like the returns***.   We're still profitable on that segment of the population, ***which allows us to be consistent***, which is important for us and frankly, very important for our retailers to ***maintain that consistency in our underwriting***.

190.    In response to Defendants' statements, Synchrony's stock price increased by $0.52 or 1.46% from the previous day's close, to close at $36.18.

191.    On January 20, 2017, Synchrony held its earnings call for the fourth quarter of 2016.   On this call, Defendant Doubles reported that "the net charge-off rate was 4.62%," "the full-year net charge-off rate was 4.5%, in line with the outlook of 4.3% to 4.5% we provided at the beginning of 2016," and "we expect net charge-offs to further normalize into the 4.75% to 5% range in 2017."   In addition, the reported allowance for loan losses as a percent of receivables was

---

[17]   Synchrony made these same claims of a "Focus on Higher Quality Asset Base," and that it maintained "Disciplined Underwriting" which "has led to a higher quality portfolio," in presentations to investors on January 30, 2017, May 24, 2017, August 8, 2017, August 8, 2017, November 13, 2017, January 30, 2018, and May 11, 2018.

5.69%. Doubles was also asked by an analyst, "are you still seeing some faster growth in charge-offs] from stores with **slightly weaker customer mix**?"  In response, Doubles claimed that:

> You can **maintain very consistent credit guidelines, which we have**.  But given that we underwrite to different loss rates across all those different dynamics, portfolio mix can play a factor, and we've certainly included that in the guidance that we've provided.

192.   Doubles stated further on the January 20, 2017 call that:

> We've also assumed a relatively stable macro environment, so we didn't include any lift from job growth, wage growth.  It's really based on more of a status quo economy.  So I think importantly, **overall we're still very comfortable operating at these levels**.  And we really like the risk-adjusted returns on the accounts that we are booking.

193.   On this same call, Defendant Keane further stated that growth in mobile applications was a "very strong metric and one that we feel very good about."

194.   The same day, Synchrony issued a press release in which it reported, *inter alia*, net earnings of $576 million and a $1.07 billion provision for loan losses.

195.   In response to Defendants' January 20, 2017 statements, Synchrony's stock price increased $0.63 or 1.77% from the previous day's close, to close at $36.24.

196.   On February 23, 2017, Synchrony published its financial results for the fiscal year ended December 31, 2016.  The same day, Synchrony filed a Form 10-K (signed by Defendants Keane and Doubles) with the SEC, in which the Company emphasized its "stable asset quality" and that the "credit environment remained favorable during 2016" and affirmed that the Company complied with critical accounting estimates in preparing its provisions for loan losses.  Synchrony further stated, "Regardless of the channel, in making the initial credit approval decision to open a credit card or other account or otherwise grant credit, we follow a series of credit risk and underwriting procedures" and "**Our actual net charge-off rates have remained relatively stable**,"

56

and "In the near term, we expect U.S. unemployment rates to continue to stabilize and ***we do not anticipate making significant changes to our underwriting standards***."

197.    Synchrony's Form 10-K affirmed the financial results the Company presented in its January 20, 2017 press release and reported $2.25 billion in net earnings and an allowance for loan losses of $4.24 billion for the 2016 fiscal year.

198.    On February 27, 2017, Synchrony executives attended the KBW Cards, Payments & Financial Technology Symposium.  At the conference, Doubles stated, "And then on credit, we guided to [4.75% to 5%] . . . [and] overall, when you think about credit, look, we are still very comfortable operating at these levels. I think the backdrop is still pretty benign; the consumer is generally healthy; I think they are being pretty prudent around their debt."

199.    Also at the February 27, 2017 conference, an analyst commented that consumer banks were increasingly going "down market" by extending credit to riskier borrowers, and asked Doubles if Synchrony's recent, so-called "very strong growth" was the result of going more "down market."  Doubles denied this and claimed:

> [O]ne of the things that's really important in our business is consistency for the retailer.  So when times are really good, we don't go a lot deeper.  And when times start to soften or normalize [as they had over at least the past six months], whatever you want to call it, we don't pull back dramatically either.  So what's really important is rather than taking your underwriting guidelines up and down quarter to quarter or year to year, is to be ***very consistent*** so that your retailers know what to expect from you.  And that just creates a better partnership. . . .  ***We haven't really changed our underwriting significantly over the past 9 to 12 months*** [and] I think that consistency point is really important to us."

200.    On the same February 27, 2017 call, an analyst also asked Doubles if Synchrony had seen higher engagement at lower credit scores (or "lower down the credit spectrum"), and Doubles responded, "We see a little bit of that," but "we keep our underwriting guidelines pretty tight, ***pretty consistent***."

201.    In response to Defendants' February 27, 2017 statements, Synchrony's stock price increased $0.46 or 1.26% from the previous day's close, to close at $36.94.

202.    On April 4, 2017, Synchrony filed its 2017 Proxy Statement on Form DEF 14A. As part of the Company's 2016 "Performance Highlights," Synchrony represented that it had "***maintained stable credit metrics*** and ***remained disciplined*** on underwriting."

203.    The Defendants' statements in ¶¶ 182-202 above were materially false and misleading when made.  Synchrony's reported net charge-off rate and loan loss reserves were materially understated, because as reported by Synchrony on April 27, 2018, the charge-off rate drastically increased with no reasonable explanation and in excess of Synchrony's previously-stated revised guidance.

204.    In addition, as Synchrony first admitted in April 2017, starting in mid-2016 and continuing through early 2017, Synchrony tightened its underwriting.  Defendants hid the significant, widespread nature of the tightened underwriting (and its negative effect on Synchrony's retail partnerships) from investors.  More specifically, for example, Defendants' statements regarding the Company's "Higher Quality Asset Base" and "stable asset quality," the Company's "disciplined . . . approach to underwriting," that "how we're underwriting today . . . allows us to be consistent," that the Company was "not seeing anything right now that tells us to change our underwriting," that the Company has not "really changed our underwriting significantly over the past 9 to 12 months," and that the Company "maintained stable credit metrics and remained disciplined on underwriting" were false and misleading when Defendants made them.

205.    In fact, Synchrony's asset base was neither "higher quality" nor "stable," nor was Synchrony's underwriting "disciplined" or "consistent."  On April 28, 2017, Synchrony admitted

that Synchrony had tightened its underwriting standards in mid-2016 after recognizing a marked decline in the quality of its assets.   Former employees of Synchrony have described that Synchrony's reaction to the discovery that defaults and loan losses were increasing due to Synchrony's lax underwriting procedures was that the Company imposed a wholesale, "broad-based" redesign of its underwriting strategy and procedures.   For example:

- FE4 explained that Synchrony began "tightening the belt" on credit in the summer of 2016 after loan losses drastically increased;

- FE5 described that, after Synchrony tightened underwriting, he fielded complaints from Lowe's customers who could not access credit lines as high as they required;

- FE6 mentioned that sales employees' bonuses between 2016 and 2017 decreased because fewer customers' applications were being approved, and bonuses were tied to application and approval numbers;

- FE8 also noticed that, in early 2017, customers with higher credit scores were obtaining more of Synchrony's cards; and

- FE6 explained that he witnessed a significant drop in approvals in late March and early April of 2017.

206.   Defendants also subsequently repeatedly admitted that Synchrony not only needed to tighten its underwriting in the second half of 2016 and early 2017, but also that it did so during that timeframe in a material way that had a significant, long-lasting, negative impact on Synchrony's growth.   Those admissions, which establish the falsity of the statements in ¶¶ 182-202 above, included the following, along with false reassuring statements (underlined below) about the purported limited scope of the underwriting changes that artificially inflated Synchrony's securities prices:

- On April 28, 2017, Doubles admitted that Synchrony had "tightened" underwriting "a bit" in the second half of 2016.   But Doubles artificially inflated Synchrony's securities prices by falsely claiming the changes to underwriting were "pretty surgical in nature" and not "anything dramatic that's going to slow the growth rate of the business";

- On June 2, 2017, Doubles admitted that "*around mid last year* [2016] is when we saw the inflection point" and "we started making changes almost immediately to address some of those areas where we saw a saw a seasoning that was higher than our expectations." But Doubles downplayed the need for the changes and artificially inflated Synchrony's securities prices by claiming that <u>the changes were "very surgical" and "very targeted"</u>;

- On July 21, 2017, an analyst asked Doubles if it seemed as if Synchrony had done "some pretty meaningful tightening" and he responded that "we have obviously tightened" but that this was <u>expected only "to have a *modest* impact on growth"</u>;

- On October 20, 2017, Doubles admitted that the tightened underwriting would have an impact on "purchase volume" and longer term, less benefit from revolving credit, but described the changes as mere "<u>refinements</u>";

- On November 14, 2017, Doubles further affirmed that "back in mid-2016, that's where we saw the inflection point on credit for us. And we said, okay, *we went right in right away as early as July, August after we saw then we started making changes*. . . . [W]e went after and kind of tightened up criteria around credit line increases, tightened up some criteria around dual card upgrades." But Doubles downplayed the need for the changes and artificially inflated Synchrony's securities prices by claiming that <u>the changes "weren't dramatic" and that Synchrony only "kind of tightened up around some of the approval criteria in some programs, *not across-the-board* but in certain target areas"</u>;

- On January 19, 2018, Doubles acknowledged that the underwriting changes that began in the second half of 2016 "have resulted in changes to our purchase volume mix by FICO score," including that "*purchase volume for the below 660 FICO range actually declined 13%,* reflecting the actions we have been taking." But Doubles artificially inflated Synchrony's securities prices by claiming that <u>the changes were mere "modest refinements" and not "wholesale changes to our underwriting portfolio"</u>;

- On April 20, 2018, Doubles disclosed that the changes to underwriting that Synchrony made in the "second half of 2016" has resulted in "purchase volume for the below 660 FICO range actually declined 15%, reflecting the actions we have been taking." But Doubles artificially inflated Synchrony's stock price by claiming that <u>the changes were mere "modest refinements"</u>; and

- On May 31, 2018, Doubles discussed how the tightened underwriting had in fact slowed Synchrony's growth, but he still artificially inflated Synchrony's securities prices by <u>downplaying the changes as mere "refinements"</u>: "In terms of the growth rate, *we expected the growth rate to come down*. . . . Again, it's that modest shift, doing less below 660, doing

60

more 720 and above.  And you're going to see that in earnings growth.  So you have to – the way we think about it is, you always have to adjust and adjust quickly to a change in the trends.  And when we saw that happen right around June of 2016, ***our teams jumped in***, and we started making those refinements."

207.    As the foregoing admissions demonstrate, Synchrony's undisclosed changes to its underwriting in the second half of 2016 and early 2017 show that its underwriting standards had been too lax leading up to that point, and resulted in a situation where, contrary to Defendants' repeated false statements, Synchrony's underwriting had not been "consistent" or "disciplined." The underlined false statements in the bullets in ¶ 206 above were materially false and misleading for their downplaying the scope and impact of Synchrony's tightening of its underwriting.  In fact, as Synchrony only publicly admitted on July 27, 2018, it had tightened underwriting "across pretty much [the] entire business."  This tightening led to undisclosed backlash from Synchrony's retail partners, including Walmart.  Synchrony also knew that its asset quality was not "stable," having recognized the need for tightened standards amid an increase in charge-offs across its whole portfolio.

208.    The Defendants' statements in ¶¶ 182-202 and underlined in ¶ 206 above were also materially misleading for their failure to disclose the following material adverse facts:  (i) in mid-2016, after years of approving risky subprime borrowers, Synchrony significantly tightened its underwriting standards; (ii) the tightened underwriting standards and resulting decline in subprime approvals created a conflict between Synchrony and its partners, including Walmart (then Synchrony's largest partner, with a customer base that included significant amounts of subprime customers); (iii) Walmart told Synchrony in 2017 to approve more borrowers; (iv) the conflict between Synchrony and Walmart jeopardized Walmart's renewal of its contract with Synchrony; (v) in the Fall of 2017, when Synchrony approached Walmart about renewing the Synchrony-Walmart contract, Walmart "balked" at the renewal; (vi) Walmart informed the Synchrony Board

in 2017 of Walmart's concerns that Synchrony needed to approve more customers and was keeping too much of the cards' revenue; and (vii) in 2017, Walmart issued a formal request for contract bids from other credit card companies.

**B.      The Purported Lack of Partner "Pushback" on Synchrony's "Refinements" to Its Underwriting Standards**

209.     In its Annual Report on Form 10-K for the year ended December 31, 2016 filed with the SEC on February 23, 2017 (the "2016 Form 10-K") and signed by Defendants Keane and Doubles, Synchrony stated:

> Our business benefits from longstanding and collaborative relationships with our partners, including some of the nation's leading retailers and manufacturers with well-known consumer brands, such as Lowe's, Walmart, Amazon and Ashley Furniture HomeStore. We believe our partner-centric business model has been successful because *it aligns our interests with those of our partners* and provides substantial value to both our partners and our customers. Our partners promote our credit products because they generate increased sales and strengthen customer loyalty.

210.     On June 2, 2017, Synchrony executives appeared at the Sanford C. Bernstein Strategic Decision Conference.  At this conference, in response to an analyst's question about "two big partnerships up in 2019," including Walmart, Defendant Keane stated that she was "confident" the Company would keep those partners: "My mantra right now inside the company is . . . our partners need us more than ever, and we have to be hitting the ball out of the park for them.  So *I feel confident* we'll continue those relationships."  Keane further claimed, "*I feel pretty confident* we'll be able to keep these relationships in our portfolio."

211.     On July 21, 2017, Synchrony held its earnings call for the second quarter of 2017. On this call, an analyst asked Synchrony about "the 2019 renewal[s] with your retailers" and "have you started those discussions and if so, how are they progressing?"  Defendant Doubles responded, "We feel pretty positive about the relationships that are coming up, the relationships we've had for

a very, very long time," and reiterated that he was "confident that we'll be able to renew those relationships."

212.   In response to Defendants' July 21, 2017 statements, Synchrony's stock price increased $1.34 or 4.54% from the previous day's close, to close at $30.87.

213.   On October 20, 2017, Synchrony held its earnings call for the third quarter of 2017. On this call, in response to analysts' questions regarding "large renewals out in 2019," including Walmart, Defendant Keane claimed that the Company was "very confident that we'll be able to renew those relationships . . . I feel like we have very good relationships right now.  Our partners need us probably more now than ever, given the transformation that's occurring in retail."

214.   In response to Defendants' October 20, 2017 statements, Synchrony's stock price increased $1.33 or 4.19% from the previous day's close, to close at $33.04.

215.   On November 14, 2017, Synchrony executives appeared at the Bank of America Merrill Lynch Future of Financials Conference.  During that conference, an analyst asked Doubles the following question, to which Doubles gave the following response:

> Analyst:   [I]n the context of Synchrony's business, you're in a little bit of a different position than others that provide, just general revolving credit.  I mean, you are interacting with merchants that – and retailers that want to drive sales.  So there's a natural tension between what they would like to do, what you would like to do from the standpoint of both credit extension and growth.  How do you really manage between those, that tension if you will?

> Doubles:   . . . You saw that tension more pre-crisis than we do today.  I think we're pretty far removed from 2008, 2009 but not that far removed that both retailers and issuers don't remember what happened, right?  And so **I think that desire to stretch on credit and underwrite deeper is not there today to the same extent as it was pre-crisis**."  The other thing you have to remember is the retailer share agreement **completely aligned [Synchrony's] interest with our retail partners**, right. . .  And that completely aligns our incentives with our retailers.  So they [the retailers] have a real incentive not to underwrite deeper as well.  And I think that's something, again, we heard a lot about and was much more of a dialogue pre-crisis than it is today.  . . .  And

like I said, we're both issuer and partner, very much aligned in staying disciplined around underwriting.

216.    In its Preliminary Prospectus Supplement filed with the SEC on November 28, 2017, and in Synchrony's Prospectus Supplement filed with the SEC on November 30, 2017, Synchrony stated:

> Our business benefits from longstanding and collaborative relationships with our partners, including some of the nation's leading retailers and manufacturers with well-known consumer brands, such as Lowe's, Walmart, Amazon and Ashley Furniture HomeStore. We believe our partner-centric business model has been successful because *it aligns our interests with those of our partners* and provides substantial value to both our partners and our customers. Our partners promote our credit products because they generate increased sales and strengthen customer loyalty.

217.    Synchrony's Preliminary Prospectus Supplement filed with the SEC on November 28, 2017, and Synchrony's Prospectus Supplement filed with the SEC on November 30, 2017, both included an accompanying prospectus dated September 16, 2016 (which is part of Synchrony's Registration Statement on Form S-3). In the September 16, 2016 prospectus, Synchrony made a substantially similar statement.

218.    On January 19, 2018, Synchrony held its earnings call for the fourth quarter of 2017. On this call, Doubles discussed with a J.P. Morgan analyst how its tightened underwriting had "materialize[d] first in your sales" and that is "where you're starting to see that." In response, the analyst discussed how "obviously, the retail partners really value the liquidity that you provide to their customers" and asked Defendants if Synchrony was "getting any pushback as you tweak the underwriting and make less credit available to th[e] sub-660 borrowers?" Defendant Keane responded that, "Our partners are very cognizant of the fact that they don't want to put credit in the hands of people that can't handle it. . . . Their names are on the cards . . . and *we are not getting any pushback on credit*."

219.    Also, on the January 19, 2018 call, when asked by an analyst about "any update on incremental trends in the competitive market" and "any progress on upcoming notable renewals," including Walmart, Defendant Keane responded, "our teams are well entrenched in our partners and working every single day to work on those renewals and working hard to really focus on what our partners need.  So *we feel pretty good about the pipeline*.  *We feel pretty good about the competitive environment*."

220.    On the same January 19, 2018 call, Defendant Doubles described that Synchrony's "underwriting refinements" had led to a "positive impact," stating:

> First, the most recent vintages continued to trend in line with our expectations.  As you remember, we started making refinements to our underwriting in the second half of 2016, and *we continue to see the positive impact to those changes*.

221.    In response to Defendants' January 19, 2018 statements, Synchrony's stock price increased $1.17 or 3.14% from the previous day's close, to close at $38.47.

222.    On March 1, 2018, Synchrony executives attended the KBW Cards, Payments & Financial Technology Symposium.  In response to an analyst's question, "When you guys do some large renewals with partners, will it not be that big of an impact on the income statement in the earnings part?" Doubles stated, "We haven't seen anything in the last 12 to 18 months that says, okay, we would materially change our RSA guidance or that historical level that we've been operating at."

223.    On April 20, 2018, Synchrony held its earnings call for the first quarter of 2018.  On this call, in response to an analyst's question about "big renewals" up in 2019, Defendant Keane stated that the Company was "well entrenched" with its partners.  Keane later added on the same call that, "[W]e're feeling good about what we're winning and the portfolios that we're bringing on and renewals that we're doing."

224.    On May 31, 2018, Synchrony executives attended the Sanford C. Bernstein Strategic Decisions Conference.  At this conference, an analyst asked the following question about Synchrony's confidence in being able to achieve upcoming renewals (including Walmart's), and Defendant Keane answered it in the following way:

Analyst:    In terms of the competitive landscape in Retail Card, every discussion I have with investors, eventually finds its way around to partnership renewals.  Without getting into specific relationships, can you tell us what gives you confidence as you face some big renewals over the next few years?

Keane:    . . . So I think one of the things that gives us confidence is the fact that we have very long-term relationships . . . we work very closely with our partners as renewals are coming up . . . *we feel good about where we're positioned competitively right now*.

225.    At this same conference, Defendant Keane stated that "a lot of what we're trying to do right now, and this is in both the big retailers down to the smaller retailers, is helping them accelerate their mobile capabilities."

226.    On June 13, 2018, Synchrony executives attended the Morgan Stanley Financials Conference.  At this appearance, in response to analyst's questions regarding Synchrony's strategy on renewing its retail partnerships, Defendant Keane stated:

. . . I'm not afraid by our competition.  I think we feel pretty positive about how we built out what we built out . . .  *With the renewals that we're working on, we have great partnerships, great dialogue going on*. . . .

I think we have good – *Walmart is a good partner.*

227.    On July 27, 2018, Defendant Keane claimed that "I think the important point here is we don't have a bad relationship with Walmart and Sam's [Club].  So we're going to leverage that and continue to leverage that."

228. On October 19, 2018, Defendant Keane claimed that "we continue to work closely with Walmart to support the program and we'll do everything on our end to ensure a successful program transition next year."

229. The Synchrony Defendants' statements in ¶¶ 182-202, underlined in ¶ 206, and in ¶¶ 209-228 above – including regarding the Company's "positive" outlook on its retail partner relationships, its "confiden[ce] that we'll be able to renew those relationships," the Company's being "completely aligned" with its partners, and its statement that "we are not getting any pushback on credit" – were materially false and misleading when made because Defendants knew that Synchrony's relationship with Walmart had soured and thus Defendants lacked a reasonable basis to be "confident" or "very confident" in the partnership. For example, by the fall of 2017, as FE9 put it, "Walmart was squawking pretty big time" about Synchrony's falling approval rates. He pinpointed these complaints by Walmart as a red flag that Synchrony could lose Walmart as a partner. FE2 similarly stated that he became aware in 2017 that Walmart was complaining about the relationship. Defendants also knew that Keane's statements that "we are not getting any pushback on credit" from its retail partners and that Synchrony's and its retail partners' interests were "completely aligned" were false because Walmart and other partners had explicitly pushed back on Synchrony's underwriting changes and its lowered approval rates. In fact, at a meeting with Synchrony executives in the fall of 2017, Walmart "balked" at the prospect of renewing the companies' partnership. Synchrony knew that Walmart wanted Synchrony to approve more borrowers—rather than fewer—and that this conflict would jeopardize the companies' long-standing relationship. Walmart had also issued a request for proposals from other banks, including Capital One, for its retail credit card business and Walmart was considering not renewing its contract with Synchrony.

230. The Defendants' statements in ¶¶ 182-202, underlined in ¶ 206, and in ¶¶ 209-228 above were also materially misleading for their failure to disclose the following material adverse facts: (i) in mid-2016, after years of approving risky subprime borrowers, Synchrony significantly tightened its underwriting standards; (ii) the tightened underwriting standards and resulting decline in subprime approvals created a conflict between Synchrony and its partners, including Walmart (then Synchrony's largest partner, with a customer base that included significant amounts of subprime customers); (iii) Walmart told Synchrony in 2017 to approve more borrowers; (iv) the conflict between Synchrony and Walmart jeopardized Walmart's renewal of its contract with Synchrony; (v) in the Fall of 2017, when Synchrony approached Walmart about renewing the Synchrony-Walmart contract, Walmart "balked" at the renewal; (vi) Walmart informed the Synchrony Board in 2017 of Walmart's concern that Synchrony was keeping too much of the cards' revenue; and (vii) in late 2017, Walmart issued a formal request for contract bids from other credit card companies.

## VI.    LOSS CAUSATION

231. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Synchrony securities and operated as a fraud and deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on April 28, 2017, July 12, 2018, July 26 and 27, 2018, and November 1, 2018 the prices of Synchrony securities fell. As a result of their purchases of Synchrony securities during the Class Period, Plaintiffs and other members of the Class suffered harm.

A.      **Synchrony's Disclosure of Poor Loan Performance and Deficient Underwriting**

232.    The truth about Synchrony's underwriting practices and their impact on Synchrony's loan portfolio and business was partially revealed on April 28, 2017, when the Company announced disappointing results for the first quarter of fiscal year 2017, including that net income had dropped 14% from a year earlier.  The Company attributed its performance to the poor credit profile of its loan portfolio.  The Company revealed that net charge-offs had spiked to $974 million, leading to a charge-off rate of 5.33%, far above the Company's 4.75% to 5% guidance and the highest Synchrony had reported since at least 2012.  Moreover, CFO Doubles warned analysts that additional charge-offs were forthcoming.   Specifically, the Company increased its loan loss reserve by $423 million to $1.3 billion, a 21% increase over the prior quarter. In addition, Defendant Doubles stated that the Company expected the net charge-off rate to remain at 5% or higher for the remainder of the year, as compared to the Company's earlier forecast of 4.75%.

233.    Prior to the earnings call, based on Synchrony's financial results press release, Morgan Stanley reported that "credit deteriorate[d] more than expected," and added that "purchase volume growth slowed."   Morgan Stanley wrote that its "question for the call" was "if this slowdown reflects ***tightening credit standards*** by SYF," and its "Key Questions for the Call" included "underwriting/credit standards and any impact to purchase and/or loan volume growth."

234.    On the call, an analyst at Credit Suisse specifically asked Doubles:  "[C]ould you just talk about what things you're doing differently, if anything, in response to this?  Like, are you doing things either to ***tighten from a credit perspective*** or from a profitability perspective, to kind of mitigate some of these results?"  Doubles responded:

> [W]hile I'll say that, ***overall, our underwriting standards and cutoffs have been largely consistent***, you see that, if you look at the FICO stress strats on the portfolio,

69

which have been pretty consistent for a number of years now.  But given we're still seeing attractive risk-adjusted returns, ***we haven't made what I would call significant changes to our underwriting model to tighten up.  The changes that we've been making, we'll continue to make, are pretty surgical in nature***.  They're specific to certain portfolios or certain credit strategies.  We're always adjusting things like line assignments, refining upgrade strategies and things like that.  So yes, ***we tightened a bit in the second half***.  We'll continue to refine our strategies here as we move throughout 2017.  We saw that actually improve some of the performance in the more recent vintages.  So we're obviously adapting to what we're seeing as these high-growth vintages mature, but ***I wouldn't say it's anything dramatic that's going to slow the growth rate of the business***.

235.    Later, Doubles repeated, "Yes, we're making some modifications [to underwriting], but as I mentioned, they're pretty surgical."

236.    As shown in the chart below, as a result of these disclosures, and on unusually high trading volume, the price of Synchrony's common stock declined by $5.25 per share, or nearly 16%, from a closing price of $33.05 per share on April 27, 2017, to close at $27.80 per share on April 28, 2017:



237.    No other adverse, Company-specific news entered the market on April 28, 2018, and therefore the entirety of Synchrony's stock price decline that day is attributable to the

undisclosed material facts concerning the poor quality of Synchrony's loan portfolio and the need to tighten underwriting that Synchrony had kept from investors and which Synchrony admitted on April 28, 2017.

238.   Following the Company's announcement, market researchers and the media connected Synchrony's poor loan portfolio performance to its lax underwriting practices:

- On April 28, 2017, Wells Fargo's Equity Research Department wrote, "Credit Rears Its Ugly Head Again" and observed that "[c]ard losses don't stay at generational lows forever, but *it is surprising that they are rising so rapidly*";

- Similarly, on May 1, 2017, Barclays stated that the "Disappointing Quarter on Big [Net Charge-Off] Miss *Undermines Faith in [Synchrony's] Credit Guidance*";

- An analyst for BMO Capital Markets also wrote on April 28, 2017 that Synchrony's performance was not the result of widespread economic conditions, given that the "economic environment continues to support positive fundamental consumer credit trends";

- Deutsche Bank agreed, writing in its April 28, 2017 note that "we are still positive on the US consumer" and noting that Synchrony's management "has been tightening underwriting since 2H16 and a bit more in 2017";

- Stephens (First Look) reported on April 28, 2017, "Our positive view on SYF relies partially on our opinion that SYF credit losses should be better than card peers; this was not the case this quarter";

- J.P. Morgan wrote on April 28, 2018:  "It will take time for investors to digest today's events and for management to restore confidence";

- On May 1, 2017, Barclays reported that Synchrony's "Disappointing Quarter on Big NCO [Net Charge-Off] Miss Undermines Faith in Credit Guidance."  It added, "SYF reported a big 1Q17 miss as *credit came in much worse than expected* causing management to significantly raise *2017 NCO guidance less than 3 months after establishing it*.  This is the second swing and miss on credit guidance in less than a year, badly bruising management's credibility on its credit forecasting";

- Similarly, BTIG wrote on May 1 that "SYF's 1Q17 result was *particularly surprising* as it represented the company's first earnings miss following ten consecutive quarters of beats"; and

- Also on May 1, 2017, Compass Point reported that:  "The earnings shortfall reflected a much larger reserve build than anticipated" and "[l]onger-term, management will need to regain credibility with the investment community and the

71

credit outlook [and] become more transparent to investors."  It added that, "[w]ith two disappointments in the last 10-11 months, management clearly needs to rebuild its credibility with the investment community" and "it will take quite a bit of time" to do so.

**B.    The True Scope of the Underwriting Changes and Their Negative Impact on Synchrony's Walmart Partnership**

239.    On July 12, 2018, multiple media sources reported that Walmart was considering moving its branded credit card business from Synchrony to Capital One and Synchrony confirmed that news that afternoon.  Citing confidential sources, the *Wall Street Journal* stated that Walmart was dissatisfied with the Company because it "***want[ed] Synchrony to approve a higher percentage of applicants***," that Walmart executives believed that Synchrony "is keeping too much of the cards' revenue," and the executives "aired those concerns in a meeting with Synchrony's board last year."  As shown in the chart below, as a result of this news, and on unusually high trading volume, the price of Synchrony's common stock fell $1.84, or 5.3%, from a closing price of $34.80 on July 11, 2018, to close at $32.96 on July 12, 2018:



72

240.    No other adverse, Company-specific news entered the market on July 12, 2018, and thus the entirety of Synchrony's stock price decline that day is attributable to the undisclosed material facts concerning the Walmart relationship that Synchrony had kept from investors and which the *Wall Street Journal* reported on July 12.

241.    Upon this news, analysts were pessimistic about Synchrony's ability to salvage its relationship with Walmart.  The Buckingham Research Group wrote on July 12, 2018, "[W]e clearly feel less optimistic about SYF's chances of retaining the long-standing relationship. . . . [W]e are clearly more concerned following this leaked info . . . [and] the uncertainty will continue to weigh on the shares."   CFRA's analyst similarly wrote on July 12, "We think there is a substantial chance [Walmart] ultimately moves its business . . .  SYF's loss of [Walmart] would be significant given [Walmart] accounts for more than 10% of SYF's revenue.  This increases risks to SYF and adds to our sell thesis."

242.    Next, on July 26, 2018, several media outlets reported that Walmart had selected Capital One for its store-brand cards, ending its close to 20-year relationship with Synchrony.  According to the *Wall Street Journal*'s reporting, people familiar with the companies' relationship explained that Walmart executives believed Synchrony was keeping too much of the card revenue in the partnership.  In addition, the *Wall Street Journal* reported that Walmart wanted Synchrony to approve a higher percentage of its card applicants.  As shown in the chart below, as a result of this disclosure, and on unusually high trading volume, Synchrony stock fell $3.44 per share, or 10.3%, from a closing price of $33.44 on July 25, 2018, to a closing price of $30.00 on July 26, 2018 and continued to decline in the following days:



243. No other adverse, Company-specific news entered the market on July 26, 2018, and thus the entirety of Synchrony's stock price decline that day is attributable to the undisclosed material facts concerning the Walmart relationship that Synchrony had kept from investors and which the media reported on July 26. Indeed, a Barclays analyst wrote about the July 26, 2018 stock price movement, "Yesterday SYF [Synchrony] announced that Walmart decided not to renew its existing partnership with SYF and ended its 20-year relationship, driving shares down 10.3% (vs. -0.30% SPX on 7/26/2018) after the news broke late in the trading day." J.P. Morgan similarly wrote on July 27, 2018 that "We believe that in the near term, SYF will **continue to be driven** by the loss of the Walmart contract."

244. Analysts expressed disappointment following Walmart's announcement that it had chosen Capital One for its retail card business and worried about what the news portended for Synchrony moving forward:

- On July 27, 2018, RBC Capital Markets described the news as a "**surprise**";

- On July 27, 2018, an analyst for BMO Capital Markets, which lowered its target price for Synchrony stock from $51 to $37, wrote, "Losing [Walmart] intensified concerns regarding future renewals";

- A JMP Securities analyst agreed, writing on July 27, 2018, "The takeaway by Capital One may raise the perceived risk assessment of other large programs in the portfolio" and wondered if Synchrony's previously-disclosed decision to acquire PayPal's credit portfolio for $7 billion on July 3, 2018 "may have been partially driven by an assessment of increased risk to the Walmart renewal";

- In a July 28, 2018 report, CFRA wrote that the loss of Walmart will be a persistent "negative overhang" for Synchrony;

- An analyst for Oppenheimer wrote on July 27, 2018 that, despite Synchrony's report of otherwise good results, "[T]his was swamped by announcing they weren't renewing the [Walmart] partnership.  This has been a major investors' concern as top five partners represent 49%/53% of the loan book/interest income.  So what now? We think the stock is likely stuck at this point . . . it's very unlikely that the transition will be smooth and the idea that not renewing the partnership will be accretive to EPS near term seems highly optimistic."

245.    In advance of Synchrony's July 27, 2018 earnings call, analysts commented that investors' and analysts' focus would be on Synchrony's commentary concerning the Walmart termination.  That day:

- Stephens (First Look) reported, "***All eyes will likely be on Walmart discussion***," "***we don't think retailers like sales volume slowdown and tightening underwriting***," and "credit improvements we've seen at SYF may disappoint retailers who push for more sales volume";

- UBS wrote that "We will be looking for additional commentary on loss of the WMT [Walmart] partnership";

- Jefferies reported that although Synchrony had had a "Good Quarter," the focus during Synchrony's July 27, 2018 earnings call would be on the Walmart transition; and

- Morgan Stanley wrote "Expect call to be dominated by discussion of Walmart and SYF's strategic options," and its "Key Questions for the Call" included "***Color on underwriting standards***."

246.    On Synchrony's July 27, 2018 earnings call, Defendant Doubles discussed Walmart's decision not to renew its partnership with Synchrony and stated that the Walmart

"program was somewhat unique in terms of the profile," which "became a challenge for us from an economic standpoint," and that in the case of Walmart, "we just weren't able to earn a return that was in line with the *credit risk* of the portfolio."  On the call, an analyst asked Doubles if Walmart's decision to not renew its agreement with Synchrony was a result of Synchrony not tightening underwriting "around the Walmart program."  Doubles responded, "No.  I would not assume that," because the "credit actions" that Synchrony had taken to tighten underwriting were "*applied across pretty much [the] entire business*."  On July 27, 2018, the price of Synchrony stock further declined from an open of $30.57 to close at $29.92.

247.    On July 30, 2018, Barclays downgraded Synchrony and removed the Company as a "Top Pick," writing that "incumbency . . . is not as big of a moat as we thought" and that "the overhang could quash any hope of a multiple re-rating over the next year plus . . . ."  The Barclays analyst also wrote that he "did not walk away" from the July 27, 2018 earnings call "particularly comforted by [Synchrony's] explanations [for why Walmart ended the relationship], nor did we feel the company adequately addressed concerns around future renewal uncertainties."  On July 30, 2018, Compass Point wrote, "Favorable Q2 Trends Overshadowed by Loss of Walmart."

248.    Finally, on November 1, 2018, Walmart filed a lawsuit against Synchrony in federal court in Arkansas alleging that the Company intentionally underwrote the Walmart/Synchrony credit card program in a way that exposes the program to significant unique credit risk and harmed Walmart.  The complaint alleged that Walmart was seeking damages "in an amount . . . estimated to be no less than $800 million."  This disclosure further revealed to investors that Walmart terminated its relationship with Synchrony because of serious underlying problems in their partnership.

249.    As shown in the chart below, as a result of this disclosure, and on unusually high trading volume, Synchrony shares declined by $3.01 or over 10%:



250.    No other adverse, Company-specific news entered the market on November 1, 2018, and thus the entirety of Synchrony's stock price decline that day is attributable to the undisclosed material facts concerning the Walmart relationship that Synchrony had kept from investors and which the were reported on November 1, 2018.

251.    Market commentators and analysts explicitly linked the allegations in Walmart's complaint to Synchrony's changing its underwriting standards and Walmart's complaints about those changes.  For instance, the *Wall Street Journal* reported on November 1, 2018:

> The lawsuit, which is heavily redacted, refers to two types of cards that Synchrony issues:  those that can be used only at a specific merchant—in this case, Walmart—and co-branded cards that carry the Walmart name and can used at most other merchants.

> Loan losses on Walmart cards increased after Synchrony converted some consumers who had Walmart store-only credit cards to Walmart co-branded cards, according to people familiar with the matter. Much of that

activity occurred roughly between 2011 and late 2016, one of the people said. Synchrony converted those cards in part to boost card usage and revenue, but losses increased and ate into the revenue Walmart expected to receive, the person said. As of this spring, loan losses stood at around 9% of outstanding balances on the Walmart cards, the person said.

252.    Similarly, an article in the *Arkansas Democrat Gazette* on November 3, 2018 reported, "The document states that Synchrony has admitted 'it applied to Walmart its business strategy of underwriting programs differently depending on profitability'; and that it took on more credit risk in its Walmart portfolio than is usual 'because it believed the Walmart contract gave Synchrony "acceptable return" for that risk,' then balked in renewal discussions when it appeared Synchrony would not be able to maintain that level of acceptable return under the new contract terms." The *Motley Fool* also reported on November 8, 2018, "Walmart is claiming that Synchrony didn't use great underwriting standards when approving people for their co-branded card, and it resulted in higher than expected losses, and therefore lower income for Walmart than they were promised with the deal."

253.    In an analyst note on November 2, 2018, JMP Securities explained that Walmart's lawsuit sought damages from Synchrony for "allegedly causing financial harm to the retailer as a result of poor underwriting that led to excessive credit losses in the Walmart co-branded portfolio." Similarly, on November 5, 2018, BTIG explained that Walmart's lawsuit "accused SYF of breaching its contract with the retailer by improperly extending credit to risky customers which had resulted in higher credit losses." Morningstar's analyst explained in a November 2, 2018 note, "Though we still think Capital One's technology advantage played a key role in wooing Walmart, this lawsuit would suggest that the decision didn't come down to solely technology as it appears *the underwriting was problematic*."

254.    Analysts reacted negatively to the news of Walmart's lawsuit against Synchrony and its general implications for Synchrony's business.  On November 2, 2018, Morningstar's

analyst wrote that: "We are finding it harder and harder to trust Synchrony's management team and at this point would appreciate greater candor from the company.  We're not ready to downgrade the company's stewardship to poor, but after today's lawsuit and the apparent mishandling of its largest retail relationship, we're getting closer."   RBC Capital Markets agreed, writing in a November 2, 2018 analyst report that Walmart and Synchrony apparently had a "contemptuous relationship."

## VII.   PRESUMPTION OF RELIANCE

255.   At all relevant times, the market for Synchrony common stock was efficient for the following reasons, among others:

(a)   Synchrony stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, Synchrony filed periodic public reports with the SEC and NYSE;

(c)   Synchrony regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Synchrony was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

79

256.    As a result of the foregoing, the market for Synchrony common stock promptly digested current information regarding Synchrony from all publicly available sources and reflected such information in the price of Synchrony stock.  Under these circumstances, all purchasers of Synchrony stock within the defined Class during the Class Period suffered similar injury through their purchase of Synchrony stock at artificially inflated prices and the presumption of reliance applies.

257.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Synchrony's reserves, charge-offs, net earnings, Synchrony's Retail Card segment, underwriting and relationships with its retail partners (including Walmart) – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Synchrony's underwriting, private-label card business and the Walmart account, as set forth above, that requirement is satisfied here.

## VIII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

258.    Synchrony's "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

259.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Synchrony who knew that the statement was false, and/or the statement omitted material adverse

information whose disclosure was necessary to render the statement not misleading.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## IX.    SUMMARY OF SCIENTER ALLEGATIONS

260.    As alleged herein, numerous facts give rise to the strong inference that, throughout the Class Period, the Synchrony Defendants knew or recklessly disregarded that their statements and omissions, as set forth in Section V. above were materially false and misleading when made. The information in this section summarizes certain of the allegations—that are set forth more fully above—that detail the Synchrony Defendants' scienter.  All of these allegations must be considered holistically in evaluating Defendants' scienter.  The cumulative knowledge of all members of Synchrony's senior management team, including the Exchange Act Individual Defendants, regarding the matters addressed herein is properly imputed to Synchrony.

### A.    Underwriting Credit Card Loans Was Synchrony's Core Operation

261.    The topic of Synchrony's underwriting practices formed the basis of several of Defendants' misstatements and omissions, and the fact that the Company's underwriting of credit card loans was a core operation of Synchrony's business and critical to Synchrony's financial success supports Synchrony Defendants' scienter.

262.    As a consumer financial services business that provides credit products to customers, Synchrony underwrites credit card loans, and Synchrony's executives, particularly Defendants Keane and Doubles, held themselves out as knowledgeable about the Company's

underwriting practices, changes to those underwriting practices, or the purported lack of change to those underwriting practices.

263.    Defendants Keane and Doubles also held themselves out as knowledgeable about Synchrony's partners' not pushing back on Synchrony credit decisions when it made changes to its underwriting practices.  As just one example, Defendant Doubles stated in December 2016, "I think importantly, we're not seeing anything right now that tells us to change our underwriting. We're always making tweaks and refinements and modifying the model a little bit, but we still really like how we're underwriting today, we like the risk-adjusted yields.  When we look at those and I think that's an important part of how we underwrite, it's easy to underwrite to a positive return today in this kind of environment."

264.    Keane stated similarly in January 2018, "I think our partners are very cognizant of the fact that they don't want to put credit in the hands of people that can't handle it, and we work very closely with them. In many cases, almost all cases, their names are on the cards.  So we work very closely with them, and *we are not getting any pushback on credit*."  As such, either Defendants Keane and Doubles made these statements knowing that they were false, or they made them with severe recklessness of the truth – that retail partners, including Walmart, were pushing back on Synchrony's tightened underwriting and decreased credit approvals.

265.    Despite Defendants Keane and Doubles' statements to the contrary, Synchrony made broad-based and significant changes to its underwriting practices, starting in the second half of 2016.  Although Keane and Doubles stated that these changes were mere "refinements," they were, in fact, so substantial that they resulted in significant reductions in the number of Synchrony's near-prime and subprime customers that Synchrony was considering for credit card approvals.

266.    Because Walmart focused its business particularly on customers with lower incomes and subprime credit, Synchrony knew or recklessly disregarded that reducing the number of subprime customers it approved for credit cards was negatively impacting Walmart's business—and thus negatively impacting the relationship between Walmart and Synchrony.

267.    In addition, because underwriting loans was a core component of Synchrony's business, Synchrony monitored customer delinquency and defaults in detail, further supporting Defendants' knowledge of the truth about the Company's underwriting standards and those standards' effect on Synchrony's business and relationships.

268.    Company executives, including Defendants Keane and Doubles, were aware of the reports that contained delinquency and default information.  According to FE8, Synchrony tracked 30-, 60-, and 90-day defaults and generated "Quarterly Assessment" reports containing those metrics.  FE8 stated that Synchrony reviewed the Quarterly Assessments as part of the Company's quarterly town hall meetings, which Quindlen and other Company executives attended via live video feed.  Keane often addressed Synchrony employees via live video feed before the quarterly town hall meetings began.

269.    Similarly, FE5 explained that Synchrony tracked 60-, 90-, and 120-day delinquencies and generated reports detailing the same.  FE5 stated that, in his role managing Synchrony's commercial clients, he received delinquency reports because his group tracked losses, reported the pertinent information to the risk function, and performed the final write-off when an account reached 180-days past due.  At that point, when Synchrony could no longer keep the account on its books, the account was shut off, written off, and transferred to the relevant financial group.  FE5 stated that he ran delinquency reports monthly, at minimum, but essentially monitored delinquencies on a daily and weekly basis.  His group compiled delinquency reports – using data

extrapolated from the Company's systems—every month for each delinquency bucket (60-, 90-, and 120-days, in addition to write-offs).  These reports were then posted to an internal Company shared drive for other employees and managers to view.  FE5 stated that there were occasionally meetings to discuss the delinquency reports—and more general performance-related issues—in more detail.

### B. The Walmart Partnership Was Critically Important to Synchrony's Business

270.     The topic of the Walmart partnership formed the basis of several of Defendants' misstatements and omissions, and the critical importance of that partnership to Synchrony's financial success supports an inference of the Synchrony Defendants' scienter.

271.     Walmart, the nation's largest retailer, was one of Synchrony's oldest retail partners and, until Walmart ended the partnership, it was one of Synchrony's most profitable and important partners.  The relationship began in 1999, and it was so significant that Synchrony maintained an office in Bentonville, Arkansas—the location of Walmart's headquarters—to service the partnership as closely as possible.

272.     As of the end of 2017, the Walmart partnership accounted for more than 10% of the total interest and fees on Synchrony loans and as of early 2019, the size of the Walmart portfolio was approximately $9 billion.

273.     Since 1993, Synchrony has maintained a separate, but also extremely valuable, relationship with Walmart's subsidiary company, Sam's Club.  Sam's Club is one of Synchrony's top five largest partnerships, and as of the end of 2018, Synchrony's top five partnerships accounted for 44% of the Company's total interest and fees on loans and 44% of its loan receivables.  Because of the magnitude of the Walmart and Sam's Club portfolios, Synchrony's senior executives were necessarily focused on maintaining those relationships.

### C. Defendants Were Aware that Walmart Was Unsatisfied with Synchrony's Tightened Underwriting Standards and Was Considering Replacing Synchrony

#### 1. Walmart Issued a Request for Proposals to Synchrony and Other Banks

274.    By late 2017, Walmart issued a request for proposals from financial institutions for its retail credit card business, indicating that Walmart was considering taking its retail card business to another bank and thus that Synchrony was at risk of losing Walmart's business.  Along with several other financial institutions, Synchrony received Walmart's request for proposals, so Synchrony was aware that Walmart was considering replacing Synchrony with another bank.  The request for proposals put the Company on notice that Walmart was exploring other options for its retail card business and makes clear that Synchrony could not have been confident that Walmart would renew its partnership with Synchrony for another term.

#### 2. Walmart Began Partnering with Other Financial Institutions for Its Consumer Finance Business

275.    Walmart's desire for more lenient underwriting standards and increased approvals is further reflected in the negotiations that took place in the summer of 2017 with Affirm, Inc., a startup financing firm.  Affirm specializes in offering small installment loans to less creditworthy individuals.

276.    As discussed above, on August 22, 2017, the *Wall Street Journal* reported that the talks between Walmart and Affirm, including for Affirm to offer installment loans to Walmart customers were "the latest sign of retailers' desire to reach new customers with limited credit histories, and of the intensifying competition facing credit-card providers such as Synchrony Financial."  The *Wall Street Journal* article added that "Affirm's loans are often geared to people who don't have enough of a borrowing history to get a credit card," that "Affirm's loans will be largely geared to costlier Walmart items like tires and other purchases over $200" and that "many

retailers, under pressure from online competition, are seeking to expand their customers' access to financing as a way to boost sales."

277.    In addition, in an attempt to encourage Synchrony to increase its approval rates, Walmart introduced Synchrony to the financial technology firm ZestFinance, which utilizes automated machine learning to "transform . . . underwrit[ing]."  ZestFinance claims that its software allows retailers to "identify millions of new creditworthy borrowers," causing an "increase in approval rates with no increase in defaults."  According to the *Wall Street Journal*, ZestFinance helps lenders to approve customers whom they would otherwise have denied.

### 3.    Negotiations Between Walmart And Synchrony to Renew the Partnership Faltered

278.    The agreement between Walmart and Synchrony was set to expire on July 31, 2019. Synchrony typically begins negotiations to renew its contracts with its retail partners approximately two years before those contracts are set to expire.  As such, by mid-2017, Synchrony and Walmart were engaged in discussions about renewing their partnership agreement.  In the Fall of 2017, Walmart "balked" at renewing the Synchrony contract.  Specifically, Walmart was frustrated that Synchrony tightened its underwriting standards and, as a result, approved fewer Walmart customers for credit cards.  Walmart was also concerned that Synchrony was keeping too much of the revenue from the Walmart-branded credit cards under Walmart and Synchrony's RSA.

279.    In late 2017, Walmart executives also expressed their dissatisfaction with the partnership directly to Synchrony's Board of Directors, of which Defendant Keane was a member.

### 4.    The Exchange Act Individual Defendants Were Intimately Involved in Attempts to Salvage the Walmart Relationship

280.    Defendants Keane, Doubles, and Quindlen were intimately involved in servicing the Walmart relationship, and they were equally involved in attempts to salvage the relationship when it appeared to be at risk of failure.

281.    Defendants Doubles, Keane, and Quindlen were also all involved in renewing Synchrony's partnership contract and personally involved in, or kept up to speed on, the negotiations that were a part of that process.

282.    According to FE11, during Synchrony's national sales meeting at the end of January 2018, Defendants Keane and Quindlen spoke to attendees about the Walmart relationship within the context of Synchrony's efforts to renew the Walmart contract, and gave an overview of Synchrony's strategy with Walmart.

283.    Keane and Doubles also spoke repeatedly during the Class Period about Synchrony's partnership with Walmart, including the details of how the negotiations between Synchrony and Walmart broke down.  This included Keane's statements on July 27, 2018 that "Last year, we began discussions with Walmart about renewing our relationship" and "[a]lthough we competed aggressively to renew the program, we were unable to reach terms that would have made economic sense for our company."  Doubles also claimed on July 27, 2018 that "In the renewal discussions, it became clear that we weren't . . . going to be able to maintain that acceptable level of return for the risk that we are taking."  Quindlen was also quoted in a pre-Class Period Synchrony press release concerning a new loyalty program for Synchrony's Walmart Credit Card and Walmart MasterCard, stating that "We work closely with Walmart to meet the evolving needs of their customers."

284.    According to former employees of Synchrony, Defendants Keane and Quindlen increased their travel to Walmart's Arkansas headquarters significantly in 2017, after it became clear that Walmart was considering bringing its retail card business to another bank.  FE6 stated that, because Arkansas was part of his territory, he was aware of the frequency of the Synchrony

executives' trips to Walmart, and he saw that Keane and Quindlen visited Bentonville frequently between April and June of 2017.

285.    FE9 similarly stated that Keane's trips to Walmart increased dramatically in 2017. He explained that, while Keane had always been involved with managing the Walmart relationship, her calls and trips to Walmart increased in the middle of 2017 through the first half of 2018.  FE9 estimated that during this period, Keane visited Arkansas approximately once every month, whereas before mid-2017, she visited once a year.  FE3 knew that Doubles was spending a significant amount of time in Arkansas because several meetings that he was supposed to attend with Doubles and other executives were cancelled due to Doubles' travel to Bentonville.

### D.    Defendants Keane, Doubles, and Quindlen Engaged in Suspiciously Timed Insider Stock Sales

286.    Defendants Keane, Doubles, and Quindlen engaged in substantial insider stock sales during the Class Period, the timing of which provides additional evidence in support of an inference of scienter.  Defendants' insider sales are suspicious because Defendants realized substantial financial benefits while they and the Company were concealing and misrepresenting the truth about Synchrony's financial health, underwriting and confidence in the security of its retail partnerships.

287.    As shown in the chart below, Defendants' stock sales were nearly non-existent in the two-year control period prior to the Class Period.  Defendants Keane and Doubles began selling shares of Synchrony stock in earnest in late 2016 and early 2017, after Synchrony recognized its deteriorating portfolio quality and need to tighten underwriting.



288.    Defendants Keane, Doubles, and Quindlen continued selling substantial amounts of Synchrony stock in January 2018, after Walmart "balked" at renewing its contract with Synchrony and after Walmart voiced its dissatisfaction with the partnership to Synchrony's Board of Directors.   Then, Defendants Keane, Doubles, and Quindlen sold more Synchrony shares in May 2018, two months before Walmart officially ended its partnership with Synchrony.   Given the fact that Defendants Keane, Doubles, and Quindlen were heavily involved in the negotiations surrounding the renewal of the Walmart partnership, these Defendants were in possession of material non-public information about the state of the relationship and whether or not the partnership would be renewed.   As such, Keane, Doubles, and Quindlen's stock sales two months prior to Walmart's terminating the partnership were suspiciously timed, which further supports an inference of scienter.

89

### 1.      Defendant Keane's Insider Sales

289.      Defendant Keane sold over $2.26 million of her shares of Synchrony common stock during the Class Period.  In particular, Defendant Keane sold shares on February 28, 2017, two months before Synchrony's April 28, 2017 announcement of its disappointing financial results for the first quarter of 2017 and its partial disclosure that it had tightened its underwriting standards. Defendant Keane also sold shares in 2018 while in possession of material, non-public information regarding the truth about Synchrony's relationship with Walmart—and the fact that that relationship would not be renewed for another term.  Defendant Keane issued materially false and misleading statements about her confidence in Synchrony's partnerships, including the Walmart relationship, and stated unequivocally that Synchrony was receiving no "pushback" from its retail partners about the changes to its underwriting practices—despite being well aware of Walmart's dissatisfaction with Synchrony's lowered credit approvals.

290.      Defendant Keane's insider sales of her shares of Synchrony common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds | Exercise Price | Net Proceeds | *10b5-1 Plan Adoption Date* |
|---|---|---|---|---|---|---|---|
| KEANE, MARGARET | 11/09/16 | 2,000 | $30.00 | $60,000 | $0.00 | $60,000 | 02/23/16 |
| KEANE, MARGARET | 11/22/16 | 6,000 | $34.00 | $204,000 | $24.55 | $56,700 | 02/23/16 |
| KEANE, MARGARET | 02/28/17 | 9,000 | $36.13 | $325,170 | $24.55 | $104,220 | 11/22/16 |
| KEANE, MARGARET | 02/28/17 | 2,500 | $36.13 | $90,325 | $0.00 | $90,325 | 11/22/16 |
| KEANE, MARGARET | 02/15/18 | 13,138 | $36.70 | $482,165 | $0.00 | $482,165 | 11/17/17 |
| KEANE, MARGARET | 02/15/18 | 11,610 | $36.70 | $426,087 | $24.55 | $141,062 | 11/17/17 |
| KEANE, MARGARET | 05/01/18 | 20,496 | $32.89 | $674,113 | $0.00 | $674,113 | 11/17/17 |
| **Total** | | **64,744** | | **$2,261,860** | | **$1,608,585** | |

291.      On November 9, 2016, Defendant Keane sold 3.2% of the vested shares and options of the Synchrony common stock she held.  On November 22, 2016, Defendant Keane sold 10% of

the vested shares and options of the Synchrony common stock she held.  On February 28, 2017, Defendant Keane sold 21.2% of the vested shares and options of the Synchrony common stock she held.  On February 15, 2018, Defendant Keane sold 22% of the of the vested shares and options of the Synchrony common stock she held.  On May 1, 2018, Defendant Keane sold 11.1% of the vested shares and options of the Synchrony common stock she held.

## 2. Defendant Doubles' Insider Sales

292.  Defendant Doubles also sold significant amounts of his shares of Synchrony common stock during the Class Period.  He sold over $1.175 million of his vested shares and options of Synchrony common stock while he was in possession of material non-public information regarding the truth about Synchrony's financial health.  In particular, Defendant Doubles sold shares on February 28, 2017, two months before Synchrony's April 28, 2017 announcement of its disappointing financial results for the first quarter of 2017 and its partial announcement that it had tightened its underwriting standards.  Defendant Doubles also sold shares in 2018 while in possession of material, non-public information regarding the truth about Synchrony's relationship with Walmart—and the fact that that relationship would not be renewed.

293.  Defendant Doubles' insider sales of his vested shares and options of Synchrony common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds | Exercise Price | Net Proceeds | 10b5-1 Plan Adoption Date |
|---|---|---|---|---|---|---|---|
| DOUBLES, BRIAN | 11/09/16 | 2,000 | $30.00 | $60,000 | $0.00 | $60,000 | 02/23/16 |
| DOUBLES, BRIAN | 11/22/16 | 6,000 | $34.00 | $204,000 | $24.55 | $56,700 | 02/23/16 |
| DOUBLES, BRIAN | 02/28/17 | 5,609 | $36.13 | $202,653 | $24.55 | $64,952 | 11/22/16 |
| DOUBLES, BRIAN | 02/28/17 | 2,500 | $36.13 | $90,325 | $0.00 | $90,325 | 11/22/16 |
| DOUBLES, BRIAN | 02/15/18 | 6,569 | $36.70 | $241,082 | $0.00 | $241,082 | 11/17/17 |
| DOUBLES, BRIAN | 02/15/18 | 5,805 | $36.70 | $213,044 | $24.55 | $70,531 | 11/17/17 |
| DOUBLES, BRIAN | 05/01/18 | 4,994 | $32.87 | $164,153 | $0.00 | $164,153 | 11/17/17 |
| **Total** | | **33,477** | | **$1,175,257** | | **$747,743** | |

294.    On November 9, 2016, Defendant Doubles sold 9.2% of the vested shares and options of the Synchrony common stock he held.  On November 22, 2016, Defendant Doubles sold 30.2% of the vested shares and options of the Synchrony common stock he held.  On February 28, 2017, Defendant Doubles sold 58.6% of the vested shares and options of the Synchrony common stock he held.  On February 15, 2018, Defendant Doubles sold 46.6% of the vested shares and options of the Synchrony common stock he held.  On May 1, 2018, Defendant Doubles sold 12.2% of the vested shares and options of the Synchrony common stock he held.

### 3.    Defendant Quindlen's Insider Sales

295.    In addition, Defendant Quindlen sold significant amounts of his shares of Synchrony common stock during the Class Period.  He sold over $1.72 million of his shares of Synchrony common stock while he was in possession of material non-public information regarding the truth about Synchrony's relationship with Walmart—and the fact that the relationship would not be renewed for another term.  Significantly, Defendant Quindlen entered on November 20, 2017 into a Rule 10b5-1 plan—for the first time ever—to sell Synchrony stock.  His entry into this plan, which allowed him to sell stock in February and May 2018, occurred simultaneously with Walmart's "balking" at renewing its contract with Synchrony.

296.    Defendant Quindlen's insider sales of his vested shares and options of Synchrony common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds | Exercise Price | Net Proceeds | 10b5-1 Plan Adoption Date |
|---|---|---|---|---|---|---|---|
| QUINDLEN, THOMAS | 02/20/18 | 10,712 | $36.73 | $393,452 | $0.00 | $393,452 | 11/20/17 |
| QUINDLEN, THOMAS | 02/20/18 | 9,578 | $36.73 | $351,800 | $24.55 | $116,660 | 11/20/17 |
| QUINDLEN, THOMAS | 02/20/18 | 3,082 | $36.72 | $113,171 | $29.33 | $22,776 | 11/20/17 |
| QUINDLEN, THOMAS | 02/21/18 | 4,560 | $37.00 | $168,720 | $30.41 | $30,050 | 11/20/17 |
| QUINDLEN, THOMAS | 05/01/18 | 9,577 | $32.89 | $314,988 | $24.55 | $79,872 | 11/20/17 |
| QUINDLEN, THOMAS | 05/01/18 | 8,195 | $32.89 | $269,534 | $0.00 | $269,534 | 11/20/17 |
| QUINDLEN, THOMAS | 05/22/18 | 3,082 | $36.00 | $110,952 | $29.33 | $20,557 | 11/20/17 |
| **Total** | | **48,786** | | **$1,722,616** | | **$932,901** | |

297.    On February 20, 2018, Defendant Quindlen sold 48.3% of the vested shares and options of the Synchrony common stock he held.  On February 21, 2018, Defendant Quindlen sold 18.3% of the vested shares and options of the Synchrony common stock he held.  On May 1, 2018, Defendant Quindlen sold 41.9% of the vested shares and options of Synchrony common stock he held.  On May 22, 2018, Defendant Quindlen sold 12.5% of the vested shares and options of the Synchrony common stock he held.

## X.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF
**For Violation of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Thereunder
(Against the Exchange Act Individual Defendants)**

298.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

299.    During the Class Period, Defendants Synchrony, Keane, Doubles and Quindlen carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause economic harm to Plaintiffs and other members of the Class.

300.    Defendants Synchrony, Keane, Doubles and Quindlen: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

301.    Defendants Synchrony, Keane, Doubles and Quindlen, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

302.    During the Class Period, Defendants Synchrony, Keane and Doubles made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

303.    During the Class Period, Defendants Keane, Doubles and Quindlen sold Synchrony common stock while in possession of material, nonpublic information about the Company's underwriting standards and practices, and its relationships with its retail partners, which gave rise to a duty to disclose the material adverse facts set forth herein or abstain from trading, which Defendants Keane, Doubles and Quindlen failed to do.

304.    Defendants Synchrony, Keane, Doubles and Quindlen had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants Synchrony, Keane, Doubles and Quindlen

engaged in this misconduct to conceal Synchrony's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

305.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Synchrony stock and were harmed when the truth about Synchrony negatively impacted the price of those securities.  Plaintiffs and the Class would not have purchased Synchrony stock at the prices they paid, or at all, had they been aware of the truth about Synchrony.

306.    As a direct and proximate result of Defendants Synchrony, Keane, Doubles and Quindlen's wrongful conduct, Plaintiff and the other members of the Class suffered harm in connection with their respective purchases of the Company's stock during the Class Period.

307.    By virtue of the foregoing, Defendants Synchrony, Keane, Doubles and Quindlen violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**SECOND CLAIM FOR RELIEF**
**For Violation of Section 20A of the Exchange Act**
**(Against the Exchange Act Individual Defendants)**

308.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

309.    As set forth in the paragraphs above and below, Defendants Keane, Doubles and Quindlen committed underlying violations of Section 10(b) and Rule 10b-5 promulgated thereunder by selling Synchrony common stock while in possession of material, nonpublic information about the Company's underwriting standards and practices, and its relationships with its retail partners.  Consequently, they are liable to contemporaneous purchasers of that stock under Section 20A of the Exchange Act.

310.    While Synchrony's securities traded at artificially inflated and distorted prices, Defendants Keane, Doubles and Quindlen personally profited by selling a total of 150,007 shares of Synchrony common stock while in possession of adverse, material non-public information about Synchrony, pocketing over $5.159 million in illegal insider trading proceeds.

311.    Under Section 20A of the Exchange Act, "[a]ny person who violates any provision of this title or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class." 15 U.S.C. §78t-1(a).

312.    Defendant Keane's insider sales of her vested shares and options of Synchrony common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds | Exercise Price | Net Proceeds | 10b5-1 Plan Adoption Date |
|---|---|---|---|---|---|---|---|
| KEANE, MARGARET | 11/09/16 | 2,000 | $30.00 | $60,000 | $0.00 | $60,000 | 02/23/16 |
| KEANE, MARGARET | 11/22/16 | 6,000 | $34.00 | $204,000 | $24.55 | $56,700 | 02/23/16 |
| KEANE, MARGARET | 02/28/17 | 9,000 | $36.13 | $325,170 | $24.55 | $104,220 | 11/22/16 |
| KEANE, MARGARET | 02/28/17 | 2,500 | $36.13 | $90,325 | $0.00 | $90,325 | 11/22/16 |
| KEANE, MARGARET | 02/15/18 | 13,138 | $36.70 | $482,165 | $0.00 | $482,165 | 11/17/17 |
| KEANE, MARGARET | 02/15/18 | 11,610 | $36.70 | $426,087 | $24.55 | $141,062 | 11/17/17 |
| KEANE, MARGARET | 05/01/18 | 20,496 | $32.89 | $674,113 | $0.00 | $674,113 | 11/17/17 |
| **Total** | | **64,744** | | **$2,261,860** | | **$1,608,585** | |

313.    Defendant Doubles' insider sales of his vested shares and options of Synchrony common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds | Exercise Price | Net Proceeds | *10b5-1 Plan Adoption Date* |
|---|---|---|---|---|---|---|---|
| DOUBLES, BRIAN | 11/09/16 | 2,000 | $30.00 | $60,000 | $0.00 | $60,000 | 02/23/16 |
| DOUBLES, BRIAN | 11/22/16 | 6,000 | $34.00 | $204,000 | $24.55 | $56,700 | 02/23/16 |
| DOUBLES, BRIAN | 02/28/17 | 5,609 | $36.13 | $202,653 | $24.55 | $64,952 | 11/22/16 |
| DOUBLES, BRIAN | 02/28/17 | 2,500 | $36.13 | $90,325 | $0.00 | $90,325 | 11/22/16 |
| DOUBLES, BRIAN | 02/15/18 | 6,569 | $36.70 | $241,082 | $0.00 | $241,082 | 11/17/17 |
| DOUBLES, BRIAN | 02/15/18 | 5,805 | $36.70 | $213,044 | $24.55 | $70,531 | 11/17/17 |
| DOUBLES, BRIAN | 05/01/18 | 4,994 | $32.87 | $164,153 | $0.00 | $164,153 | 11/17/17 |
| **Total** | | **33,477** | | **$1,175,257** | | **$747,743** | |

314.    Defendant Quindlen's insider sales of his vested shares and options of Synchrony common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds | Exercise Price | Net Proceeds | *10b5-1 Plan Adoption Date* |
|---|---|---|---|---|---|---|---|
| QUINDLEN, THOMAS | 02/20/18 | 10,712 | $36.73 | $393,452 | $0.00 | $393,452 | 11/20/17 |
| QUINDLEN, THOMAS | 02/20/18 | 9,578 | $36.73 | $351,800 | $24.55 | $116,660 | 11/20/17 |
| QUINDLEN, THOMAS | 02/20/18 | 3,082 | $36.72 | $113,171 | $29.33 | $22,776 | 11/20/17 |
| QUINDLEN, THOMAS | 02/21/18 | 4,560 | $37.00 | $168,720 | $30.41 | $30,050 | 11/20/17 |
| QUINDLEN, THOMAS | 05/01/18 | 9,577 | $32.89 | $314,988 | $24.55 | $79,872 | 11/20/17 |
| QUINDLEN, THOMAS | 05/01/18 | 8,195 | $32.89 | $269,534 | $0.00 | $269,534 | 11/20/17 |
| QUINDLEN, THOMAS | 05/22/18 | 3,082 | $36.00 | $110,952 | $29.33 | $20,557 | 11/20/17 |
| **Total** | | **48,786** | | **$1,722,616** | | **$932,901** | |

315.    Contemporaneously with the Exchange Act Individual Defendants' insider sales, Lead Plaintiff APG purchased a total of 782,580 shares of Synchrony common stock for a total of more than $27,203,065 between November 9, 2016 and May 1, 2018.  Lead Plaintiff's and Class members' contemporaneous purchases included:

| Defendant Sales | | | | Plaintiff Purchases | | | | |
|---|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | No. of Shares Sold | Price | Net Proceeds | Plaintiff | Purchase Date | No. of Shares Purchased | Price | Amount Paid |
| 11/9/2016 | | | | | | | | |
| Doubles | 11/09/16 | 2,000 | $30.000 | $60,000 | APG | 11/09/16 | 1,726 | $29.915 | $51,633 |
| Keane | 11/09/16 | 2,000 | $30.000 | $60,000 | APG | 11/09/16 | 13,713 | $29.894 | $409,930 |
| | | | | | APG | 11/10/16 | 414 | $31.137 | $12,891 |
| | | | | | APG | 11/10/16 | 8,183 | $31.271 | $255,892 |
| | | | | | APG | 11/11/16 | 13,718 | $32.097 | $440,304 |
| | | | | | APG | 11/14/16 | 6,181 | $33.455 | $206,787 |
| | | | | | APG | 11/15/16 | 853 | $33.254 | $28,365 |
| | | | | | APG | 11/15/16 | 228 | $33.254 | $7,582 |
| | | | | | APG | 11/16/16 | 243 | $32.766 | $7,962 |
| | | | | | APG | 11/16/16 | 906 | $32.766 | $29,686 |
| | | | | | APG | 11/16/16 | 12,500 | $32.793 | $409,906 |
| | | | | | APG | 11/16/16 | 26,878 | $32.820 | $882,139 |
| 11/22/2016 | | | | | | | | |
| Doubles | 11/22/16 | 6,000 | $34.000 | $56,700 | APG | 11/22/16 | 6,400 | $33.945 | $217,249 |
| Keane | 11/22/16 | 6,000 | $34.000 | $56,700 | APG | 11/23/16 | 211 | $34.203 | $7,217 |
| | | | | | APG | 11/23/16 | 41,200 | $34.717 | $1,430,349 |
| | | | | | APG | 11/23/16 | 1,300 | $34.631 | $45,020 |
| | | | | | APG | 11/28/16 | 31,600 | $34.051 | $1,076,002 |
| | | | | | APG | 11/28/16 | 43,400 | $34.057 | $1,478,078 |
| | | | | | APG | 11/28/16 | 1,000 | $34.088 | $34,088 |
| | | | | | APG | 11/29/16 | 79,600 | $33.948 | $2,702,221 |
| | | | | | APG | 11/29/16 | 5,800 | $33.946 | $196,889 |
| 2/28/2017 | | | | | | | | |
| Keane | 02/28/17 | 11,500 | $36.130 | $194,545 | APG | 02/28/17 | 5,096 | $36.240 | $184,679 |
| Doubles | 02/28/17 | 8,109 | $36.130 | $155,277 | APG | 03/03/17 | 113,116 | $35.973 | $4,069,065 |
| | | | | | APG | 03/06/17 | 132,790 | $35.578 | $4,724,350 |
| | | | | | APG | 03/07/17 | 43,224 | $35.693 | $1,542,786 |
| 2/15/2018 | | | | | | | | |
| Doubles | 02/15/18 | 12,374 | $36.700 | $311,613 | Purchases by Other Class Members | | | | |
| Keane | 02/15/18 | 24,748 | $36.700 | $623,226 | Purchases by Other Class Members | | | | |
| 2/20/2018 | | | | | | | | |
| Quindlen | 02/20/18 | 23,372 | $36.727 | $532,888 | Purchases by Other Class Members | | | | |
| 2/21/2018 | | | | | | | | |
| Quindlen | 02/21/18 | 4,560 | $37.000 | $30,050 | Purchases by Other Class Members | | | | |
| 5/1/2018 | | | | | | | | |
| Doubles | 05/01/18 | 4,994 | $32.870 | $164,153 | APG | 05/08/18 | 9,100 | $32.830 | $298,753 |
| Keane | 05/01/18 | 20,496 | $32.890 | $674,113 | APG | 05/08/18 | 49,000 | $33.119 | $1,622,831 |
| Quindlen | 05/01/18 | 17,772 | $32.890 | $349,406 | | | | | |
| 5/22/2018 | | | | | | | | |
| Quindlen | 05/22/18 | 3,082 | $36.000 | $20,557 | APG | 05/22/18 | 21,200 | $36.152 | $766,431 |
| | | | | | APG | 05/22/18 | 29,200 | $36.150 | $1,055,586 |
| | | | | | APG | 05/22/18 | 2,100 | $36.152 | $75,920 |
| | | | | | APG | 05/23/18 | 81,700 | $35.893 | $2,932,474 |

316.    Tens of thousands of other Class members, if not more, also purchased shares contemporaneously with the Exchange Act Individual Defendants' insider sales during the Class Period.  Synchrony had a total of 1.2 billion shares traded in the United States during the Class Period, or an average daily trading volume of more than 2.4 million shares.  On each of the days that the Individual Defendants sold their Synchrony shares, between 30,000 and 4.7 million shares were traded to investors, including members of the Class.

317.    Plaintiffs and other Class members who purchased shares of Synchrony common stock contemporaneously with the Exchange Act Individual Defendants' insider sales suffered damages because: (i) in reliance on the integrity of the market, they paid artificially inflated prices for those shares as a result of the Exchange Act Individual Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act; and (ii) they would not have purchased Synchrony common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Exchange Act Individual Defendants' false and misleading statements and omissions.

**THIRD CLAIM FOR RELIEF**
**For Violation of Section 20(a) of the Exchange Act**
**(Against the Exchange Act Individual Defendants)**

318.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

319.    The Exchange Act Individual Defendants acted as controlling persons of Synchrony within the meaning of Section 20(a) of the Exchange Act by virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Synchrony, the Individual Defendants had the

power and ability to control the actions of Synchrony and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.   SECURITIES ACT ALLEGATIONS

320.   In this section of the Complaint, Named Plaintiff Stichting Depositary APG Fixed Income Credits Pool ("APG DFICP") asserts a series of strict liability and negligence claims based in the Securities Act on behalf of itself and the members of the class who purchased or otherwise acquired Synchrony 3.95% bonds due 2027 (CUSIP No. 87165BAM5) either in or traceable to Synchrony's December 1, 2017 note offering during the Class Period and suffered damages as a result.

321.   APG DFICP's claims under the Securities Act do not sound in fraud, and APG DFICP expressly disavows and disclaims any allegations of fraud, scheme or intentional conduct as part of its claims under the Securities Act, which do not have scienter, fraudulent intent, or motive as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud APG DFICP or members of the Class.

322.   As alleged below, Synchrony and other Securities Act Defendants made a series of materially untrue statements and omissions of material facts in Synchrony's registration statement, preliminary prospectus and prospectus in connection with the Company's December 1, 2017 Offering of $1,000,000,000 aggregate principal amount of 3.950% Senior Notes due 2027 (the "Notes"), and in the Company's public filings incorporated by reference into and therefore deemed part of the registration statement, preliminary prospectus and prospectus for the Offering.

323.    Synchrony made the public Offering pursuant to the Company's Registration Statement on Form S-3 (File No. 333-213681) (the "Registration Statement") and a related Prospectus, including the related Prospectus Supplement, filed with the SEC.

324.    Specifically, on September 16, 2016, Synchrony filed the Registration Statement with the SEC.  The Registration Statement was signed by Defendants Keane and Doubles, as well as Defendants David Melito (Synchrony Senior Vice President, Chief Accounting Officer and Controller) and Synchrony Directors Paget Alves, Arthur Coviello, Jr., William Graylin, Roy Guthrie, Richard Hartnack, Jeffrey Naylor, Laurel Richie, and Olympia Snowe.

325.    The Offering was underwritten by Underwriter Defendants Barclays Capital Inc., Mizuho Securities USA LLC and Morgan Stanley & Co. LLC, acting severally on behalf of themselves and TD Securities (USA) LLC, Blaylock Van, LLC, CastleOak Securities, L.P., Mischler Financial Group, Inc., R. Seelaus & Co., Inc., and The Williams Capital Group, L.P. (collectively, the "Underwriter Defendants").

326.    Synchrony supplemented the Registration Statement with a preliminary prospectus supplement filed with the SEC on November 28, 2017 (the "Preliminary Prospectus Supplement"), a pricing term sheet filed with the SEC on November 28, 2017 (the "Pricing Term Sheet"), and a prospectus supplement filed with the SEC on November 30, 2017 (the "Prospectus Supplement" and together with the Registration Statement, the Preliminary Prospectus Supplement, and the Pricing Term Sheet, the "Offering Materials").

327.    The Offering Materials also incorporated by reference Synchrony's Annual Report on Form 10-K for the year ended December 31, 2016 filed with the SEC on February 23, 2017, and the false and/or misleading statements contained therein.

### A.      Securities Act Parties

#### 1.      Securities Act Plaintiff

328.     Securities Act Plaintiff Stichting Depositary APG Fixed Income Credits Pool ("APG DFICP") is an investment pool managed by APG Asset Management N.V. that purchased Synchrony Notes (CUSIP No. 87165BAM5) traceable to Synchrony's December 1, 2017 Offering.

#### 2.      Securities Act Individual Defendants

329.     Securities Act Defendants Margaret M. Keane and Brian D. Doubles were each officers of Synchrony at the time of the filing of the Registration Statement with the SEC on September 16, 2016.  Defendant Keane was also a member of the Synchrony Board of Directors at the time of the filing of the Registration Statement.

330.     Securities Act Defendant David Melito ("Melito") served, at all relevant times, as Synchrony's Senior Vice President, Chief Accounting Officer, and Controller.  Melito was appointed to serve in this position in February 2014.  As Senior Vice President, Chief Accounting Officer, and Controller, Melito signed the Registration Statement filed with the SEC on September 16, 2016.

331.     Securities Act Defendant Paget Alves ("Alves") was, at all relevant times, a member of Synchrony's Board of Directors.  Alves joined the Board of Directors in September 2015 and continued to serve as a director through the end of the Class Period, including at the time Synchrony conducted the Offering.  As a director of Synchrony, Alves signed the Registration Statement filed with the SEC on September 16, 2016.

332.     Securities Act Defendant Arthur Coviello, Jr. ("Coviello") was, at all relevant times, a member of Synchrony's Board of Directors.  Coviello joined the Board of Directors in September 2015 and continued to serve as a director through the end of the Class Period, including at the time

Synchrony conducted the Offering.  As a director of Synchrony, Coviello signed the Registration Statement filed with the SEC on September 16, 2016.

333.     Securities Act Defendant William Graylin ("Graylin") was, at all relevant times, a member of Synchrony's Board of Directors.  Graylin joined the Board of Directors in September 2015 and continued to serve as a director through the end of the Class Period, including at the time Synchrony conducted the Offering.  As a director of Synchrony, Graylin signed the Registration Statement filed with the SEC on September 16, 2016.

334.     Securities Act Defendant Roy Guthrie ("Guthrie") was, at all relevant times, a member of Synchrony's Board of Directors.  Guthrie joined the Board of Directors in April 2014 and continued to serve as a director through the end of the Class Period, including at the time Synchrony conducted the Offering.  As a director of Synchrony, Guthrie signed the Registration Statement filed with the SEC on September 16, 2016.

335.     Securities Act Defendant Richard Hartnack ("Hartnack") was, at all relevant times, a member of Synchrony's Board of Directors.  Hartnack joined the Board of Directors in April 2014 and continued to serve as a director through the end of the Class Period, including at the time Synchrony conducted the Offering.  As a director of Synchrony, Hartnack signed the Registration Statement filed with the SEC on September 16, 2016.

336.     Securities Act Defendant Jeffrey Naylor ("Naylor") was, at all relevant times, a member of Synchrony's Board of Directors.  Naylor joined the Board of Directors in April 2014 and continued to serve as a director through the end of the Class Period, including at the time Synchrony conducted the Offering.  As a director of Synchrony, Naylor signed the Registration Statement filed with the SEC on September 16, 2016.

337.     Securities Act Defendant Laurel Richie ("Richie") was, at all relevant times, a member of Synchrony's Board of Directors.  Richie joined the Board of Directors in September 2015 and continued to serve as a director through the end of the Class Period, including at the time Synchrony conducted the Offering.  As a director of Synchrony, Richie signed the Registration Statement filed with the SEC on September 16, 2016.

338.     Securities Act Defendant Olympia Snowe ("Snowe") was, at all relevant times, a member of Synchrony's Board of Directors.  Snowe joined the Board of Directors in January 2015 and continued to serve as a director through the end of the Class Period, including at the time Synchrony conducted the Offering.  As a director of Synchrony, Snow signed the Registration Statement filed with the SEC on September 16, 2016.

339.     Defendants Keane, Doubles, Melito, Alves, Coviello, Graylin, Guthrie, Hartnack, Naylor, Richie, and Snowe are collectively referred to herein as the "Securities Act Individual Defendants."  Each of the Securities Act Individual Defendants, by virtue of his or her management or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto.  The Securities Act Individual Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial reporting of Synchrony.  By virtue of such duties, these officers and directors were required to supervise the preparation and dissemination of the Registration Statement.

340.     All of the Securities Act Individual Defendants were control persons of Synchrony within the meaning of Section 15 of the Securities Act by reason of their own involvement in the daily business of Synchrony and/or as senior executives and/or directors of Synchrony.  The Securities Act Individual Defendants, at the time they held positions with Synchrony, were able

to, and did, exercise substantial control over the operations of Synchrony, including control of the materially untrue and misleading statements, omissions and course of conduct complained of herein.

341.     It is appropriate to treat all of the Securities Act Individual Defendants as a group for pleading purposes and to presume that the untrue and misleading information conveyed in the Registration Statement as alleged herein is the collective action of the narrowly defined group of Defendants identified above.

342.     As officers, directors, and/or controlling persons of a publicly held company and under the federal securities laws, the Securities Act Individual Defendants had a duty: (a) to disseminate promptly complete, accurate, and truthful information with respect to Synchrony; (b) to correct any previously issued statements from any source that had become materially misleading or untrue; and (c) to disclose any trends that would materially affect earnings and the present and future operating results of Synchrony, so that the market price of Synchrony's publicly traded securities would be based upon truthful and accurate information.

### 3.     The Underwriter Defendants

343.     Securities Act Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation with headquarters in New York, New York.  Barclays operates as a brokerage firm and investment advisor in the United States. Barclays served as a joint book-running manager for the Offering.  Barclays was paid an underwriting discount of $1,613,150 for its services in connection with the Offering.

344.     Securities Act Defendant Mizuho Securities USA LLC ("Mizuho") is a Delaware limited liability company with headquarters in New York, New York.  Mizuho operates as an investment bank in the United States.  Mizuho served as a joint book-running manager for the

Offering. Mizuho was paid an underwriting discount of $1,613,150 for its services in connection with the Offering.

345.    Securities Act Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware limited liability company with headquarters in New York, New York. Morgan Stanley operates as an investment bank in the United States. Morgan Stanley served as a joint book-running manager for the Offering. Morgan Stanley was paid an underwriting discount of $1,613,700 for its services in connection with the Offering.

346.    Securities Act Defendant TD Securities (USA) LLC ("TD Securities") is a Delaware limited liability company with headquarters in New York, New York. TD Securities operates as an investment bank and brokerage firm in the United States. TD Securities served as senior co-manager for the Offering. TD Securities was paid an underwriting discount of $385,000 for its services in connection with the Offering.

347.    Securities Act Defendant Blaylock Van, LLC ("Blaylock Van") is a California corporation with headquarters in New York, New York. Blaylock Van operates as a brokerage firm and investment advisor in the United States. Blaylock Van served as a co-manager for the Offering. Blaylock Van was paid an underwriting discount of $55,000 for its services in connection with the Offering.

348.    Securities Act Defendant CastleOak Securities, L.P. ("CastleOak") is a Delaware limited liability company with headquarters in New York, New York. CastleOak operates as a brokerage firm in the United States. CastleOak served as a co-manager for the Offering. CastleOak was paid an underwriting discount of $55,000 for its services in connection with the Offering.

349.    Securities Act Defendant Mischler Financial Group, Inc. ("Mischler") is a California corporation with headquarters in Corona Del Mar, California.  Mischler operates as brokerage firm in the United States.  Mischler served as a co-manager for the Offering.  Mischler was paid an underwriting discount of $55,000 for its services in connection with the Offering.

350.    Securities Act Defendant R. Seelaus & Co., Inc. ("R. Seelaus") is a Delaware limited liability company with headquarters in Summit, New Jersey.  R. Seelaus operates as a brokerage firm in the United States.  R. Seelaus served as a co-manager for the Offering.  R. Seelaus was paid an underwriting discount of $55,000 for its services in connection with the Offering.

351.    Securities Act Defendant The Williams Capital Group, L.P. ("Williams") is a Delaware partnership with headquarters in New York, New York.  Williams operates as a brokerage firm in the United States.  Williams served as a co-manager for the Offering.  Williams was paid an underwriting discount of $55,000 for its services in connection with the Offering.

352.    The Securities Act Individual Defendants and the Underwriter Defendants are referred to collectively herein as the "Securities Act Defendants."

**B.    The Offering Materials Contained Material Misstatements and Omissions**

353.    In Synchrony's Preliminary Prospectus Supplement filed with the SEC on November 28, 2017, and in Synchrony's Prospectus Supplement filed with the SEC on November 30, 2017, the Company claimed that:

> Our business benefits from longstanding and collaborative relationships with our partners, including some of the nation's leading retailers and manufacturers with well-known consumer brands, such as Lowe's, Walmart, Amazon and Ashley Furniture HomeStore.  We believe our partner-centric business model has been successful because ***it aligns our interests with those of our partners*** and provides substantial value to both our partners and our customers.  Our partners promote our credit products because they generate increased sales and strengthen customer loyalty.

107

354.    Synchrony's Preliminary Prospectus Supplement filed with the SEC on November 28, 2017, and Synchrony's Prospectus Supplement filed with the SEC on November 30, 2017, both included an accompanying prospectus dated September 16, 2016 (which is part of Synchrony's Registration Statement on Form S-3).   In the September 16, 2016 prospectus, Synchrony made the substantially similar claim that:

> Our business benefits from longstanding and collaborative relationships with our partners, including some of the nation's leading retailers and manufacturers with well-known consumer brands.  We believe our partner-centric business model has been successful because ***it aligns our interests with those of our partners*** and provides substantial value to both our partners and our customers.  Our partners promote our credit products because they generate increased sales and strengthen customer loyalty.

355.    In addition, Synchrony's Annual Report on Form 10-K for the year ended December 31, 2016 filed with the SEC on February 23, 2017 (the "2016 Form 10-K"), and incorporated by reference into the Offering Materials, similarly claimed that:

> Our business benefits from longstanding and collaborative relationships with our partners, including some of the nation's leading retailers and manufacturers with well-known consumer brands, such as Lowe's, Walmart, Amazon and Ashley Furniture HomeStore.  We believe our partner-centric business model has been successful because ***it aligns our interests with those of our partners*** and provides substantial value to both our partners and our customers.  Our partners promote our credit products because they generate increased sales and strengthen customer loyalty.

356.    The foregoing statements in ¶¶ 353-355 were materially misstated and omitted material facts sufficient to render them not misstated because, undisclosed to investors:  (i) in mid-2016, after years of approving risky subprime borrowers, Synchrony significantly tightened its underwriting standards; (ii) the tightened underwriting standards and resulting decline in subprime approvals created a conflict between Synchrony and its partners, including Walmart (then Synchrony's largest partner, with a customer base that included significant amounts of subprime

customers); (iii) Walmart told Synchrony in 2017 to approve more borrowers; (iv) the conflict between Synchrony and Walmart jeopardized Walmart's renewal of its contract with Synchrony; (v) in the Fall of 2017, when Synchrony approached Walmart about renewing the Synchrony-Walmart contract, Walmart "balked" at the renewal; (vi) Walmart informed the Synchrony Board in 2017 of Walmart's concern that Synchrony was keeping too much of the cards' revenue; and (vii) in late 2017, Walmart issued a formal request for contract bids from other credit card companies.

357.    In Synchrony's 2016 Form 10-K, filed with the SEC on February 23, 2017, Synchrony also emphasized its "stable asset quality" and that the "credit environment remained favorable during 2016," and affirmed that the Company complied with critical accounting estimates in preparing its provisions for loan losses.  The Company also described the underwriting and credit risk procedures it undertakes and stated that it did not anticipate making changes to those protocols or standards.  For example, the Company stated, "Regardless of the channel, in making the initial credit approval decision to open a credit card or other account or otherwise grant credit, we follow a series of credit risk and underwriting procedures," "Our actual net charge-off rates have remained relatively stable," and "In the near term, we expect U.S. unemployment rates to continue to stabilize and we do not anticipate making significant changes to our underwriting standards."  These statements were materially misstated for the reasons set forth in ¶ 356 and because Synchrony had already recognized that its underwriting standards were too lax and made significant changes to strengthen them, which would necessarily lead to the approval of fewer loans and retail partner backlash.

358.    The foregoing alleged misstatements in ¶¶ 353-355 and 357 were also materially misstated for their failure to disclose material, non-public facts whose non-disclosure rendered the

Securities Act Defendants' statements materially misstated.  During the Class Period, the Securities

Act Defendants failed to disclose the material adverse facts below that were in existence at the

time each of the foregoing material misstatements was made, the disclosure of which would have

led to declines in Synchrony's stock price at an earlier date:

  a.    in mid-2016, after years of approving risky subprime borrowers, Synchrony tightened its underwriting standards;

  b.    the tightened underwriting standards and resulting decline in subprime approvals created a conflict between Synchrony and its partners, including Walmart (then Synchrony's largest partner, with a customer base that included significant amounts of subprime customers);

  c.    Walmart told Synchrony in 2017 to approve more borrowers;

  d.    the conflict between Synchrony and Walmart jeopardized Walmart's renewal of its contract with Synchrony;

  e.    in the Fall of 2017, when Synchrony approached Walmart about renewing the Synchrony-Walmart contract, Walmart "balked" at the renewal;

  f.    Walmart informed the Synchrony Board in 2017 of Walmart's concern that Synchrony was keeping too much of the cards' revenue; and

  g.    in late 2017, Walmart issued a formal request for contract bids from other credit card companies—something Walmart had never done before.

359.    Defendants' statements with regard to the status of Synchrony's partner

relationships, Synchrony's purported "stable asset quality," the "favorable" "credit environment"

during 2016, and Synchrony's underwriting procedures, were not only materially misstated

because they sought to affirmatively represent that Synchrony's underwriting standards did not

require tightening (and were not being tightened), and that Synchrony partners were "aligned" with

Synchrony's underwriting practices, but also because they omitted the above-referenced material

facts necessary to make the statements not misleading when made.  These omissions were later

revealed by Defendants' admissions that Walmart's partnership with Synchrony was in jeopardy,

that Synchrony had tightened its underwriting "across pretty much [the] entire business," that

Walmart in fact terminated that partnership and instead entered into a partnership agreement with Synchrony's competitor Capital One, and Walmart brought suit against Synchrony.

360.   APG DFICP purchased Notes traceable to the Offering and suffered damages as a result of Defendants' material misstatements and omissions in the Offering Materials and documents incorporated by reference therein.

### C. The Securities Act Defendants Failed to Exercise Reasonable Care or Conduct a Reasonable Investigation in Connection with the Offering

361.   None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete and not misstated in all material respects.

362.   Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information.  Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process.  At a minimum, due diligence for every public offering should involve: (1) interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (8) a review of critical non-public documents forming the basis for the company's assets, liabilities and earnings.  Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors

are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

363.    Had the Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

364.    The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Offering Documents and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

365.    The Underwriter Defendants could not simply rely on the work of Synchrony's outside auditors because the investing public relies on underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed.  The Underwriter Defendants must conduct their own, independent (and reasonable) investigation.  Had the Underwriter Defendants conducted a reasonable investigation, they would have known that the Offering Materials contained material misstatements and omissions concerning the lack of alignment between Synchrony and its retail partners with respect to Synchrony's tightened underwriting and the pushback on Synchrony's decreased approvals that Synchrony had received from its retail partners, including Walmart.

366.    Similarly, the Securities Act Individual Defendants who signed the Registration Statement and failed to conduct a reasonable investigation into the statements contained in the Registration Statement and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. Had these Securities Act Individual Defendants conducted a reasonable investigation, they would

have known that the Offering Documents contained material misstatements and omissions concerning the lack of alignment between Synchrony and its partners' interests.

367.   These Securities Act Defendants were sophisticated in financing and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the Company's misstatements and omissions notwithstanding numerous "red flags," including without limitation, Synchrony's lax underwriting standards; Synchrony's broad-based changes to its underwriting; Walmart's "pushback" on Synchrony's lowered approval rate and increased loan loss reserves; the meetings between senior Walmart and Synchrony executives and Board members in 2017, including when Walmart "balked" at renewing its contract with Synchrony; and Walmart's decision to bid out the Synchrony contract to other banks.

## XII.   CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT

### FOURTH CLAIM FOR RELIEF
**For Violations of Section 11 of The Securities Act**
**(Against Synchrony, the Securities Act Individual Defendants,**
**and the Underwriter Defendants)**

368.   Plaintiff APG DFICP repeats and realleges each and every allegation contained above.

369.   This claim is brought by Plaintiff APG DFICP pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of itself and all persons and entities that purchased or otherwise acquired Synchrony 3.95% bonds due 2027 (CUSIP No. 87165BAM5) either in or traceable to Synchrony's December 1, 2017 note offering during the Class Period and suffered damages as a result, against Synchrony, the Securities Act Individual Defendants and the Underwriter Defendants, and does not sound in fraud.

370.   The Registration Statement for the Offering was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the

statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

371.    The Company is the registrant for the Offering.  As signatories of the Registration Statement, the Securities Act Individual Defendants were responsible for their contents and dissemination.

372.    As issuer of the Notes, Synchrony is strictly liable to Plaintiff APG DFICP and to the relevant members of the Class within the scope of this Count for the material misstatements and omissions contained in the Offering Materials.

373.    The Underwriter Defendants served as the underwriters for the Offering and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Materials.

374.    None of the Securities Act Individual Defendants or Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true and without omissions of any material facts and were not misleading.

375.    The Securities Act Defendants named in this claim issued, caused to be issued and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Offering Materials, which misrepresented or failed to disclose, *inter alia,* the facts set forth above.  By reasons of the conduct herein alleged, each such Securities Act Defendant violated Section 11 of the Securities Act.

376.    Plaintiff APG DFICP and other members of the Class within the scope of this Count acquired Synchrony Notes pursuant to, or traceable to, the defective Offering Materials.

377.    Plaintiff APG DFICP and the Class members within the scope of this Count have sustained damages.  The value of Synchrony's Notes has declined substantially subsequent to and due to the violations described herein.

378.    At the times they purchased Synchrony Notes, Plaintiff APG DFICP and the other members of the Class within the scope of this Count were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to Synchrony's subsequent announcements.

### FIFTH CLAIM FOR RELIEF
**For Violation of Section 15 of the Securities Act**
**(Against the Securities Act Individual Defendants)**

379.    Plaintiff APG DFICP repeats and realleges each and every allegation contained above.

380.    This claim is brought by Plaintiff APG DFICP pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of itself and all persons and entities that purchased or otherwise acquired Synchrony 3.95% bonds due 2027 (CUSIP No. 87165BAM5) either in or traceable to Synchrony's December 1, 2017 note offering during the Class Period and suffered damages as a result, against the Securities Act Individual Defendants and does not sound in fraud.

381.    Each of the Securities Act Individual Defendants was a control person of Synchrony by virtue of his or her position as a director and/or as senior officer of the Company.  Each of the Securities Act Individual Defendants was a control person of Synchrony within the meaning of Section 15 of the Securities Act by reason of his or her own involvement in the daily business of Synchrony and/or as senior executives or directors of Synchrony.  The Securities Act Individual Defendants, at the time they held positions with Synchrony, were able to, and did, exercise

substantial control over the operations of Synchrony, including control of the materially untrue and misleading statements, omissions and course of conduct complained of herein.

382.    Each of the Securities Act Individual Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Claim Four above, based on having signed the Offering Materials and having otherwise participated in the process that allowed the Offering to be successfully completed.

383.    As a result of the foregoing, Plaintiff APG DFICP and the other members of the Class within the scope of this Count have suffered damages.

## XIII.   CLASS ACTION ALLEGATIONS

384.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who: (i) purchased or otherwise acquired the publicly traded common stock of Synchrony between October 21, 2016 and November 1, 2018, inclusive (the "Class Period"); and/or (ii) purchased or otherwise acquired Synchrony 3.95% bonds due 2027 (CUSIP No. 87165BAM5) either in or traceable to Synchrony's December 1, 2017 note offering during the Class Period.  Excluded from the Class are Defendants and their families, directors, and officers of Synchrony and their families and affiliates.

385.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Synchrony has approximately 740 million shares of stock outstanding, and issued hundreds of thousands of damaged notes, owned by at least hundreds or thousands of investors.

386.    Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

116

    (b)     Whether Defendants violated the Securities Act;

    (c)     Whether Defendants misrepresented material facts;

    (d)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    (f)     Whether Defendants' misconduct impacted the price of Synchrony securities that are a part of the defined Class;

    (g)     Whether Defendants' conduct caused the members of the Class to sustain harm; and

    (h)     The extent of harm sustained by Class members and the appropriate measure of harm.

387.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained harm from Defendants' wrongful conduct.

388.    Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

389.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

      B.     Awarding compensation to Plaintiffs and other Class members against all Defendants, jointly and severally, for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

      D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XV.   JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  April 5, 2019              Respectfully submitted,

*/s/ Salvatore J. Graziano*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
Salvatore J. Graziano (admitted *pro hac vice*)
Adam H. Wierzbowski (admitted *pro hac vice*)
Kate W. Aufses (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY  10020
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444
salvatore@blbglaw.com
adam@blbglaw.com
kate.aufses@blbglaw.com

*Counsel for Lead Plaintiff Stichting Depositary
APG Developed Markets Equity Pool, Plaintiff
Stichting Depositary APG Fixed Income Credits
Pool and Lead Counsel for the Class*

**MOTLEY RICE LLC**
William H. Narwold (ct 00133)
Mathew P. Jasinski (ct 27520)
20 Church Street, 17th Floor
Hartford, CT  06103
Telephone:  (860) 882-1681

118

Facsimile:  (860) 882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

*Liaison Counsel for Lead Plaintiff Stichting Depositary APG Developed Markets Equity Pool and Plaintiff Stichting Depositary APG Fixed Income Credits Pool*