# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

IN RE SYNCHRONY FINANCIAL
SECURITIES LITIGATION

No. 3:18-cv-1818 (VAB)

## RULING AND ORDER ON MOTION TO DISMISS

On April 5, 2019, Stichting Depositary APG Developed Markets Equity Pool ("APG" or

"Lead Plaintiff") and Stichting Depositary APG Fixed Income Credits Pool ("APG Fixed")

(collectively "Lead Plaintiffs") filed an Amended Complaint on behalf of themselves, all

similarly situated purchasers of Synchrony Financial common stock ("Synchrony stock")

between October 21, 2016 and November 1, 2018 (the "Class Period"), and all similarly situated

purchasers of Synchrony Financial 3.95% bonds due 2027 (the "Synchrony Notes") either in or

traceable to Synchrony Financial's December 1, 2017 note offering (the "Offering") during the

Class Period. Am. Compl. at 5, ECF No. 78 (Apr. 5, 2019).

Lead Plaintiffs sued Synchrony Financial ("Synchrony"), Margaret M. Keane, Brian D.

Doubles, Thomas M. Quindlen (collectively with Synchrony, "Exchange Act Defendants"),

David Melito, Paget Alves, Arthur Coviello, Jr., William Graylin, Roy Guthrie, Richard

Hartnack, Jeffrey Naylor, Laurel Richie, Olympia Snowe, Barclays Capital Inc., Mizuho

Securities USA LLC, Morgan Stanley & Co. LLC, TD Securities (USA) LLC, Blaylock Van,

LLC, Castleoak Securities, L.P., Mischler Financial Group, Inc., R. Seelaus & Co., Inc., and The

Williams Capital Group, L.P (collectively "Defendants").

Lead Plaintiffs allege numerous violations of Sections 10(b), 20A, and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t-1, and 78t(a), against Synchrony, Ms. Keane, Mr. Doubles, and Mr. Quindlen; insider trading in violation of SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder, against Ms. Keane, Mr. Doubles, and Mr. Quindlen; and violations of Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o against Defendants.

Defendants move to dismiss the Securities Class Action in its entirety and with prejudice.

For the reasons explained below, the Court **GRANTS** the motion to dismiss **with prejudice**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations[1]

According to Lead Plaintiffs:

> This case is about a company that loosened its underwriting standards to boost growth, handing out credit cards to consumers who never should have had them. When it saw that this scheme generated a pool of bad loans, the company pulled back on underwriting so hard that it stalled its own growth and killed its most lucrative retail partnership with Walmart. Each step of the way, rather than disclose to investors that its lax underwriting standards had generated significant loan losses and historic charge-offs, and how its pull-back on underwriting was causing pushback from retail partners and jeopardizing the Walmart contract, Synchrony hid the truth and issued a series of materially false and misleading statements to investors that artificially inflated Synchrony's securities prices. When the truth was revealed, Synchrony's securities prices fell sharply in response, causing significant harm to the class of Synchrony investors that Lead Plaintiff APG represents in this action.

Am. Compl. ¶ 1. The relevant events in this lawsuit culminate in Walmart's termination of its twenty-year partnership with Synchrony and Walmart's breach of contract action filed against

---

[1] For the purposes of these motions at this time, all nonconclusory factual allegations in the Amended Complaint are accepted as true. All reasonable inferences are drawn in favor of the nonmovant, Lead Plaintiffs. *U.S. v. City of N.Y.*, 359 F.3d 83, 91 (2d Cir. 2004).

Synchrony shortly thereafter, and also focus on Synchrony's statements and underwriting efforts leading up to Walmart's announcement of its non-renewal. *See* Am. Compl. ¶¶ 1–37; Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Compl. at 1–2, ECF No. 99 (June 26, 2019) ("Sec. Defs.' Mem").

Synchrony, a Delaware corporation and consumer financial services company based in Connecticut, sells stock on the New York Stock Exchange. Am. Compl. ¶ 45. As of October 26, 2017, Synchrony allegedly had over 780 million shares of stock outstanding. *Id.* Synchrony allegedly is the largest provider of private label credit cards in the United States. *Id.* ¶ 51. Private label credit cards allegedly bear the name of a specific retailer and are intended primarily for use on purchases with that retailer. *Id.* Synchrony also offers general purpose co-brand credit cards ("Dual Cards"), which are "branded by one of Synchrony's retail partners," and "functions like a [private label credit card] when a consumer uses it to purchase goods or services from that retail partner, but . . . like an ordinary credit card when the consumer uses it elsewhere." *Id.* ¶ 52. Synchrony allegedly "has a practice of converting [private label credit card] customers into Dual Card customers." *Id.* ¶ 53. Synchrony's credit cards are generally backed, however, by banks and credit card issuers, and not the retail partners themselves.[2] *Id.* ¶¶ 3, 52.

Within each of Synchrony's three sales platforms—Retail Card, Payment Solutions, and CareCredit—Synchrony allegedly has partner relationships with retailers and consumer brands. *Id.* ¶¶ 55–56. The retail partnerships allegedly are the "cornerstone of Synchrony's business,"

---

[2] *See, e.g., Tatusko v. GE Capital Corp.*, No. 3:04-cv-1828 (CFD), 2007 WL 2524940, at *1 n.5 (D. Conn. Aug. 31, 2007) ("Private label credit cards are store credit cards. GE Capital issued private label cards for stores such as Gap, Home Depot, and Lowes."); *Bryan v. Credit Control, LLC*, No. 18-cv-0865 (SJF)(SIL), 2018 WL 6520730, at *1 (E.D.N.Y. Dec. 11, 2018) ("Although the Debt stems from a credit card that could only be used to purchase goods from Kohl's, the store's credit accounts are issued and owned by third-party banks. Kohl's credit cards were issued by Chase Bank until 2011, and since then by Capital One Bank.") (citations omitted).

and include "retail giants" like Sam's Club,[3] Amazon, BP, Lowe's, The Gap, J.C. Penney, Ashley Furniture Homestore, and until recently, Walmart. *Id.* ¶ 56. Retailers allegedly "enter into Retail Card arrangements with Synchrony to increase sales and marketing, and to encourage customer loyalty," while customers get "instant access to credit, discounts, attractive loyalty programs, and promotional offers." *Id.* ¶ 57.

Synchrony allegedly controls the credit criteria, issues the credit cards, and owns the underlying accounts and loan receivables generated under the programs. *Id.* Based on retailer share arrangements that are allegedly typically included in Synchrony's Retail Card partnership agreements, Synchrony and the retail partner allegedly "share in the gains from their partnership that flow from customers' fees, interest payments and other charges on their credit accounts," provided that "the economic performance of the program exceeds a contractually-defined threshold." *Id.* ¶ 58. Synchrony allegedly claims that its retailer share arrangements "align its interests with its partners[.]'" *Id.*

Walmart, allegedly the nation's largest retailer, was also Synchrony's "most important retail partner." *Id.* ¶ 59. Synchrony allegedly maintained an office in Bentonville, Arkansas, where Walmart also has its headquarters. *Id.* ¶ 60. At the end of 2017, "the Walmart partnership accounted for more than 10% of the total interest and fees on Synchrony loans." *Id.* ¶ 63. In early 2019, "Synchrony estimated the size of its Walmart portfolio to be approximately $9 billion." *Id.* Walmart allegedly focuses a "significant portion of [its] store credit card business . . . on subprime borrowers," *id.* ¶ 69, and "historically [has] drawn a significant amount of its business from low-income consumers with subprime credit," *id.* ¶ 67. Consequently, "Walmart was incentivized to encourage Synchrony to grant subprime customers access to credit," which

---

[3] Sam's Club is a "Walmart subsidiary and retail wholesale club." Am. Compl. ¶ 61.

"increase[d] Walmart's sales as well as Walmart's fees on the credit card financing" under its

retailer share agreement with Synchrony." *Id.* ¶ 69. Because Synchrony allegedly leveraged its

balance sheets, "a modest increase in losses [due to subprime and near-prime borrowers[4]] can

have a meaningful impact" on Synchrony's capital position and securities prices. *Id.* ¶ 66.

Synchrony allegedly "generated a lot of revenue from [subprime borrowers] through interest

payments and late fees," and "Walmart wanted approval for almost everyone." *Id.* ¶ 71.

Briefly, Defendants are alleged to have committed numerous misrepresentations related

to Synchrony's credit underwriting practices; "the resulting decrease in near-prime and subprime

customers;" and "pushback" from retail partners, namely Walmart. *Id.* ¶ 98. These

misrepresentations allegedly began on October 21, 2016, and continued as late as June 2018. *See

id.* ¶¶ 100—when Ms. Keane assured investors that Synchrony's relationship with Walmart, its

largest retail partner, was strong. *See id.* ¶¶ 100–71.

The falsity of the statements detailed in the Amended Complaint allegedly came to light

when: (1) on April 28, 2017 (the start of the Class Period), Synchrony announced "disappointing

results for the first quarter of fiscal year 2017, including that net income had dropped 14% from

a year earlier," and attributed these losses to the "poor credit profile of its loan portfolio" and a

spike in charge-offs, *id.* ¶ 232; (2) on July 26, 2018, Synchrony confirmed—after media sources

---

[4] According to Securities Plaintiffs:

> Credit scores "rank order" consumers by their predicted credit risk, and a credit score indicates how likely a consumer is to repay a debt relative to other consumers. Below-prime borrowers are typically defined as individuals with a FICO score below 660.1 In 2016, 2017, and 2018, over 25% of Synchrony's credit card loans were issued to borrowers with FICO scores of 660 or less. . . . Subprime and near-prime borrowers typically have lower incomes, worse credit histories, and represent a higher risk of loss than prime borrowers. This risk is compounded by the fact that consumer credit loans rarely require any collateral to protect the company from losses.

Am. Compl. ¶¶ 65–66 (footnotes omitted).

first reported—that Walmart ended its twenty-year partnership with Synchrony in favor of Capital One Bank, *id.* ¶¶ 174–75; and (3) on November 1, 2018 (the end of the Class Period), Walmart sued Synchrony in federal court, claiming "that Synchrony intentionally underwrote the Walmart/Synchrony credit card program in a way that exposed the program to significant credit risk and harmed Walmart," *id.* ¶ 177.

Lead Plaintiffs therefore generally allege that Exchange Act Defendants' misrepresentations were materially false and misleading, artificially inflating Synchrony's stock price and ultimately, when the truth was revealed, leading to significant losses and harm to shareholders. According to the Lead Plaintiffs, Ms. Keane and Mr. Doubles "held themselves out as knowledgeable" about Synchrony's underwriting practices, its partnership relationships, and retail partners' pushback on Synchrony's changes to its credit underwriting. *Id.* ¶¶ 262-63.

### 1. Parties to the Securities Class Action

#### i. Exchange Act Parties

APG "is one of the largest institutional investors in the world" with allegedly "over $500 billion under management." Am. Compl. ¶ 43. APG allegedly purchased shares of Synchrony stock during the Class Period. *Id.* APG Fixed is an investment pool that allegedly purchased Synchrony Notes during the Class Period. *Id.* ¶ 44. Lead Plaintiffs allegedly "suffered damages as a result of the federal securities laws alleged herein." *Id.* ¶¶ 43–44.

Lead Plaintiffs allege violations of Sections 10(b), 20A, and 20(a) of the Exchange Act and SEC Rule 10b-5 against Synchrony and the following corporate officers:

- Margaret M. Keane, who allegedly is and was for all relevant times the Chief Executive Officer ("CEO") and President of Synchrony, as well as a member of its Board of Directors; *id.* ¶ 46;

- Brian D. Doubles, who allegedly is and was for all relevant times Synchrony's Chief Financial Officer ("CFO") and Executive Vice President, *id.* ¶ 47;

- Thomas M. Quindlen, who allegedly is and was for all relevant times Synchrony's Executive Vice President and CEO of Retail Card, *id.* ¶ 48.

During the Class Period, Ms. Keane and Mr. Doubles allegedly "regularly spoke in public . . . about [Synchrony's] underwriting standards and practices, the quality of its loan portfolio, its relationships with its retail partners, the Offering . . . [they] possessed the power and authority to control the contents of Synchrony's reports to the SEC, press releases, and [more.]" *Id.* ¶ 50. In addition, Lead Plaintiffs allege that Ms. Keane and Mr. Doubles "were each provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected." *Id.*

"Because of their positions and access to material non-public information available to them, Defendants Keane and Doubles each knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading." *Id.*

### ii. Securities Act Parties

Lead Plaintiffs allege violations of Sections 11 and 15 of the Securities Act against Ms. Keane and Mr. Doubles, who were allegedly each Synchrony officers at the time of the Registration Statement's filing with the SEC on September 16, 2016, *id.* ¶¶ 39, 329, and the following individual Defendants:

- David Melito, who allegedly served as Synchrony's Senior Vice President, Chief Accounting Officer, and Controller from at all relevant times, *id.* ¶ 330;

- Paget Alves, who alleged served as a member of Synchrony's Board of Directors ("BOD") at all relevant times, *id.* ¶ 331;

- Arthur Coviello, Jr., who allegedly served as a member of Synchrony's BOD at all relevant times, *id.* ¶ 332;

- William Graylin, who allegedly served as a member of Synchrony's BOD at all relevant times, *id.* ¶ 333;

- Roy Guthrie, who allegedly served as a member of Synchrony's BOD at all relevant times, *id.* ¶ 334;

- Richard Hartnack, who allegedly served as a member of Synchrony's BOD at all relevant times, *id.* ¶ 335;

- Jeffrey Naylor, who allegedly served as a member of Synchrony's BOD at all relevant times, *id.* ¶ 336;

- Laurel Richie, who allegedly served as a member of Synchrony's BOD at all relevant times, *id.* ¶ 337; and

- Olympia Snowe, who allegedly served as a member of Synchrony's BOD at all relevant times, *id.* ¶ 338.

Defendants Keane, Doubles, Melito, Alves, Coviello, Graylin, Guthrie, Hartnack, Naylor, Richie, and Snowe are collectively referred to as the Securities Act Individual Defendants.

The following Underwriter Defendants also allegedly violated Sections 11 and 15 of the Securities Act:

- Barclays Capital Inc. ("Barclays"), allegedly a Connecticut corporation with headquarters in New York, New York, operating as a brokerage firm and investment advisor; Barclays allegedly paid an underwriting discount of $1,613,150 for its services as a joint book-running manager for the Offering, *id.* ¶ 343;

- Mizuho Securities USA LLC ("Mizuho"), allegedly a Delaware limited liability company with headquarters in New York, New York, operating as an investment bank; Mizuho was allegedly paid an underwriting discount of $1,613,150 for its services as a joint book-running manager for the Offering, *id.* ¶ 344;

- Morgan Stanley & Co. LLC ("Morgan Stanley"), allegedly a Delaware limited liability company with headquarters in New York, New York, operating as an investment bank; Morgan Stanley was allegedly paid an underwriting discount of $1,613,700 for its services as a joint book-running manager for the Offering, *id.* ¶ 345;

- TD Securities (USA) LLC ("TD Securities"), allegedly a Delaware limited liability company with headquarters in New York, New York, operating as an investment bank and brokerage firm; TD Securities was allegedly paid an

underwriting discount of $385,000 for its services as a senior co-manager for the Offering, *id.* ¶ 346;

- Blaylock Van, LLC ("Blaylock Van"), allegedly a California corporation with headquarters in New York, New York, operating as an investment advisor and brokerage firm; Blaylock Van was allegedly paid an underwriting discount of $55,000 for its services as a co-manager for the Offering, *id.* ¶ 347;

- CastleOak Securities, L.P. ("CastleOak"), allegedly a Delaware limited liability company with headquarters in New York, New York, operating as a brokerage firm; Blaylock Van was allegedly paid an underwriting discount of $55,000 for its services as a co-manager for the Offering, *id.* ¶ 348;

- Mischler Financial Group, Inc. ("Mischler"), allegedly a California corporation with headquarters in Corona Del Mar, California, operating as a brokerage firm; Mischler was allegedly paid an underwriting discount of $55,000 for its services as a co-manager for the Offering, *id.* ¶ 349;

- R. Seelaus & Co., Inc. ("R. Seelaus"), allegedly a Delaware limited liability company with headquarters in Summit, New Jersey, operating as a brokerage firm; R. Seelaus was allegedly paid an underwriting discount of $55,000 for its services as a co-manager for the Offering, *id.* ¶ 350; and

- The Williams Capital Group, L.P. ("Williams"), allegedly a Delaware partnership with headquarters in New York, New York, operating as a brokerage firm; Williams was allegedly paid an underwriting discount of $55,000 for its services as a co-manager for the Offering, *id.* ¶ 351.

### 2. Relevant Alleged Misrepresentations and Nondisclosures Before April 28, 2017

Lead Plaintiffs allege that in mid-2016, "Synchrony recognized a marked deterioration in the credit quality of its 2015 and 2016 vintage loans and anticipated charge-offs across the whole portfolio." *Id.* ¶ 72. This deterioration allegedly was caused by Synchrony's conversion of a number of Walmart private label credit cards to Dual Cards between 2011 and 2016. *Id.* ¶ 74. Although this conversion was allegedly done to boost usage and revenue, "the outcome was that losses increased—because riskier borrowers had more freedom to use their cards—and Walmart saw less revenue than it expected to receive under its partnership with Synchrony." *Id.* ¶ 75. Following these increased losses, Synchrony allegedly undertook a widespread analysis of these

losses. *Id.* ¶ 76. At the end of 2016, Synchrony allegedly realized that "Walmart's loan losses were dramatically higher" than it had originally anticipated, which pulled down Synchrony's entire loan loss metric. *Id.*

In the second half of 2016 and through early 2017, allegedly unknown to investors, Synchrony "drastically tightened its underwriting standards" in response to its "risky and deteriorating portfolio." *Id.* ¶ 78. Lead Plaintiffs allege that at the same time, Synchrony "misrepresented to investors that its underwriting remained 'consistent' and 'disciplined,' and that any underwriting changes were 'surgical' in nature." *Id.* ¶ 23. During "the first third of the Class Period, Synchrony hid from investors its need to tighten underwriting—and the fact that it had already tightened underwriting—because it would have sent a negative message to the market that Synchrony's underwriting was previously too lax." *Id.* ¶ 99.

Lead Plaintiffs present numerous examples of Synchrony's alleged misrepresentations, as well as Ms. Keane and Mr. Doubles's alleged personal benefit therefrom.

On October 21, 2016, Mr. Doubles allegedly emphasized to investors Synchrony's "'strong growth' in loan receivables and the 'favorable' 'credit environment.'" *Id.* ¶ 100. On October 27, 2016, Synchrony allegedly filed a Form 10-Q and reported its loan portfolio's "stable asset quality." *Id.* On November 3, 2016, in a presentation to investors, Synchrony allegedly emphasized its focus on "[d]isciplined [u]nderwriting." *Id.*

These alleged misrepresentations "artificially inflated the price of Synchrony common stock" so that from October 20 to November 9, 2016, the stock price increased "more than 11%." *Id.* ¶ 102 (emphasis omitted). On November 9, 2016, Mr. Doubles and Ms. Keane each allegedly sold 2,000 shares at $30.00/share. *Id.* ¶ 103. On November 22, 2016, both Ms. Keane and Mr. Doubles allegedly entered into Rule 10b5-1 plans for stock sales to occur in February 2017. *Id.* ¶ 104. That same day, they also allegedly each sold 6,0000 shares at $34.00/share. *Id.*

On December 7, 2016, at the Goldman Sachs U.S. Financial Services Conference, Mr. Doubles allegedly claimed that Synchrony was "not seeing anything right now" that required it to "change [its] underwriting." *Id.* ¶ 105. On January 20, 2017, on an earnings call, Mr. Doubles allegedly stated Synchrony had maintained "very consistent credit guidelines." *Id.* Mr. Doubles made similar statements in Synchrony presentations on January 30, 2017; February 23, 2017; and February 27, 2017, when Mr. Doubles allegedly claimed that "[w]e haven't really changed our underwriting significantly over the past 9 to 12 months." *Id.*

These statements allegedly artificially inflated Synchrony's stock price and caused it to increase more than 8% from November 22, 2016 to February 27, 2017. *Id.* ¶ 107. Furthermore, industry analysts like Jefferies and Deutsche Bank also allegedly accepted these representations, and praised Synchrony's "higher quality portfolio . . . [and] credit strategies." *Id.* ¶ 108. On February 28, 2017, Mr. Doubles allegedly sold 8,109 shares of Synchrony stock and Ms. Keane allegedly sold 11,500 shares, each for $36.13/share. *Id.* ¶ 109.

On April 4, 2017, Synchrony allegedly filed its 2017 Proxy Statement on Form DEF 14A, and stated that it "maintained stable credit metrics and remained disciplined on underwriting." *Id.* ¶ 110 (emphasis omitted).

Former employees allegedly corroborate Synchrony's underwriting changes beginning in 2016. *Id.* ¶ 83. Former Employee ("FE") 5, a former Vice President of Operations at Synchrony who dealt with the Lowe's account, stated that Lowe's and its customers were complaining about not obtaining as much credit as the customers had wanted. *Id.* ¶ 84. According to FE5, who learned about this from quarterly updates from Ms. Keane, these complaints "stemmed from concerns at Synchrony that collectible losses were higher than what the Company expected." *Id.*

FE6, a former Regional Credit Sales Manager at Synchrony, stated that "employees' bonuses decreased in parallel to the decrease in the number of consumers that Synchrony

approved because Synchrony based a portion of sales employees' bonuses on the number of applications submitted and a portion on the number of applications actually approved." *Id.* ¶ 85. FE6 also allegedly "witnessed a 'significant drop' in approvals going into the spring of 2017, . . . with a year-over-year decline of approximately 15–20%." *Id.* ¶ 89. At the same time, in early 2017, FE8, a former Credit Collections Specialist at Synchrony, allegedly witnessed "an increase in customers with better credit scores obtaining Synchrony cards." *Id.* ¶ 88.

On April 28, 2017, on an earnings call, Synchrony allegedly made its "first partial corrective disclosure," *id.* ¶ 100, and announced "sharply disappointing results for the first quarter of fiscal year 2017, including a 14% decline in annual net income, and attributed its poor performance to its souring loan portfolio," *id.* ¶ 111. Mr. Doubles allegedly stated, with respect to underwriting: "The changes that we've been making, we'll continue to make, are pretty surgical in nature." *Id.* ¶ 90. On the same call, Ms. Keane allegedly stated: "'Our results were impacted by the 45% increase in the provision for loan losses we experienced this quarter,'" and that "'net charge-offs came in at 5.33% compared to 4.74% in the first quarter of last year.'" *Id.* ¶ 113. Mr. Doubles allegedly added that the "'provision for loan losses increased 45% over last year,'" that "'the increase was driven by higher reserve build and receivables growth,'" and that the "'back half of [2016] is better than first half,'" but that the "'underwriting box for us has been largely consistent.'" *Id.* ¶¶ 113–14. When asked by a Credit Suisse analyst to "talk about what things [Synchrony is] doing differently" in response, and whether Synchrony is "doing things either to tighten from a credit perspective or from a profitability perspective," Ms. Keane allegedly reiterated that Synchrony's "overall underwriting standards and cutoffs have been largely consistent." *Id.* ¶ 115 (emphasis omitted). Ms. Keane allegedly further answered:

> [W]e haven't made what I would call significant changes to our underwriting model to tighten up. The changes that we've been making, we'll continue to make, are pretty surgical in nature.

> They're specific to certain portfolios or certain credit strategies. We're always adjusting things like line assignments, refining upgrade strategies and things like that. So yes, we tightened a bit in the second half. We'll continue to refine our strategies here as we move throughout 2017 . . . I wouldn't say it's anything dramatic that's going to slow down the growth rate of the business.

*Id.* (emphasis omitted). Mr. Doubles later allegedly repeated that the "modifications" were "pretty surgical." *Id.* ¶ 116.

Synchrony's stock allegedly dropped nearly 16% due to the statements made on the April 28, 2017 call. *Id.* ¶¶ 118, 236. Following Synchrony's announcement on changes to its underwriting practices, "market researchers and the media connected Synchrony's poor loan portfolio performance to its lax underwriting practices." *Id.* ¶ 238 (citing and quoting from numerous sources).

Lead Plaintiffs allege that these statements "continued to downplay the widespread nature of Synchrony's tightening of its underwriting and that the underwriting changes were so significant that they would materially reduce approvals and threatened Synchrony's long-standing relationships with its retail partners, including Walmart." *Id.* ¶ 119.

### 3. Impact on Synchrony's Partnership with Walmart and Relevant Events After April 28, 2017

According to the Lead Plaintiffs, the Exchange Act Defendants "publicly misstated (and failed to disclose) that the modifications to Synchrony's underwriting, and the resulting decrease in near-prime and subprime customers, frustrated retail partners' (including Walmart's) ongoing demand for more approvals from Synchrony for near-prime and subprime customers, and caused Synchrony's retail partners to push back on these credit decisions by Synchrony." *Id.* ¶ 98.

According to the Lead Plaintiffs, "Walmart historically had one of the lowest requirements for credit approvals across all of Synchrony's portfolios," *id.* ¶ 123, and tension with Walmart ensued due to Synchrony's alleged tightening of its underwriting practices, *id.* ¶¶

121–27. Numerous former employees recount how they heard through supervisors or first-hand that Walmart was displeased, "beginning in the fall of 2017, when it saw approval rates for [private label credit cards or Dual Cards] beginning to drop." *Id.* ¶ 134; *see also id.* ¶¶ 122, 125 133, 135–39, 144–47, 149–53. Former employees also describe Synchrony's allegedly "struggling" relationship with Sam's Club, a Walmart subsidiary. *Id.* ¶ 140–41.

Ms. Keane's allegedly increased contacts with Walmart in the middle of 2017 was further "evidence that the relationship between Synchrony and Walmart was suffering." *Id.* ¶ 142. According to FE6, Ms. Keane and Mr. Quindlen flew frequently to Walmart's Arkansas headquarters between April and June 2017. *Id.* According to FE9, a former Acquisitions Strategy Manager at Synchrony, Ms. Keane visited Walmart's headquarters about once or twice a month during this time, before she visited once or twice a year. *Id.* ¶ 143.

The "pushback" that Synchrony allegedly received from retail partners regarding its "new underwriting standards and decreased approvals" extended beyond Walmart, and included Sam's Club and Lowe's, which was concerned mainly about its commercial customers. *Id.* ¶¶ 155–56. Lead Plaintiffs allege the following instances where Exchange Act Defendants "repeatedly overstated the health of its partnerships and affirmatively, falsely represented that Synchrony was receiving no 'pushback' from its partners on its credit decisions." *Id.* ¶ 157.

On June 2, 2017, in response to a question on an earnings call about "'2 big partnerships up in 2019,'" Ms. Keane allegedly responded that she was "pretty confident" that Synchrony would keep the partnerships. *Id.* Lead Plaintiffs also allege that Mr. Doubles "admitted" on this call that "Synchrony saw mid-2016 'as the inflection point' at which Synchrony started 'making changes almost immediately,'" allegedly to its underwriting practices. *Id.* ¶ 79.

On July 21, 2017, on an earnings call, Mr. Doubles similarly allegedly claimed feeling "pretty positive about the relationships that are coming up, the relationships we've had for a

very, very long time," and reiterated later that he was "confident" of renewals. *Id.* ¶ 157. According to Securities, Synchrony's stock price increased 4.54% that day "[i]n response to" these misrepresentations. *Id.* ¶¶ 211–12.

On October 20, 2017, on an earnings call, in response to an analyst's question about the "large renewals out in 2019," Ms. Keane allegedly responded that Synchrony was "very confident" about renewing those relationships. *Id.* ¶ 157. She also allegedly stated: "I feel like we have very good relationships right now." *Id.* According to Lead Plaintiffs, Synchrony's stock price increased 4.19% that day "[i]n response to" these misrepresentations. *Id.* ¶¶ 213–14.

On November 14, 2017, Mr. Doubles allegedly "dismissed analyst concerns about how Synchrony was managing the 'natural tension' between 'retailers that want to drive sales' and Synchrony's goals from 'the standpoint of both credit extension and growth.'" *Id.* ¶ 157. Mr. Doubles also allegedly claimed to investors that Synchrony's retailer share agreements "completely aligned" Synchrony's interests with those of its retail partners, so the retailers "have a real incentive not to underwrite deeper as well." *Id.* Finally, Mr. Doubles allegedly elaborated on Synchrony's "tighten[ing] up . . . of the approval criteria in some programs, not across-the-board but in certain target areas." *Id.* ¶ 82.

These alleged misrepresentations "artificially inflated Synchrony's stock price" such that from June 2 to November 14, 2017, Synchrony's stock price increased almost 19%. *Id.* ¶ 159. On November 17, 2017, Mr. Doubles and Ms. Keane allegedly entered into Rule 10b5-1 plans for stock sales in early 2018, "while they knew [about Walmart's pushback] . . . and . . . that Walmart had balked at renewing its partnership with Synchrony." *Id.* ¶ 160.

On January 19, 2018, on an earnings call, Ms. Keane allegedly again "rejected analyst concerns that the Company's 'underwriting refinements and tightening' had led to a decline in consumer purchase volume and 'pushback' from retail partners." *Id.* ¶ 161. Ms. Keane allegedly

stated that Synchrony was "not getting any pushback on credit," and that "these are modest refinements." *Id.* Mr. Doubles allegedly described the "refinements" as having had a "positive impact": "As you remember, we started making refinements to our underwriting in the second half of 2016, and we continue to see the positive impact of those changes." *Id.* ¶ 162.

Lead Plaintiffs allege these statements were "materially false and misleading," because Synchrony had received "pushback on credit" from Walmart and Lowe's, so Synchrony was not seeing a "positive impact" of its underwriting changes. *Id.* ¶ 163. These alleged misrepresentations "artificially inflated" Synchrony's stock prices and allegedly caused Synchrony's stock price to increase 3.14%, with Ms. Keane and Mr. Doubles allegedly personally benefitting. *Id.* ¶¶ 165, 218–21. On February 15, 2018, Mr. Doubles allegedly sold 12,374 shares and Ms. Keane sold 24,748 shares at $36.70/share, "for combined total proceeds of $1.362 million." *Id.* ¶ 165. Five days and six days later, Mr. Quindlen allegedly sold a total of 27,932 shares at prices ranging from $36.72/share to $37.00/share, "for total proceeds of $1.027 million." *Id.* This allegedly was the first time Mr. Quindlen sold personally-held shares of Synchrony stock. *Id.*

On April 20, 2018, Mr. Doubles allegedly reported that in the first quarter of 2018, "consumer lending underwritten for customers with FICO scores lower than 600 declined 15%," which also reflected Synchrony's recent actions. *Id.* ¶ 96.

Lead Plaintiffs describe several other instances where the Exchange Act Defendants allegedly made misrepresentations and failed to disclose retailer pushback. *See id.* ¶¶ 166–71. For instance, on April 20, 2018, on an earnings call, while allegedly discussing changes to Synchrony's underwriting practices, Mr. Doubles stated: "We started to make refinements to our underwriting in the second half of 2016, and we continue to see the positive impact of those

changes." *Id.* ¶ 167. In response to an analyst's question about "big renewals" up in 2019, Ms. Keane stated that Synchrony was "well entrenched" with its partners. *Id.*

On May 1, 2018, Mr. Doubles, Ms. Keane, and Mr. Quindlen allegedly personally benefited from the artificial inflation of Synchrony's stock. *Id.* ¶ 168. Mr. Doubles allegedly sold 4,994 shares at $32.87/share, Ms. Keane allegedly sold 20,496 shares at the same price, and Mr. Quindlen allegedly sold 17,772 shares at $32.89/share. *Id.* On May 22, 2018, Mr. Quindlen also allegedly sold 3,082 shares at $36.00/share. *Id.* The total proceeds from these sales allegedly were $1.533 million. *Id.*

On June 13, 2018, at a conference, in response to an analyst's question regarding Synchrony's partner relationships, Ms. Keane allegedly stated:

> We have a good partnership . . . I think we have good—Walmart is a good partner . . . I'm not afraid by our competition. I think we feel pretty positive about how we built out what we build out . . . With the renewals that we're working on, we have great partnerships, great dialogue going on.

*Id.* ¶ 170 (emphasis omitted).

### 4. The End of Synchrony's Partnership with Walmart

Exchange Act Defendants were allegedly aware that Walmart was unsatisfied with Synchrony's tightened underwriting standards and was considering replacing Synchrony—with Ms. Keane, Mr. Doubles, and Mr. Quindlen "intimately involved in servicing" and "salvag[ing]" the Walmart relationship—yet they continued to make materially false and misleading statements. *Id.* ¶¶ 274–80.

On July 12, 2018, "multiple media sources reported that Walmart was considering moving its branded credit card business from Synchrony to Capital One and had, in fact, pushed back on Synchrony's reduction in credit approvals after it tightened its underwriting." *Id.* ¶ 172. Citing confidential sources, the *Wall Street Journal* stated that Walmart was allegedly

dissatisfied with Synchrony because it "want[ed] Synchrony to approve a higher percentage of applicants," that Walmart executives allegedly believed Synchrony was "keeping too much of the cards' revenue," and that they "aired those concerns in a meeting with Synchrony's board last year." *Id.* ¶ 239. According to the *Wall Street Journal*, in late 2017, unknown to investors, Walmart allegedly launched "for the 'first time,' a formal request for bids from other credit card issuers," including meetings in early 2018 with Synchrony competitors Capital One and Goldman Sachs Group. *Id.* ¶ 148.

Upon this news, Synchrony's stock allegedly fell 5%. *Id.* ¶¶ 173, 239–41. Lead Plaintiffs allege that "[n]o other adverse, Company-specific news entered the market" that day, so the decline in Synchrony's stock price was entirely attributable to "the undisclosed material facts concerning the Walmart relationship that Synchrony had kept from investors" and which the *Wall Street Journal* reported. *Id.* ¶ 240.

On July 26, 2018, several media sources confirmed that "Walmart had selected Capital One for its store-brand cards, ending its close to 20-year relationship with Synchrony." *Id.* ¶ 242. Upon this news, Synchrony's stock allegedly fell 10.3% and analysts "worried about what the news portended for Synchrony moving forward." *Id.* ¶¶ 242–43. Lead Plaintiffs allege that "[n]o other adverse, Company-specific news entered the market" that day, so the decline in Synchrony's stock price was entirely attributable to "the undisclosed material facts concerning the Walmart relationship that Synchrony had kept from investors." *Id.* ¶ 243.

On July 27, 2018, on an earnings call, in response to an analyst's question about the state of the Synchrony-Walmart partnership, Mr. Doubles allegedly stated that the old agreement with Walmart "was somewhat unique in terms of the profile." *Id.* ¶ 176. Mr. Doubles allegedly continued:

> That became a challenge for us from an economic standpoint. And in this case, we just weren't able to earn a return that was in line with the credit risk of the portfolio. Under the old agreement, we were earning an acceptable return for that risk. In the renewal discussions, it became clear that we weren't . . . going to be able to maintain that acceptable level of return for the risk that we are taking.

*Id.* In response to an analyst's question about whether Walmart's decision not to renew was due to Synchrony's tightening underwriting around the Walmart program, Mr. Doubles allegedly responded, "'No. I would not assume that,' because the 'credit actions' that Synchrony had taken to tighten underwriting were 'applied across pretty much [the] entire business.'" *Id.* ¶ 246 (emphasis omitted).

On July 30, 2018, a Barclays analyst allegedly downgraded Synchrony from a "Top Pick," stating that after the July 27, 2018 earnings call, he was not "particularly comforted by [Synchrony's] explanations, nor did [Barclays] feel [that Synchrony] adequately addressed concerns around future renewal uncertainties." *Id.* ¶ 247.

On October 24, 2018, the *Wall Street Journal* allegedly reported that in 2017, "after Walmart told Synchrony it should approve more applicants," Walmart "began offering loans from financial technology firm Affirm Inc. as an alternative to Synchrony cards." *Id.* ¶ 132.

On November 1, 2018, Walmart filed a lawsuit against Synchrony in Arkansas, alleging breach of contract and the implied covenant of good faith and fair dealing. *Id.* ¶ 177. Walmart sought $800 million in damages and claimed:

> Synchrony said it took on a 'unique' level of 'credit risk' with the Walmart/Synchrony credit card program (that is, Synchrony extended credit to riskier customers in the Walmart/Synchrony credit card program as compared to other programs) because the contract between Synchrony and Walmart gave Synchrony what it viewed as an 'acceptable return' for that risk.

*Id.* ¶¶ 177–78 (quoting *Walmart v. Synchrony*, Compl. ¶ 24, No. 5:18-cv-05216-TLP (W.D. Ark. Nov. 1, 2018) ("Walmart Compl.")).

From November 1 to November 2, 2018, Synchrony's shares allegedly declined by 10%. *Id.* ¶¶ 179, 249. Lead Plaintiffs allege that "[n]o other adverse, Company-specific news entered the market" that day, so the decline in Synchrony's stock price was entirely attributable to "the undisclosed material facts concerning the Walmart relationship that Synchrony had kept from investors." *Id.* ¶ 250. Market commentators and analysts allegedly "explicitly linked the allegations in Walmart's complaint to Synchrony's changing its underwriting standards and Walmart's complaints about those changes." *Id.* ¶ 251 (citing excerpts from the *Wall Street Journal*); *id.* ¶ 252 (citing excerpts from the *Arkansas Democrat-Gazette* and the *Motley Fool*); *id.* ¶¶ 253–54 (citing various analyst notes and reports).

Lead Plaintiffs allege that Synchrony, Ms. Keane, and Mr. Doubles

> each made materially false and misleading statements and omissions concerning, among other things: (i) the quality of Synchrony's credit portfolio; (ii) Synchrony's purported "consistent" and "disciplined" approach to underwriting; and (iii) the strength of Synchrony's relationships with its key retail partners and purported lack of any pushback from them on Synchrony's changes to its credit approvals.

*Id.* ¶ 181.

Furthermore, Lead Plaintiffs allege that the statements described above

> were also materially misleading for their failure to disclose the following material adverse facts: (i) in mid-2016, after years of approving risky subprime borrowers, Synchrony significantly tightened its underwriting standards; (ii) the tightened underwriting standards and resulting decline in subprime approvals created a conflict between Synchrony and its partners, including Walmart (then Synchrony's largest partner, with a customer base that included significant amounts of subprime customers); (iii) Walmart told Synchrony in 2017 to approve more borrowers; (iv) the conflict between Synchrony and Walmart jeopardized Walmart's renewal of its contract with Synchrony; (v) in the Fall of 2017, when Synchrony approached Walmart about renewing the Synchrony-Walmart

contract, Walmart "balked" at the renewal; (vi) Walmart informed
the Synchrony Board in 2017 of Walmart's concerns that Synchrony
needed to approve more customers and was keeping too much of the
cards' revenue; and (vii) in 2017, Walmart issued a formal request
for contract bids from other credit card companies.

*Id.* ¶ 208.

As a result of their purchases of Synchrony securities during the Class Period and the

Exchange Act Defendants' alleged misrepresentations detailed above, Lead Plaintiffs first allege

they suffered harm under Section 10(b) of the Exchange Act and SEC Rule 10b-5. *Id.* ¶¶ 231,

298–307; *see also id.* ¶¶ 255–57 (regarding the presumption of reliance and why it should also

apply Class-wide). Furthermore, they allege that the statutory safe harbor is inapplicable to

Synchrony, *id.* ¶¶ 258–59, and that numerous facts support the inference that Exchange Act

Defendants "knew or recklessly disregarded that their statements and omissions, as set forth . . .

above were materially false and misleading when made," *id.* ¶ 260; *see also id.* ¶¶ 261–85.

According to Lead Plaintiffs, the stock sales of Ms. Keane, Mr. Doubles, and Mr.

Quindlen detailed above was insider trading in violation of Section 20A of the Exchange Act

because they sold Synchrony common stock "while in possession of material, nonpublic

information about [Synchrony's] underwriting standards and practices, and its relationships with

its retail partners." *Id.* ¶ 309.

Over the Class Period, Ms. Keane allegedly personally profited by selling 64,744 shares,

with gross proceeds of $2,261,860 and net proceeds of $1,608,585, *id.* ¶ 312; Mr. Doubles

allegedly personally profited by selling 33,477 shares, with gross proceeds of $1,175,257 and net

proceeds of $747,743, *id.* ¶ 313; and Mr. Quindlen allegedly personally profited by selling

48,786 shares, with gross proceeds of $1,722,616 and net proceeds of $932,901, *id.* ¶ 314.

At the same time the Exchange Act Defendants allegedly were selling their stock, the

Lead Plaintiffs allegedly purchased a total of 782,580 shares of Synchrony common stock for

more than $27.2 million, *id.* ¶ 315, and they detail purchases by other class members as well. Lead Plaintiffs allege that their purchase of Synchrony common stock, contemporaneous with these alleged insider sales, caused them to pay "artificially inflated prices," and that "they would not have purchased Synchrony common stock at the prices they paid, or at all, if they had been aware" of this artificial inflation. *Id.* ¶ 317.

Ms. Keane, Mr. Doubles, and Mr. Quindlen also allegedly violated Section 20(a) of the Exchange Act for their misrepresentations because they are allegedly "controlling persons of Synchrony." *Id.* ¶ 319.

### 5. Class Action Allegations Under the Securities Act

In addition to the above allegations related to claims under the Exchange Act, Lead Plaintiffs also asserts strict liability and negligence claims under the Securities Act "on behalf of itself and the members of the class who purchased or otherwise acquired the Synchrony notes in the Offering and suffered damages as a result." *Id.* ¶ 320.

Defendants allegedly "made a series of materially untrue statements and omissions of material facts" in Synchrony's registration statement, preliminary prospectus, prospectus, and other public filings incorporated by reference or otherwise deemed part of the registration statement[5] ("Offering Materials") in connection with the Offering of the Synchrony Notes, which has $1 billion aggregate principal amount due in 2027. *Id.* ¶¶ 322, 326.

Lead Plaintiffs allege that the Securities Act Individual Defendants specifically "were required to supervise the preparation and dissemination of the [Offering's] Registration Statement." *Id.* ¶ 339. They allege that the Securities Act Individual Defendants had a duty:

---

[5] Specifically, these materials are Synchrony's Annual Report on Form 10-K for 2016 filed with the SEC on February 23, 2017, the preliminary prospectus supplement filed with the SEC on November 28, 2017, a pricing term sheet filed with the SEC on November 28, 2017, a prospectus supplement filed with the SEC on November 30, 2017. *Id.* ¶¶ 326–27.

> (a) to disseminate promptly complete, accurate, and truthful information with respect to Synchrony; (b) to correct any previously issued statements from any source that had become materially misleading or untrue; and (c) to disclose any trends that would materially affect earnings and the present and future operating results of Synchrony, so that the market price of Synchrony's publicly traded securities would be based upon truthful and accurate information.

*Id.* ¶ 342.

On September 16, 2016, Synchrony allegedly filed with the Securities and Exchange Commission ("SEC") the registration statement, which was signed by the Securities Act Individual Defendants. *Id.* ¶ 324. The Offering allegedly was underwritten by Underwriter Defendants. *Id.* ¶ 325.

Lead Plaintiffs allege that the Offering Materials contain the following statement:

> Our business benefits from longstanding and collaborative relationships with our partners, including some of the nation's leading retailers and manufacturers with well-known consumer brands. We believe our partner-centric business model has been successful because it aligns our interests with those of our partners and provides substantial value to both our partners and our customers. Our partners promote our credit products because they generate increased sales and strengthen customer loyalty.

*Id.* ¶¶ 353–55 (emphasis omitted). According to the Lead Plaintiffs, the preceding statement allegedly "materially misstated and omitted material facts sufficient to render them not misstated," because of their preceding allegations regarding Defendants' misrepresentations of Synchrony's underwriting practices and retail partner relationships. *Id.* ¶ 356.

Lead Plaintiffs highlight additional portions of Synchrony's 2016 Form 10-K as material misstatements, specifically where Synchrony allegedly emphasized its "stable asset quality;" that the "credit environment remained favorable during 2016;" and other remarks indicating Synchrony was "not anticipat[ing] making changes to [its] underwriting standards." *Id.* ¶ 357. Lead Plaintiffs also allege that the foregoing misstatements also "fail[ed] to disclose material,

non-public facts whose non-disclosure rendered" the statements "materially misstated." *Id.* ¶ 358; *see also id.* ¶¶ 358–59 (reiterating the misstatements at issue). Furthermore, Defendants allegedly failed to investigate, and did not possess reasonable grounds, for the beliefs that "the statements contained in the Offering Materials were accurate and complete and not misstated in all material aspects." *Id.* ¶ 361.

Lead Plaintiffs allege that there was a lack of due diligence on the part of Defendants, *id.* ¶¶ 362, 364–67, and that had Defendants "exercised reasonable care, they would have known of the material misstatements and omissions alleged herein," *id.* ¶ 363.

For their claim under Section 11 of the Securities Act, Lead Plaintiffs allege that they suffered damages from their purchase of the Synchrony Notes, because the registration statement and other Offering Materials were "inaccurate and misleading." *Id.* ¶¶ 370–71. This claim is brought against the Defendants for their participation in the issuance of allegedly "materially untrue and misleading written statements to the investing public that were contained in the Offering Materials." *Id.* ¶ 375. The claim under Section 15 of the Securities Act is brought against the Securities Act Individual Defendants only, based on their positions as directors or senior officers of Synchrony. *Id.* ¶¶ 380–81.

Lead Plaintiffs also seek to bring their claims under the Securities Act as a class action under Rule 23 of the Federal Rules of Civil Procedure. *Id.* ¶¶ 384–89.

### B. Procedural History

The Court assumes familiarity with the underlying procedural history. *See* Ruling and Order on Mots. to Appoint Lead Pl. and Lead Counsel at 4–7, ECF No. 59 (Feb. 5, 2019).

On February 5, 2019, the Court appointed APG as Lead Plaintiff and Bernstein Litowitz Berger & Grossman LLP as Lead Counsel for the Class. *Id.* at 13.

On March 25, 2019, the Court *sua sponte* ordered: (1) consolidation of the Derivative Actions with this action, the Securities Class Action; (2) assignment of any related actions that are "subsequently filed, removed, or transferred to this District to this Court;" and (3) consolidation of any related actions assigned to this Court with this action. Order, ECF No. 73 (Mar. 25, 2019) ("Consolidation Order"). As a result, two shareholder derivative actions brought on behalf of Synchrony by Jeffrey Gilbert and Maureen Aldridge ("Derivative Plaintiffs")— *Gilbert v. Keane et al.*, No. 3:19-cv-130, and *Aldridge v. Keane et al.*, No. 3:19-cv-369 ("Derivative Actions")—were consolidated with the Securities Class Action on the same day. Notice of Consolidation, ECF Nos. 74–75 (Mar. 25, 2019).

On April 5, 2019, Lead Plaintiffs filed their Amended Complaint. Am. Compl.

On April 12, 2019, Derivative Plaintiffs moved for relief from the Consolidation Order, and requested that the Court: (1) sever the Derivative Actions from the Securities Class Action or (2) separately consolidate the Derivative Actions under a new caption and appoint the Rosen Law Firm, P.A., and The Brown Law Firm, P.C., as Co-Lead Counsel. Mot. for Relief from Order for Consolidation and Appointment of Co-Lead Counsel for Pls. at 2–3, ECF No. 80 (Apr. 12, 2019) ("Mot. for Consolidation Relief").

On June 26, 2019, Defendants moved to dismiss the Amended Complaint. Mot. to Dismiss, ECF No. 98 (June 26, 2019). In addition to a supporting memorandum, Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Compl., ECF No. 99 (June 26, 2019) ("Defs.' Mem"), Defendants also filed eighty exhibits, ECF Nos. 99-1 to 99-80, which include transcripts of earnings calls, transcripts of industry conferences, and relevant journal or news articles, most of which were referenced in Lead Plaintiffs' Amended Complaint.

In addition, Defendants filed the following excerpted public disclosures, which were also filed with the SEC:

- Form 10-Qs,[6] indicating Synchrony's quarterly reports from the third quarter of 2015, ECF No. 99-59, and the third quarter of 2016, ECF No. 99-10;

- Form 8-Ks,[7] indicating Synchrony's current report from 2016, ECF No. 99-5, and 2017, ECF No. 99-66;

- 2015 Form 10-K,[8] indicating Synchrony's 2015 annual report, ECF No. 99-62;

- 2016 Form 10-K, indicating Synchrony's 2016 annual report, ECF No. 99-24;

- 2017 Form 10-K, indicating Synchrony's 2017 annual report, ECF No. 99-40; and

- 2018 Form 10-K, indicating Synchrony's 2018 annual report, ECF No. 99-52.

On August 21, 2019, Lead Plaintiffs opposed the motion to dismiss. Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Am. Compl., ECF No. 116 (Aug. 21, 2019) ("Pls.' Opp'n"). In support, Lead Plaintiffs filed twenty-nine exhibits, including the redacted Walmart Complaint, transcripts from various earnings call held by Capital One Financial Corporation and Discover Financial Services, and transcripts from Synchrony's presentations at certain industry conferences. Exs., ECF Nos. 116-2 to 116-29.

---

[6] *See* Form 10-Q, *Securities and Exchange Commission*, available at https://www.sec.gov/fast-answers/answersform10qhtm.html (last visited Mar. 28, 2020) ("The federal securities laws require public companies to disclose information on an ongoing basis. For example, domestic issuers must submit annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K for a number of specified events and must comply with a variety of other disclosure requirements. The Form 10-Q includes unaudited financial statements and provides a continuing view of the company's financial position during the year. The report must be filed for each of the first three fiscal quarters of the company's fiscal year." (hyperlinks omitted)).

[7] *See* Form 8-K, *Securities and Exchange Commission*, available at https://www.sec.gov/fast-answers/answersform8khtm.html (last visited Mar. 28, 2020) ("In addition to filing annual reports on Form 10-K and quarterly reports on Form 10-Q, public companies must report certain material corporate events on a more current basis. Form 8-K is the 'current report' companies must file with the SEC to announce major events that shareholders should know about." (hyperlinks omitted)).

[8] *See* Form 10-K, *Securities and Exchange Commission*, available at https://www.sec.gov/fast-answers/answers-form10khtm.html (last visited Mar. 28, 2020) ("The federal securities laws require public companies to disclose information on an ongoing basis. . . .  The annual report on Form 10-K provides a comprehensive overview of the company's business and financial condition and includes audited financial statements.").

On October 11, 2019, Defendants replied. Defs.' Reply Mem. of Law in Further Supp. of Their Mot. to Dismiss the Am. Compl., ECF No. 118 (Oct. 11, 2019) ("Defs.' Reply").

On October 24, 2019, Lead Plaintiffs filed a notice of additional authority concerning the decision in *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Industries Ltd.*, No. 3:17-cv-558, 2019 WL 4674839 (D. Conn. Sept. 25, 2019). Pls.' Notice of Add'l Auth. in Further Opp'n to Defs.' Mot. to Dismiss, ECF No. 124 (Oct. 24, 2019) ("Pls.' Notice of Add'l Auth.").

On November 1, 2019, Defendants responded. Defs.' Resp. to Pls.' Notice of Add'l Auth., ECF No. 126 (Nov. 1, 2019) ("Defs.' Resp. to Add'l Auth.").

On March 26, 2020, the Court held a hearing on Defendants' motion to dismiss and Derivative Plaintiffs' motion for relief from consolidation.[9] Minute Entry, ECF No. 151 (Mar. 26, 2020).

At that hearing, the Court separately granted Derivative Plaintiffs relief from consolidation. Order, ECF No. 152 (Mar. 26, 2020). The Court severed the Derivative Actions from the Securities Class Action, and separately consolidated the Derivative Actions into their own action, under the caption of *In re Synchrony Financial Derivative Litigation*, with the lead case being No. 3:19-cv-130. *Id.*

---

[9] Also pending before the Court is Lead Plaintiffs' motion for a partial modification of the discovery stay imposed under the Private Securities Litigation Reform Act—Lead Plaintiffs request that the Court order Defendants to produce an unredacted copy of the complaint in *Walmart v. Synchrony Bank*, No. 5:18-cv-5216 (TLB) (W.D. Ark. 2018). Pls.' Mot. for Partial Modification of the PSLRA Discovery Stay, ECF No. 121 (Oct. 21, 2019) ("Pls.' Mot. to Modify PSLRA Discovery Stay"); Pls.' Mem. of Law in Supp. of Pls.' Mot. to Modify PSLRA Discovery Stay, ECF No. 122 (Oct. 21, 2019).

Defendants have opposed the modification of the discovery stay and argued that Lead Plaintiffs failed to demonstrate undue prejudice. Defs.' Mem. of Law in Opp'n to Pls.' Mot. to Modify PSLRA Discovery Stay, ECF No. 128 (Nov. 12, 2019).

The Court's disposition of Defendants' motion to dismiss renders this motion moot, and the Court will rule accordingly after the entrance of this ruling and order.

The Court also amended the caption of this case, the Securities Class Action, No. 3:18-cv-1818, to *In re Synchrony Financial Securities Litigation*. Order, ECF No. 153 (Mar. 26, 2020).

## II.    STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

For most claims brought under sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b), imposes

heightened pleading requirements governed by the PSLRA or Rule 9(b) of the Federal Rules of Civil Procedure. *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) ("As the district court observed, the particularity requirement of Rule 9(b) applies to securities fraud claims brought under Section 10(b) and Rule 10b–5 . . . . The district court concluded that the same heightened pleading standard applies to securities claims brought under Section 11 and Section 12(a)(2) when premised on averments of fraud. We agree."); *see also Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc*., 268 F. Supp. 3d 526, 535 (S.D.N.Y. 2017) ("A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act ("PSLRA"[.]")); *In re Initial Pub. Offering Sec. Litig*., 241 F. Supp. 2d 281, 334–35 (S.D.N.Y. 2003) ("Congress intended that the PSLRA supersede the Federal Rules only as to those elements which the PSLRA explicitly mentions (i.e., scienter and material misstatements and omissions). See S. Rep. No. 104–98, at 15. In all other respects, the Rules govern these pleadings.").

Under Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Bank of Am. AIG Disclosure Sec. Litig*., 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd* 566 F. App'x 93 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 99 (2d Cir. 2007)); *see also* Fed. R. Civ. P. 9(b) (requiring that a complaint that alleges fraud plead "the circumstances constituting fraud . . . with particularity.").

On the loss causation element of securities fraud claims, however, Plaintiffs must meet only Rule 8 pleading requirements. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005) ("We concede that the Federal Rules of Civil Procedure require only 'a short and plain statement

of the claim showing that the pleader is entitled to relief.' Fed. Rule Civ. Proc. 8(a)(2). And we assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.").

## III.  DISCUSSION

Lead Plaintiffs assert five claims for relief: (1) violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, against Synchrony, Ms. Keane, Mr. Doubles, and Mr. Quindlen; (2) violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against Ms. Keane, Mr. Doubles, and Mr. Quindlen; (3) violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Ms. Keane, Mr. Doubles, and Mr. Quindlen; (4)  violations of Section 11 of the Securities Act,15 U.S.C. § 77k, against Defendants; and (5) violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Securities Act Individual Defendants. The claims under Sections 11 and 15 are newly added claims purportedly brought by APG Fixed.

Defendants argue that the Amended Complaint should be dismissed for the following reasons: (1) Lead Plaintiffs fail to plead any actionable misrepresentation as of April 28, 2017; (2) they fail to plead a strong inference of scienter with respect to statements made before April 28, 2017; (3) they fail to plead an actionable misrepresentation after April 28, 2017; (4) they fail to plead particularized facts giving rise to a strong inference of scienter for statements made after April 28, 2017; (5) their insider trading claim under Section 20A fails, as does their claim under Section 20(a); and (6) the Amended Complaint fails to state a Securities Act claim.

The Court will address each of these issues in turn.

## A. Claims Under Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for "any person, directly or indirectly. . ."

> [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

SEC Rule 10b-5 makes it unlawful for "any person, directly or indirectly . . .":

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"To state a cause of action under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 645 F. App'x 72, 74 (2d Cir. 2016) (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996)).

In monetary damages suits against non-controlling persons, plaintiffs first must specify each allegedly misleading statement or omission. 15 U.S.C. §§ 78u-4(b)(1)(A)–(B). *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir.2005) (internal citation omitted), *cert. denied*, 546 U.S. 935 (2005). Plaintiffs then must demonstrate that each misstatement is material. *In re*

*Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 306 (S.D.N.Y. 2005) ("A plaintiff must allege a material misstatement . . . and that misstatement must be the cause of the plaintiff's loss . . . ."). "For an undisclosed fact to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

Misstatements of corporate success come in two varieties: vague and inactionable puffery, and material misrepresentations of existing facts. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true . . . . these statements were plainly false and misleading."). "[S]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient" to support a claim of securities fraud. *Id.*

By contrast, "defendants may be liable for misrepresentations of existing facts." *Id.* (citing *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 74–75 (S.D.N.Y. 1996)). To withstand a motion to dismiss, Plaintiffs must plead more than a laggardly response to problems or lack of corporate skepticism. *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 161 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (dismissal of a second amended complaint where the defendants "should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud."). Rather, Plaintiffs must plead material misrepresentations, such as a failure "to timely disclose material data which resulted in misrepresentations of the defendant compan[y's] current finances where it was clearly pled that

the defendants knew or should have known better." *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 572 (S.D.N.Y. 2007) (citing *Novak*, 216 F.3d at 311).

Plaintiffs also must meet the Private Securities Litigation Reform Act's heightened pleading standard by "stat[ing] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . stat[ing] with particularity all facts on which that belief is formed." 15 U.S.C. §§ 78u-4(b)(1)(B). If Plaintiffs' allegations are based on confidential sources, those individuals must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Novak*, 216 F.3d at 314).

Lead Plaintiffs allege that Synchrony, Ms. Keane, and Mr. Doubles

> each made materially false and misleading statements and omissions concerning, among other things: (i) the quality of Synchrony's credit portfolio; (ii) Synchrony's purported "consistent" and "disciplined" approach to underwriting; and (iii) the strength of Synchrony's relationships with its key retail partners and purported lack of any pushback from them on Synchrony's changes to its credit approvals.

Am. Compl. ¶ 181.

> Furthermore, Lead Plaintiffs allege that the statements described above

> were also materially misleading for their failure to disclose the following material adverse facts: (i) in mid-2016, after years of approving risky subprime borrowers, Synchrony significantly tightened its underwriting standards; (ii) the tightened underwriting standards and resulting decline in subprime approvals created a conflict between Synchrony and its partners, including Walmart (then Synchrony's largest partner, with a customer base that included significant amounts of subprime customers); (iii) Walmart told Synchrony in 2017 to approve more borrowers; (iv) the conflict between Synchrony and Walmart jeopardized Walmart's renewal of its contract with Synchrony; (v) in the Fall of 2017, when Synchrony approached Walmart about renewing the Synchrony-Walmart contract, Walmart "balked" at the renewal; (vi) Walmart informed the Synchrony Board in 2017 of Walmart's concerns that Synchrony

needed to approve more customers and was keeping too much of the cards' revenue; and (vii) in 2017, Walmart issued a formal request for contract bids from other credit card companies.

*Id.* ¶ 208.

### a. Alleged Misrepresentations Made Before April 28, 2017

Defendants argue that Lead Plaintiffs "fail to adequately plead any actionable misrepresentation or scienter" for statements made between October 16, 2016 and April 28, 2017. Defs.' Mem. at 19.

Defendants first argue that the Amended Complaint relies on "improper puzzle pleading," and next contend that Lead Plaintiffs fail to plead the falsity of several statements related to historical financial numbers or "stable asset quality." *Id.* at 19–21. Specifically, Defendants point to statements related to net charge-offs and loan losses on October 21, 2016, January 20, 2017, February 23, 2017, and snippets from Synchrony's 3Q16 Form 10-Q and 2016 Form 10-K. *Id.* at 20–21.

Defendants also argue that Lead Plaintiffs fail to plead the falsity of any statements describing Synchrony's underwriting as "disciplined or "consistent." *Id.* at 21–22. According to Defendants, Lead Plaintiffs do not base these statements regarding "loosening," then "severe," "drastic," and "wholesale, broad-based" tightening in underwriting "on any facts, let alone particularized ones." *Id.* at 22.

Defendants further argue that Lead Plaintiffs do not plead any facts about when or how Synchrony allegedly loosened its underwriting standards before the Class Period, nor do they plead any facts supporting the contention that increased loan losses and net charge-offs announced in April 2017 resulted from allegedly loosened underwriting or that Synchrony tightened its underwriting as alleged. *Id.* at 22–23. Instead of identifying specific changes to

Synchrony's underwriting evincing "drastic" tightening, Defendants contend that Lead Plaintiffs "rely on conclusory assertions and anecdotes from low-level FEs." *Id.* at 23.

Finally, Defendants argue that Lead Plaintiffs misrepresented Mr. Doubles's July 27, 2018 statement, and that it was not an admission of extensive underwriting changes, but rather one of the numerous disclosures by Defendants about "(i) ongoing tweaking of underwriting, and (ii) the refinements that had been and were being made." *Id.* at 25–26. Defendants submit that Lead Plaintiffs' "quibble with the adjectives used (or not used) does not and cannot state securities fraud," *id.* at 26, and that the post-April 28, 2017 statements must also separately be dismissed as instances of non-actionable puffery or statements of opinion, *id.* at 26–27.

In response, Lead Plaintiffs first contend that the Amended Complaint is not "puzzle pleading," because it "details specific false statements . . . and why each is materially false and misleading." Pls.' Opp'n at 16. Next, Lead Plaintiffs argue that Defendants' repeated denials of tightened underwriting and claims of "consistent" underwriting were materially false and misleading. *Id.* at 17–18. Lead Plaintiffs use statements made on or after April 28, 2017— statements that "admit" changes in underwriting—to support their "challenge [of] Defendants' [pre-April 28, 2017] denials that Synchrony had tightened underwriting." *Id.* at 18–19. Lead Plaintiffs contend they have sufficiently pled facts about Synchrony's earlier loosening, namely that "Synchrony loosened underwriting by expanding credit offerings, and net receivables, by converting [private label credit cards] into Dual Cards," which increases Synchrony's credit exposure without changing its opening FICO stratifications. *Id.* at 19–20 (citing Am. Compl. ¶¶ 9–10, 52–56).

As for statements about net charge-offs and loan losses, Lead Plaintiffs contend that Defendants "later admitted to tightening underwriting in mid-2016," and that Walmart's complaint also alleged Synchrony exposed them to excess credit risk. *Id.* at 20. To support their

allegations that the statements on October 27, 2016 and February 23, 2017 about net charge-off rates, loan loss provisions, and "stable asset quality" were "materially misleading when made," Lead Plaintiffs argue it is not "fraud by hindsight" because Synchrony contemporaneously claimed the favorability of the credit environment in 2016. *Id.* at 21–22.

Finally, Lead Plaintiffs contend that Defendants' denials of tightened underwriting and claims of "consistent" or "disciplined" underwriting were not puffery, "but misrepresentations of existing facts that were central to Synchrony's business." *Id.* at 22. According to Lead Plaintiffs, these statements "misleadingly failed to disclose Synchrony's need to tighten underwriting, Synchrony's risky underwriting of the Walmart portfolio, and the true NCOs and loan losses Synchrony faced." *Id.* at 23. The statements also are not opinions in Lead Plaintiffs' view; and if they were opinions, Lead Plaintiffs contend they are actionable. *Id.* at 24–25.

In reply, Defendants argue that Plaintiffs have failed to adequately allege fraud in the first portion of the Class Period. Defs.' Reply at 2–11.

The Court agrees.

"An alleged misrepresentation is material if 'there is substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (citation omitted). A securities fraud plaintiff thus plausibly must allege that a statement would be misleading to a reasonable investor given the "total mix" of available information. *See Castellano*, 257 F.3d at 180 ("[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." (citation and internal quotation marks omitted)). Lead Plaintiffs' allegations, although lengthy, fall into one of two categories: (1) Defendants drastically tightened their

underwriting in response to underwriting that was previously too lax; and (2) Defendants failed to disclose the tightening of underwriting as it occurred.

For the reasons explained below—namely, that Lead Plaintiffs have narrowly focused on select statements, to the exclusion of all of the publicly available information and disclosures—the Court finds that Lead Plaintiffs have not met their heightened pleading burden with respect to statements made before April 28, 2017.

As an initial matter, "a material misstatement must be false at the time it was made." *In re Express Scripts Holdings Co. Secs. Litig.*, 773 F. App'x 9, 12 (2d Cir. 2019) (citation omitted). Whether a statement is misleading must be "evaluated not only by the literal truth of the statement but also by the context and manner of presentation." *Id.* (quoting *Singh*, 918 F.3d at 67) (quotation marks omitted).

Consequently, Lead Plaintiffs may not use Synchrony's disclosures or admissions on or after April 28, 2017, as evidence of earlier alleged misrepresentations, because they "cannot proceed with 'allegations of fraud by hindsight.'" *In re Express Scripts*, 773 F. App'x at 14 (quoting *Novak*, 216 F.3d at 309). Furthermore, statements are neither false or misleading if they "'are too general to cause a reasonable investor to rely on them' and 'lack the sort of definite projections that might require later correction.'" *Id.* at 12. In this case, Defendants' statements about Synchrony's "stable asset quality," "relatively stable" actual net charge-off rates, and "consistent," "disciplined" underwriting are not material misstatements that would mislead a reasonable investor in the "total mix" of available information.

"Corporate officials . . . are only responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309 (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)). And even if statements about "stable asset quality," net charge-offs, and loan losses were misrepresentations or false, "meaningful cautionary language . . . can render omissions or

misrepresentations immaterial." *In re Duane Reade Inc. Secs. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *5 (S.D.N.Y. Nov. 25, 2003) (citation omitted). Here, the underlying financial documents, when reviewed in their totality, provide "meaningful cautionary language."

As to Lead Plaintiffs' allegations that Defendants' statements about net charge-offs and loan losses were misrepresentations, they "must do more than allege that Defendants could not have actually believed that loan loss reserves were adequate because they later increased reserves." *Malin*, 499 F. Supp. 2d at 148 (collecting cases); *see also Denny*, 576 F.2d at 470 (dismissing Rule 10b-5 claim when plaintiff simply pointed to later disclosures as evidence of misstatements in the original disclosures).

As to Defendants' statements about "stable asset quality," Lead Plaintiffs have similarly failed to demonstrate that they were false. As one example, in Defendants' 2016 Form 10-K, ECF No. 99-24 at 73, "stable asset quality" is a heading, where the paragraph explains in greater detail Synchrony's actual net charge-off rates, and notes that these results were contingent on factors not yet known. *See, e.g.*, 2016 Form 10-K, ECF No. 99-24 at 40 (paragraph explaining in detail the heading "Our results of operations and growth depend on our ability to retain existing partners and attract new partners" (emphasis omitted)).

Indeed, Synchrony noted: "The underlying assumptions, estimates and assessments we use to provide for [loan] losses are updated periodically . . . Changes in [loan loss] estimates can significantly affect the allowance and provision for losses. It is possible that we will experience credit losses that are different from our current estimates."  2016 Form 10-K, ECF No. 99-24 at 104; *see id.* at 48 ("Changes in economic conditions . . . , both within and outside our control, may require an increase in the allowance for loan losses. We may underestimate our incurred losses and fail to maintain an allowance for loan losses sufficient to account for these losses." (emphasis omitted)).

As to Defendants' statements about "consistent" or "disciplined" underwriting, Lead Plaintiffs have failed to plead with particularity the falsity of these pre-April 28, 2017 statements. Preliminarily, these statements are "vague . . . generic statements [that] do not invite reasonable reliance." *Singh*, 918 F.3d at 60. And when viewed in the "total mix" of available information, these statements are insufficient to support Lead Plaintiffs' securities fraud claim.

Even as Defendants referred to their underwriting as "consistent" or "disciplined," Defendants also regularly disclosed on the earnings calls and in various documents that they consistently modified their underwriting standards based on the specific program and various factors. For example, during the conference call on December 7, 2016, in response to the analyst's question about Synchrony's credit underwriting, before Mr. Doubles referenced Synchrony's underwriting as "consistent," he also stated, *inter alia*, "We're always making tweaks and refinements and modifying the model a little bit." Ex. 19: Tr. Goldman Sachs Conference, ECF No. 99-19 (Dec. 7, 2016); *see also* 2015 Form 10-K, ECF No. 99-62 at 20 ("We periodically analyze performance trends of accounts originated at different score levels as compared to projected performance, and adjust the minimum score or the opening credit limit to manage risk."); 2016 Form 10-K, ECF No. 99-24 at 20 ("We periodically analyze performance trends of accounts originated at different score levels as compared to projected performance, and adjust the minimum score or the opening credit limit to manage risk. Different scoring models may be used depending upon bureau type and account source."); *id.* at 48 ("Our ability to manage credit risk and avoid high charge-off rates also may be adversely affected by economic conditions that may be difficult to predict, such as the recent financial crisis. . . . There can be no assurance that our credit underwriting and risk management strategies will enable us to avoid high charge-off levels or delinquencies, or that our allowance for loan losses will be sufficient to cover actual losses.").

As a result, Lead Plaintiffs have failed to allege that these statements—standing alone or viewed together with their other allegations—are material misrepresentations on which a reasonable investor would rely, given the broader context of all of the publicly disclosed information Synchrony made available to investors.

In any event, many of the cited statements, taken out of context from more extensive and detailed earnings calls or public disclosures, would constitute inactionable puffery or opinion. *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations."). "While certain statements, viewed in isolation, may be mere puffery, when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors." *In re Signet Jewelers Ltd. Secs. Litig.*, No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018) (internal quotation marks and citations omitted). Here, though, as the Court has already outlined, the "total mix" of information would inform a reasonable investor that Defendants were consistently "modifying" their underwriting, even if many of the challenged statements about "consistent" and "disciplined" underwriting were made in direct response to analyst questions about Synchrony's underwriting and credit decisions.

Given the "total mix" of publicly available information and the immateriality of many of the statements, the Lead Plaintiffs have failed to allege plausibly that reasonable investors would have been misled by Defendants' statements, much of which was optimism or puffery.

Accordingly, all claims stemming from Defendants' alleged misstatements regarding Synchrony's net charge-off rates, loan losses, "stable asset quality," and "consistent," "disciplined" underwriting—essentially all pre-April 28, 2017 statements—will be dismissed.

### b. Alleged Misrepresentations Made on or After April 28, 2017

With respect to statements made on or after April 28, 2017, Defendants first argue that

Lead Plaintiffs fail again to adequately plead any actionable misrepresentation. Defs.' Mem. at

28. As Defendants view the law, "Second Circuit precedent precludes" Lead Plaintiffs' claim

that "Synchrony had some duty to disclose a 'souring' of the Walmart relationship sooner." *Id.*

Defendants contend that Lead Plaintiffs fail to plead the falsity of "statements describing

the nature of Synchrony's underwriting changes as 'surgical' or 'targeted;'" statements about

alignment of Synchrony's interests with its retail partners; and statements about no "pushback"

from retail partners on Synchrony's underwriting changes. *Id.* at 35–38. Defendants argue that

Lead Plaintiffs mischaracterize or ignore the context of Ms. Keane's and Mr. Doubles's

statements expressing confidence in renewals. *Id.* at 38–39. According to Defendants, none of

the challenged statements about renewals were specific to Walmart; they also submit that Ms.

Keane and Mr. Doubles "were not required to take a negative view of their business prospects or

to accompany their disclosures with the particular pejorative favored by Plaintiffs with the

benefit of hindsight." *Id.* at 40–41.

Finally, Defendants argue that they had no duty to disclose each step of the Walmart

negotiations or to predict that Walmart would not renew, because the "discussions were

ongoing." *Id.* at 41–43 (citation omitted). In Defendants' view, many of the challenged

statements made post-April 28, 2017, are also "inactionable puffery on which no reasonable

investor would rely, particularly given the context of Defendants' repeated warnings about

intense competition for renewals." *Id.* at 43–44.

In response, Lead Plaintiffs argue that they have adequately pled the falsity of

Defendants' statements that they were "confident" that retail partners would renew their

contracts, and they were "not getting any pushback on credit" from retail partners. Pls.' Opp'n at

30. They contend that they have adequately pled that Synchrony tightened its underwriting, "hid that tightening and its true scope from investors," and that retail partners, including Walmart, "pushed back on Synchrony's reduced credit approvals." *Id.* at 31. According to Lead Plaintiffs, contemporaneous facts corroborate this retail partner pushback, which further supports the falsity of Defendants' "partner-centric business model," because "[w]hen Synchrony attempted to mitigate downside on the Walmart portfolio by tightening underwriting, the Company further misaligned its interests from Walmart's." *Id.* at 32–34.

As for Defendants' statements about "surgical" underwriting changes, Lead Plaintiffs point to FEs who state "there was nothing surgical about" the "broad-based" changes. *Id.* at 34–35. For example, on the commercial side, Lead Plaintiffs emphasize a new FICO cut-off score of 620, where previously there was no cut-off. *Id.* at 35.

According to Lead Plaintiffs, Defendants had a duty to disclose Walmart's pushback and the allegedly faltering contract renewal negotiations because these events were directly contrary to their contemporaneous public statements. *Id.* at 35–38. Based on the context, Lead Plaintiffs submit these statements and nondisclosures are not puffery or opinion, but material misrepresentations, especially because "the Walmart negotiations provided no basis for confidence." *Id.* at 38–41.

In reply, Defendants submit that many of the challenged statements constitute puffery or opinion, Defs.' Reply at 14–15, and regardless, they argue that Lead Plaintiffs have not identified any actionable misrepresentation—because the statements at issue were not false—nor did Defendants have a duty to disclose "every step of the Walmart negotiations or predict that Walmart would not renew," *id.* at 11–14 (internal quotation marks omitted).

The Court agrees.

"A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998). There is, however, "no duty to update vague statements of optimism or expressions of opinion," "statements [that] are not material," or statements that are "not forward looking and do[ ] not contain some factual representation that remains 'alive' in the minds of investors as a continuing representation." *Id.*

"A pure omission is actionable under securities laws only when the corporation is subject to a duty to disclose the omitted facts, and in and of themselves, Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information." *In re Express Scripts Holdings Co. Secs. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016)).

As an initial matter, Defendants' statements expressing confidence in partnership renewals, even Walmart's renewal, are not materially misleading, especially because Defendants warned about the increased competition for renewals. *See, e.g.*, Tr. Earnings Call, ECF No. Ex. 99-39 at 13 (Jan. 19, 2018) (Ms. Keane describing the environment around renewals as "competitive"); *see also Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630, 633 (2d Cir. 2019) ("To the extent these statements implicitly downplayed the risk that the non-renewal of the Costco Canada Agreement foretold the non-renewal of the Costco U.S. Agreement, such a connotation was "not sufficiently concrete, specific or material to impose a duty to update." (citing *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d at 110). Here, Defendants' "statements 'suggest only hope that . . . the talks would go well' and 'did not become materially misleading when the talks did not go well.'" *In re Express Scripts*, 773 F. App'x at 13 (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).

As the Second Circuit recently noted in an analogous case: "[Lead Plaintiff] essentially argues that Defendants should have anticipated the outcome of the negotiations sooner or that the negotiations would deteriorate, but in the circumstances here, where the discussions were ongoing, Defendants did not have a duty to disclose more about the uncertain state of the negotiations." *Id.* at 14 (citation omitted). Similarly here, "[D]efendants' lack of clairvoyance [regarding the Walmart renewals] simply does not constitute securities fraud." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995). As a result, those alleged misstatements will not support a viable securities fraud claim.

Finally, no reasonable investor would be misled by Defendants' statements about their "completely aligned" interests with retail partners, because these are "vague . . . generic statements [that] do not invite reasonable reliance," *Singh*, 918 F.3d at 60, especially when viewed in the "total mix" of available information. *See, e.g.*, 2017 Form 10-K, ECF No. 99-40 at 50 (paragraphs explaining the heading "Competition in the consumer finance industry is intense"). In any event, these statements constitute inactionable puffery on which no reasonable investor would rely.

As for Defendants' statements regarding "surgical" changes to Synchrony's underwriting, Lead Plaintiffs also fail to allege that these statements—standing alone or viewed in the broader context of their other allegations—are material misrepresentations on which a reasonable investor would rely.

First, as discussed with respect to Defendants' statements about "consistent" or "disciplined" underwriting, *supra* above, Defendants regularly disclosed their constant modifications of underwriting standards. The use of "surgical" as a descriptor in this "total mix" of information is another example of a "vague" and "generic" statement that fails to invite reasonable reliance. *Singh*, 918 F.3d at 60.

Second, Mr. Doubles's statements on the July 27, 2018 earnings calls were not false or contradicted by the Walmart Complaint. Lead Plaintiffs emphasized as a misrepresentation Mr. Doubles's statement that Walmart's non-renewal was not due to Synchrony's tightened underwriting, Compl. ¶¶ 176, 246, yet their citing of the Walmart Complaint contradicts their allegation. According to Lead Plaintiffs, the November 1, 2018 Walmart Complaint claimed that "Synchrony . . . exposed [Walmart] to significant credit risk and . . . extended credit to riskier customers in the Walmart/Synchrony credit card program as compared to other programs." Compl. ¶¶ 177–78 (quoting Walmart Compl. ¶ 24). These allegations thus suggest that Walmart's non-renewal was due to Defendants' too-loose underwriting, and not stricter or tightened underwriting, as the Lead Plaintiffs allege. As a result, no reasonable investor would believe that Walmart's non-renewal was due to Synchrony's tightened underwriting.

Accordingly, all claims stemming from the alleged misrepresentations from any of Defendants' post-April 28, 2017 statements will be dismissed.

### c.  Scienter and Loss Causation

Because the Court will dismiss Lead Plaintiffs' claims based on their failure to allege a material misrepresentation, the Court will not reach the issues of scienter or loss causation. *See Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 30 (2d Cir. 2019) (summary order) (affirming district court's judgment on the alternative grounds that the statements at issue did not "amount to a material misrepresentation or omission actionable under section 10(b)" (internal citation omitted)); *In re Ferrellgas Partners, L.P., Secs. Litig.*, No. 16 CIV. 7840 (RJS), 2018 WL 2081859, at *16 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019) (concluding that "Plaintiffs have not pleaded a material misstatement or omission, which alone warrants dismissal of their claim for securities fraud under Section 10(b) and Rule 10b-5," but also continuing to analyze scienter as "an alternate basis for dismissal"); *In re Barrick Gold Corp.*

*Sec. Litig.*, 341 F. Supp. 3d 358 (S.D.N.Y. 2018) ("Given the foregoing, we need not address the parties' loss causation arguments."); *Gissin v. Endres*, 739 F. Supp. 2d 488, 515 n.167 (S.D.N.Y. 2010) ("Because plaintiffs have failed to allege adequate grounds for fraud . . . , I need not address either loss causation or reliance."); *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 219–20 (S.D.N.Y. 2009) (declining to address loss causation after finding "the complaint does not adequately allege that defendants made an actionable misstatement or material omission with scienter" (emphasis omitted)).

## B. Claims Under Section 20A and 20(a) of the Exchange Act

Section 20A of the Exchange Act "provides an express private right of action for those who trade contemporaneously with an inside trader." *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 372 (2d Cir. 2014) (citing 15 U.S.C. § 78t-1). Liability under Section 20A first "requires an independent Securities Exchange Act violation." *Id.* (citing *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994)).

Section 20(a) of the Exchange Act imposes liability on control persons. 15 U.S.C. § 78t(a). Section § 77o defines a control person as:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. §§ 77o(a).

To establish the requisite state of mind for a control person, a plaintiff must plead "facts giving rise to a strong inference" that the control person "knowingly or recklessly failed (i) to conduct a reasonable investigation of the rated security with respect to the factual elements relied

upon by its own methodology for evaluating credit risk; or (ii) to obtain reasonable verification of such factual elements . . . from other sources . . . ." 15 U.S.C. § 78u-4(b)(2)(B). The control person will not be liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

Because the Court will dismiss Lead Plaintiffs' claims for primary violations of a securities law, specifically Section 10(b) of the Exchange Act and SEC Rule 10b-5, their derivative claims under Sections 20A and 20(a) claim must also be dismissed.[10] *See Steginsky*, 741 F.3d at 372 ("§ 20A liability requires an independent Securities Exchange Act violation" (citing *Jackson Nat'l*, 32 F.3d at 703)); *One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("In order to establish a prima facie case of liability under § 20(a), a plaintiff must show, among other things, 'a primary violation by a control[] person.'" (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998))).

Accordingly, the Court will dismiss Lead Plaintiffs' claims under Sections 20A and 20(a) in their entirety.

### C. Claims Under Sections 11 and 15 of Securities Act

#### a. Section 11 Claims

Under Section 11 of the Securities Act, issuers and other signatories of a registration statement are liable for any "untrue statement of a material fact" or omission of "a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). "So long as a plaintiff establishes one of the three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an

---

[10] The Court also notes that no predicate violation of Section 10(b) or Rule 10b-5 was attributed to Mr. Quindlen, so Lead Plaintiffs' ability to plead a violation of Section 20(a) as to Mr. Quindlen would have further failed for this reason.

affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading—then, in a Section 11 case, 'the general rule [is] that an issuer's liability . . . is absolute.'" *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011) (citations omitted).

Defendants argue that Lead Plaintiffs have failed to plead any actionable misstatement in the Offering Materials, and that Lead Plaintiffs' challenge to the "recycled" allegations is time-barred for their failure to file suit within one year of Defendants' disclosures on April 28, 2017. Defs.' Mem. at 52–53. In addition, they contend that Lead Plaintiffs' claims must be dismissed for the additional reason that they "fail to plead a domestic transaction as required to overcome the presumption against the extraterritorial application of the federal securities laws." *Id.* at 53.

According to Defendants' view of the law, to satisfy *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247, 267 (2010), Lead Plaintiffs "must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States." Defs.' Mem. at 54 (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012)). Finally, Defendants contend that APG Fixed—as the plaintiff "seeking to serve as a representative party on behalf of a class"—failed to file the sworn certification required by the PSLRA. *Id.* (quoting 15 U.S.C. § 77z-1(a)(2)(A)).

In response, Lead Plaintiffs emphasize as alleged omitted facts the statements that occurred prior to the Offering on December 1, 2017. Pls.' Opp'n at 51–53. They contend that even after April 28, 2017, Defendants still "repeatedly, falsely reassured investors that Synchrony's changes to underwriting were 'very targeted,'" which they allege was not corrected until July 27, 2018, when Defendants allegedly "admitted to broad-based changes." *Id.* at 53. Lead Plaintiffs next submit that their purchases of the Synchrony Notes were "domestic" and submit additional facts in a supporting declaration and exhibit. *Id.* at 53–54 (citing Ex. 26: Van

Lidth De Jeude Decl., ECF No. 116-26 (Aug. 21, 2019)). Finally, to overcome Defendants'

arguments about Lead Plaintiffs' PSLRA certification, Lead Plaintiffs contend "that purported

deficiency has been cured" by their exhibits here, or alternatively, they request leave to amend to

include the certification. *Id.* at 55.

Defendants first reply that "the one misstatement [Lead Plaintiffs] press[] as actionable . .

. is puffery and not an actionable misstatement." Defs.' Reply at 19. Second, Defendants argue

that these claims are time-barred because the Amended Complaint alleges that Defendants

"admitted" on April 28, 2017 that the statements at issue were false. *Id.* (citing Compl. ¶¶ 204–

05). According to Defendants, "a statement can only be actionable based on facts that existed at

the time it was made (not ones that subsequently came into existence), and even one alleged

'admission' of wrongdoing is sufficient to start the limitations period." *Id.* (citations omitted).

Third, Defendants argue that Lead Plaintiffs' improper attempt to amend the Amended

Complaint with a declaration and supporting exhibits still fails to plead a domestic transaction.

*Id.* at 20.

The Court agrees, at least in part.

"The same course of conduct that would support a Rule 10b-5 claim may as well support

a Section 11 claim . . . [but] claims that do rely upon averments of fraud are subject to the test of

Rule 9(b)." *Rombach*, 355 F.3d at 171. Although APG Fixed "expressly disavows and disclaims

any allegations of fraud," Compl. ¶ 321, the Court finds that "the wording and imputations of the

complaint are classically associated with fraud," *Rombach*, 355 F.3d at 172.

As the Court has already detailed above, Lead Plaintiffs have failed to plead any

actionable misrepresentation, because they have failed to establish that a reasonable investor,

attuned to the "total mix" of information, would be misled by any of the alleged misstatements.

Here, regarding the Section 11 claims, Lead Plaintiffs point to the following passage, which appears numerous times in the Offering Materials:

> Our business benefits from longstanding and collaborative relationships with our partners, including some of the nation's leading retailers and manufacturers with well-known consumer brands. We believe our partner-centric business model has been successful because ***it aligns our interests with those of our partners*** and provides substantial value to both our partners and our customers. Our partners promote our credit products because they generate increased sales and strengthen customer loyalty.

Compl. ¶¶ 353–55 (emphasis in original). Lead Plaintiffs contend that these statements, along with other statements already discussed and rejected as misrepresentations, made the registration statement and other Offering Materials "inaccurate and misleading." *Id.* ¶¶ 370–71.

The Second Circuit in *Rombach* rejected a similar attempt to characterize allegations as sounding in negligence, when the plaintiffs referred to the registration statement as "inaccurate and misleading," containing "untrue statements of material facts," and issuing "materially false and misleading written statements." 355 F.3d at 172 (emphasis omitted). Consequently, Lead Plaintiffs here have also failed to "differentiate their asserted negligence claims from the fraud claims which permeate the Complaint." *In re Ultrafem Inc. Secs. Litig.*, 91 F. Supp. 2d 678, 690 (S.D.N.Y. 2000).

The Court has already detailed why the cited language—Defendants' alleged "touting" of Synchrony's "partner-centric model" that "aligns" its interests with its partners, Pls.' Opp'n at 51—fails to rise to the level of a material misrepresentation. Even in the context of Walmart, this language is, at best, inactionable puffery. Significantly, Lead Plaintiffs do not plead any new alleged misstatements that have not already been rejected by the Court.

Furthermore, claims under Section 11 "are subject to a one-year statute of limitations which commences upon 'the discovery of the untrue statement or the omission, or after such

discovery should have been made by the exercise of reasonable diligence.'" *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138 (2d Cir. 2013) (quoting 15 U.S.C. § 77m). According to Lead Plaintiffs' Amended Complaint, "the truth began to partially emerge," *see* Compl. at 32 (formatting from heading omitted), when Defendants made their "first partial corrective disclosure on April 28, 2017," *id.* ¶ 100; *see also id.* ¶ 289 (referencing the "partial disclosure" on April 28, 2017 again).

Lead Plaintiffs' attempt to argue that "the April 28, 2017 partial corrective disclosure did not trigger the statute of limitations" because of "continuing fraud" is unavailing, *see* Pls.' Opp'n at 53 (citing nonbinding precedent), because their own allegations establish that this corrective disclosure date is the date on which they had "actual or constructive notice of the claim," *Amorosa v. AOL Time Warner, Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011). Here, the Section 11 claim was not brought until Lead Plaintiffs' filed their Amended Complaint on April 5, 2019, which is more than a year after the "first partial corrective disclosure on April 28, 2017"—"when Lead Plaintiffs had constructive notice of their claims." Compl. ¶ 100; *Freidus*, 734 F.3d at 138. Consequently, the Section 11 claim is also time-barred.

As a result, the Court will dismiss Lead Plaintiffs' Section 11 claim, and will not address Defendants' arguments regarding the pleading of a domestic transaction[11] or the filing of a sworn certification by APG Fixed.

---

[11] The Court does note that the facts that purportedly support the establishment of a domestic transaction were not properly included in the Amended Complaint, nor was leave sought to add these allegations. In any event, leave to amend Plaintiffs' pleading would be futile for the reasons discussed below.

### b. Section 15 Claims

Section 15 of the Securities Act imposes liability on control persons for a violation of Section 11. 15 U.S.C. § 77o(a). Because a Section 15 claim is "necessarily predicated on a primary violation of securities law," *Shetty v. Trivago N.V.*, -- F. App'x --, 2019 WL 6834250 (2d Cir. Dec. 16, 2019) (quoting *Rombach*, 355 F.3d at 177–78), and the Court has found that Lead Plaintiffs failed to plead such a primary violation of the Section 11, the Court will dismiss the Section 15 claim as well.

Accordingly, all of Lead Plaintiff's claims will be dismissed.

### D. Lead Plaintiffs' Leave to Amend

Under Federal Rule of Civil Procedure 15(a), "A party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(2). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

Under Rule 15, the decision to grant leave to amend is within the discretion of the court, but the court must give some "justifying reason" for denying leave. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Reasons for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]" *Id.*; *see also Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (noting leave to amend may be denied when amendment is "unlikely to be productive," such as when an amendment is "futile" and "could not withstand a motion to

dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." (internal citation omitted)); *Park B. Smith, Inc. v. CHF Indus. Inc.*, 811 F. Supp. 2d 766, 779 (S.D.N.Y. 2011) ("While mere delay absent a showing of bad faith or undue prejudice, is not enough for a district court to deny leave to amend, the longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." (internal quotation marks omitted)).

Despite their extensive allegations, the Lead Plaintiffs' claims lack a strong basis in law or fact for the reasons detailed above, making any further amendment futile. Indeed, Lead Plaintiffs have already had an opportunity to amend their complaint with greater specificity. *Compare* Compl, ECF No. 1 (totaling twenty-seven pages), *with* Am. Compl., ECF No. 78 (totaling 123 pages).

As a result, having found that Lead Plaintiffs have failed to plausibly allege that any statement would be misleading to a reasonable investor given the "total mix" of available information, and finding now that no further amendment could alter this "total mix" of information based on their purported claims, the Court will dismiss this case with prejudice. *Cf. ATSI Commc'ns, Inc.*, 493 F.3d at 109 ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b) . . . [plaintiff here] was given that opportunity." (internal citation omitted)); *see Ia. Pub. Emps.' Ret. Sys. v. Deloitte & Touche LLP*, 558 F. App'x 138, 140 (2d Cir. 2014) (agreeing with the district court that "leave to amend would have been futile" for plaintiff's claims under Section 10(b) and SEC Rule 10b-5); *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim would not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." (citation omitted)); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d. Cir 1995) ("One good reason to deny leave to amend is when such leave would be futile." (citation omitted)); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.

1993) (affirming dismissal with prejudice because, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of [the district court's] discretion to deny leave to amend").

Accordingly, the Lead Plaintiffs' claims are dismissed with prejudice.

## IV.    CONCLUSION

For the reasons explained above, the Court **GRANTS** Defendants' motion to dismiss the case **with prejudice**.

The Clerk of Court is respectfully directed to enter judgment for Defendants and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 31st day of March, 2020.

      /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge