**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

IN RE SYNCHRONY FINANCIAL
SECURITIES LITIGATION

No. 3:18-cv-1818 (VAB)

**RULING AND ORDER ON MOTION TO DISMISS**

On April 5, 2019, Stichting Depositary APG Developed Markets Equity Pool and

Stichting Depositary APG Fixed Income Credits Pool (collectively, the "Lead Plaintiffs") filed

an Amended Complaint in this putative class action against, *inter alia*, Synchrony Financial

("Synchrony"), Margaret M. Keane, Brian D. Doubles, and Thomas M. Quindlen (collectively,

the "Defendants").[1] Am. Compl., ECF No. 78 (Apr. 5, 2019) ("Am. Compl.").

Lead Plaintiffs filed the Amended Complaint on behalf of themselves, all similarly

situated purchasers of Synchrony Financial common stock between October 21, 2016 and

November 1, 2018 (the "Class Period"), and all similarly situated purchasers of Synchrony

Financial 3.95% bonds due 2027 either in or traceable to Synchrony's December 1, 2017 note

offering during the Class Period, alleging violations of Sections 10(b), 20A, and 20(a) of the

---

[1] The full list of defendants includes: Synchrony, Margaret M. Keane, Brian D. Doubles, Thomas M. Quindlen, David Melito, Paget Alves, Arthur Coviello, Jr., William Graylin, Roy Guthrie, Richard Hartnack, Jeffrey Naylor, Laurel Richie, Olympia Snowe, Barclays Capital Inc., Mizuho Securities USA LLC, Morgan Stanley & Co. LLC, TD Securities (USA) LLC, Blaylock Van, LLC, Castleoak Securities, L.P., Mischler Financial Group, Inc., R. Seelaus & Co., Inc., and The Williams Capital Group, L.P. *See In re Synchrony Fin. Sec. Litig.*, 450 F. Supp. 3d 127, 131 (D. Conn. 2020) ("*Synchrony I*"). Only Synchrony, Ms. Keane, Mr. Doubles, and Mr. Quindlen are relevant to the Exchange Act claim on remand from the Second Circuit. *See id.* (naming "Exchange Act Defendants"); *see also In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021) ("*Synchrony II*") (affirming dismissal of Amended Complaint in *Synchrony I* except as to fraud allegations premised on statement about "pushback" from retail partners as relevant to Exchange Act claims).

Exchange Act, 15 U.S.C. §§ 78j(b), 78t-1, and 78t(a); insider trading in violation of SEC Rule 10b-5, and 17 C.F.R. § 240.10b-5 promulgated thereunder; and violations of Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o. *Id.* at 5, 13.

On March 31, 2020, this Court dismissed all claims. *See In re Synchrony Fin. Sec. Litig.*, 450 F. Supp. 3d 127, 131 (D. Conn. 2020) ("*Synchrony I*"). On appeal, the Second Circuit affirmed in part and reversed in part, remanding for further proceedings Lead Plaintiffs' claim under the Exchange Act for allegedly false or misleading statements regarding "pushback" from retail partners, as required to state a class action claim for securities fraud. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021) ("*Synchrony II*").

Defendants now have renewed their motion to dismiss as to this remaining claim and seek dismissal of the case. Mot. to Dismiss, ECF No. 166 (May 17, 2021); *see also* Defs.' Mem. of Law in Supp. of Renewed Mot. to Dismiss the Am. Compl., ECF No. 167 (May 17, 2021) ("Mot. to Dismiss").

For the reasons explained below, the Court **DENIES** the motion to dismiss.

In light of this ruling, the parties are ordered to meet, confer, and submit a report under Rule 26(f) of the Federal Rules of Civil Procedure by **March 11, 2022**, as further discussed below.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Familiarity with the underlying factual allegations and procedural history of this action is assumed. *See Synchrony I*, 450 F. Supp. 3d at 131–47.

On March 31, 2020, this Court issued a ruling and order dismissing the Amended Complaint with prejudice. *See id.*

On April 20, 2020, Lead Plaintiffs appealed the district court's judgment to the Second Circuit. Notice of Appeal, ECF No. 158 (Apr. 20, 2020).

On February 16, 2021, the Second Circuit affirmed in part and reversed in part, remanding for further proceedings Lead Plaintiffs' claim under the Exchange Act for allegedly false or misleading statements regarding "pushback" from retail partners, as required to state a class action claim for securities fraud. *See Synchrony II*, 988 F.3d at 161. The Second Circuit affirmed this Court's dismissal of all other remaining claims under the Exchange Act, including, *inter alia*, statements that the company was "pretty confident" and "pretty positive" about the prospect of renewing partnerships in 2019, as well as allegations that Synchrony and its representatives misrepresented the scope of changes in their underwriting standards. *Id.* at 170–72. The Second Circuit further affirmed this Court's dismissal of all claims under the Securities Act. *Id.* at 172–74.

Following remand, on May 17, 2021, Defendants renewed their motion to dismiss the Amended Complaint, with accompanying documentation. *See* Mot. to Dismiss; *see also* Decl. of Jessica Roll in Supp. of Defs.' Renewed Mot. to Dismiss the Am. Compl., ECF No. 168 (May 17, 2021).

On July 1, 2021, Lead Plaintiffs filed a memorandum of law in opposition to the Defendants' renewed motion to dismiss. *See* Pls.' Mem. of Law in Opp'n to Defs.' Renewed Mot. to Dismiss the Am. Compl., ECF No. 169 (July 1, 2021) ("Opp'n").

On August 2, 2021, Defendants submitted a reply. *See* Defs.' Reply Mem. of Law in Further Supp. of their Renewed Mot. to Dismiss the Am. Compl., ECF No. 170 (Aug. 2, 2021) ("Reply").

## II.    STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

For most claims brought under sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), imposes heightened pleading requirements governed by the PSLRA or Rule 9(b) of the Federal Rules of Civil Procedure. *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) ("As the

district court observed, the particularity requirement of Rule 9(b) applies to securities fraud claims brought under Section 10(b) and Rule 10b–5 . . . . The district court concluded that the same heightened pleading standard applies to securities claims brought under Section 11 and Section 12(a)(2) when premised on averments of fraud. We agree." (internal citation omitted)); *see also Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc*., 268 F. Supp. 3d 526, 535 (S.D.N.Y. 2017) ("A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the [PSLRA]."); *In re Initial Pub. Offering Sec. Litig*., 241 F. Supp. 2d 281, 334–35 (S.D.N.Y. 2003) ("Congress intended that the PSLRA supersede the Federal Rules only as to those elements which the PSLRA explicitly mentions (*i.e.*, scienter and material misstatements and omissions). . . . In all other respects, the Rules govern these pleadings." (internal citation omitted)).

Under Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Bank of Am. AIG Disclosure Sec. Litig*., 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)); *see also* Fed. R. Civ. P. 9(b) (requiring that a complaint that alleges fraud plead "with particularity the circumstances constituting fraud").

As to loss causation, whether Rule 9(b) or the PSLRA heightens the standard for loss causation remains an open question. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 182–83 (2d Cir. 2015) (noting circuit split and leaving open the question "as to the level of particularity" required to plead loss causation "in the PSLRA context"); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005) ("We concede that the Federal Rules of

Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' . . . And we assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss." (internal citation omitted)). "The [ ] majority of courts" in the Second Circuit, however, "have required that loss causation meet only the requirements of Rule 8." *See Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 753 n.7 (S.D.N.Y. 2011) (collecting cases); *see also Cellular Tech. Servs. Co. v. TruePosition, Inc.*, 609 F. Supp. 2d 223, 236 (D. Conn. 2009) (stating that, in a securities fraud claim, "pleading of causation is governed by Rule 8—not the heightened pleading requirements of Rule 9(b) or the PSLRA").

## III.   DISCUSSION

Section 10(b) of the Exchange Act makes it unlawful for "any person, directly or indirectly. . ."

> [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

SEC Rule 10b-5 makes it unlawful for "any person, directly or indirectly . . .":

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"To state a cause of action under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 645 F. App'x 72, 74 (2d Cir. 2016) (summary order) (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996)).

The Court will review each of these elements below.

### 1. False Statement or Omitted Material Fact

In order to state a claim for securities fraud, plaintiffs first must specify each allegedly misleading statement or omission. *See* 15 U.S.C. §§ 78u-4(b)(1)(A)–(B); *see also Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) ("[W]henever plaintiffs allege . . . that defendants made material misstatements or omissions, the complaint must 'state with particularity all facts on which that belief is formed.'" (quoting 15 U.S.C. §§ 78u-4(b)(1))). Plaintiffs then must demonstrate that each misstatement is material. *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 306 (S.D.N.Y. 2005) ("A plaintiff must allege a material misstatement . . . and that misstatement must be the cause of the plaintiff's loss . . . ."). "For an undisclosed fact to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).

Lead Plaintiffs allege that, in an earnings call on January 19, 2018, Ms. Keane made a material misstatement regarding "pushback" from retail partners. Am. Compl. ¶ 31; Opp'n at 7–16. The allegedly false and materially misleading statement occured in the following exchange:

> Analyst: "Are you getting any pushback as you tweak the underwriting and make less credit available to those sub-660 borrowers?"
>
> Ms. Keane: "I think our partners are very cognizant of the fact that they don't want to put credit in the hands of people that can't handle it, and we work very closely with them. In many cases, almost all cases, their names are on the cards. So we work very closely with them, and we are not getting any pushback on credit. They work closely with us, and again, we all want to be responsible here, including our partners."

Ex. 16 to Decl. of Jessica Roll in Supp. of Defs.' Renewed Mot. to Dismiss the Am. Compl. at 17–18, ECF No. 168-16 (May 17, 2021) ("Ex. 16").

In their renewed motion to dismiss, Defendants argue that the alleged misstatement was not material, and that no reasonable investor would have considered Ms. Keane's statement in the January 2018 call important in making investment decisions. Mot. to Dismiss at 2, 14–15. In Defendants' view, the statement at issue was "not tied to renewal negotiations in any way" and "merely noted that Synchrony's partners were generally in agreement that they do not want to put credit in the hands of people who cannot handle it and were not pushing back on credit in that sense." *Id.*

In further support of their position, Defendants assert that the alleged misstatement was "unscripted" and underscore that the statement "did not name any retailer in particular." *Id.* at 14–15 (internal citation omitted). Defendants also argue that Ms. Keane's disclosure, in the same January 2018 call, that "Synchrony would not be commenting on any renewal negotiations with particular retailers" undercuts any allegation of reasonable reliance, especially "in light of investors' knowledge of the disclosed inherent tension with partners on underwriting." *Id.* at 15. (emphasis omitted) (internal citation omitted).

In response, Lead Plaintiffs argue, first, that a reasonable investor would have relied on

the alleged misstatement because it was offered by the CEO of a publicly-traded company during a shareholder conference call, "in direct response to an analyst's question." Opp'n at 9. Lead Plaintiffs reject any contention that the statement was merely "off-the-cuff" or "unscripted," especially where no discovery has occurred, and further argue that, even if the comment was not scripted, the question was not unanticipated, *id.* at 10–14; indeed, in Lead Plaintiffs' view, the line of inquiry was to be expected, given multiple past conversations with investors in which analysts asked similar questions out of "concern about the state of Sychrony's retail partnerships," *id.* at 15.

The context of the January 2018 call, Lead Plaintiffs argue, further supports that a reasonable investor would have relied on the alleged misrepresentation. *Id.* at 14–15. For example, before the alleged misstatement, Ms. Keane stated that Synchrony is "very focused on . . . [its] renewals." *Id.* at 14 (citing Ex. 16 at 13). The analyst's question, within this context, evinces concern that Synchrony's underwriting changes might impact their prospects for retail partnership renewal, according to Lead Plaintiffs. *Id.* at 14–15. And, in Lead Plaintiffs' view, any general disclosures by Ms. Keane regarding "potential disagreement" with retail partners do not insulate the company and its representatives from liability in regard to the narrower assertion that the company had not received "pushback" on its credit decisions by January 2018. *Id.* at 15–16.

Finally, Lead Plaintiffs point to several allegations in the Amended Complaint that, in their view, underscore the materiality of the alleged representation, including that Walmart was "Synchrony's largest and most financially significant retail partner," *see id.* at 9 (citing Am. Compl. ¶¶ 59–71). In Lead Plaintiffs' view, the alleged fall in stock price that occurred after the disclosure to the public of Walmart's pushback also supports a finding of materiality. *See id.* at 10 (internal citations omitted).

The Court agrees.

As a preliminary matter, the Second Circuit determined that the statement was sufficiently "concrete" and "factual" to survive a motion to dismiss. *Synchrony II*, 988 F.3d at 168 (internal citation omitted). Thus, at this stage of the analysis, the issue is whether the alleged misrepresentation was material.

At the pleading stage, the materiality requirement is satisfied, if the plaintiff alleges a misstatement or omission that "a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (citing *Levinson*, 485 U.S. at 231). In order for a statement to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Levinson,* 485 U.S. at 231–32 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)). "Because materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks and citations omitted).

Here, reasonable minds could differ as to the importance of the "no pushback" representation. It is plausible that an investor could view any resistance from retail partners, including, most significantly, Walmart, to tightened underwriting policies as significant to an investment decision under the circumstances. The Amended Complaint alleges that, on other occasions, analysts had asked similar questions about the status of Synchrony's most important

retail partnerships, indicating the importance of this issue to investors in the company. *See* Opp'n
at 11 (citing Am. Compl. ¶¶ 100–05, 157–71). Even if the disclosed information about
Walmart's resistance to changed underwriting policies did not definitively indicate the
termination of the relationship with Walmart, it altered the "total mix" of information available
as to the value of the investment. *Levinson,* 485 U.S. at 231–32 (quoting *TSC Indus., Inc.,* 426
U.S. at 449); *see also, e.g.*, *Hutchins v. NBTY, Inc.*, No. 10-CV-2159 (LDW) (WDW), 2012 WL
1078823, at *6 (E.D.N.Y. Mar. 30, 2012) (Where "NBTY was Wal-Mart's exclusive nutritional
supplement supplier and Wal-Mart accounted for a substantial percentage of NBTY's sales. . .
[i]t is plausible that a reasonable investor would view NBTY's potential loss of Wal-Mart's
business—or retaining it at lower prices—[as] significant to an investment decision under the
circumstances.").

    The company's disclosures and warnings, moreover, are not sufficient to offset an
inference of reasonable reliance under the circumstances. Although Ms. Keane stated that she
could not comment on specific renewal negotiations, *see* Ex. 16 at 16, the alleged misstatement
painted with a wider brush; as interpreted by the Second Circuit, the statement regarding
"pushback" meant that "by January 19, 2018, Synchrony had not received any negative reactions
or opposition from retail partners to changes in its underwriting practices," *Synchrony II*, 988
F.3d at 168, without limitation to the context of specific renewal negotiations.

    In addition, under the "bespeaks caution" doctrine, "alleged misrepresentations in a stock
offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could
consider them important in light of adequate cautionary language set out in the same
offering." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). When there is
cautionary language in the disclosure, the Court analyzes

> the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.

*Id.* (citing *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)); *see also Chang*, 355 F.3d at 173 (reciting the same standard for the "bespeaks caution" doctrine in securities fraud cases).

"Cautionary words about future risk," however, "cannot insulate from liability the failure to disclose that the risk has transpired." *Id.* (citing *In re Prudential Secs. Inc. P'ships Litig.,* 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")). Here, there are specific allegations in the Amended Complaint to suggest that the very risk of partner termination of which investors were warned had materialized, where, as noted by the Second Circuit: "[o]ne former employee allegedly observed that [Ms.] Keane and [Mr.] Doubles traveled to Arkansas with increased frequency during the latter half of 2017 and into early 2018 to mitigate the impact of alarming feedback from the Walmart client relationship manager that the relationship was doomed" and "two [Wall Street Journal] articles cited in the complaint also collectively reported that Walmart balked at the idea of renewal in fall 2017 and that, for the first time in the history of the Walmart-Synchrony relationship, Walmart began soliciting bids from other credit card issuers by late 2017." *Synchrony II*, 988 F.3d at 168 (internal citation and quotation marks omitted). Certainly, disagreements between Synchrony and its retail partners about extension of credit were bound to occur; the allegations in the Amended Complaint,

however, are not consistent with unremarkable tension short of peril to the companies'
relationship.

Accordingly, the Court will not dismiss the Amended Complaint on the grounds that the
misstatement was immaterial.

### 2. Scienter

"To plead scienter so as to survive a motion to dismiss, a plaintiff must state 'with
particularity facts giving rise to a strong inference that the defendant acted with the required state
of mind[.]'" *Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5, 7 (2d Cir. 2015)
(summary order) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326
(2007)). "The requisite 'strong inference' of scienter is one which is 'at least as likely as any
plausible opposing inference.'" *City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*,
752 F.3d 173, 185 (2d Cir. 2014) (emphasis omitted) (quoting *Tellabs, Inc.*, 551 U.S. at 328).

Scienter "may be established by facts '(1) showing that the defendants had both motive
and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of
conscious misbehavior or recklessness.'" *Id.* at 184 (quoting *Shaar Fund*, 493 F.3d at 99); *see
also Sodhi v. Gentium S.p.A.*, No. 14-CV-287 (JPO), 2015 WL 273724, at *7 (S.D.N.Y. Jan. 22,
2015) ("A securities plaintiff can plead scienter by alleging that the defendant had a motive and
an opportunity to commit securities fraud." (internal citation omitted)); *In re Scholastic Corp.*,
252 F.3d 63, 74 (2d Cir. 2001) ("Plaintiffs can plead scienter by (a) alleging facts demonstrating
that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging
facts to show strong circumstantial evidence of defendants' conscious misbehavior or
recklessness.").

A complaint alleging securities fraud under § 10(b) of the Exchange Act may establish scienter through "strong circumstantial evidence of conscious misbehavior or recklessness." *City of Pontiac*, 752 F.3d at 184 (quoting *Shaar Fund*, 493 F.3d at 99). Recklessness means "a state of mind 'approximating actual intent,'" which can be established by "'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Novak*, 216 F.3d at 308).

Defendants argue, first, that the context in which Ms. Keane made the alleged misstatement weighs against a finding of scienter. Mot. to Dismiss at 17–18. Specifically, Defendants contend that Ms. Keane's assertion that "we are not getting any pushback on credit" must be viewed within the context of the analyst's question, which Defendants view as "imprecise"; in this context, Defendants argue that the "no pushback" statement does not constitute a "definitive declaration that Walmart specifically never expressed any displeasure with Synchrony's underwriting." *Id.* at 18, 19 n.10.

Defendants further highlight disclosures that Synchrony made about the state of the market as evidence that the alleged misstatement cannot plausibly be viewed as reckless or an extreme departure from the standard of ordinary care, or otherwise reflect a conscious intent to mislead investors. *Id.* at 19–22. For example, Ms. Keane stated during the earnings call in January 2018 that she "[could not] comment at [*sic*] any particular [retailer renewal]." *See id.* at 20 (citing Ex. 16 at 13). In addition, during the same call, she warned investors about the "competitive environment" for retailer renewal. *Id.* at 19–20 (citing Ex. 16 at 13). Defendants also underscore that, at other points in the company's conversations with its investors, Synchrony acknowledged a "natural tension between its interests and those of its partners with

respect to underwriting, and regularly described underwriting as a key risk factor that retailers think about in considering renewal." *Id.* at 20 (citing, *inter alia*, Ex. 16 at 6) (internal quotation marks omitted); *see also* Ex. 17 to Decl. of Jessica Roll in Supp. of Defs.' Renewed Mot. to Dismiss the Am. Compl. at 40, ECF No. 168-17 (May 17, 2021) (stating that Synchrony's "program agreements generally permit [their] partner[s] to terminate the agreement prior to its scheduled termination date for various reasons, including if . . . [Synchrony] fail[s] to achieve certain targets with respect to approvals of new customers as a result of the credit criteria use[d]").

In addition, Defendants argue that alleged statements of former employees about the relationship between Synchrony and Walmart in 2017 and 2018, which the Second Circuit found relevant as to the falsity of the "no pushback" statement, *see Synchrony II*, 988 F.3d at 168–69, fail to raise a sufficiently strong inference of scienter, where the former employees did not have close contact with Ms. Keane and, in Defendants view, made statements that were only "generic," "conclusory," and untethered from "concerns about tightened underwriting," Mot. to Dismiss at 21–26.

Finally, Defendants argue that any inference of scienter that could be drawn from the allegations in the Amended Complaint is undermined by the fact that, as a result of the Second Circuit's decision in *Synchrony II*, the Lead Plaintiffs have "only adequately alleged the falsity of a single passing statement made by [Ms.] Keane during the entire [C]lass [P]eriod." *Id.* at 21.

In Lead Plaintiffs' view, scienter is strongly supported by the allegations in the Amended Complaint that Synchrony and its representatives knew the "no pushback" statement was false when made, as noted by the Second Circuit in *Synchrony II. See* Opp'n at 17. The Lead Plaintiffs further argue that scienter is alleged by the "personal involvement [of Defendants] in the

negotiations with Walmart," *id.* at 19, and that the statements of former employees regarding the company's relationship with Walmart, including those highlighted in *Synchrony II*, provide sufficient support for a finding of scienter, even without allegations of direct contact between those former employees and the named defendants, *id.* at 18–19.

Finally, the Lead Plaintiffs argue that, while the critical importance of the Walmart relationship to Synchrony's financial success may not be dispositive to the scienter inquiry, the allegations regarding the significance of the partnership with Walmart to Synchrony "bolster[]" other allegations regarding scienter in the Amended Complaint. *Id.* at 20.

The Court agrees.

"Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp.*, 252 F.3d at 76 (citing *Novak*, 216 F.3d at 308). Here, there are multiple allegations in the Amended Complaint to support that Synchrony and its representatives, including Ms. Keane, knew or should have known that Synchrony was mispresenting material facts with respect to Synchrony's relationship with its partners, when Ms. Keane made the alleged misstatement at issue.

The Second Circuit highlighted the following allegations in *Synchrony II*:

> Stichting includes statements from former employees who were personally involved with the Walmart account and attended meetings with Walmart representatives, claiming that Walmart had expressed frustration with Synchrony's underwriting practices in 2017. One former employee allegedly observed that Keane and Doubles traveled to Arkansas with increased frequency during the latter half of 2017 and into early 2018 to mitigate the impact of "alarming feedback from the Walmart client relationship manager that the relationship was doomed." . . . The two WSJ articles cited in the complaint also collectively reported that Walmart "balked" at

> the idea of renewal in fall 2017 and that, for the first time in the history of the Walmart-Synchrony relationship, Walmart began soliciting bids from other credit card issuers by late 2017. . . . Former employees corroborated this, explaining that it was well known within Synchrony that Walmart had solicited bids from at least one of Synchrony's competitors.

*Synchrony II*, 988 F.3d at 168 (internal citations omitted). These allegations, although not dispositive to the scienter inquiry,[2] provide support for the relevant recklessness analysis under *In re Scholastic Corp.*, 252 F.3d 63 (2d Cir. 2001).

As noted by the Second Circuit, the inference of falsehood that can be drawn from these allegations can be directly attributed to Ms. Keane, and, thus, imputed to the corporation. The "most straightforward" way to raise a strong inference of corporate scienter is to "impute it from an individual defendant," here, Ms. Keane, who made the challenged misstatement. *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (internal citation omitted). The Lead Plaintiffs adequately do so, where they allege that Ms. Keane traveled to Arkansas with increased frequency during the latter half of 2017 and into early 2018 to mitigate the impact of "alarming feedback" that the relationship with Walmart was "doomed." *See Synchrony II*, 988 F.3d at 168 ("[S]everal allegations within the amended complaint specifically allege that Synchrony and its representatives knew the statement was false when made.").[3]

---

[2] The Second Circuit did not reach this prong of the analysis in its opinion. *Synchrony II*, 988 F.3d at 170.

[3] The attribution of this allegation to an unnamed former employee in the Amended Complaint also does not undercut an inference of scienter, contrary to Defendants' arguments. *See* Mot. to Dismiss at 23. The scienter inquiry may rely on information from a confidential source so long as the source is "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak,* 216 F.3d at 314. Here, the Amended Complaint describes FE6 as a "Former Regional Credit Sales Manager," Am. Compl. ¶ 85 n.8, who, "[b]ecause Arkansas was in [his] territory, [ ] was aware of the[] [increased] meetings [between Ms. Keane and Walmart in 2017]" and "saw that Keane and Quindlen visited Bentonville frequently between April and June of 2017," *id.* ¶¶ 142, 284. It also ascribes the allegation that the relationship with Walmart was "doomed" to FE9, a former acquisitions strategy manager at Synchrony Financial in the Alpharetta, Georgia office, who participated in Synchrony's calls with Walmart in the fall of 2017, and observed Ms. Keane making increased trips to Arkansas. *Id.* ¶¶ 91 n.11, 137, 143.

Even though disclosures about risk may, in some circumstances, undercut an inference of a state of mind going toward deliberate illegal behavior or conduct which is highly unreasonable, *see Holbrook v. Trivago N.V.*, No. 17-CV-8348 (NRB), 2019 WL 948809, at *21 (S.D.N.Y. Feb. 26, 2019) (finding that "defendants' disclosures about [ ] risk are inconsistent with a state of mind going toward deliberate illegal behavior or conduct which is highly unreasonable" (internal citation and quotation marks omitted)), *aff'd*, 796 F. App'x 31 (2d Cir. 2019) (summary order), here, Defendants do not provide, nor has the Court located, any authority to suggest that such disclaimers allow this Court to dismiss a complaint for lack of scienter where the plaintiffs have adequately alleged that the defendants knew or should have known that a statement, even if only a single statement, was false when made, *see, e.g.*, *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09-CV-4050 (PKC), 2010 WL 3790810, at *19–20 (S.D.N.Y. Sept. 28, 2010) (finding lack of scienter where defendant disclosed inherent risk of investment in credit-blemished loans but Plaintiff did not allege that "[the Defendant] knew that any fraudulent loan applications related to loans in the Securitizations").

The Second Circuit's unpublished opinion, *Furher v. Ericsson LM Tel. Co.*, 363 F. App'x 763 (2d Cir. 2009), does not change this analysis. In *Furher*, the Second Circuit stated that, "[w]here the allegation of recklessness is supported by nothing other than the fact of inaccuracy, and the statements are, at worst, only slightly inaccurate, the inference of reckless disregard for the truth is not likely to be compelling." *Id.* at 765. The alleged misstatement at issue in that case included statements made by a CEO during a conversation with analysts, which the defendants contended "conveyed the impression that third-quarter results would be only slightly down from second-quarter results when [the individual defendant] knew that the results would be disastrously worse." *Id.* at 764. The Second Circuit found that these statements were taken "out

of context" of an "informal back-and-forth with analysts," partially in response to questions that were themselves "imprecise and potentially ambiguous." *Id.*

Here, the question from the analyst was not "imprecise" or "potentially ambiguous", as the Defendants claim, but rather direct and targeted: "are you getting any pushback as you tweak the underwriting and make less credit available to those sub-660 borrowers?" Ex. 16 at 17. Ms. Keane's response allegedly also was clear, and her statement regarding "pushback" expressed that, "by January 19, 2018, Synchrony had not received any negative reactions or opposition from retail partners to changes in its underwriting practices." *Synchrony II*, 988 F.3d at 168. Ms. Keane's alleged misstatement then is not "slightly inaccurate" and, therefore, only "tenuous[ly]" false, as in *Furher. See Furher*, 363 F. App'x at 764; *see also In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91, 94 (2d Cir. 2010) (finding no strong inference of scienter where "the [challenged] statements are reviewed in their entirety and in the context of the questions from analysts to which they were responsive"). Rather, the Lead Plaintiffs adequately have alleged that the statement regarding "pushback" was "false," at least with respect to Walmart. *Synchrony II*, 988 F.3d at 168.

Accordingly, the Court will not dismiss the Amended Complaint for lack of scienter, as there are sufficient allegations to support an inference of recklessness.

### 3. Loss Causation

"A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Dura Pharm.*, 544 U.S. at 338. In the Second Circuit, a plaintiff must allege that there is a direct "relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (internal citation omitted). "If that relationship is sufficiently direct, loss

causation is established . . . ; but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, . . . a fraud claim will not lie." *Id.* (internal citations and quotation marks omitted).

Bare allegations of market loss are insufficient to survive a motion to dismiss. *Dura Pharm., Inc.*, 544 U.S. at 345. "The securities statutes seek to maintain public confidence in the marketplace." *Id.* These statutes do so "not to provide investors with broad insurance against market losses, but to protect them against th[e] economic losses that misrepresentations actually cause." *Id.* (internal citations omitted). Thus, plaintiffs must "allege and prove the traditional elements of causation and loss." *Id.* at 346 ("The statute thereby makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss.").

To adequately plead loss causation, a plaintiff must allege "that the market reacted negatively to a corrective disclosure regarding the falsity" of defendants' statements. *Lentell*, 396 F.3d at 175. "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (internal citation omitted). But plaintiffs must "allege sufficient facts to raise a reasonable inference that [defendants' misstatements or fraudulent conduct] caused an ascertainable portion of its loss." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015).

The Plaintiffs' burden of pleading loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 187 (citing *Dura Pharm*, 544 U.S. at 347). "The complaint must simply give defendants 'some indication' of the actual loss suffered and of a plausible causal link

between that loss and the alleged misrepresentations." *Id.* (quoting *Dura Pharm.*, 544 U.S. at 347); *see also Bos. Ret. Sys. v. Alexion Pharms., Inc.*, No. 3:16-CV-2127 (AWT), 2021 WL 3675180, at *26 (D. Conn. Aug. 19, 2021) (finding loss causation established where "the factual allegations in the Amended Complaint do more than give defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations" (internal citation and quotation marks omitted) (emphasis omitted)).

Plaintiffs allege corrective disclosures on July 12, 2018; July 26 and 27, 2018; and November 1, 2018. [4] *See* Opp'n at 29–36. The alleged corrective disclosures include the following:

- On July 12, 2018, "multiple media sources reported that Walmart was considering moving its branded credit card business" from Synchrony to Capital One, and the Wall Street Journal "stated that Walmart was dissatisfied with the Company because it wanted Synchrony to approve a higher percentage of applicants [and] that Walmart executives believed that Synchrony is keeping too much of the cards' revenue." Am. Compl. ¶ 239 (internal quotation marks omitted) (alteration omitted).

- On July 26 and 27, 2018, "several media outlets reported that Walmart had selected Capital One for its store-brand cards," and the Wall Street Journal stated, based on unnamed "people familiar with the companies' relationship," that "Walmart executives believed Synchrony was keeping too much of the card revenue" and "that Walmart wanted Synchrony to approve a higher percentage of its card applicants." *Id.* ¶¶ 242, 246.

---

[4] Plaintiffs do not rely on the previously alleged April 28, 2017 corrective disclosure in support of loss causation. *See* Opp'n at 29 n.26.

- On November 1, 2018, Walmart filed a lawsuit against Synchrony regarding "serious underlying problems in their partnership," including "poor" and "problematic" underwriting that resulted in "improperly extended credit to risky customers." *Id.* ¶¶ 248, 253.

Defendants argue that Lead Plaintiffs fail to establish loss causation in relation to each of these alleged corrective disclosures. First, as to the media reporting on July 12, 2018, the Defendants contend that the statements at issue constituted mere "speculation." Mot. to Dismiss at 31–32. The Defendants also argue that the alleged statements in the media sources failed to "correct[] the statement concerning pushback on tightened underwriting," and, further, demonstrate that other factors, such as Walmart's desire for a more "tech-forward" partner, led to the termination of the company's partnership with Wal-Mart. *Id.* at 32–33.

Second, as to the alleged disclosures on July 26 and 27, 2018, Defendants contend that the media reporting "d[id] not identify any new information about pushback on tightened credit . . ., as [ ] necessary . . . to constitute a corrective disclosure," and, even if it did, the Wall Street Journal article in particular reported a number of other alternative reasons for the termination, which defeat the necessary causation, including "that Walmart believed Synchrony was keeping too much of the cards' revenue and that Capital One was more tech-forward . . . ." *Id.* at 32–33.

Third, as to the alleged disclosure on November 1, 2018, Defendants identify at least three deficiencies, including: (1) that Lead Plaintiffs do not allege that the filing of Walmart's lawsuit revealed "any information about pushback on tightened underwriting"; (2) that the lawsuit in fact did not reveal any such information, and, indeed, "alleged that Synchrony's underwriting was too loose," as opposed to too tight; and (3) "to the extent Walmart's . . . suit revealed any 'new' information at all, it was on [ ] unrelated topics," including the amount of

22

damages sought from Synchrony and the fact that the parties were now in litigation. *Id.* at 33–36 (emphasis omitted) (internal citations omitted).

In response, Lead Plaintiffs contend that, first, the July 12, 2018 disclosure revealed the alleged fraud where the Wall Street Journal reported that Walmart had indeed resisted, or "pushed back" on, the changes in Synchrony's underwriting practices, when Walmart expressed its desire for Synchrony to approve a higher percentage of applicants "in a meeting with Synchrony's board last year." Opp'n at 30 (internal citation omitted). Lead Plaintiffs further highlight that the disclosure by the Wall Street Journal on July 12, 2018 revealed that Walmart had put forth a formal request for bids from other companies for the first time. *See id.* (internal citation omitted).

Second, Lead Plaintiffs argue that the information disclosed by media outlets on July 26 and 27, 2018 included relevant, new information that caused the alleged stock price drop: namely, that Walmart's dissatisfaction with Synchrony's refusal to approve a higher percentage of its credit card applications "actually caused Walmart to choose Capital One over Synchrony," *id.* at 33 (emphasis omitted), and that the proposed explanation for the stock price drop, while potentially not the only possible cause of the decline, is sufficient to survive a motion to dismiss, *see id.* at 33–34 (citing, *inter alia*, *Carpenters*, 750 F.3d at 233).

Finally, as to the alleged disclosure on November 1, 2018, Lead Plaintiffs contend that the suit revealed relevant, new information, including "for the first time the magnitude of the disagreement between the companies" in addition to the reason "why Walmart terminated the Synchrony partnership: problematic underwriting." *Id.* at 34 (emphasis omitted). Lead Plaintiffs further contend that the Amended Complaint sufficiently alleges loss causation where it alleges

that "all of the November 1, 2018 stock price decline" can be causally attributed to "the disclosure of Walmart's lawsuit." *Id.* at 35–36 (internal citation omitted) (emphasis omitted).

In reply, Defendants argue that Lead Plaintiffs have failed to allege facts to support an inference that an "ascertainable" portion of the stock price decline was caused by the alleged misstatement, in reliance on this Court's decision in *In re Frontier Communications Corp. Stockholders Litigation*, No. 3:17-CV-1617 (VAB), 2020 WL 1430019 (D. Conn. Mar. 24, 2020). *See* Reply at 8. In addition, in Defendants' view, the Lead Plaintiffs have provided "no explanation" for how investors could still be misled by the alleged "pushback" statement on November 1, 2018, after it was allegedly disclosed on multiple occasions in different mediums, and, "[a]t bottom," the arguments advanced in opposition to the motion to dismiss reveal that "Plaintiffs are seeking insurance against a stock price decline unrelated to the remaining alleged fraud." *Id.* at 9–10.

The Court disagrees.

"To establish loss causation, a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell*, 396 F.3d at 175 (alteration in original) (emphasis in original) (internal quotation marks and citation omitted) . The Lead Plaintiffs thus must allege that the market reacted negatively to a corrective disclosure regarding the falsity of the single alleged misstatement here: Ms. Keane's representation that there had been no "pushback" from retail partners regarding tightened underwriting policies.

Of the three disclosures alleged, only the first reveals the information allegedly concealed by Ms. Keane's statement. On July 12, 2018, the Wall Street Journal revealed that Walmart "want[ed] Synchrony to approve a higher percentage of applicants" and had "aired those concerns in a meeting with Synchrony's board last year," Am. Compl. ¶ 239 (emphasis omitted),

and that, in late 2017, Walmart launched "for the 'first time,' a formal request for bids from other credit card issuers," *id.* ¶ 148. These specific disclosures[5] reveal the information that allegedly had been concealed: that Synchrony's partners—including, most importantly, Walmart—had in fact resisted or "pushed back" on Synchrony's tightened underwriting policies, in direct contradiction to the alleged misstatement.

Certainly, this matter involved stock loss in a "complex, nationwide company." which complicates the loss causation analysis, especially where there are external factors that may have contributed to the alleged loss. *See In re Frontier Commc'ns, Corp. S'holders Litig.,* No. 3:17-CV-1617 (VAB), 2019 WL 1099075, at *24–25 (D. Conn. Mar. 8, 2019). Plaintiffs, however, "need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price." *Carpenters*, 750 F.3d at 233 (internal citation omitted); *Putnam Advisory*, 783 F.3d at 404 (stating that, at the motion to dismiss stage, a plaintiff need not provide "conclusive proof of [a] causal link" (citing *Dura Pharm*, 544 U.S. at 347)). At this stage of the litigation, Lead Plaintiffs need only allege sufficient facts to raise a reasonable inference that the alleged concealment caused an "ascertainable" portion of the alleged loss: in this case, the alleged drop of 5.3% in stock price on July 12, 2018. *See* Am. Compl. ¶ 239.

---

[5] Defendants characterize the statements in the Wall Street Journal article differently, stating that the article said that "Walmart was dissatisfied with the Company" and "Walmart executives believed that Synchrony is keeping too much of the cards' revenue." Mot. to Dismiss at 31–32 (citing Am. Compl. ¶ 239). When the allegations highlighted above, however, are considered, any argument that the statements were "speculative" or "vague" can be considered at a later stage of the case, following discovery. *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 504–05, 514 (2d Cir. 2010) (affirming district court grant of summary judgment to defendant in Exchange Act claim, where allegations were based, in part, upon "speculat[ive]" reporting by the Wall Street Journal). Moreover, the Second Circuit cases cited by the Defendants in support of this argument are distinguishable. In some of these cases, the disclosure contained a specific statement that the assertions contained therein were speculative, *see Janbay v. Canadian Solar, Inc.*, No. 10-CV-4430 (RWS), 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) (rejecting loss causation where "June 2, 2010 article admittedly 'speculat[ed]' about why some [of Defendant's] customers were returning goods"), and, in others, the allegedly concealed risk was already known to the public, *see In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 512 (rejecting loss causation where all that "appellant has shown is a negative characterization of already-public information").

In support of their argument that the alleged loss was not ascertainable, the Defendants refer to this Court's decision in *In re Frontier Communications Corp. Stockholders Litigation*, No. 3:17-CV-1617 (VAB), 2019 WL 1099075 (D. Conn. Mar. 8, 2019). In *Frontier*, this Court found that plaintiffs had failed to allege loss causation where they had "not alleged sufficient facts to support an inference that an ascertainable portion of [a] complex, nationwide company's stock loss [could] be traced to [the alleged] disclosures . . . ." *Id.* at *24 (internal citation and quotation marks omitted). In that case, however, the stock price had "declined nearly 50% before the first corrective disclosure," the stock price fluctuated between the alleged corrective events, and the company faced "ongoing negative press coverage, litigation, and regulatory scrutiny". *Id.* at *24–25. This Court found that, "[w]hile none of these issues, on its own, is fatal to [the] [p]laintiffs' claims," they collectively rendered the plaintiffs' arguments too tenuous to survive a motion to dismiss. *Id.* at *25.

There is no such collective fatal flaw here. Before the first corrective disclosure on July 12, 2018, the only alleged indication of Synchrony's financial distress occurred over a year before, when the stock price had declined approximately 15% after the release of first quarter results in April of 2017. Am. Compl. ¶ 236. The negative press coverage and litigation that occurred, moreover, began after this alleged disclosure. *See id.* ¶¶ 238, 239. At least based on the liberal reading of the Amended Complaint required of the Court at this stage of the litigation, there is an insufficient basis to conclude that, as of July 12, 2018, investors were aware of the financial decline of the company but chose to invest anyway, and, accordingly, are impermissibly seeking relief from the courts as insurance against stock price decline unrelated to the remaining alleged fraud. *See Dura Pharm*, 544 U.S. at 345 (stating that securities fraud actions do not "provide investors with broad insurance against market losses" but instead

"protect them against those economic losses that misrepresentations actually cause" (internal citations omitted)).

"Of course, if the loss was caused by an intervening event, the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Putnam Advisory*, 783 F.3d at 404–05 (alterations omitted) (citing *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). Plaintiffs therefore have adequately alleged with particularity that the alleged misstatement "gave plaintiffs an inaccurate perspective from which to value the Group securities," at least as to the alleged loss on July 12, 2018. *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97 (2d Cir. 2001).

Accordingly, the Amended Complaint also will not be dismissed for lack of loss causation.

## IV.    DISCOVERY

In recognition of the viable claim in this case being narrower than anticipated by the Lead Plaintiffs initially—given this Ruling and Order, and the Court's previous one, *see Synchrony I* —the parties are ordered to meet, confer, and submit a Rule 26(f) report by **March 11, 2022**. Consistent with this Court's "inherent authority to manage [its] docket[] . . . with a view toward the efficient and expedient resolution of cases," *Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016), and the time already passed since the filing of this lawsuit, the Court expects the parties, where possible, to agree only to the discovery "relevant to any party's claim or defense and proportional to the needs of the case . . . [,]" Fed. R. Civ. P. 26(b), and to develop a timeline for this case's resolution, as expeditiously as reasonably possible, *see* Fed. R. Civ. P. 1 (requiring

"the parties to secure the just, speedy, and inexpensive determination of every action and proceeding").

## V.    CONCLUSION

For the reasons explained above, the Court **DENIES** the motion to dismiss.

In light of this ruling, the parties are ordered to meet, confer, and submit a report under Rule 26(f) of the Federal Rules of Civil Procedure by **March 11, 2022**, as further discussed above.

**SO ORDERED** at Bridgeport, Connecticut, this 11th day of February, 2022.

  /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge
