**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| IN RE: SYNCHRONY FINANCIAL SECURITIES LITIGATION | No. 3:18-cv-1818-VAB<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**CLASS REPRESENTATIVE AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     PROCEDURAL HISTORY ...................................................................................... 3

III.    STATEMENT OF FACTS ........................................................................................ 7

IV.     ARGUMENT .......................................................................................................... 10

    A.      The Proposed Class Satisfies Rule 23(a) ................................................. 12

        1.      The Class Is Sufficiently Numerous ............................................ 12

        2.      There Are Common Questions of Law and Fact ...................................... 13

        3.      The Proposed Class Representative's Claims Satisfy Typicality ............. 13

        4.      The Proposed Class Representative Is More than Adequate ................... 15

        5.      The Proposed Class Is Ascertainable .......................................... 18

    B.      The Proposed Class Satisfies Rule 23(b)(3) ......................................... 18

        1.      Common Factual and Legal Questions Predominate .............................. 19

            a.      The Fraud-on-the-Market Presumption of Reliance Applies........ 20

                i.      The *Cammer* Factors Support Market Efficiency ............. 21

                    (a)     Synchrony Common Stock Had a High Weekly Trading Volume (*Cammer* Factor One) ................................................................ 22

                    (b)     Synchrony Was Covered Extensively by Market Analysts (*Cammer* Factor Two) ............... 22

                    (c)     There Were Numerous Market Makers for Synchrony Common Stock (*Cammer* Factor Three) ................................................................ 23

                    (d)     Synchrony Was Eligible to File Form S-3 Registration Statements (*Cammer* Factor Four) ................................................................. 23

                    (e)     Synchrony's Stock Price Reacted to Unexpected News (*Cammer* Factor Five)............. 24

i

            ii.      The *Krogman* Factors Support Market Efficiency............ 25

       b.      Plaintiffs Are Entitled to the *Affiliated Ute* Presumption of
              Reliance...................................................................................... 26

       c.      Damages Are Measurable by a Common Methodology............... 27

    2.     A Class Action Is Superior to Alternative Forms of Redress ................... 28

  C.     Proposed Class Counsel Satisfies Rule 23(g) ........................................................ 29

V.     CONCLUSION.................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972).................................................................................3, 20, 26, 27

*Alexander v. Azar*,
   2020 WL 1430089 (D. Conn. Mar. 24, 2020),
   *aff'd sub nom. Barrows v. Becerra*, 24 F.4th 116 (2d Cir. 2022)...........................................11

*In re Alstom SA Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) ..................................................................................23

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)......................................................................................................19

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)......................................................................................................19

*In re Bank of Am. Sec., Derivative and ERISA Litig.*,
   281 F.R.D. 134 (S.D.N.Y. 2012) ..................................................................12, 14, 17

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)..........................................................................................3, 20, 21

*In re Beacon Assocs. Litig.*,
   282 F.R.D. 315 (S.D.N.Y. 2012) ..................................................................................20

*Billhofer v. Flamel Techs., S.A.*,
   281 F.R.D. 150 (S.D.N.Y. 2012) ..................................................................................13

*Brecher v. Republic of Argentina*,
   806 F.3d 22 (2d Cir. 2015)............................................................................................18

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ......................................................................... *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ....................................................................22, 23, 25, 26

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed
   Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) ...................................................... 13-14

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*,
   *HQ*, 322 F. Supp. 3d 676 (D. Md. 2018) ...............................................................12

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..................................................................................................28

*In re Deutsche Bank AG Sec. Litig.*,
328 F.R.D. 71 (S.D.N.Y. 2018) .........................................................................13, 15

*In re Deutsche Telekom AG Sec. Litig.*,
229 F. Supp. 2d 277 (S.D.N.Y. 2002).....................................................................1

*Elkind v. Revlon Consumer Prod. Corp.*,
2017 WL 9480894 (E.D.N.Y. Mar. 9, 2017)............................................................2

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ...................................................................14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)...............................................................................................19

*In re Facebook, Inc., IPO Sec. and Derivative Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ...........................................................................18

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)....................................................................................15

*In re Frontier Commc'ns Corp. Stockholders Litig.*,
No. 3:17-cv-01617-VAB, ECF No. 214 (D. Conn. May 30, 2022)........................17

*Gen. Tel. Co. of the Sw. v. Falcon*,
457 U.S. 147 (1982)...............................................................................................12

*In re Globalstar Sec. Litig.*,
2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004) ..........................................................13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)............................................................................................3, 20

*Hanks v. Lincoln Life & Annuity Co. of N.Y.*,
330 F.R.D. 374 (S.D.N.Y. 2019) ...........................................................................13

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) .........................................................1

*In re JPMorgan Chase & Co. Sec. Litig.*,
2015 WL 10433433 (S.D.N.Y. Sep. 29, 2015)......................................23, 25, 26, 28

*Krogman v. Sterritt*,
202 F.R.D. 467 (N. D. Tex. 2001) .............................................................21, 25, 26

*Lapin v. Goldman Sachs & Co.*,
254 F.R.D. 168 (S.D.N.Y. 2008) ...............................................................................16

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014)..........................................................................12

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
328 F.R.D. 86 (S.D.N.Y. 2018) .................................................................................22

*Menkes v. Stolt-Nielsen S.A.*,
270 F.R.D. 80 (D. Conn. 2010)..................................................................................21

*Mujo v. Jani-King Int'l, Inc.*,
2019 WL 145524 (D. Conn. Jan. 9, 2019)..................................................................17

*In re Myriad Genetics, Inc. Sec. Litig.*,
2021 WL 5882259 (D. Utah Dec. 13, 2021)...............................................................20

*Nnebe v. Daus*,
2022 WL 615039 (S.D.N.Y. Mar. 1, 2022) ................................................................11

*In re NYSE Specialists Sec. Litig.*,
260 F.R.D. 55 (S.D.N.Y. 2009) ...................................................................................1

*Pearlstein v. BlackBerry Ltd.*,
2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ...............................................18, 26, 30

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017)....................................................................19, 20, 24

*Pirnik v. Fiat Chrysler Auto., N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) ...............................................................22, 24, 28

*Ret. Sys. v. Morgan Stanley & Co., Inc.*,
772 F.3d 111 (2d Cir. 2014)......................................................................................12

*Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019).................................................................................28

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015)................................................................................27, 28

*Ruzhinskaya v. Healthport Techs.*,
LLC, 311 F.R.D. 87 (S.D.N.Y. 2015).........................................................................17

*In re Sadia S.A. Sec. Litig.*,
269 F.R.D. 298 (S.D.N.Y. 2010) ...............................................................................23

*In re SCOR Holding (Switzerland) AG Litig.*,
  537 F. Supp. 2d 556 (S.D.N.Y. 2008)......................................................................20

*Spagnola v. Chubb Corp.*,
  264 F.R.D. 76 (S.D.N.Y. 2010) ...............................................................................17

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016),
  *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017)...............19

*In re SunEdison, Inc. Sec. Litig.*,
  329 F.R.D. 124 (S.D.N.Y. 2019) .............................................................................17

*Sykes v. Mel S. Harris & Assocs., LLC*,
  780 F.3d 70 (2d Cir. 2015)......................................................................................28

*In re Synchrony Fin. Sec. Litig.*,
  2022 WL 427499 (D. Conn. Feb. 11, 2022) ....................................................... *passim*

*In re Synchrony Fin. Sec. Litig.*,
  450 F. Supp. 3d 127 (D. Conn. 2020).......................................................................4

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021)......................................................................................5

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008).....................................................................................21

*In re Teva Sec. Litig.*,
  2021 WL 872156 (D. Conn. Mar. 9, 2021) ........................................................ *passim*

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
  283 F.R.D. 199 (S.D.N.Y. 2012) ........................................................................14, 29

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) ...............................................................................1

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  333 F.R.D. 39 (S.D.N.Y. 2019) ...............................................................................22

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)................................................................................ *passim*

*Wagner v. Barrick Gold Corp.*,
  251 F.R.D. 112 (S.D.N.Y. 2008) ..............................................................................23

*Wilson v. LSB Indus., Inc.*,
  2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)......................................................13, 26, 28

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ..................................................................22, 24

*Woe v. Cuomo*,
    729 F.2d 96 (2d Cir. 1984)..................................................................................12

*Yi Xiang v. Inovalon Holdings, Inc.*,
    327 F.R.D. 510 (S.D.N.Y. 2018) ........................................................................16

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ................................................................................... *passim*

H.R. Conf. Rep. No. 104- 369, at 34 (1995)...............................................................16

7AA Wright et al., Federal Practice & Procedure § 1785.4 (3d ed. 2016 update) ........................11

Pursuant to Federal Rule of Civil Procedure 23, Lead Plaintiff Stichting Depositary APG Developed Markets Equity Pool ("Lead Plaintiff" or "APG") and Plaintiff Stichting Depositary APG Fixed Income Credits Pool (collectively with Lead Plaintiff, "Plaintiffs") respectfully request that the Court: (i) certify the Class (defined below); (ii) appoint APG as Class Representative; and (iii) appoint Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as Class Counsel and Motley Rice LLC ("Motley") as Liaison Class Counsel (together with Class Counsel, "Counsel").[1]

## I.    PRELIMINARY STATEMENT

This Action asserts claims against Synchrony and certain of its executives under Sections 10(b), 20A, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Courts in this Circuit and elsewhere have long recognized that these sorts of private actions are essential to the enforcement of the securities laws and ideally suited for class certification, as they arise from public misstatements and omissions harming tens of thousands of investors in a common manner. *See, e.g.*, *In re Deutsche Telekom AG Sec. Litig.*, 229 F. Supp. 2d 277, 282 (S.D.N.Y. 2002) ("Class actions are generally well-suited to securities fraud cases."); *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 75 (S.D.N.Y. 2009) ("[C]ourts have long recognized that [c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws." (second alteration in original) (quoting *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 240 (S.D.N.Y. 2006))); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *17 (S.D.N.Y. Dec. 19, 2014) (private securities fraud actions provide "a most effective weapon in the enforcement of securities laws and are a necessary

---

[1] Unless otherwise noted, (i) capitalized terms and abbreviations not defined herein have the same meanings ascribed to them in the operative Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 78); (ii) references to "¶__" refer to paragraphs of the Complaint; (iii) all emphasis is added; (iv) all internal citations and punctuation are omitted; and (v) all references to the "Wierzbowski Decl." refer to the Declaration of Adam H. Wierzbowski filed herewith.

supplement to Commission action"). Thus, consistent with the "liberal rather than restrictive construction of Rule 23" and "standard of flexibility" followed in this Circuit, securities class actions are routinely certified. *See, e.g.*, *Elkind v. Revlon Consumer Prod. Corp.*, 2017 WL 9480894, at *6 (E.D.N.Y. Mar. 9, 2017). This action is no different, and Plaintiffs readily satisfy all requirements for class certification.

*First*, the proposed Class includes many thousands of class members, readily satisfying numerosity under Rule 23(a)(1).

*Second*, there are numerous common issues of law and fact, including as to falsity, materiality, scienter, loss causation, and damages—any one of which sufficiently establishes commonality under Rule 23(a)(2).

*Third*, the claims of APG are typical of the proposed Class sufficient for Rule 23(a)(3), as among other things both APG and the proposed Class were harmed by the same alleged fraud and artificial inflation in the price of Synchrony common stock.

*Fourth*, as this Court already ruled in appointing the Lead Plaintiff, APG is a sophisticated institutional investor who will zealously advocate for the interests of the proposed Class, with whom its interests are squarely aligned. Plaintiffs' chosen counsel are also among the most experienced securities class action law firms in the country. These facts and others demonstrate adequacy under Rule 23(a)(4).

*Fifth*, this Action satisfies the predominance requirement of Rule 23(b)(3). Common issues of law and fact abound and are subject to common proof, including issues of falsity, materiality, scienter, and loss causation. Moreover, as discussed in greater detail below and in the accompanying expert report of Dr. Steven P. Feinstein, Ph.D., CFA (the "Feinstein Report," attached as Ex. 1 to the Wierzbowski Decl.), empirical analysis establishes that Synchrony

common stock traded on an efficient market, and thus the proposed Class is entitled to the fraud-on-the-market presumption of class-wide reliance. *See Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988) (adopting fraud-on-the-market presumption); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*"); *Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017). As Plaintiff's claims are based on the concealment of retail partners' pushback and related facts, Plaintiffs are also entitled to an omissions-based presumption of reliance. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Finally, as to damages, Plaintiffs and their expert have proposed a common class-wide methodology to calculate damages that is consistent with Plaintiffs' theory of liability, thus further satisfying Rule 23(b)(3)'s predominance requirement.

*Sixth*, adjudication as a class action readily satisfies Rule 23(b)(3)'s "superiority" requirement because, as discussed further below, tens-of-thousands of investors suffered damages as a result of Defendants' alleged misconduct, and it is therefore desirable to hear all such claims in one court.

*Finally*, pursuant to Rule 23(g), Lead Counsel BLB&G and Liaison Counsel Motley Rice should be appointed Class Counsel and Liaison Class Counsel because they are well qualified to prosecute this Action on behalf of Plaintiffs and the Class.

For these reasons, and as discussed further below, Plaintiffs respectfully request that the Court certify the proposed Class, appoint APG as Class Representative under Rules 23(a) and 23(b)(3), and appoint BLB&G and Motley Rice as Class Counsel and Liaison Class Counsel pursuant to Rule 23(g).

## II.    PROCEDURAL HISTORY

On February 5, 2019, the Court appointed APG to serve as Lead Plaintiff in this Action and appointed BLB&G as Lead Counsel and Motley Rice as Liaison Counsel for the putative

Class. ECF No. 59. APG is an institutional investment fund whose authorized representative, APG Asset Management N.V., has over $500 billion under management and is one of the largest institutional investors in the world. *See* Ex. 2 ¶3. APG purchased shares of Synchrony stock on the open market during the Class Period and suffered damages when Synchrony's stock price fell as the truth about the pushback on Synchrony's tightened underwriting that Synchrony had been receiving from its retail partners was revealed. *See id.*; ECF No. 39-3.

On April 5, 2019, Plaintiffs filed the operative Amended Complaint, which sets forth Defendants' alleged violations of the Exchange Act and describes how those violations damaged Synchrony investors. ECF No. 78.[2]

On June 26, 2019, Defendants moved to dismiss the claims asserted in the Complaint. ECF Nos. 98-100. Defendants asserted that Plaintiffs failed to sufficiently allege that Defendants made any actionable misstatements or omissions; that Defendants did not act with scienter; that the alleged corrective disclosures did not sufficiently plead loss causation; and that Plaintiffs' claims under the Securities Act were barred by the statute of limitations. ECF No. 99. Following full briefing, on March 31, 2020, the Court granted Defendants' motion to dismiss. *See In re Synchrony Fin. Sec. Litig.*, 450 F. Supp. 3d 127 (D. Conn. 2020) ("*Synchrony I*").

Plaintiffs timely appealed this Court's decision to the U.S. Court of Appeals for the Second Circuit. After full briefing and oral argument, the Second Circuit ruled that Plaintiffs plausibly alleged the falsity of Defendant former Synchrony CEO Margaret Keane's statement on January 19, 2018 that Synchrony was "not getting any pushback on credit," holding:

> [W]e interpret Keane's statement to mean that, by January 19, 2018, Synchrony had not received any negative reactions or opposition from retail partners to

---

[2] The Complaint also set forth claims under the Securities Act of 1933 (the "Securities Act") in connection with a note offering conducted by Synchrony on December 1, 2017. The Complaint also originally alleged a class period of October 21, 2016 to November 1, 2018, inclusive.

4

> changes in its underwriting practices. Unlike the other alleged misrepresentations, this statement was specific enough to survive the pleadings stage. Keane's assertion about pushback was not a vague expression of opinion that talks with multiple partners would go well. Instead, it was a concrete description and a factual representation that purported to describe the state of Synchrony's business relationships as of January 19, 2018. We disagree with the district court that a general disclosure about the competitive nature of the consumer finance market properly contextualizes this statement.

*See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168 (2d Cir. 2021) ("*Synchrony II*"). Further, the Second Circuit held that "several allegations within the amended complaint specifically allege that Synchrony and its representatives knew the [January 19, 2018] statement was false when made," crediting the Complaint's allegations based on statements from former Synchrony employees. *Id*.

After sustaining Plaintiffs' claims in part, the Court of Appeals remanded the case to this Court. Defendants then filed a motion to dismiss the remainder of the case, which, following the Second Circuit's affirmance of the District Court's dismissal of Plaintiffs' Securities Act claims (*see Synchrony II*, 988 F.3d at 172-74), comprised only claims under the Exchange Act. After full briefing, the Court issued an opinion denying Defendants' renewed motion to dismiss. *See In re Synchrony Fin. Sec. Litig.*, 2022 WL 427499 (D. Conn. Feb. 11, 2022) ("*Synchrony III*"). Specifically, this Court agreed with Plaintiffs that Defendant Keane's January 19, 2018 statement was material to investors, holding:

> It is plausible that an investor could view any resistance from retail partners, including, most significantly, Walmart, to tightened underwriting policies as significant to an investment decision under the circumstances. The Amended Complaint alleges that, on other occasions, analysts had asked similar questions about the status of Synchrony's most important retail partnerships, indicating the importance of this issue to investors in the company.

*Id*. at *6.

Further, the Court found that the Complaint adequately alleged Defendant Keane's—and thus Synchrony's—scienter, holding, "there are multiple allegations in the Amended Complaint to

5

support that Synchrony and its representatives, including Ms. Keane, knew or should have known that Synchrony was mispresenting material facts with respect to Synchrony's relationship with its partners, when Ms. Keane made the alleged misstatement at issue." *Id*. at *8.

Finally, the Court "disagree[d]" with Defendants' contention that the Complaint failed to plead loss causation. *Id*. at *12. Specifically, the Court held that the news disclosed on July 12, 2018 contained "specific disclosures [that] reveal the information that allegedly had been concealed: that Synchrony's partners—including, most importantly, Walmart—had in fact resisted or 'pushed back' on Synchrony's tightened underwriting policies, in direct contradiction to the alleged misstatement." *Id*. The Court found, however, that "[o]f the three disclosures alleged, only the first [the news released on July 12, 2018] reveals the information allegedly concealed by Ms. Keane's statement." *Id*. Further, the Court held that the Complaint alleged "sufficient facts to raise a reasonable inference that the alleged concealment caused an 'ascertainable' portion of the alleged loss: in this case, the alleged drop of 5.3% in stock price on July 12, 2018." *Id*. at *13.

Immediately after this Court sustained Plaintiffs' claims and denied Defendants' renewed motion to dismiss, Plaintiffs began pursuing discovery, including by negotiating a Rule 26(f) report and case schedule (ECF Nos. 174, 175); litigating a dispute concerning the scope of discovery, over which the Court heard oral argument on April 5, 2022 (ECF Nos. 174, 179); issuing and responding to document requests and interrogatories; reviewing the limited documents produced by Defendants to date while continuing negotiations for a proportionate production of custodial emails and other relevant documents; gathering and producing documents in response to Defendants' document requests; and pursuing third-party discovery from certain of Synchrony's retail partners.

While the parties are still discussing the parameters of Defendants' full document production, pursuant to the agreed-upon schedule, Plaintiffs now move for class certification. ECF No. 174.

III.   **STATEMENT OF FACTS**

As discussed above, the Second Circuit Court of Appeals and this Court sustained Plaintiffs' claims under Sections 10(b), 20A, and 20(a) of the Exchange Act, on behalf of all persons or entities who purchased or otherwise acquired the common stock of Synchrony between January 19, 2018 and July 12, 2018, inclusive (the "Class Period"), and who were damaged thereby. *Supra* § II. Synchrony is the nation's largest provider of private-label credit cards ("PLCCs"). ¶51. A PLCC is a credit card branded by a retailer, which a consumer may use to purchase goods from that retailer alone. *Id.* At all relevant times, Synchrony's common stock was listed and actively traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SYF," and many tens-of-thousands of investors owned, bought, and sold Synchrony's stock. ¶¶45, 255. As of March 31, 2018 (the approximate midpoint of the Class Period), Synchrony had over 760 million shares of stock outstanding, owned by thousands of investors. ¶45.

As alleged in the Complaint, by mid-2016, Synchrony had been forced to tighten its underwriting practices. For instance, on April 28, 2017, while announcing Synchrony's disappointing first quarter 2017 results, Defendant Doubles admitted that Synchrony had tightened underwriting in the second half of 2016. ¶¶115-16. On June 2, 2017, Doubles further described mid-2016 as "the inflection point" at which Synchrony recognized that its deteriorating 2015-2016 loans were driving "a[n] uptick in charge-offs for the whole portfolio." ¶73. As a result, Synchrony "started making [underwriting] changes almost immediately." *Id.* On November 14, 2017, Doubles stated that, over the prior year, Synchrony "tightened up criteria" for "credit line increases," "dual

card upgrades," and "approval criteria in some programs," noting "those have had an impact." ¶¶82, 206.

As Synchrony tightened underwriting starting in mid-2016, its retail partners (including its most valuable retail partner for decades, Walmart)—who relied on Synchrony's credit cards to generate revenue—pushed back. ¶278. By 2017, Synchrony's relationship with Walmart was contentious. ¶¶121-27. In response, beginning at least as early as mid-2017, Keane increased her contact with Walmart, revealing that the partnership was suffering and required her personal attention, and Keane and Synchrony's CEO of Retail Card Thomas Quindlen frequently visited Walmart's Arkansas headquarters between April and June 2017. ¶¶142-43. As the *WSJ* later reported, Walmart and Synchrony held at least two high-level meetings in 2017, at which Walmart "balked" at renewing its agreement with Synchrony, voicing to Synchrony's Board that Synchrony was not approving enough credit for its customers. ¶278. As Defendant Doubles later explained— ***after*** Walmart terminated the partnership—on July 27, 2018: "In the renewal discussions, it became clear that we weren't . . . going to be able to maintain that acceptable level of return for the risk that we are taking" in the Walmart portfolio. ¶176.

Further signaling that the partnership was in jeopardy, but unknown to investors in October 2017, for the first time, Walmart solicited bids for its retail credit-card business from other banks, including Capital One and Goldman Sachs. ¶148. Synchrony received a copy of the request for proposals on October 27, 2017. *See* ¶274; ECF No. 100-33. Certain other Synchrony retail partners—including Sam's Club and Lowe's—were also concerned about credit for their commercial customers and likewise pushing back on Synchrony's tightened underwriting and decreased approvals. ¶¶155-56. Yet at around the same time as Synchrony faced these serious challenges to its relationships with its key retail partners, Defendants Keane, Quindlen and

8

Doubles suspiciously entered into Rule 10b5-1 securities trading plans in November 2017; and, as discussed below, at highly suspicious times just months later, they then sold tens of thousands of their own Synchrony stock for millions of dollars. ¶¶290, 293, 296.

Against the above backdrop of retail partner pushback—which was known only to Defendants—during Synchrony's earnings call with investors on January 19, 2018, in response to a specific inquiry from a securities analyst about Synchrony's tightened underwriting for subprime customers, Defendants falsely and misleadingly concealed the truth. Specifically, an analyst asked Defendant Keane, "[T]he retail partners really value the liquidity that you provide to their customers. Are you getting any push back as you tweak the underwriting and make less credit available for those sub-660 borrowers?" Keane responded, "[W]e are not getting any pushback on credit," and she voiced confidence in the strength of Synchrony's retail partnerships. ¶218. However, as the Complaint alleges, Defendant Keane's statement was materially false and misleading because by this time, Defendants were well aware that Walmart was disappointed in Synchrony's underwriting tightening, and that the relationship was in jeopardy.

Thereafter, in February and May 2018—after Defendant Keane concealed that Synchrony's retail partners were pushing back on underwriting—Keane, Doubles, and Quindlen collectively sold personally-held Synchrony stock for gross proceeds of more than $3.9 million. ¶¶286-97.

On July 12, 2018, news broke that Walmart was considering ending its partnership with Synchrony, with media outlets reporting that Walmart "want[ed] Synchrony to approve a higher percentage of applicants" and had "aired those concerns in a meeting with Synchrony's board last year." ¶239. The media also reported that day that, in late 2017, Walmart launched "for the 'first time,' a formal request for bids from other credit card issuers," and met with Capital One and

Goldman Sachs in early 2018. ¶148. This news contradicted Defendants' false statement and caused Synchrony's share price to fall 5.3%, to $32.69, by the close of that day (July 12, 2018), and to continue to decline another 1.6% on the following day (July 13, 2018), closing at $32.44. ¶239.

Additional, new information related to Defendants' fraud continued to emerge after the current proposed Class Period, prompting further declines in Synchrony common stock price. On July 26, 2018, the media revealed that Walmart was moving its credit-card business to Capital One, causing Synchrony's share price to fall 10.3% by the close of trading that day, to $30.00, and continue declining over the following days. ¶242. Then, on November 1, 2018, Walmart sued Synchrony, alleging that Synchrony's underwriting had exposed Walmart to significant risk and seeking $800 million in damages. ¶248. On this news, Synchrony's share price fell another 10%. ¶249.

## IV.    ARGUMENT

Plaintiffs' Amended Complaint alleged a class period of October 21, 2016 to November 1, 2018, and in particular, alleged that the truth about Defendants' fraud was revealed to investors through a series of three partial corrective disclosures that occurred on July 12, 2018, July 26, 2018, and November 1, 2018, discussed above. ¶¶231-54. However, in *Synchrony III*, this Court held, "Of the three disclosures alleged, only the first reveals the information allegedly concealed by Ms. Keane's [January 19, 2018] statement." 2022 WL 427499, at *12. For example, as the Court wrote:

> On July 12, 2018, the Wall Street Journal revealed that Walmart "want[ed] Synchrony to approve a higher percentage of applicants" and had "aired those concerns in a meeting with Synchrony's board last year," Am. Compl. ¶ 239 (emphasis omitted), and that, in late 2017, Walmart launched "for the 'first time,' a formal request for bids from other credit card issuers," *id.* ¶ 148. These specific disclosures reveal the information that allegedly had been concealed: that Synchrony's partners—including, most importantly, Walmart—had in fact resisted

or "pushed back" on Synchrony's tightened underwriting policies, in direct contradiction to the alleged misstatement.

*Id*.

Plaintiffs respectfully disagree with the Court's conclusion that only the July 12, 2018 disclosure revealed the falsity of Defendant Keane's denial of partner "pushback" on January 19, 2018, but, consistent with the Court's ruling, Plaintiffs hereby seek to certify a Class of investors who purchased or otherwise acquired the common stock of Synchrony between January 19, 2018 and July 12, 2018.

Plaintiffs reserve all rights to potentially later expand the Class Period depending on the evidence revealed as Defendants move forward with their production of custodial emails and other documents throughout the remainder of discovery and/or to seek damages for the full extent of the decline of Synchrony's stock as alleged in the Amended Complaint. The Federal Rules provide that "an order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Courts in this District and elsewhere have also held that "a court retains discretion to alter [or] amend . . . the class at any time before final judgment." *Alexander v. Azar*, 2020 WL 1430089, at *51 (D. Conn. Mar. 24, 2020), *aff'd sub nom. Barrows v. Becerra*, 24 F.4th 116 (2d Cir. 2022); *see also Nnebe v. Daus*, 2022 WL 615039, at *9, n.8 (S.D.N.Y. Mar. 1, 2022) ("To the extent any issues remain as to liability . . . such issues can be managed on a classwide basis by amending the class definition or creating subclasses."); 7AA Wright et al., Federal Practice & Procedure § 1785.4 (3d ed. 2016 update) ("Reference to the final judgment [in Rule 23(c)(1)(C)] avoids a possible ambiguity under the prior rule, making clear that after a determination of liability it may be permissible to amend the class definition or subdivide the class if it becomes necessary in order to define the remedy or if decertification is warranted.").

11

In particular, a court retains discretion to expand a class period "based on information obtained in discovery" or "in the light of subsequent developments in the litigation." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, *HQ*, 322 F. Supp. 3d 676, 682 (D. Md. 2018) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). *See also Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984) (explaining that courts should "view a class action liberally in the early stages of litigation, since the class can always be modified or subdivided as issues are refined for trial").

## A.    The Proposed Class Satisfies Rule 23(a)

### 1.    The Class Is Sufficiently Numerous

The proposed Class consists of thousands of members, readily establishing the requisite numerosity under Rule 23(a). *See In re Teva Sec. Litig.*, 2021 WL 872156, at *4 (D. Conn. Mar. 9, 2021) ("Numerosity is presumed for classes larger than forty members.") (quoting *Penn. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014)).

During the Class Period, Synchrony stock was heavily traded on the NYSE (Feinstein Rpt. ¶29), with an average of 5.7 million shares traded daily (*id*. ¶57), 760.88 million shares in Synchrony's float, 761.35 million shares outstanding (*id*. ¶92), and an average weekly trading volume of approximately 28.3 million shares, or 3.71% of shares outstanding (*id*. ¶58). Joinder of this vast number of investors would be impractical, satisfying the "numerosity" requirement. *See, e.g.*, *Teva*, 2021 WL 872156, at *4 (quoting *In re Bank of Am. Sec., Deriv. and ERISA Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012)) (finding numerosity based on "a showing that a large number of shares were outstanding and traded during the relevant period"); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 423-24 (S.D.N.Y. 2014) ("32.9 million shares outstanding and average weekly trading volume of approximately 6 million shares" establishes numerosity).

## 2.    There Are Common Questions of Law and Fact

The proposed Class also readily satisfies Rule 23(a)'s commonality requirement, which requires only "a single issue of law or fact that is common across all class members and is thus easily met in most cases." *Teva*, 2021 WL 872156, at \*4 (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:18 (5th ed.) (Westlaw 2021)); *see also, e.g.*, *In re Globalstar Sec. Litig.*, 2004 WL 2754674, at \*4 (S.D.N.Y. Dec. 1, 2004) ("The commonality requirement has been applied permissively in securities fraud litigation."); *Hanks v. Lincoln Life & Annuity Co. of N.Y.*, 330 F.R.D. 374, 379 (S.D.N.Y. 2019) (noting commonality is a "low hurdle"). Common questions of law and/or fact here include: (i) whether Defendant Keane's January 8, 2019 statement was false and misleading; (ii) whether Keane's misrepresentation and omissions were material; (iii) whether Keane acted with the requisite scienter; (iv) whether the price of Synchrony common stock was artificially inflated by Keane's misstatement and omissions; (v) the amount of damages; and (vi) whether Defendants were control persons. Thus, commonality is satisfied here. *See, e.g.*, *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at \*4 (S.D.N.Y. Aug. 13, 2018) (same sorts of issues are "susceptible to common answers because their resolution does not differ based on the identity of the plaintiff"); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 157 (S.D.N.Y. 2012) ("[A]lleged misrepresentations and scienter, which form the basis of [p]laintiff's claims, are necessarily common.").

## 3.    The Proposed Class Representative's Claims Satisfy Typicality

The typicality requirement of Rule 23(a) "is not demanding," *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 80 (S.D.N.Y. 2018), and requires only that the proposed class representative's claim "arises from the same course of events" as each class member's claim, and that they make "similar legal arguments to prove the defendant's liability." *Teva*, 2021 WL 872156, at \*4 (D. Conn. Mar. 9, 2021) (quoting *Cent. States Se. and Sw. Areas Health & Welfare*

13

*Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007)). Thus, courts evaluating typicality "generally look not at the plaintiffs' behavior, but rather [at] the defendant's actions." *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012) (alteration in original). The typicality requirement is easily met here: like all other members of the proposed Class, APG purchased shares of Synchrony common stock during the Class Period, at prices artificially inflated by Defendants' fraud, and suffered damages when the truth was publicly revealed, and concealed risks materialized. *See* Ex. 2 ¶3. Indeed, in appointing APG as Lead Plaintiff, this Court already recognized as such, *see also* ECF No. 59 at 11 ("Here, APG's claims are typical of the proposed class members. Like the other proposed Class members, APG alleges that it '(i) purchased Synchrony common stock during the Class Period, (ii) at prices artificially inflated by Defendants' materially false and misleading statements and/or omissions, and (iii) was damaged as a result.'").

In addition, APG purchased Synchrony common stock contemporaneously with Defendants, while Defendants were in possession of material nonpublic information concerning the issues at the heart of the Class's Section 10(b) and 20(a) claims. *See* ¶¶286-97. Thus, APG's claims are typical of all Class members who traded contemporaneously with Defendants. *See, e.g.*, *In re Enron Corp. Sec. Deriv. & "ERISA" Litig.*, 529 F. Supp. 2d 644, 700 (S.D. Tex. 2006) (typicality established for 20A claims because class representatives "invested in Enron stock contemporaneously with the sale of Enron stock by Defendants with alleged inside information").

Thus, APG and all other Class members will require proof of the same evidence to prevail on their respective claims establishing typicality. *See, e.g.*, *Bank of Am.*, 281 F.R.D. at 139 (typicality established where "class plaintiffs assert that they acquired BofA securities at prices

14

allegedly inflated by defendants' misstatements and/or omissions and have an interest in maximizing their recovery").

### 4.       The Proposed Class Representative Is More than Adequate

The final prong of Rule 23(a) requires that the proposed class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). An analysis of adequacy considers whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Teva*, 2021 WL 872156, at \*5 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)). Only a "fundamental" conflict of interest that goes to the "heart of the litigation" will defeat adequacy under Rule 23(a)(4). *Id*. (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed.) (Westlaw 2021)); *see also Deutsche Bank*, 328 F.R.D. at 82 ("A conflict or potential conflict alone will not necessarily defeat class certification—the conflict must be fundamental."). No conflict of interest exists here; to the contrary, APG's interests are completely aligned with—and are not antagonistic to—the Class. APG purchased Synchrony common stock during the Class Period based upon publicly available information and was injured by the same wrongful course of conduct that injured the Class. *See supra* § IV.A.3.

Indeed, in appointing APG as Lead Plaintiff, this Court already preliminarily determined that APG is capable of representing the Class. *See* ECF No. 59 at 12 ("APG's sizeable interest in this case . . . as well as its position as a sophisticated institutional investor, ensures that it will engage in vigorous advocacy on behalf of the proposed Class."). Since being appointed Lead Plaintiff, APG has continued to demonstrate its commitment to participate in and supervise the prosecution of this action on behalf of the Class, keeping itself informed of developments in the case, and vigorously prosecute it on behalf of all Class members, and will continue to do so. Among other things, APG has pursued appointment as, and was appointed, Lead Plaintiff and

reviewed the operative complaint and other pleadings filed in this action. In addition, through its keen oversight of counsel, APG also: (i) investigated and filed the Complaint; (ii) opposed Defendants' motion to dismiss; (iii) served and responded to discovery requests, including by collecting and producing documents; and (iv) retained and consulted with a market efficiency and damages expert in support of the instant motion. Throughout the case, APG also communicated with counsel regarding litigation strategy and significant case developments, including in connection with Plaintiffs' partial success at the U.S. Court of Appeals for the Second Circuit and Plaintiffs' success in opposing Defendants' second motion to dismiss before this Court. APG will continue to vigorously prosecute this case, oversee counsel, and perform similar activities throughout this litigation, including participating in discovery, trial preparation, and any settlement discussions. Ex. 2 ¶¶4-6.

These facts readily establish that APG possesses the requisite adequacy. *See, e.g.*, *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y. 2008) (holding plaintiff was adequate class representative where it was "familiar with the facts and legal theories underlying the case, [] in regular contact with his lawyers, has met with them, has reviewed the complaint and other case documents, and understands that [it] is responsible for making decisions that impact the class and representing the class's best interests"). In addition, as an institutional investor, APG is especially well-qualified to serve as Class Representative. *See* H.R. Conf. Rep. No. 104- 369, at 34 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730, 733 (Private Securities Litigation Reform Act of 1995 is intended to "increase the likelihood that institutional investors will serve as lead plaintiffs"); *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 525 (S.D.N.Y. 2018) (institutional investors are "unequivocally preferred as lead plaintiff"). Moreover, APG is not subject to any unique defense

16

that would "become the focus of the litigation, thus overshadowing the primary claims, and prejudicing other class members." *Spagnola v. Chubb Corp*., 264 F.R.D. 76, 94 (S.D.N.Y. 2010).

APG also has protected the interests of the Class by retaining BLB&G as proposed Class Counsel and Motley as proposed Liaison Counsel. *See, e.g.*, *Bank of Am.*, 281 F.R.D. at 140 (finding that "plaintiffs have retained experienced and qualified counsel who have, to date, ably conducted this litigation"); *Mujo v. Jani-King Int'l, Inc.*, 2019 WL 145524, at \*6 (D. Conn. Jan. 9, 2019) (holding that Plaintiffs met Rule 23(a)(4)'s adequacy of representation requirement where class counsel had "litigated class actions asserting the same types of" claims). BLB&G is highly experienced, has a proven track record in litigating complex securities class actions including before this Court, has vigorously prosecuted this case, and will continue to vigorously prosecute the claims of the proposed Class. *See, e.g.*, *In re Frontier Commc'ns Corp. Stockholders Litig.*, No. 3:17-cv-01617-VAB, ECF No. 214, at 19 (D. Conn. May 30, 2022) (finding that BLB&G is a "skilled law firm with significant experience in complex securities litigation"); *In re SunEdison, Inc. Sec. Litig*., 329 F.R.D. 124, 147 (S.D.N.Y. 2019) ("In light of Bernstein Litowitz's substantial resources and experience in litigating securities class actions, and the conduct of the litigation to date, the Court concludes that Bernstein Litowitz satisfies Rule 23(g), and its motion for appointment as class counsel on behalf of both subclasses is granted."). Likewise, proposed Liaison Counsel Motley has also been involved in numerous complex securities actions in this Circuit, and is amply qualified to serve as liaison counsel. *See, e.g.*, *Ruzhinskaya v. Healthport Techs.,* LLC, 311 F.R.D. 87, 100 (S.D.N.Y. 2015) ("Motley Rice LLC has substantial experience in class action and consumer litigation."). *See also generally* Exs. 3 and 4.

Counsel's adequacy—and APG's adequacy in selecting them—is further established by their work under APG's supervision on this case to date, which has included an ongoing

17

investigation into the facts, a successful appeal to the Second Circuit, and overcoming the Defendants' second motion to dismiss. *See, e.g.*, *In re Facebook, Inc., IPO Sec. and Deriv. Litig.*, 312 F.R.D. 332, 345 (S.D.N.Y. 2015) (adequacy established in part by including "surviving a motion to dismiss against some of the finest firms in the nation"). Accordingly, APG satisfies the adequacy requirement of Rule 23(a)(4).

### 5. The Proposed Class Is Ascertainable

Although not expressly required under Rule 23, courts in this Circuit also consider whether the members of the proposed class are ascertainable and not "truly indeterminable." *Facebook*, 312 F.R.D. at 353. This requirement is "not demanding," and requires only that the proposed class be "sufficiently definite"—*i.e.*, "defined by objective criteria that are administratively feasible" to apply. *Id.* at 352-53 (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)). The proposed Class here readily satisfies this consideration, as it is defined by objective criteria— the purchase or acquisition of Synchrony common stock during the Class Period and damage therefrom—which can be readily determined from investor records. *See, e.g.*, *Teva,* 2021 WL 872156, at *10 ("The proposed Class here is ascertainable because records document the purchasers of the relevant . . . securities."); *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *13 (S.D.N.Y. Jan. 26, 2021) (noting that class can "easily" be ascertained "by references to investor records").

### B. The Proposed Class Satisfies Rule 23(b)(3)

Once a proposed class representative shows that the class meets the four requirements of Rule 23(a), the court determines whether the action can be maintained under one of the three subsections of Rule 23(b). Here, Plaintiffs seeks class certification under Rule 23(b)(3) because, as discussed below, "questions of law or fact common to class members predominate over any

questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1. Common Factual and Legal Questions Predominate

"Predominance is a test readily met in certain cases alleging . . . securities fraud[.]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). This inquiry is satisfied where "*questions* of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013) (emphasis in original); *see also Waggoner*, 875 F.3d at 93 ("Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof"); *In re Petrobras Sec.*, 862 F.3d 250, 268 (2d Cir. 2017) (stating that predominance is a "comparative standard" that "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof," only that common issues "*predominate* over any questions affecting only individual [class] members") (emphasis and alterations in original).

"Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*"). Because courts regularly hold that the falsity, scienter, materiality, and loss causation elements of Exchange Act claims are common to all Class members, whether common questions predominate for such claims often "turns on the element of reliance." *Id.* at 810; *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 n.17 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner*, 875 F.3d at 79 ("Reliance is typically the only ground on which to challenge predominance because section 10(b) claims will almost always arise from a common nucleus of facts."); *see generally Amgen*, 568 U.S. at 467, 475 (noting falsity,

19

materiality, and loss causation are common questions for purposes of Rule 23(b)(3)). Pursuant to the Supreme Court's rulings in *Basic* and *Halliburton II*, Plaintiffs can "satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." 573 U.S. at 283-84.[3] As demonstrated below, Plaintiffs here are entitled to this so-called "fraud-on-the-market presumption." *Infra* § IV.B.1.a. Plaintiffs are also entitled to the *Affiliated Ute* presumption for reliance for their omissions-based claims. Finally, as also discussed below, Plaintiffs propose a class-wide damages methodology sufficient to demonstrate predominance. *Infra* § IV.B.1.b.

### a.    The Fraud-on-the-Market Presumption of Reliance Applies

To invoke the fraud-on-the-market presumption of reliance, Plaintiffs must show that (i) the "statements were public," (ii) the "securities traded in efficient markets," and (iii) the shares were purchased at "market price" after the statements were made and "before corrective disclosures revealed the truth." *Teva*, 2021 WL 872156, at *13. The burden to establish market efficiency is "not an onerous one." *Waggoner*, 875 F.3d at 97; *see also Teva*, 2021 WL 872156, at *13 ("In assessing market efficiency, courts should not let the perfect become the enemy of the good.") (quoting *Petrobras*, 312 F.R.D. at 371).

---

[3] Common questions also predominate as to Plaintiffs' Section 20(a) claims because "provided there is predominance with respect to the Section 10(b) claim—i.e., the 'primary violation'—the predominance requirement will also be met with respect to the Section 20(a) claim, as the issue of control is susceptible to generalized proof." *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 572 n.21 (S.D.N.Y. 2008); *see also In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012) (finding common issues related to Section 20(a) claims predominate). Likewise, where "common questions of fact and law predominate on the predicate 10(b) violation . . . they would predominate on the insider trading claim as well." *See In re Myriad Genetics, Inc. Sec. Litig.*, 2021 WL 5882259, at *10 (D. Utah Dec. 13, 2021) (granting class certification for "violations of Sections 10(b), 20(a), and 20A of the Exchange Act").

The Second Circuit has not adopted a specific test to analyze market efficiency, but "it has noted that the inquiry set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) has been routinely applied by district courts," and the "[t]hree additional factors identified in *Krogman v. Sterritt* [202 F.R.D. 467, 475 (N. D. Tex. 2001)] have also subsequently been considered as part of the *Cammer* analysis." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 96-97 (D. Conn. 2010) (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 n. 11, 210-11 (2d Cir. 2008) and collecting cases). "The *Cammer* and *Krogman* factors are simply tools to help district courts analyze market efficiency in determining whether the *Basic* presumption of reliance applies in class certification decision-making. But they are no more than tools in arriving at that conclusion, and certain factors will be more helpful than others in assessing particular securities and particular markets for efficiency." *Teva*, 2021 WL 872156, at *9 (citing *Waggoner*, 875 F.3d at 98). As discussed below, consideration of all these factors here supports efficiency.

### i.    The *Cammer* Factors Support Market Efficiency

Under *Cammer*, courts typically consider the following factors in assessing market efficiency: (i) a large weekly trading volume; (ii) significant securities analyst coverage; (iii) the existence of market makers and arbitrageurs in the security; (iv) the eligibility of the issuer to file an S-3 registration statement; and (v) a history of a cause-and-effect relationship between public information revealing unexpected corporate events or financial results and movement in the corporation's stock price. *See Cammer*, 711 F. Supp. at 1286-87. To be clear, not all five factors are required for market efficiency. In any event, as Plaintiffs' expert Dr. Feinstein demonstrates, each of the five "*Cammer* factors" strongly supports a finding of market efficiency here.

21

**(a)    Synchrony Common Stock Had a High Weekly Trading Volume (*Cammer* Factor One)**

During the Class Period, the average weekly trading volume of Synchrony common stock was 3.71% of shares outstanding or approximately 28.3 million shares. Feinstein Rpt. ¶58. On its own, this heavy trading volume justifies a strong presumption that Synchrony stock traded in an efficient market. *See, e.g.*, *Teva*, 2021 WL 872156, at *8 (holding an "average weekly trading [volume] of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one" and "one percent would justify a substantial presumption" (quoting *Cammer*, 711 F. Supp. at 1293)); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (trading volume of 3.2% points to market efficiency); *Pirnik v. Fiat Chrysler Auto., N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) (same with 2.5%).

**(b)    Synchrony Was Covered Extensively by Market Analysts (*Cammer* Factor Two)**

"*Cammer* recognizes that a stock covered by a 'significant number of analysts' is more likely to be efficient because such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 79 (S.D.N.Y. 2015) (citing *Cammer*, 711 F. Supp. at 1286). Here, at least 24 different securities analysts from major financial institutions published reports on or followed Synchrony's securities during the Class Period. Feinstein Rpt. ¶¶62-64 ("[A]nalysts from at least 24 firms followed the Company during the Class Period."). This extensive analyst coverage also strongly indicates that Synchrony common stock traded in an efficient market. *See, e.g.*, *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (15 analyst firms providing coverage during class period supported finding of market efficiency); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) (coverage by at least three analyst firms supports market efficiency).

22

**(c)** **There Were Numerous Market Makers for Synchrony Common Stock (*Cammer* Factor Three)**

The third *Cammer* factor looks at the existence of market makers and traders who increase liquidity in the market. *Cammer*, 711 F. Supp. at 1286-87. As *Cammer* explained, "market makers and arbitrageurs . . . ensure completion of the market mechanism" and "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Id.* Here, Synchrony common stock was listed and actively traded during the Class Period on the NYSE, which maintains a "Designated Market Maker" system. Feinstein Rpt. ¶74. Courts have held that NYSE listing is a "strong indication that the market for the stock is efficient" in its own right. *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *7 (S.D.N.Y. Sep. 29, 2015). *See also, e.g.*, *Barclays PLC*, 310 F.R.D. at 91 (recognizing that NYSE listing "weighs in favor of finding market efficiency"); *In re Sadia S.A. Sec. Litig.*, 269 F.R.D. 298, 309 (S.D.N.Y. 2010) (recognizing the NYSE as an "open, well-developed and efficient market"); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) (courts recognize that when "a security is listed on the NYSE . . . or a similar national market, the market for that security is presumed to be efficient" (alterations in original)). Additionally, during the Class Period, Synchrony common stock was owned by at least 1,057 institutional investors (Feinstein Rpt. ¶68), who had the resources and information to act as arbitrageurs. *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (institutional investors who held substantial portion of defendant's common stock "likely acted as arbitrageurs and facilitated the efficiency of the market.").

**(d)** **Synchrony Was Eligible to File Form S-3 Registration Statements (*Cammer* Factor Four)**

Throughout the Class Period, Synchrony satisfied the SEC reporting and float requirements to file a Form S-3 registration statement, which "indicates that the company is easily able to issue

23

new securities" and further demonstrates the efficiency of the market for Synchrony common stock. Feinstein Rpt. ¶¶81-87; *Winstar*, 290 F.R.D. at 447.

**(e)     Synchrony's Stock Price Reacted to Unexpected News (*Cammer* Factor Five)**

Finally, *Cammer* factor five concerns the existence of a cause-and-effect relationship between the subject company's stock price and the release of new information about that company, which is commonly demonstrated through the use of event studies prepared by financial experts.

To be clear, however, neither *Cammer* factor five—nor any particular *Cammer* factor—is necessary to demonstrate efficiency, and the Second Circuit has specifically recognized that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies." *Waggoner*, 875 F.3d at 97; *see also Petrobras*, 862 F.3d at 277 ("The district court properly declined to view direct and indirect evidence as distinct requirements, opting instead for a holistic analysis based on the totality of the evidence presented."). In particular, when, as here, "Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact." *Pirnik*, 327 F.R.D. at 45, n.3; *see also Teva*, 2021 WL 872156, at *16, *36 (holding that "the 'indirect' indicia of market efficiency strongly support[ed]" a finding of market efficiency and the fifth *Cammer* factor had "limited relevance").

Nevertheless, as described below, the robust event study analysis that Dr. Feinstein conducted demonstrates "a cause-and-effect relationship between the release of new Company information and changes in Synchrony's stock price, which demonstrates and therefore indicates market efficiency." Feinstein Rpt. ¶104;[4] *see Waggoner*, 875 F.3d at 94 (noting with approval that

---

[4] Dr. Feinstein's event study "focused on the Company's earnings announcements, comparing those information events to all other days" (Feinstein Rpt. ¶111) during the period from "13 July 2017 through

plaintiffs "generally attempt to satisfy *Cammer* 5 by submitting an event study"). Dr. Feinstein's event study demonstrated, among other things, that statistically significant abnormal returns on "earnings announcement days" during the Class Period occurred 10 times more often than on "non- or lesser-news" days—a difference that is itself "highly statistically significant." Feinstein Rpt. ¶¶137-141 ("The earnings announcement days did, in fact, exhibit a significantly greater incidence of statistically significant returns compared to all other days."). In sum, Dr. Feinstein concluded, "[t]hese results prove that the Synchrony stock price responded to Company-specific information, which is the hallmark of an efficient market." *Id.* ¶104. Thus, Dr. Feinstein's event study provides further direct evidence of market efficiency.

### ii.      The *Krogman* Factors Support Market Efficiency

In addition to the *Cammer* factors, courts in the Second Circuit have also taken into consideration three additional factors articulated by the *Krogman* court as indications of market efficiency for the fraud-on-the-market presumption of reliance: "[s]ubstantial market capitalization with a narrow bid-ask spread[ ] and a large public float." *JPMorgan*, 2015 WL 10433433, at *7 (first alteration supplied); *see also, e.g.*, *Barclays PLC*, 310 F.R.D. at 81 ("The markets for companies with higher market capitalizations and shares with a smaller bid-ask spread are more likely to be efficient.") (citing *Krogman*, 202 F.R.D. at 478). Here, each further supports market efficiency.

*First*, Synchrony's market capitalization exceeded $24 billion throughout the Class Period. Feinstein Rpt. ¶89 ("Over the entire Class Period, the market capitalization averaged $26.86 billion, which was larger than 96% of all other publicly traded companies in the U.S., as measured

---

12 July 2018, which was the one-year period ending on the last day of the Class Period." *Id*. ¶115. "Numerous courts have accepted the FDT test [or z-test] (or a similar comparative test) as a sound statistical method" for evaluating market efficiency. *Teva*, 2021 WL 872156, at *27.

by market capitalization."). *See Barclays PLC*, 310 F.R.D. at 92 (market capitalization as low as $0.5 to $3.2 billion supports finding of market efficiency).

***Second***, during the Class Period, Synchrony's common stock float averaged 99.94% of the shares outstanding. Feinstein Rpt. ¶92. *Compare, e.g.*, *Pearlstein*, 2021 WL 253453, at *16 ("average float of 84.4% of shares outstanding" supported "finding of market efficiency"); *Wilson*, 2018 WL 3913115, at *15 (82.41% average float indicates efficiency).

***Third***, the average bid-ask spread for Synchrony stock during the Class Period was a narrow 0.03% of the stock price. Feinstein Rpt. ¶95. *See JPMorgan Chase*, 2015 WL 10433433, at *7 (average bid-ask spread of 0.02% supported efficient market finding); *Teva*, 2021 WL 872156, at *15 (bid-ask spread of 0.035% supports efficiency).

Thus, each of the *Krogman* factors further supports a finding of market efficiency and the application of a presumption of reliance.

> **b.      Plaintiffs Are Entitled to the *Affiliated Ute* Presumption of Reliance**

Plaintiffs are also entitled to a presumption of reliance for their claims under *Affiliated Ute*, which provides that for claims involving a failure to disclose, "positive proof of reliance is not a prerequisite to recovery." 406 U.S. at 153-54. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id*. Plaintiffs' Section 10(b) claims allege that throughout the Class Period, Defendant Keane's false statement omitted material facts that were necessary to make those statements not misleading. *See Synchrony III*, 2022 WL 427499, at *12 (D. Conn. Feb. 11, 2022) (finding the July 12, 2018 disclosures "reveal the information that ***allegedly had been concealed***: that Synchrony's partners—including, most importantly, Walmart—had in fact resisted or 'pushed back' on Synchrony's tightened underwriting policies, in direct contradiction

26

to the alleged misstatement"). Because the Complaint alleges actionable omissions, the Class is also entitled to rely on the *Affiliated Ute* presumption to establish reliance.

### c.   Damages Are Measurable by a Common Methodology

Finally, Plaintiffs and their expert have proposed a methodology to measure damages for members of the proposed Class that result from the asserted theory of liability. Specifically, Dr. Feinstein proposes a straightforward event study methodology to measure out-of-pocket damages based upon Plaintiffs' theory of liability under Exchange Act Section 10(b)[5]—that Defendants' material misstatement and omissions created or maintained artificial inflation in Synchrony's stock price during the Class Period, causing losses when that inflation was released from the stock price following the disclosure of information revealing the fraud. *See* Feinstein Rpt. ¶¶148-59. Under this methodology, Dr. Feinstein will, at the appropriate time after the completion of fact discovery, use his event study to quantify the amount of artificial inflation in Synchrony's stock price that Defendants' misstatement and omissions caused or maintained. *See id.* That artificial inflation amount—which will be calculated on a per-share basis using common evidence—can then be formulaically applied to all Class members' transactions to compute individual damages. *Id.* ¶¶157-59 ("[A]ny valuation or computational complexities that may be encountered in the execution of the damage model will affect all Class members commonly, and therefore will be addressed in common fashion.").[6] "Professor Feinstein's proposed damages model has been

---

[5] Similarly, for damages under Section 20A, because "the losses sustained by any investor depend only on that investor's positions in Synchrony stock and the stock price . . . damages for all investors can be computed using [a] common damage formula." *Id.* ¶¶160-67.

[6] While the actual amount of damages sustained will differ depending on each Class member's transactions in Synchrony common stock, it is "well-established in [the Second Circuit] that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)." *Roach*, 778 F.3d at 405; *see also Teva*, 2021 WL 872156, at *41 ("Indeed, class certification may be appropriate pursuant to Rule 23(b)(3) even in cases 'involving individualized damages calculations.'").

accepted in securities fraud class actions in cases like this one, where Plaintiffs seek out-of-pocket damages to recover artificial inflation caused by Defendants' misrepresentations." *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 398 (N.D. Ga. 2019) (collecting cases).

Plaintiffs' proposed damages methodology is thus "directly linked with [its] underlying theory of class wide liability . . . and is therefore in accord with . . . *Comcast*" and the requirements of Rule 23. *Waggoner*, 875 F.3d at 105-06 (discussing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015); *Pirnik*, 327 F.R.D. at 47. This methodology has been endorsed repeatedly by courts in this Circuit. *See, e.g.*, *Waggoner*, 875 F.3d at 106 (predominance satisfied where "damages for individual class members could be calculated by applying a method across the entire class that focused on the decline in stock price following the [corrective] disclosure . . . and then isolating company-specific events from market and industry events"); *Wilson*, 2018 WL 3913115, at *17 (proposed damages methodology using event study to measure artificial stock price inflation sufficient); *JPMorgan*, 2015 WL 10433433, at *7 (same). Nothing more is required at this stage. *See, e.g.*, *Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 88 (2d Cir. 2015) ("All that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability."). Accordingly, Plaintiffs' damages methodology further supports predominance.

### 2.    A Class Action Is Superior to Alternative Forms of Redress

"In general, '[s]ecurities suits easily satisfy the Superiority Requirement of Rule 23(b)(3) because 'the alternatives are either no recourse for thousands of stockholders' or 'a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'" *See Teva*, 2021 WL 872156, at *9 (collecting authorities). This action is no different, and each of the four factors articulated as part of the superiority analysis of Rule 23(b)(3) supports certification.

*First*, the proposed Class consists of a large number of geographically-dispersed Synchrony common stock purchasers, whose individual damages are likely small enough to render individual litigation prohibitively expensive. Thus, the interests of members of the Class support proceeding as a class action rather than individually prosecuting separate actions. *See* Rule 23(b)(3)(A).

*Second*, Plaintiffs are not aware of any other pending litigation alleging the same claims against Synchrony. *See* Rule 23(b)(3)(B).

*Third*, concentrating litigation against Defendants "in a single forum, particularly this one, has clear benefits," including eliminating the "risk of inconsistent adjudication" and promoting "the fair and efficient use of the judicial system." *Tsereteli*, 283 F.R.D. at 218. *See* Rule 23(b)(3)(C).

*Fourth*, securities class actions generally raise no unusual manageability issues—and this action is no different. *See* Rule 23(b)(3)(D); *see also Tsereteli*, 283 F.R.D. at 218 ("There are no difficulties likely to be encountered in the management of this action as a class action apart from those inherent in any hard fought battle where substantial sums are at issue and all active parties are represented by able counsel.").

Thus, superiority is established.

## C.    Proposed Class Counsel Satisfies Rule 23(g)

Finally, Plaintiffs request that the Court appoint Lead Counsel BLB&G as Class Counsel pursuant to Rule 23(g), and Motley as Liaison Counsel for the Class. In appointing class counsel under Rule 23(g), courts must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to represent the class." Fed.

29

R. Civ. P. 23(g)(1)(A). Both law firms are highly experienced in litigating federal securities class actions and other complex litigation. *See supra* § IV.A.4.

Further, counsel has already done substantial work in this case, including, among other things, (i) conducting a thorough pre-suit investigation; (ii) drafting a detailed amended complaint; (iii) briefing Defendants' initial motion to dismiss; (iv) briefing and arguing an appeal to the Second Circuit Court of Appeals of the Court's decision granting Defendants' motion to dismiss; (v) successfully briefing Plaintiffs' Opposition to Defendants' renewed motion to dismiss following the Second Circuit's remand of the case to this Court; (vi) negotiating a case schedule and litigating a dispute concerning the scope of discovery; (v) propounding extensive discovery on Defendants, including document requests and interrogatories; (vi) serving document subpoenas to various non-parties who possess relevant information; (vii) responding to written discovery from Defendants and already producing hundreds of pages of documents in response; (viii) retaining and working with an expert economist to evaluate efficiency and prepare a robust damages methodology in market efficiency and damages; (ix) assembling dedicated teams of experienced attorneys and staff to prosecute the claims on behalf of Plaintiffs and the Class; and (x) drafting and filing this motion for class certification. *See* Wierzbowski Decl. ¶11. Moreover, as described in Section IV.A.4, counsel has demonstrated its commitment to prosecuting this action, and will continue to devote the resources required to serve the Class's best interests. *See Pearlstein*, 2021 WL 253453, at *11 (finding Rule 23(g) requirements satisfied where lead counsel and additional counsel had together been "ably conduct[ing]" the litigation for several years).

## V.    **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) certify this action as a class action pursuant to Rules 23(a) and 23(b)(3); (ii) appoint APG to serve as Class

Representative; (iii) appoint BLB&G as Class Counsel and Motley as Liaison Counsel for the

Class; and (iv) grant such other and further relief as the Court deems just and proper.

Dated:  June 24, 2022

                                               **BERNSTEIN LITOWITZ BERGER**
                                                **& GROSSMANN LLP**

                                               */s/ Adam H. Wierzbowski*
                                               Salvatore J. Graziano (admitted *pro hac vice*)
                                               Adam H. Wierzbowski (admitted *pro hac vice*)
                                               Jesse L. Jensen (admitted *pro hac vice*)
                                               Kate W. Aufses (admitted *pro hac vice*)
                                               1251 Avenue of the Americas
                                               New York, NY  10020
                                               Telephone: (212) 554-1400
                                             Facsimile: (212) 554-1444
                                             salvatore@blbglaw.com
                                             adam@blbglaw.com
                                             jesse.jensen@blbglaw.com
                                             kate.aufses@blbglaw.com

                                             *Counsel for Plaintiffs Stichting Depositary*
                                             *APG Developed Markets Equity Pool, Plaintiff*
                                             *Stichting Depositary APG Fixed Income*
                                             *Credits Pool and Lead Counsel for the Class*

                                             **MOTLEY RICE LLC**
                                             William H. Narwold (ct 00133)
                                             Mathew P. Jasinski (ct 27520)
                                             20 Church Street, 17th Floor
                                             Hartford, CT  06103
                                             Telephone: (860) 882-1681
                                             Facsimile: (860) 882-1682
                                             bnarwold@motleyrice.com
                                             mjasinski@motleyrice.com

                                             *Liaison Counsel for Plaintiffs Stichting*
                                             *Depositary APG Developed Markets Equity*
                                             *Pool and Plaintiff Stichting Depositary APG*
                                             *Fixed Income Credits Pool*

31