## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

IN RE SYNCHRONY FINANCIAL
SECURITIES LITIGATION

No. 3:18-cv-1818 (VAB)

## RULING AND ORDER ON MOTION FOR CLASS CERTIFICATION

On April 5, 2019, Stichting Depositary APG Developed Markets Equity Pool ("Lead

Plaintiff") and Stichting Depositary APG Fixed Income Credits Pool (collectively, "Plaintiffs")

filed an Amended Complaint in this putative class action against, *inter alia*, Synchrony Financial

("Synchrony"), Margaret M. Keane, Brian D. Doubles, and Thomas M. Quindlen (collectively,

the "Defendants").[1] Am. Compl., ECF No. 78 (Apr. 5, 2019) ("Am. Compl."). Plaintiffs allege

that Synchrony and certain Synchrony executives violated Sections 10(b), 20A, and 20(a) of the

Exchange Act, 15 U.S.C. §§ 78j(b), 78t-1, and 78t(a), and Securities and Exchange Commission

("SEC") Rule 10b-5 promulgated thereunder. *Id.* at 5, 13.

On June 24, 2022, Plaintiffs filed a motion for class certification and appointment of the

Lead Plaintiff as class representative, Bernstein Litowitz Berger & Grossmann LLP ("BLB&G")

as Class Counsel, and Motley Rice LLP ("Motley Rice") as Liaison Counsel. *See* Pls.' Mot. for

---

[1] The full list of defendants includes: Synchrony, Margaret M. Keane, Brian D. Doubles, Thomas M. Quindlen, David Melito, Paget Alves, Arthur Coviello, Jr., William Graylin, Roy Guthrie, Richard Hartnack, Jeffrey Naylor, Laurel Richie, Olympia Snowe, Barclays Capital Inc., Mizuho Securities USA LLC, Morgan Stanley & Co. LLC, TD Securities (USA) LLC, Blaylock Van, LLC, Castleoak Securities, L.P., Mischler Financial Group, Inc., R. Seelaus & Co., Inc., and The Williams Capital Group, L.P. *See In re Synchrony Fin. Sec. Litig.*, 450 F. Supp. 3d 127, 131 (D. Conn. 2020) ("*Synchrony I*"). Only Synchrony, Ms. Keane, Mr. Doubles, and Mr. Quindlen are relevant to the Exchange Act claim on remand from the Second Circuit. *See id.* (naming "Exchange Act Defendants"); *see also In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021) ("*Synchrony II*") (affirming dismissal of Amended Complaint in *Synchrony I* except as to fraud allegations premised on statement about "pushback" from retail partners as relevant to Exchange Act claims).

Class Certification and Appt. of Class Representative and Class Counsel, ECF No. 187 (June 24, 2022). To date, Defendants have not filed an opposition to this motion.

For the following reasons, the motion for class certification is **GRANTED.**

The Class is defined as: all persons or entities who purchased or otherwise acquired the common stock of Synchrony between January 19, 2018, and July 12, 2018, inclusive, and who were damaged thereby.

The Court appoints the Lead Plaintiff as Class Representative, BLB&G as Class Counsel, and Motley Rice as Liaison Counsel.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

In light of the lengthy history of this case, the Court assumes the parties' familiarity with the factual and procedural background. *See Synchrony I*, 450 F. Supp. 3d at 131–47; *Synchrony II*, 988 F.3d at 161–166; *In re Synchrony Fin. Sec. Litig.*, No. 3:18-cv-1818 (VAB), 2022 WL 427499 (D. Conn. Feb. 11, 2022) ("*Synchrony III*"). The Court will focus only on what is relevant to the motion for class certification.

On February 5, 2019, the Court appointed Stichting Depositary APG Developed Markets Equity Pool as the Lead Plaintiff and approved BLB&G as Lead Counsel for the proposed class. *See* Ruling and Order on Mots. to Appoint Lead Plaintiff and Lead Counsel, ECF No. 59 ("Order Appointing Lead Pl.").

On April 5, 2019, Plaintiffs filed an Amended Complaint. *See* Am. Compl.

On March 11, 2022, the parties filed a joint Rule 26(f) report outlining a proposed schedule for the anticipated class certification motion and requested that the motion for class certification would be filed by June 24, 2022, any opposition would be filed by August 26, 2022, and any reply would be filed by October 7, 2022. *See* Rule 26(f) Report at 14, ECF No. 174.

On June 24, 2022, Plaintiffs filed a motion to certify a class, a memorandum of law in support, and a declaration from Adam H. Wierzbowski with supporting documents including a study done by Dr. Steven Feinstein ("Dr. Feinstein"). *See* Pls.' Mot. for Class Certification and Appt. of Class Representative and Class Counsel, ECF No. 187; Mem. of Law in Supp. of Pls.' Mot. for Class Certification, ECF No. 188 ("Mot."); Decl. of Adam H. Wierzbowski in Supp. of Pls.' Mot. for Class Certification, ECF No. 189 ("Wierzbowski Decl.").

On August 15, 2022, the parties filed a motion for extension of time, *see* Consent Mot. for Extension of Time, ECF No. 192, which the Court granted on August 16, 2022, *see* Order, ECF No. 193.

After resolving a discovery dispute, the Court *sua sponte* amended the scheduling order to extend the deadline to oppose the motion for class certification to January 13, 2023. *See* Order, ECF No. 224.

On November 23, 2022, the parties filed a motion for extension of time, *see* Joint Mot. for Extension of Time, ECF No. 225, which the Court granted on November 27, 2022, *see* Order, ECF No. 226. This order did not alter the January 13, 2023 deadline to oppose the motion for class certification. *See* Order, ECF No. 226.

To date, Defendants have not filed an opposition to Plaintiffs' motion for class certification.

## II.    STANDARD OF REVIEW

At the class certification stage, courts generally accept the factual allegations of the complaint as true. *Richards v. FleetBoston Fin. Corp.*, 235 F.R.D. 165, 168 (D. Conn. 2006) (citing *Shelter Realty Corp. v. Allied Maint. Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir. 1978)). To be certified, a class must satisfy each of the Rule 23(a) prerequisites:

3

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (citing Fed. R. Civ. P. 23(a)). "In addition to satisfying the requirements set forth in Federal Rule of Civil Procedure 23(a), a plaintiff seeking class certification must establish one of the bases for certification identified in Federal Rule of Civil Procedure 23(b)." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (citing Fed. R. Civ. P. 23(b)).

To reach these class certification questions, courts must resolve some factual disputes. Although the Supreme Court has required district courts to engage in a rigorous analysis of the facts, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351–52 (2011)). Courts, however, "must resolve material factual disputes relevant to each Rule 23 requirement." *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010).

## III. DISCUSSION

Plaintiffs urge the Court to define the class as "all persons or entities who purchased or otherwise acquired the common stock of Synchrony between January 19, 2018 and July 12, 2018, inclusive (the 'Class Period'), and who were damaged thereby" (the "Proposed Class"). Mot. at 15.[2] Although Defendants have not filed an opposition to the motion for class certification, this Court has an independent obligation to determine whether the Proposed Class

---

[2] Plaintiffs also "reserve all rights to potentially later expand the Class Period depending on the evidence revealed" during discovery. Mot. at 11 (citing *Alexander v. Azar*, No. 3:11-cv-1703 (MPS), 2020 WL 1430089, at *51 (D. Conn. Mar. 24, 2020) ("[A] court retains discretion to alter, amend, or decertify the class at any time before final judgment.")).

satisfies the requirements for class certification. *See Callari v. Blackman Plumbing Supply, Inc.*, 153 F. Supp. 3d 590, 593 (E.D.N.Y. 2015) ("[T]he [district] [c]ourt had an independent obligation to consider the evidence in the record and assess whether the proposed class met the Rule 23(a) requirements." (citing *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008))); *In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172, at *6 (S.D.N.Y. Aug. 13, 2020) ("[T]he Court has an independent obligation to ensure that the standards for class certification are met—and a responsibility to ensure that certification would not harm absent class members, whose interests may not be aligned with those of the named Plaintiffs or Defendants.").

### A.  Rule 23(a) Requirements

#### 1.  Numerosity

With respect to the first requirement, numerosity is satisfied if the Proposed Class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed where a putative class has forty or more members." *Falberg v. Goldman Sachs Grp.*, No. 19 Civ. 9910 (ER), 2022 WL 538146, at *7 (S.D.N.Y. Feb. 14, 2022) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). Plaintiffs, however, are "not required" to show the "exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) (citations omitted); *see also Basso v. New York Univ.*, 363 F. Supp. 3d 413, 421 (S.D.N.Y. 2019) (finding numerosity met where there were "over 300" class members in the proposed class).

"[T]he numerosity inquiry is not strictly mathematical but must take into account the context of the particular case," including whether joinder is impractical based on "(i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their

ability to sue separately, and (v) requests for injunctive relief that would involve future class members." *Penn. Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014) (citations omitted).

Plaintiffs argue that the Proposed Class is numerous because Synchrony stock was "heavily traded" on the New York Stock Exchange ("NYSE") with "an average of 5.7 million shares traded daily," "760.88 million shares in Synchrony's float, 761.35 million shares outstanding," and "an average weekly trading volume of approximately 28.3 million shares, or 3.71% of shares outstanding" during the Class Period. Mot. at 12. Plaintiffs contend that courts regularly find that similar metrics are sufficient to meet the numerosity requirement. *Id.* (citing *In re Teva Sec. Litig.*, No. 3:17-cv-588 (SRU), 2021 WL 872156 (D. Conn. Mar. 9, 2021) and *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415 (S.D.N.Y. 2014)).

The Court agrees.

Based on the information about Synchrony's stock trading activity during the Class Period, the Proposed Class will likely include at least thousands of members, which is well above the 40-member threshold that triggers a presumption in favor of numerosity. *See* Ex. 1 to Wierzbowski Decl. ¶¶ 29, 57–58, 92, ECF No. 189-1 ("Feinstein Report"). In light of the large number of members in the Proposed Class, "the impracticability of bringing all class members before the court is obvious and the Rule 23(a)(1) requirement is easily met." *Baker v. Saint-Gobain Performance Plastics Corp.*, No. 1:16-CV-0917 (LEK/DJS), 2022 WL 9515003, at *4 (N.D.N.Y. Sept. 30, 2022) (finding approximately 1,300 members was sufficient to satisfy numerosity); *see also In re IMAX Sec. Litig.*, 272 F.R.D. 138, 146 (S.D.N.Y. 2010) (find that numerosity was satisfied because "IMAX had at least 40 million shares outstanding and traded on the NASDAQ during the proposed Class Period, hundreds of millions of IMAX shares were

traded on the NASDAQ during the proposed Class Period, and defendants have not challenged numerosity").

Accordingly, Plaintiffs have established numerosity.

### 2.  Commonality

Commonality requires that "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a), and that "the plaintiff . . . demonstrate[s] that the class members have suffered the same injury," *Wal-Mart Stores*, 564 U.S. at 350 (internal citations and quotation marks omitted). "This requirement has been characterized as a low hurdle," *McIntire*, 38 F. Supp. 3d at 424 (internal quotation marks and citation omitted), and "even a single common question will do," *Wal-Mart Stores*, 564 U.S. at 359 (cleaned up). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Nextel*, 780 F.3d at 137 (internal quotation marks and citation omitted).

In Plaintiffs' view, the common questions of law or fact include: "(i) whether . . . Keane's January 8, 2019 statement was false and misleading; (ii) whether Keane's misrepresentation and omissions were material; (iii) whether Keane acted with the requisite scienter; (iv) whether the price of Synchrony common stock was artificially inflated by Keane's misstatement and omissions; (v) . . . damages; and (vi) whether Defendants were control persons." Mot. at 13. Therefore, Plaintiffs argue that they have satisfied the commonality requirement. *Id.*

The Court agrees.

Several of the questions Plaintiffs identified necessarily relate to all members of the Proposed Class because each question primarily concerns Defendants' conduct. *See Nextel*, 780 F.3d at 137 ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."); *see also Billhofer v.*

*Flamel Techs., S.A.*, 281 F.R.D. 150, 157 (S.D.N.Y. 2012) ("[A]lleged misrepresentations and

scienter, which form the basis of [p]laintiff's claims, are necessarily common."). Together, these

questions are sufficient to establish the requisite common questions of law and fact. *See Wal-*

*Mart Stores*, 564 U.S. at 359 (noting that, for commonality, "even a single common question will

do" (cleaned up)).

Accordingly, Plaintiffs have established commonality.

### 3. Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of

the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality "is satisfied when each

class member's claim arises from the same course of events, and each class member makes

similar legal arguments to prove the defendant's liability." *Cent. States Se. & Sw. Areas Health*

*& Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007)

(internal quotation marks omitted). Typicality does not require that the representative parties'

claims "be identical to those of all class members." *Wilson v. LSB Indus., Inc.*, No. 15 Civ. 7614

(RA) (GWG), 2018 WL 3913115, at *4 (S.D.N.Y. Aug. 13, 2018) (citing *Frank v. Eastman*

*Kodak Co.*, 228 F.R.D. 174, 182 (W.D.N.Y. 2005)). "In securities actions, in particular,

typicality is 'not demanding.'" *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 80 (S.D.N.Y.

2018) (quoting *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 208

(S.D.N.Y. 2012)). "So long as plaintiffs assert that defendants committed the same wrongful acts

in the same manner, against all members of the class, they establish the necessary typicality." *Id.*

(cleaned up).

Plaintiffs argue that the Lead Plaintiff suffered a harm typical of the class because it

"purchased shares of Synchrony common stock during the Class Period, at prices artificially

inflated by Defendants' fraud, and suffered damages when the truth was publicly revealed, and concealed risks materialized." Mot. at 14. Plaintiffs emphasize that the Court already recognized this in its order appointing the Lead Plaintiff. *Id.* (citing Order Appointing Lead Pl. at 11, ("Here, APG's claims are typical of the proposed class members.")). Additionally, Plaintiffs argue that the Lead Plaintiff "purchased Synchrony common stock contemporaneously with Defendants, while Defendants were in possession of material nonpublic information" and therefore, the Lead Plaintiff's claims are "typical of all Class members who traded contemporaneously with Defendants," allegedly in violation of Section 10(b) and 20(a). *Id.*

      The Court agrees.

      As Plaintiffs emphasize, the Lead Plaintiff "purchased shares of Synchrony common stock during the Class Period, at prices artificially inflated by Defendants' fraud, and suffered damages when the truth was publicly revealed, and concealed risks materialized" and "purchased Synchrony common stock contemporaneously with Defendants, while Defendants were in possession of material nonpublic information." *Id.*; *see also* Ex. 2 to Wierzbowski Decl. ¶ 3, ECF No. 189-2 ("APG Decl.") ("[Lead Plaintiff] purchased shares of Synchrony common during the Class Period . . . and suffered losses when Synchrony's stock price declined in response to the disclosure of corrective information."). This is typical of the class allegations included in the Amended Complaint. *See* Am. Compl. ¶¶ 384–389 (alleging claims on behalf of "all persons and entities who: (i) purchased or otherwise acquired the publicly traded common stock of Synchrony . . . ; and/or purchased or otherwise acquired Synchrony 3.95% bonds due 2027 . . . traceable to Synchrony's December 1, 2017 note offering during the Class Period").

      These allegations are sufficient to satisfy the typicality requirement. *See, e.g.*, *In re Bank of Am. Corp. Sec., Deriv., and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 139

(S.D.N.Y. Feb. 6, 2012) (finding typicality where "the class plaintiffs assert that they acquired BofA securities at prices allegedly inflated by defendants' misstatements and/or omissions, and have an interest in maximizing their recovery").

Accordingly, Plaintiffs have established typicality.

### 4. Adequate Representative

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy 'entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced[,] and able to conduct the litigation.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).

"The focus is on uncovering 'conflicts of interest between named parties and the class they seek to represent.'" *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "[A] conflict or potential conflict alone," however, "will not . . . necessarily defeat class certification—the conflict must be fundamental." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 134 (S.D.N.Y. 2014) (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).

"A finding that a proposed class representative satisfies the typicality inquiry," though not sufficient on its own, "constitutes strong evidence that [its] interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiff['s] claims will vindicate those of the class." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 109 (S.D.N.Y. 2011) (citing *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008)); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 461

(S.D.N.Y. 2018) (explaining that adequacy of representation overlaps with the commonality and typicality inquiry).

Plaintiffs argue that there is no conflict of interest because the Lead Plaintiff's "interests are completely aligned with—and are not antagonistic to—the Class." Mot. at 15. In Plaintiffs' view, "this Court already preliminarily determined that APG is capable of representing the Class" in its order appointing Lead Plaintiff. *Id.* Plaintiffs argue that the Lead Plaintiff has "continued to demonstrate its commitment to participate in and supervise the prosecution of this action on behalf of the Class" by pursuing appointment as the Lead Plaintiff, investigating and filing the Complaint, opposing the motions to dismiss, serving and responding to discovery requests, and retaining and consulting a market efficiency and damages expert to support this motion. *Id.* at 15–16. Plaintiffs emphasize that "as an institutional investor, APG is especially well-qualified" to be the Class Representative, and "APG is not subject to any unique defense." *Id.* at 16. Plaintiffs also argue that the Lead Plaintiffs' choice of proposed Class Counsel, BLB&G, and Liaison Counsel, Motley Rice, is further evidence that the Proposed Class will be adequately represented. *Id.* at 17–18.

The Court agrees.

The Court has not identified any information in the record before it that would suggest a disagreement in the interests of the Lead Plaintiff and the Proposed Class. Therefore, as this Court previously held, because the Lead Plaintiff does not have any apparent antagonistic interests; the Lead Plaintiff has actively participated in the litigation to date, APG Decl. ¶¶ 4–6; and the Lead Plaintiff has "sizeable interest in this case—between $66.7 and $87.2 million—as well as its position as a sophistical institutional investor," the adequacy requirement as it relates to the Lead Plaintiff is satisfied. *See* Order Appointing Lead Pl. at 12; *see also In re MF Glob.*

*Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 237 (S.D.N.Y. 2015) (finding that the lead plaintiff

was "an institutional investor of the type unequivocally preferred as lead plaintiff by the Private

Securities Litigation Reform Act (PLSRA)" (internal quotation marks omitted) (citing *In re*

*Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42 (S.D.N.Y. 1998))).

 Additionally, the Lead Plaintiff has selected two firms—BLB&G and Motley Rice—that

are highly experienced in securities class actions. *See* Ex. 3 to Wierzbowski Decl. at 8–15, ECF

No. 189-3 ("BLB&G Resume") (noting the firm's significant class action recoveries); *see also In*

*re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 147 (S.D.N.Y. 2019) ("In light of Bernstein

Litowitz's substantial resources and experience in litigating securities class actions, and the

conduct of the litigation to date, the Court concludes that Bernstein Litowitz satisfies Rule 23(g),

and its motion for appointment as class counsel on behalf of both subclasses is granted.");

*Ruzhinskaya v. Healthport Techs., LLC*, 311 F.R.D. 87, 100 (S.D.N.Y. 2015) ("Motley Rice LLC

has substantial experience in class action and consumer litigation."). Additionally, BLB&G and

Motley Rice have both, to date, conducted this litigation competently, including opposing two

motions to dismiss and arguing the case on appeal at the Second Circuit.

 This is sufficient to show that Plaintiff's attorneys are "qualified, experienced, and able"

to conduct this litigation. *See e.g.*, *Flores v. CGI Inc.*, No. 22-cv-350 (KHP), 2022 WL

13804077, at *4 (S.D.N.Y. Oct. 21, 2022) (finding adequacy was satisfied where the plaintiffs

"do not have any interests that are different from or adverse to the Class Members" and the

plaintiffs retained "qualified and experienced counsel" that "ha[d] litigated and settled

numerous" similar cases such that they were "highly experienced in this type of litigation").

 Accordingly, Plaintiffs have established that the representative party, Lead Plaintiff, and

the selected counsel, BLB&G, and Motley Rice, will adequately represent the Proposed Class.

### 5.  Ascertainability

In the Second Circuit, there is an "implied Rule 23 requirement of ascertainability." *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017) ("*Petrobras II*"). "[A] class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries." *Id.*

Plaintiffs argue that the Proposed Class is ascertainable because "it is defined by objective criteria—the purchase or acquisition of Synchrony common stock during the Class Period and damage therefrom—which can be readily determined from investor records." Mot. at 18.

The Court agrees.

Here, the Proposed Class is defined by objective criteria and is readily ascertainable by investor records. *See, e.g.*, *In re Teva Sec. Litig.*, 2021 WL 872156, at *10 ("The proposed Class here is ascertainable because records document the purchasers of the relevant Teva securities.").

Accordingly, Plaintiffs have established that the Proposed Class is ascertainable.

### B.  Rule 23(b)(3) Requirements

"In addition to satisfying the requirements set forth in Federal Rule of Civil Procedure 23(a), a plaintiff seeking class certification must establish one of the bases for certification identified in Federal Rule of Civil Procedure 23(b)." *Waggoner*, 875 F.3d at 93. To do this, Plaintiffs argue they have satisfied the predominance and superiority requirements of Rule 23(b)(3).

The Court will address each requirement in turn.

### 1.  Predominance

"The predominance requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved

through generalized proof, and if these particular issues are more substantial than the issues

subject only to individualized proof." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108,

118 (2d Cir. 2013) (internal quotation marks omitted), *cert denied*, 572 U.S. 1087 (2014).

Predominance is similar to, but "more demanding than," the commonality requirement. *Comcast*

*Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

"Considering whether 'questions of law or fact common to class members predominate'

begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc.*

*v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*").[3] The elements of a Section 10(b)

and Rule 10b–5 claim are: "(1) a material misrepresentation or omission by the defendant; (2)

scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of

a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citations and

internal quotation marks omitted).

"Whether common questions of law or fact predominate in a securities fraud action often

turns on the element of reliance." *Halliburton I*, 563 U.S. at 810. Typically, the plaintiff "can

demonstrate reliance . . . by showing that he was aware of a company's statement and engaged in

a relevant transaction . . . based on that specific misrepresentation." *Id.* In a class action,

however, plaintiffs are not required to prove the individual reliance of each investor because that

"would prevent such plaintiffs 'from proceeding with a class action, since individual issues'

---

[3] If predominance is satisfied with respect to the Section 10(b) claim, it is also satisfied for the Section 20(a) claim. *See In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 572 n.21 (S.D.N.Y. 2008) (finding that "provided there is predominance with respect to the Section 10(b) claim—i.e., the 'primary violation'—the predominance requirement will also be met with respect to the Section 20(a) claim, as the issue of control is susceptible to generalized proof"); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 53–54 (S.D.N.Y. 2012) ("For substantially the reasons discussed above with respect to the [10(b) claim], the Court finds that the proposed 20A Subclass satisfies the requirements of Rule 23(a) and (b)."). Therefore, the Court focuses its inquiry on the Section 10(b) claim.

would 'overwhelm[] the common ones.'" *Id.* (alteration in original) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988)). Instead, in a class action, plaintiffs typically prove reliance by triggering certain presumptions. *See id.* at 811.

Here, Plaintiffs argue that they are entitled to the *Basic* presumption of reliance, or, in the alternative, they are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Mot. at 20. Plaintiffs also argue that there is a "class-wide damages methodology sufficient to demonstrate predominance." *Id.*

### 1. The *Basic* Presumption

Under the "fraud-on-the-market theory," "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed" (the "*Basic* presumption"). *Basic*, 485 U.S. at 247. The *Basic* presumption requires the plaintiff to prove that "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277–78 (2014) ("*Halliburton II*"). "Because a failure of proof on the issue of materiality, unlike the issues of market efficiency and publicity, does not give rise to any prospect of individual questions overwhelming common ones, materiality need not be proved prior to Rule 23(b)(3) class certification." *Amgen*, 568 U.S. at 474; *see also Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1959 (2021) ("The remaining *Basic* prerequisites—publicity, market efficiency, and market timing—must be satisfied by plaintiffs before class certification." (citations and internal quotation marks omitted)).

Here, the alleged statements were public, *see, e.g.*, Am. Compl. ¶ 218 (describing Defendants' responses to analyst questions during a January 2018 earnings call), and Plaintiffs allegedly "traded the stock between when the misrepresentations were made and when the truth was revealed," *see, e.g.*, *id.* ¶ 315 (depicting the Lead Plaintiff and Proposed Class Members' Synchrony stock purchases during the Class Period), and therefore, the Court focuses its inquiry on market efficiency.

The Second Circuit has "repeatedly—and recently—declined to adopt a particular test for market efficiency." *Waggoner*, 875 F.3d at 94. District courts in this Circuit, however, "regularly consider" the factors in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), in evaluating whether a particular security trades in an efficient market. *See id.* at 94–95.

Plaintiffs argue that the *Cammer* and *Krogman* factors all weigh in their favor.

### a. The *Cammer* Factors

The five *Cammer* factors are: (1) the security's "average weekly trading volume"; (2) the amount of analyst coverage; (3) "[t]he existence market makers and arbitrageurs"; (4) whether the company can file an SEC Form S-3 registration statement; and (5) whether "empirical facts show[] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *See Cammer*, 711 F. Supp. at 1286–87. The first four *Cammer* factors are considered "indirect" factors because they "examine indirect indicia of market efficiency for a particular security." *Waggoner*, 875 F.3d at 94 (quoting *Petrobras II*, 862 F.3d 276). The fifth *Cammer* factor is considered direct evidence of market efficiency. *Id.*

Plaintiffs argue that each of the five *Cammer* factors weigh in their favor. More specifically, Plaintiffs argue that the first *Cammer* factor weighs in their favor because, during

the Class Period, "the average weekly trading volume" was "3.71% of shares outstanding or approximately 28.3 million shares," which, in Plaintiffs' view, "justifies a strong presumption that Synchrony stock traded on an efficient market." Mot. at 22. Plaintiffs argue that the second *Cammer* factor weighs in their favor because "at least 24 different securities analysts from major financial institutions published reports on or followed Synchrony's securities during the Class Period." *Id.*

Next, Plaintiffs argue that the third *Cammer* factor weighs in their favor because "Synchrony common stock was listed and actively traded during the Class Period on the NYSE, which maintains a Designated Market Maker System." *Id.* at 23. Plaintiffs also emphasize that "Synchrony common stock was owned by at least 1,057 institutional investors . . . who had the resources and information to act as arbitrageurs." *Id.* Plaintiffs argue that the fourth *Cammer* factor weighs in their favor because "Synchrony satisfied the SEC reporting and float requirements to file a Form S-3 registration statements, which" in Plaintiffs' view, "indicates that the company is easily able to issue new securities." *Id.* at 23–24.

Finally, Plaintiffs argue that the fifth *Cammer* factor weighs in their favor. In support of this argument, Plaintiffs rely on "the robust event study analysis" by Dr. Feinstein, which, in Plaintiffs' view, "demonstrates a cause-and-effect relationship between the release of new Company information and changes in Synchrony's stock price." *Id.* at 24. Plaintiffs emphasize that "Dr. Feinstein's event study demonstrated . . . that statistically significant abnormal returns on earnings announcement days . . . occurred 10 time more often then on non- or lesser-news days," which was a "highly statistically significant" result. *Id.* at 24–25.

Overall, the Court agrees.

For the first *Cammer* factor, Synchrony's average weekly trading volume of 3.71% of shares outstanding during the Class Period, *see* Feinstein Report ¶ 58, weighs in favor of finding market efficiency. *See Cammer*, 711 F. Supp. at 1286 (noting that "average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one" and that "one percent would justify a substantial presumption" (citations omitted)); *see also Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) (finding the first *Cammer* factor weighed in the plaintiffs' favor where "the average weekly trading volume of FCA stock on the NYSE during the Class Period was 2.5%").

The second *Cammer* factor also weighs in Plaintiffs favor because, as Dr. Feinstein noted in his report, "analysts from at least 24 firms followed [Synchrony] during the Class Period" and there were "312 articles published about [Synchrony] during the Class period," including news articles and press releases. Feinstein Report ¶¶ 62–64, 70; *see also In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) (finding that "at least three analysts" reporting on the company's bonds and "numerous analysts" following the company's stock during the class period weighed in favor of market efficiency); *Villella v. Chem. & Mining Co. of Chile, Inc.*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (finding that 15 firms following the company weighed in favor of market efficiency).

For the third *Cammer* factor, Synchrony stock was listed and traded on the NYSE, which maintains a "Designated Market Maker" system, and, during the Class Period, "there were 93 market makers for Synchrony stock . . . includ[ing] . . . Barclays, Deutsche, Goldman Sachs, Morgan Stanley, and UBS." *See* Feinstein Report ¶¶ 74, 78. Therefore, this factor also weighs in favor of market efficiency. *See McIntire*, 38 F. Supp. 3d at 432 ("The Court is satisfied that CCME's 20-market-maker average supports a presumption of market efficiency."); *Winstar*

*Commc'ns*, 290 F.R.D. at 447 (finding the fact that "six large, reputable banks . . . served as market makers . . . weigh[ed] toward a finding of market efficiency"); *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (finding that 14 market makers was "indicative of efficiency").

The fourth *Cammer* factor weighs in favor of market efficiency because "Synchrony regularly filed required SEC financial reports, and Synchrony satisfied both the original and revised float conditions for S-3 registration throughout the entire class period." Feinstein Report ¶ 86; *see, e.g.*, *Teva*, 2021 WL 872156, at * 14 (finding that the fourth *Cammer* factor weighed in favor of market efficiency because the company "was at all times during the Class Period eligible to file either a Form F-3 or a Form S-3").

Finally, "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact" under the fifth *Cammer* factor. *Waggoner*, 875 F.3d at 97. The fifth *Cammer* factor, however, "has been considered the most important *Cammer* factor in certain cases because it assesses the essence of an efficient market and the foundation for the fraud on the market theory." *Id.* "Direct evidence of an efficient market may be more critical . . . in a situation in which the other four *Cammer* factors (and/or the *Krogman* factors) are less compelling in showing an efficient market." *Id.* at 98.

Here, the fifth *Cammer* factor is not required to find market efficiency because, as the Court discusses above and below, all seven of the indirect *Cammer* and *Krogman* factors weigh in favor of finding market efficiency. *See id.* at 98–99 (finding the district court was not required to rely on direct evidence of price impact under the fifth *Cammer* factor because the first four *Cammer* factors and the three *Krogman* factors "weighed so clearly in favor of concluding that the market . . . was efficient that the [d]efendants did not even challenge them").

That said, here, Plaintiffs' evidence of price impact adds further support in favor of finding market efficiency. Notably, courts have "endorsed the comparison test that" Dr. Feinstein used in the event study. *See, e.g.*, *McIntire*, 38 F. Supp. 3d at 430 ("If the stock price is significantly more likely to change on News Days than on Non-News Days, that suggests a causal relationship between material news and the stock price."); *see also In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 369 (S.D.N.Y. 2016) *aff'd in part and vacated in part*, 862 F.3d 250, 257 (2d Cir. 2017) ("There is no dispute that z-tests are commonly used and widely accepted statistical tools."); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (using the plaintiff's expert's "event study comparing the day-to-day percentage change in [the company's] share prices that resulted from disclosures of new information" to analyze the fifth *Cammer* factor).

Dr. Feinstein's event study "focused on the Company's earnings announcements, comparing those information events to all other days" during the period from July 13, 2017, through July 12, 2018, "which was the one-year period ending on the last day of the Class Period." Feinstein Report ¶¶ 111, 115. Dr. Feinstein found that three of Synchrony's four "earnings announcements during [this period] elicited statistically significant price reactions at the 95% confidence level or higher." *Id.* ¶ 136. Dr. Feinstein then concluded that this indicates market efficiency because "[t]he probability that [three] of [four] earnings announcement days would be statistically significant if Synchrony stock did not respond to information . . . is 0.12%." *Id.* ¶141.

Dr. Feinstein ran an additional test during "an extended time period" that covered January 1, 2017, through December 31, 2018, which was "a two-year period surrounding the Class Period." *Id.* ¶ 142. During this period, Dr. Feinstein found that five of Synchrony's eight

earnings announcements had "statistically significant stock price returns." *Id.* Dr. Feinstein concluded that this "indicates market efficiency" because "[t]he probability that [five] of the [eight] earnings announcement days would be statistically significant if Synchrony stock did not respond to information . . . is 0.003%." *Id.* ¶ 144.

In light of the statistically significant results during the Class Period and the extended period, and courts' general approval of the underlying methods, the fifth *Cammer* factor weighs in favor of Plaintiffs. *See, e.g., In re Groupo Televisa Sec. Litig.*, No. 18 Civ. 1979 (LLS), 2020 WL 3050550, at *7 (S.D.N.Y. June 8, 2020) (concluding "market behavior was consistent with an efficient market" on the basis of a study of four events in which "[t]hree of the four events were unlikely to cause an unusual market reaction" and a "single event which conveyed concrete, urgent . . . information . . . produced a statistically significant price drop"); *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 84 (S.D.N.Y. 2015) (collecting cases and noting that "courts have found market efficiency in the absence of an event study or where the event study was not definitive").

Accordingly, each of the five *Cammer* factors weigh in favor of market efficiency.

The Court will now consider the *Krogman* factors.

### b. The *Krogman* Factors

The three *Krogman* factors, which, like the first four *Cammer* factors, are "indirect" factors, are: "(1) the company's market capitalization,[4] (2) the security's bid-ask spread,[5] and (3) the 'float,' which is 'the percentage of stock not held by insiders.'" *Teva*, 2021 WL 872156, at *9 (quoting *Krogman*, 202 F.R.D. at 474). The first *Krogman* factor, high market

---

[4] "Market capitalization" is "the number of shares multiplied by the prevailing share price." *Krogman*, 202 F.R.D. at 478 (citation omitted).
[5] "The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman*, 202 F.R.D. at 478.

capitalization, "may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. If the security's bid-ask spread is large, under the second *Krogman* factor, this "is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Id.* Finally, a high float is consistent with market efficiency "[b]ecause insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security." *Id.* (cleaned up).

Plaintiffs argue that all three *Krogman* factors weigh in their favor. More specifically, Plaintiffs emphasize that "Synchrony's market capitalization exceeded $24 billion throughout the Class Period"; "Synchrony's common stock float averaged 99.94% of the shares outstanding"; and "the average bid-ask spread for Synchrony stock . . . was a narrow 0.03% of the stock price." Mot. at 25–26. In Plaintiffs' view, these facts are sufficient for the Court to find that all three *Krogman* factors weigh in favor of market efficiency. *Id.* at 26.

The Court agrees.

Synchrony's $24 billion market capitalization, 99.94% common stock float average, and 0.03% bid-ask spread during the Class Period all support a finding of market efficiency. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM) (RWL), 2019 WL 3001084, at *12 (S.D.N.Y. July 10, 2019) (finding that all three *Krogman* factors weigh in favor of market efficiency where the company had a market capitalization of $7.3 billion, a common stock float average of 99.4% to 99.8%, and an average bid-ask spread of 0.03%); *Pearlstein v. BlackBerry Ltd.*, No. 13 Civ. 7060 (CM), 2021 WL 253453, at *16 (S.D.N.Y. Jan. 26, 2021) (finding that all three *Krogman* factors weigh in favor of market efficiency where the company had a market capitalization of $6.45 billion, a common stock float average of 84.4%, and an average bid-ask

spread of 0.09%); *Teva*, 2021 WL 872156, at *15 (finding that all three *Krogman* factors weigh in favor of market efficiency where the company had a market capitalization of up to $4 billion, a common stock float average of 100%, and an average bid-ask spread of 2.66%).

Accordingly, Plaintiffs have established that the *Basic* presumption applies for predominance purposes and therefore, the Court will consider whether predominance is satisfied as it relates to class-wide damages.[6]

### 2.   Class-Wide Damages

Under Rule 23(b)(3), Plaintiffs must also show that common questions of law or fact predominate with respect to calculating damages. "[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case," and "courts must conduct a rigorous analysis to determine whether that is so." *Comcast*, 569 U.S. at 35 (internal quotation marks and citations omitted). Plaintiffs must "be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (internal quotation marks and citation omitted). In Section 10(b) cases, economic loss is often determined by the "out-of-pocket" measure for damages. *See Acticon AG v. China N.E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (explaining that out-of-pocket damages seek to ensure that "a defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got" (quoting *Levine v. Seilon, Inc.*, 439 F.2d 328, 334 (2d Cir. 1971))).

Plaintiffs argue Dr. Feinstein has "proposed a straightforward event study methodology to measure out-of-pocket damages." Mot. at 27. More specifically, Dr. Feinstein's methodology

---

[6] Because Plaintiffs are entitled to a *Basic* presumption of reliance, the Court need not and does not address the presumption of reliance under *Affiliated Ute. See, e.g., Teva*, 2021 WL 872156, at *13 ("I need not address the Plaintiffs' *Affiliated Ute* argument because I hold that the Plaintiffs are entitled to the *Basic* presumption, which the Defendants fail to rebut.").

seeks "to quantify the amount of artificial inflation in Synchrony's stock price that Defendants' misstatement and omissions caused or maintained" so that amount "can then be formulaically applied to all Class Members' transactions to compute individual damages." *Id.* In Plaintiffs' view, this proposed damages methodology is "directly linked with [its] underlying theory of class wide liability . . . and is therefore in accord with . . . *Comcast*" and Rule 23. *Id.* at 28. Plaintiffs emphasize that this methodology has been endorsed "repeatedly" in this Circuit. *Id.*

The Court agrees.

Dr. Feinstein's methodology relies on easily ascertainable data points for calculating the per share damages: the purchase date and sale date of Synchrony stock, which are directly linked with Plaintiffs underlying theory of liability. *See* Feinstein Report ¶¶ 157(iv)–(v). Additionally, the method outlined in Dr. Feinstein's report has been used approvingly by other courts in this Circuit. *See Pearlstein*, 2021 WL 253453, at *22–23 (approving Dr. Feinstein's method of calculating class-wide damages on a motion for class certification); *Wilson*, 2018 WL 3913115, at *16 (same); *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 3852 (GBD), 2015 WL 10433433, at *7 (S.D.N.Y. Sept. 29, 2015) (same). Plaintiffs' "proposed measure for damages is directly linked with their underlying theory of classwide liability and is therefore in accord with the Supreme Court's decision in *Comcast*." *Waggoner*, 875 F.3d at 106 (cleaned up) (citations and internal quotation marks omitted).

Accordingly, Plaintiffs have established predominance.

### 2.  Superiority

Under Rule 23(b)(3), Plaintiffs must also establish "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Nextel*, 780 F.3d at 137. To determine whether a class action is superior, courts consider (1) "the class members'

interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D). In general, "[s]ecurities suits easily satisfy the Superiority Requirement of Rule 23(b)(3) because 'the alternatives are either no recourse for thousands of stockholders' or 'a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'" *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 311 F.R.D. 373, 383 (S.D.N.Y. 2015) (quoting *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968)).

Plaintiffs argue that the superiority is satisfied because the Proposed Class "consists of a large number of geographically-dispersed Synchrony common stock purchasers, whose individual damages are likely small enough to render individual litigation prohibitively expensive"; no other litigation alleging the same claims is currently pending; concentrating the litigation "in a single forum . . . has clear benefits, including eliminating the risk of inconsistent adjudication and promoting the fair and efficient use of the judicial system"; and "securities class actions generally raise no unusual manageability issues." Mot. at 37.

The Court agrees.

Based on the above, Plaintiffs have established that bringing this case as a class action will promote judicial efficiency and provide relief to those with claims too small to justify individual lawsuits. *See In re Pfizer*, 282 F.R.D. at 53 (finding superiority established where "[t]here is no indication that individual class members have any interest in prosecuting their claims separately, or that any such litigation has already commenced," "concentrating the litigation in this forum would promote judicial economy," and there were no identified

"difficulties in managing this case as a class action"); *see also Teva*, 2021 WL 872156, at *10 (finding superiority was established "based on the dispersed nature of the class").

Accordingly, Plaintiffs have established superiority, the final Rule 23 requirement, and the Court will grant the motion for class certification.

## C.  The Rule 23(g) Requirement for Class Counsel

To appoint Lead Counsel and Liaison Counsel, Plaintiffs must satisfy Rule 23(g), which requires courts to consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to represent the class." Fed. R. Civ. P. 23(g).

As already discussed above, BLB&G and Motley Rice, to date, have ably conducted this litigation for several years, including on appeal to the Second Circuit, and both firms have the necessary experience in complex litigation, class actions, and cases of this type.

Accordingly, Plaintiffs have satisfied Rule 23(g), and the Court will appoint BLB&G as Lead Counsel and Motley Rice as Liaison Counsel.

## IV.    CONCLUSION

For the reasons explained above, the motion for class certification is **GRANTED**.

The Class is defined as: all persons or entities who purchased or otherwise acquired the common stock of Synchrony between January 19, 2018, and July 12, 2018, inclusive, and who were damaged thereby.

The Court appoints the Lead Plaintiff as Class Representative, BLB&G as Class Counsel, and Motley Rice as Liaison Counsel.

**SO ORDERED** at Bridgeport, Connecticut, this 3rd day of February, 2023.

                                                     /s/ Victor A. Bolden

                                                     Victor A. Bolden
                                                     United States District Judge